```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                              -  -  -

 4    SHIRE ORPHAN THERAPIES LLC and  )     Civil Action
      SANOFI-AVENTIS DEUTSCHLAND      )
 5    GMBH,                           )
                                      )
 6                 Plaintiffs,        )
                                      )
 7          v.                        )
                                      )
 8    FRESENIUS KABI USA, LLC,        )
                                      )
 9                 Defendant.         )     No. 15-1102-GMS

10                              -  -  -

11                       Wilmington, Delaware
                      Wednesday, January 31, 2018
12                           9:00 a.m.
                           Trial Day 3
13                              -  -  -

14

15    BEFORE:  HONORABLE GREGORY M. SLEET, Senior Judge, U.S.D.C.,
                                     District of Delaware
16

17    APPEARANCES:

18            JACK B. BLUMENFELD, ESQ., and
              DAREN J. FAHNESTOCK, ESQ.
19            Morris, Nichols, Arsht & Tunnell LLP
                     -and-
20            EDGAR H. HAUG, ESQ.,
              SANDRA KUZMICH, Ph.D., ESQ.,
21            LAURA A. CHUBB, ESQ., and
              ELIZABETH MURPHY, ESQ.
22            Haug Partners LLP
              (New York, NY)
23
                            Counsel for Plaintiffs
24

25
```

1    APPEARANCES CONTINUED:

2              KAREN E. KELLER, ESQ.
               Shaw Keller LLP
3                      -and-
               DARYL L. WIESEN, ESQ.
4              WILLIAM G. JAMES, ESQ.,
               JOHN COY STULL, ESQ., and
5              SAMUEL SHERRY, ESQ.
               Goodwin Procter LLP
6              (Washington, DC)

7                                    Counsel for Defendant

8                              -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

09:02:23  1          THE COURT:  Good morning.

09:02:24  2              (Counsel respond "Good morning.")

09:02:25  3          THE COURT:  Please, take your seats.  I guess

09:02:29  4  it's video time?

09:02:32  5          MS. KUZMICH:  Your Honor, plaintiffs are ready

09:02:34  6  to proceed with a live witness, the expert.

09:02:37  7          THE COURT:  All right.

09:02:38  8          MS. KUZMICH:  Plaintiffs would like to call Dr.

09:02:40  9  Loren David Walensky to the stand.

09:02:48  10          Your Honor, permission to approach the Bench

09:02:51  11  with the witness?

09:02:53  12          THE COURT:  Certainly.

09:03:01  13          ... LOREN DAVID WALENSKY, having been duly sworn

09:03:17  14  as a witness, was examined and testified as follows ...

09:03:26  15          THE COURT:  Good morning, Doctor.

09:03:27  16          THE WITNESS:  Good morning.

09:03:30  17          THE COURT:  Doctor, I will remind you, please be

09:03:42  18  careful about that step.

          19                    DIRECT EXAMINATION

09:04:07  20  BY MS. KUZMICH:

09:04:07  21  Q.    Would you please state your full name for the record?

09:04:09  22  A.    Loren David Walensky.

09:04:10  23  Q.    Good morning, Dr. Walensky.  What is your current

09:04:14  24  employment?

09:04:15  25  A.    I am a professor at Harvard Medical School.  I am a

09:04:18  1    research scientist at the Dana Farber Cancer Institute.  And

09:04:22  2    I am a physician in pediatric cancer at Boston Children's

09:04:27  3    Hospital.

09:04:27  4    Q.    Would you please turn to PTX-264 in the binder that I

09:04:32  5    have handed you.  Are you familiar with this document?

09:04:49  6    A.    Yes, I am.

09:04:50  7    Q.    What is this document?

09:04:51  8    A.    It is my CV.

09:04:52  9    Q.    Is this information in your CV accurate and up to

09:04:56  10   date?

09:04:56  11   A.    Yes, as of September of 2017.

09:04:59  12   Q.    Would you briefly describe your educational

09:05:03  13   background?

09:05:03  14   A.    Sure.  I went to college at Princeton University,

09:05:07  15   where I got a Bachelor of Arts in chemistry and also was a

09:05:11  16   Science Policy Certificate student in the Woodrow Wilson

09:05:15  17   School of Public International Affairs.

09:05:17  18           There I performed synthetic chemistry research

09:05:19  19   in the laboratory of Ted Taylor, where we designed small

09:05:23  20   molecules to target the folic acid pathway in cancer.

09:05:27  21           From there I graduated in 1990 as valedictorian,

09:05:30  22   and went on to Johns Hopkins University School of Medicine

09:05:34  23   where I received both my M.D. and Ph.D. degrees in 1997.

09:05:40  24           There I got my Ph.D. in pharmacology and

09:05:44  25   molecular sciences, in the laboratory of Solomon Snyder, who

Walensky - direct

09:05:48  1  is a renowned neuroscientist and pharmacologist who

09:05:53  2  specializes in receptor-ligand interactions.  That is stated

09:05:57  3  there.

09:05:57  4  Q.    Would you briefly describe your professional positions

09:06:00  5  since obtaining your Ph.D. in 1997?

09:06:05  6  A.    So from 1997 to 1998, I was a postdoctoral fellow in

09:06:12  7  Solomon Snyder's laboratory, which was postdoctoral research

09:06:18  8  experience in the neurosciences and signaling.  From there I

09:06:21  9  went from Baltimore to Boston, where I completed my

09:06:23  10  internship in pediatrics at Boston's Children Hospital and

09:06:28  11  the following year completed my junior residency in

09:06:31  12  pediatrics at Boston Children's Hospital.

09:06:32  13        From there I became a pediatric

09:06:35  14  hematology/oncology fellow.  That started in the year 2000.

09:06:38  15  That was a combined program where you trained as a pediatric

09:06:41  16  cancer doctor and also conducted research.

09:06:44  17        And I conducted my postdoctoral research in the

09:06:47  18  laboratory with Dr. Stan Korsmeyer and was co-mentored by

09:06:51  19  Greg Verdine, a chemist at Harvard who specialized in the

09:06:56  20  development of a new technology to stabilize peptides and

09:07:00  21  improve their behaviors so they could be developed as

09:07:03  22  discovery agents but also as new forms of peptide

09:07:07  23  therapeutics.

09:07:09  24        From that position I went to a faculty

09:07:12  25  fellowship at the Harvard Medical School at the Dana Farber

09:07:17    1    Center in 2003, then I was promoted as an assistant

09:07:21    2    professor in 2006, at which point I started my own

09:07:24    3    independent research laboratory in peptide development.

09:07:27    4            I was promoted to associate professor in 2011

09:07:30    5    and was promoted to full professor in 2016.  And I became

09:07:34    6    the medical director of the Harvard and the Massachusetts

09:07:39    7    Institute of Technology M.D. Ph.D. training program in 2013.

09:07:43    8    Q.    What positions do you currently hold at the

09:07:46    9    institutions to which you are affiliated?

09:07:47   10    A.    My official titles are professor of pediatrics at

09:07:50   11    Harvard Medical School.  I am a principal investigator in

09:07:53   12    Cancer Chemical Biology at the Dana Farber Cancer Institute.

09:07:57   13    I am an attending physician in pediatric oncology at Boston

09:08:03   14    Children's Hospital.  And I am the director of the M.D.

09:08:06   15    Ph.D. training program at Harvard Medical School and MIT.

09:08:11   16    Q.    Dr. Walensky, during your fellowship in molecular

09:08:14   17    oncology at Dana Farber, what were your areas of research?

09:08:18   18    A.    So I focused with this co-mentored post-doc between

09:08:23   19    Stan Korsmeyer and Greg Verdine, which was a fusion between

09:08:26   20    chemistry and cancer biology, and my project was to develop

09:08:32   21    a new class of peptides where we would generate them in a

09:08:35   22    way by using non-natural amino acid substitutions to

09:08:38   23    generate more potent peptides both in their ability to bind

09:08:41   24    their targets, but also to withstand protease degradation so

09:08:46   25    that they can be used both as research tools to discover new

09:08:51   1   biology but also to apply them as potential therapeutics.

09:08:53   2   Q.    In what areas is your research focused as a principal

09:08:58   3   investigator today?

09:08:58   4   A.    So I continued on this theme in my laboratory, which I

09:09:02   5   have had for the past 12 years.  What we do is we design

09:09:05   6   peptides, we synthesize them.  We characterize and purify

09:09:10   7   them.  And then we apply the peptides in biochemical assays.

09:09:14   8        We apply our peptides in cell biology assays.

09:09:16   9   And then we apply our peptides in animal studies looking at

09:09:20   10   their pharmacology, their biological activity, and also then

09:09:24   11   try to translate them into prototype peptide therapeutics.

09:09:29   12   Q.    Are there particular types of peptides in which your

09:09:32   13   research is focused?

09:09:34   14   A.    Yes.  So my research has touched certain areas of

09:09:37   15   biology.  I especially emphasized cell death research, so

09:09:41   16   the BCL-2 family proteins that regulate how our cells live

09:09:45   17   and die, which is particularly relevant to cancer, because

09:09:49   18   cancer resistance, recurrence and relapse results from the

09:09:54   19   inability of cells to die.

09:09:56   20        So I focus on those biochemical proteins or

09:09:59   21   actions to try to help cancer cells remember how to die.  We

09:10:03   22   also develop peptides for targeting infectious diseases and

09:10:07   23   also endocrinologic diseases like diabetes.

09:10:10   24   Q.    What research tools do you use as a principal

09:10:13   25   investigator?

Walensky - direct

| 09:10:13 | 1 | A.      So I would say my laboratory is multidisciplinary.  So |
| 09:10:17 | 2 | we start with chemistry and peptide chemistry in particular. |
| 09:10:20 | 3 | We design new classes of peptides, including new non-natural |
| 09:10:24 | 4 | amino acids that would go into those peptides.  We develop |
| 09:10:28 | 5 | chemistries to stabilize the peptides.  And then we use |
| 09:10:31 | 6 | biochemical methods, cell biology methods, mouse modeling |
| 09:10:36 | 7 | studies and also structural biology to characterize our |
| 09:10:39 | 8 | peptides and develop them on this pathway toward clinical |
| 09:10:43 | 9 | development. |
| 09:10:43 | 10 | Q.      Other than the research you just described, do you |
| 09:10:47 | 11 | have other responsibilities as a principal investigator? |
| 09:10:49 | 12 | A.      Yes.  So my laboratory has always been in the 16 to 24 |
| 09:10:55 | 13 | person range size.  And I train undergraduate students in |
| 09:10:59 | 14 | science, I train Ph.D. students from the chemical-biology |
| 09:11:04 | 15 | program, from the biological and biomedical sciences program |
| 09:11:07 | 16 | that spans Harvard and MIT.  And I also train postdoctoral |
| 09:11:11 | 17 | fellows, who then go on to start their own laboratories in |
| 09:11:14 | 18 | basic research. |
| 09:11:15 | 19 | Q.      Are you involved in any professional activities |
| 09:11:19 | 20 | outside of the university? |
| 09:11:20 | 21 | A.      Yes.  I serve on the scientific advisory board of |
| 09:11:24 | 22 | several entities, including pediatric cancer foundations, |
| 09:11:28 | 23 | also, I am a consultant and scientific advisor for Aileron |
| 09:11:32 | 24 | Therapeutics, which is a peptide company that I helped |
| 09:11:35 | 25 | co-found as a scientist. |

Walensky - direct

09:11:36  1    Q.      Could you provide a little more detail as to what are

09:11:40  2    the activities of Aileron Therapeutics?

09:11:46  3    A.      Aileron Therapeutics has licensed a bunch of my

09:11:47  4    patents.   What they are trying to do is to commercialize our

09:11:51  5    peptide stapling technology to develop peptide drugs for

09:11:55  6    various diseases.   Right now we are focused on cancer.   One

09:12:00  7    of the compounds that they licensed and developed from my

09:12:02  8    group is currently in Phase II clinical testing.

09:12:05  9    Q.      And you referred to I think stapling peptides.   Could

09:12:09  10   you explain a little briefly about what that is?

09:12:11  11   A.      Yes.   So in order for peptides to work, they need to

09:12:14  12   have a defined structure.   And one of the problems with

09:12:18  13   peptides is that they could unfold and change shape and they

09:12:23  14   can lose biological activity.

09:12:24  15           They can also get broken down in the body very

09:12:26  16   quickly.

09:12:26  17           So we developed a way to insert non-natural

09:12:29  18   amino acids into the peptides and then we crosslinked them

09:12:32  19   with a stapling chemistry and essentially put a strut into

09:12:35  20   the peptides so that we don't allow it to unfold, lose its

09:12:40  21   shape, and also to maintain stability so that they have much

09:12:43  22   better properties when you inject them into animals or

09:12:46  23   people.

09:12:46  24           THE COURT:   Doctor, I don't mean to be rude.

09:12:50  25           Is this level of detail necessary to qualify

09:12:53    1    this witness?

09:12:54    2                MS. KUZMICH:  I will move on, Your Honor.

09:12:56    3    BY MS. KUZMICH:

09:12:56    4    Q.    Dr. Walensky, have you authored any publications?

09:12:59    5    A.    Yes, over 70.

09:13:00    6    Q.    Have you been elected to any organizations in

09:13:02    7    recognition for your research?

09:13:03    8    A.    Yes.  The Society For Pediatric Research, the American

09:13:07    9    Pediatric Association, the American Society for Clinical

09:13:10   10    Investigation, and I just completed my term as the chairman

09:13:13   11    of the Cancer Molecular Pathobiology study section for the

09:13:18   12    National Institutes of Health.

09:13:19   13                THE COURT:  What area are you offering him as an

09:13:21   14    expert in?

09:13:23   15                MS. KUZMICH:  In the field of peptide drug

09:13:26   16    development, biochemistry, and pharmacology, as an expert.

09:13:29   17                THE COURT:  Any objection?

09:13:30   18                MR. JAMES:  No objection.

09:13:30   19                THE COURT:  It seems the doctor is eminently

09:13:33   20    qualified, and you are accepted as an expert.

09:13:35   21                THE WITNESS:  Thank you.

09:13:37   22    BY MS. KUZMICH:

09:13:38   23    Q.    Dr. Walensky, have you provided any demonstratives to

09:13:41   24    use today?

09:13:42   25    A.    Yes, I have.

Walensky - direct

| 08:47:24 | 1 | Q.     And would you please confirm that those demonstratives |
| 09:13:26 | 2 | appear in the front sleeve of your binder? |
| 09:13:28 | 3 | A.     They do. |
| 09:13:28 | 4 | Q.     What opinions have you been asked to provide in this |
| 09:13:33 | 5 | case today? |
| 09:13:33 | 6 | A.     So I was asked to determine my opinion on whether |
| 09:13:39 | 7 | claim 14 of the '333 patent is not invalid for |
| 09:13:42 | 8 | obviousness-type double patenting over Claim 1 of the '7,803 |
| 09:13:46 | 9 | patent in view of the prior art as of January 1989, and the |
| 09:13:49 | 10 | opinion that I've come to is that Claim 14 of the '333 |
| 09:13:53 | 11 | patent is not invalid for obviousness-type double patenting |
| 09:13:57 | 12 | over Claim 1 of the '7,803 patent in view of the prior art |
| 09:14:01 | 13 | as of January of 1989.  And I base this opinion as |
| 09:14:05 | 14 | summarized here on the definition of a person of ordinary |
| 09:14:08 | 15 | skill in the art in the context of the '333 patent, the |
| 09:14:13 | 16 | meaning of Claim 14 of the '333 patent, the meaning of claim |
| 09:14:16 | 17 | terms in the '7,803 patent, and how a person of ordinary |
| 09:14:21 | 18 | skill in the art would have viewed Claim 1 of the '7,803 |
| 09:14:24 | 19 | patent in the context of the prior art. |
| 09:14:28 | 20 | Q.     Dr. Walensky, you stated that you formed an opinion as |
| 09:14:30 | 21 | to the definition of a person of ordinary skill in the art. |
| 09:14:34 | 22 | What is your understanding of the term person of ordinary |
| 09:14:37 | 23 | skill in the art? |
| 09:14:38 | 24 | A.     It's a hypothetical person who has knowledge of the |
| 09:14:41 | 25 | relevant prior art. |

Walensky - direct

09:14:42   1    Q.    And did you arrive at a definition of a person of

09:14:44   2    ordinary skill in the art in the context of the '333

09:14:48   3    patent?

09:14:48   4    A.    Yes.  I summarized that on PDX-3.2.  A person of

09:14:52   5    ordinary skill in the art in the context of the '333 patent

09:14:56   6    is a person who has at least a Ph.D. in organic chemistry,

09:15:00   7    medicinal chemistry, pharmacology, or a similar field, and

09:15:04   8    has a working knowledge of the chemistry and biochemistry of

09:15:07   9    bradykinin or other peptides for the purposes of drug

09:15:10   10   development.

09:15:11   11   Q.    Dr. Walensky, are you comfortable today if we use the

09:15:14   12   term POSA to refer to your person of ordinary skill in the

09:15:17   13   art as you have defined it?

09:15:19   14         THE COURT:  That's a term I use, Doctor, so you

09:15:20   15   can use that.

09:15:21   16         THE WITNESS:  Okay.  Yes.

           17   BY MS. KUZMICH:

09:15:24   18   Q.    Did you consider any information in forming your

09:15:27   19   opinion as to the definition of a POSA in the context of the

09:15:30   20   '333 patent?

09:15:30   21   A.    Yes, I did.  So if you turn to PDX-3.3, these are the

09:15:34   22   factors:  The educational level of the inventors and the

09:15:37   23   workers in the field, the type of problems that were

09:15:39   24   encountered in the art at the time, the prior art solutions

09:15:42   25   to those problems, the rapidity with which innovations were

09:15:47  1    made, and the sophistication of the technology.

09:15:50  2    Q.    And generally, Dr. Walensky, how did these factors

09:15:53  3    inform your opinion as to the definition of a POSA?

09:15:55  4    A.    So I was informed by counsel that the education level

09:15:59  5    of the inventors and workers at the time had a Ph.D. in

09:16:03  6    synthetic organic chemistry or a Ph.D in pharmacology or

09:16:08  7    were medical doctors, and what they were confronting was

09:16:11  8    that they had a field where hundreds and hundreds of analogs

09:16:13  9    were being made to try to come up with bradykinin

09:16:16  10   antagonists, and one of the major challenges was that the

09:16:19  11   assays that were used were very variable between

09:16:23  12   laboratories and the actual results produced by those assays

09:16:27  13   were also variable between laboratories.

09:16:29  14         Another major problem here was that they

09:16:32  15   did not have the receptor or the target clone, so they

09:16:36  16   didn't know its structure, and so they were basically

09:16:39  17   designing an agonists in a black box.

09:16:42  18         There were some solutions to this, like you

09:16:44  19   could substitute various amino acids in and try different

09:16:47  20   combinations to try to come up with solutions.  One of those

09:16:50  21   solutions was substituting a D-phenylalanine for proline and

09:16:55  22   having an antagonist as a result.  That was one.  That was

09:16:58  23   the start of the field in these antagonists.  But

09:17:01  24   innovations were slow.  It took over 25 years to come up

09:17:04  25   with that peptide and it also took hundreds and hundreds of

09:17:08   1    analogs to come upon it.

09:17:10   2    Q.    So is it the case that is the information that

09:17:14   3    informed your opinion as to the definition of a POSA on

09:17:17   4    DXT-3.2?

09:17:18   5    A.    Yes.  That's the context.

09:17:20   6    Q.    Dr. Walensky, would your opinion as to whether Claim

09:17:22   7    14 of the '333 patent is invalid for obviousness-type double

09:17:25   8    patenting over Claim 1 of the '7,803 patent change if the

09:17:30   9    Court accepts Dr. Bachovchin's definition of a POSA?

09:17:34   10   A.    No.

09:17:36   11   Q.    Dr. Walensky, going back to your opinions listed on

09:17:39   12   PDX 3.1, you state that you formed an opinion as to the

09:17:44   13   meaning of Claim 14 of the '333 patent; is that correct?

09:17:46   14   A.    Yes.

09:17:47   15   Q.    What is your opinion as to the meaning of Claim 14 of

09:17:49   16   the '333 patent?

09:17:52   17   A.    So if you go to PDX-3.4, I explained my interpretation

09:17:56   18   of the meaning of Claim 14 of the '333 patent, which is

09:17:58   19   entitled, peptides having bradykinin antagonist action.  The

09:18:03   20   claim is written there.  A POSA would have interpreted Claim

09:18:06   21   14 of the '333 patent as a peptide of a formula

09:18:11   22   D-Arg-Arg-Pro-Hyp-Gly-Thia-Ser-D-Tic-Oic-Arg-OH or a

09:18:20   23   physiologically tolerable salt peptide of said peptide with

09:18:24   24   bradykinin antagonist activity.

09:18:24   25   Q.    Did you consider any information in coming to your

Walensky - direct

09:18:26    1    opinion as to the meaning of Claim 14?

09:18:27    2    A.     Yes, I did.  If we turn to PDX-3.5.  I summarized the

09:18:32    3    basis for my opinion from the language of Claim 14, the

09:18:35    4    title of the patent, the abstract, statements throughout the

09:18:38    5    patent, and the biological data.

09:18:40    6    Q.     So let's begin with the language of Claim 14, Dr.

09:18:44    7    Walensky.  Please turn to JTX-1.24 at column 44, line 44

09:18:50    8    through 46.  That is Claim 14 of the '333 patent.

09:18:56    9             Would you please explain how that language of

09:18:58   10    the claim informed your opinion.

09:18:59   11    A.     So in column 44, we are at line 44.  It says, a

09:19:06   12    peptide of the formula of

09:19:09   13    D-Arg-Arg-Pro-Hyp-Gly-Thia-Ser-D-Tic-Oic-Arg-OH or a

09:19:17   14    physiologically tolerable salt of said peptide.

09:19:22   15    Q.     You said you also considered information on JTX-1.2,

09:19:28   16    which is the face of the patent.  If you could turn to

09:19:30   17    JTX-1.2 and explain what information you considered on the

09:19:34   18    face of the patent to form your opinion?

09:19:34   19    A.     -- so I read the title and it says, peptides having

09:19:37   20    bradykinin antagonist action.

09:19:38   21    Q.     And did you consider any other information on the face

09:19:41   22    of the patent?

09:19:41   23    A.     I read the abstract and the abstract describes the

09:19:44   24    peptide of the formula I again, and then it says, it says

09:19:49   25    that this is the formula I that's described here.  I will

09:19:53   1   quote, have bradykinin antagonist action for therapeutic

09:19:57   2   utility.   Their therapeutic utility includes all

09:20:02   3   pathological states which are mediated, caused or supported

09:20:05   4   by bradykinin and bradykinin related peptides.

09:20:07   5   Q.      What does it mean to have bradykinin antagonist

09:20:10   6   action?

09:20:10   7   A.      So basically it's a peptide that you would make that

09:20:12   8   would prevent the natural peptide from binding to its

09:20:15   9   receptor.   So it's essentially a disruptor of the natural

09:20:18   10  interaction between the hormone and the receptor.

09:20:21   11  Q.      Looking at bullet point 4 on PDX-3.5, you say that you

09:20:27   12  considered statements in the patent specification.   What

09:20:29   13  statements did you consider in the patent specification of

09:20:31   14  the '333 patent?

09:20:32   15  A.      So if you go to Column 1 and just look at line 44, it

09:20:37   16  says, the present invention relates to novel peptides having

09:20:41   17  bradykinin antagonist action and to a process for their

09:20:45   18  preparation.

09:20:46   19              And then if you continue down to line 53,

09:20:49   20  it says, the present invention is based on the object of

09:20:52   21  finding novel active peptides having bradykinin antagonist

09:20:56   22  action.

09:20:57   23  Q.      And, Dr. Walensky, finally, if you could focus on your

09:21:01   24  last bullet point on PDX 3.5 referring to the biological

09:21:06   25  data of the '333 patent, what biological data do you

Walensky - direct

09:21:10   1    consider, please?

09:21:11   2    A.    So spanning Column 16 and 17, there's a table that

09:21:14   3    lists peptides, and then on the --

09:21:17   4              THE COURT:  If you could get rid of those arrows

09:21:19   5    if you hit the screen or something?  Yes.  Thank you.

09:21:23   6              THE WITNESS:  So in Table 1 there's a list of

09:21:25   7    peptides, and on the right-hand column there's a list of

09:21:28   8    numbers that are, you know, headed by IC 50.

09:21:31   9              So it's looking at the inhibitor concentration

09:21:34   10   of these peptides that's required to block the peptide's

09:21:38   11   ability to bind to its receptor by 50 percent, and all the

09:21:41   12   peptides listed here have bradykinin antagonist action.

09:21:44   13   Q.    Doctor, is the peptide of Claim 14 of the '333 patent

09:21:49   14   in Table 1?

09:21:49   15   A.    It is.  It's the one two-thirds down that has a

09:21:54   16   reading of 5.4 times ten to the minus nine.  That's the

09:21:58   17   peptide and it has bradykinin antagonist action.

09:22:00   18   Q.    Dr. Walensky, in your view of the '333 patent, did any

09:22:04   19   of the peptides of the invention have biological activity

09:22:08   20   other than bradykinin antagonist action?

09:22:10   21   A.    No.

09:22:11   22   Q.    Based on the information in the '333 patent, how would

09:22:14   23   a person of ordinary in the art construe Claim 14?

09:22:17   24   A.    They would look at the claim.  They would see the

09:22:20   25   composition that was indicated, and it indicates by looking

Walensky - direct

09:22:24    1    at that in the context of this, that the peptide composition

09:22:28    2    is patented because of bradykinin antagonist action.

09:22:30    3    Q.    Dr. Walensky, would your opinion as to whether

09:22:32    4    Claim 14 of the '333 patent is invalid for obviousness-type

09:22:37    5    double patenting change if the Court accepts Dr.

09:22:42    6    Bachovchin's construction of Claim 14?

09:22:43    7    A.    No.

09:22:44    8    Q.    Dr. Walensky, I'd like to move on to the topic of

09:22:47    9    obviousness-type double patenting.  And you testified

09:22:50    10   earlier that you concluded that claim 14 of the '333 patent

09:22:56    11   is not invalid for obviousness-type double patenting over

09:22:59    12   Claim 1 of the '7,803 patent; is that correct?

09:23:03    13   A.    Yes.

09:23:04    14   Q.    Would you please provide us the basis for this

09:23:06    15   opinion.

09:23:07    16   A.    Okay.  So on PDX-3.6, I summarized the basis for my

09:23:12    17   opinion.

09:23:14    18          Number one, a POSA would have interpreted

09:23:15    19   the claim term Z-P-A-B-C-E-F-K-(D)Q-G-M-F'-I, a peptide of

09:23:25    20   the Formula I in Claim 1 of the '7,803 patent to mean a

09:23:28    21   peptide with a Z group, which is an N terminal modification

09:23:32    22   that is an integral and permanent component of the final and

09:23:36    23   claimed peptide product.  This interpretation is solely

09:23:39    24   based on the language of Claim 1.

09:23:42    25          The claim term P language is also informative as

09:23:46    1    to the meaning of the peptide of Formula I.

09:23:48    2            The second point is that in addition to the

09:23:50    3    language of Claim 1, Claims 2 and 3 and also the

09:23:53    4    specification of the patent demonstrate that a peptide of

09:23:57    5    the Formula I in Claim 1 of the '7,803 patent means a

09:24:01    6    peptide with a Z group, which is an N terminal modification

09:24:04    7    that is an integral and permanent component of the final and

09:24:09    8    claimed peptide product.

09:24:10    9            Third, in view of the prior art as of January of

09:24:13   10    1989, a POSA would not have been motivated to remove the

09:24:17   11    N-terminal modifications of the peptides of Claim 1 of the

09:24:21   12    '7,803 patent when creating a bradykinin antagonist.  It was

09:24:24   13    expressly taught to include in bradykinin antagonists

09:24:30   14    permanent N-terminal modification such as the Z groups that

09:24:33   15    are listed in Claim 1 of the '7,803 patent.

09:24:36   16            And, finally, point 4.  As of January 1989, a

09:24:41   17    POSA that was confronted with D-Tic at position seven or Oic

09:24:46   18    at position eight, in the context of a peptide that

09:24:50   19    otherwise appears to be a bradykinin analog, would have had

09:24:54   20    no reasonable expectation of success that such a peptide

09:24:57   21    would have bradykinin antagonist action.

09:25:00   22    Q.    Dr. Walensky, to make this conversation a bit easier,

09:25:04   23    if we could agree that the claim term

09:25:08   24    Z-P-A-B-C-E-F-K-(D)Q-G-M-F'-I, that we could refer to that

09:25:16   25    as a peptide of the formula I.

Walensky - direct

09:25:19  1    A.     Yes.

09:25:19  2    Q.     Thank you.

09:25:21  3           You state on PDX-3.6 that your first point is

09:25:25  4    just based on the language of Claim 1, a person of ordinary

09:25:28  5    skill would have interpreted the peptide of formula I to

09:25:32  6    mean a peptide with a permanent Z group, and I will

09:25:36  7    abbreviate that not to read your whole definition or

09:25:39  8    position in.

09:25:39  9           If you would please then provide us with your,

09:25:43  10   a summary of why you considered the claim language of Claim

09:25:48  11   1.

09:25:49  12   A.     Sure.  So if you turn to PDX-3.7, I list the basis for

09:25:53  13   my opinion, which is, the language of Claim 1 itself.  The

09:25:58  14   common chemical features of all of the Z groups that

09:26:02  15   indicate permanence, and the option for the P group.

09:26:05  16   Q.     If you would please turn to DTX-59_0011, which is

09:26:12  17   Claim 1 of the '7,803 patent.

09:26:19  18          How did the language of Claim 1 inform your

09:26:22  19   opinion as to the meaning of a peptide of the formula I?

09:26:25  20   A.     So one just reads the language.  It says there on

09:26:35  21   column 20, line 21, a peptide of a formula I, and it lists

09:26:40  22   the composition, Z-P-A-B-C-E-F-K-(D)-Q-G-M-F'-I in which,

09:26:49  23   and I will continue reading Z, is, and it lists several

09:26:53  24   chemical choices.  Fmoc, dibenzylacetyl, cyclohexylcarbonyl,

09:27:00  25   N-N-dibenzyl-glycyl, 2(4-isobutylphenyl) propionyl, (2-R

1    tert butylsulfonylmethyl)-3-(1-naphthyl) propionyl,

2    indole-3-yl-acetyl, 6-(4-benzoyl-benzoylamino) hexanoyl, 1,

3    8-naphthalimidoacetyl, 7-theophyllineacetyl or N-benzoyl.

4            And then if you continue, P is a direct linkage,

5    Aoc, epsilon-aminohexanoyl, D-Aoc, Aeg(Fmoc),

6    4-aminocyclohexylcarbonyl or Oic.

7            So what I mean by reading that language, D gives

8    you 11 choices.  P gives you seven choices.  One of the

9    choices for P is not to use P.  The option not to use Z is

10   not listed among the choices for Z.

11           So just by reading that plain language, a POSA

12   recognizes that this composition contains one of those 11 Z

13   groups in the claimed peptide.  But for the P, they are very

14   clear that you could have one of those six chemical

15   additions or not include them at all.  And that option of

16   not including it at all is explicitly not listed in Z.  So

17   the interpretation of the POSA is, my claimed peptide has to

18   have a Z as a permanent component of that claimed

19   composition.

20   Q.   You also state on PDX-3.7 that you looked at a common

21   chemical feature of all the Z groups that indicate

22   permanence.  Could you please explain what you mean by that

23   statement?

24   A.   Yes.  To simplify I prepared PDX-3.8.

25   Q.   What this slide shows, this is bradykinin peptides

Walensky - direct

09:29:05  1   with modifications at the N-terminus.  That is the title of

09:29:08  2   the patent.  What I am showing you here are all of the

09:29:11  3   pictures, the structures of what those 11 Z groups could be

09:29:16  4   that are listed under the Z group as choices.

09:29:19  5        Now, if you go to the next clip, what you will

09:29:22  6   see is that the common feature for every single one of these

09:29:26  7   choices is an acyl group highlighted in purple.  That is

09:29:31  8   kind of your entry to the club, so to speak.  That is what

09:29:34  9   gets you into the Z club, that you have the acyl group.

09:29:39  10        I wanted to also point out that Fmoc, which is

09:29:41  11  the first structure listed, has an extra feature, which is

09:29:44  12  that O.  And that is an oxygen.

09:29:46  13        Now, the combination of that green O and the

09:29:49  14  purple acyl group gives you a new chemical name called

09:29:53  15  urethane.

09:29:54  16        So what you are seeing in that list are all acyl

09:29:58  17  groups and Fmoc has an extra name, it is an aromatic

09:30:01  18  urethane.  And again, the card-carrying entry point to get

09:30:05  19  into this group is the purple highlighted commonality, and

09:30:08  20  again there is no option for omitting the permanent Z group

09:30:12  21  in the explicit language of the claim.

09:30:15  22  Q.   Dr. Walensky, you also stated on PDX-3.7 that the

09:30:19  23  options for the P group informed your opinion as to the

09:30:23  24  meaning of the peptide of Formula I.  Could you explain your

09:30:26  25  opinion that you stated there with respect to the P group?

09:30:30   1   A.      Sure.   So I do the same thing in the next slide,

09:30:33   2   PDX-3.9, for P.   For P, again, I just summarized the

09:30:37   3   chemical structures for you of the six chemical choices.

09:30:41   4   And there they are.   And what you will notice here is that

09:30:45   5   in addition to these one of six choices that you can make to

09:30:49   6   insert at the P position, there is the option of no choice,

09:30:53   7   which is what I read right from the claim language.

09:30:56   8          So the key point to make here in looking at P

09:30:59   9   is, if we go to the next panel there, that they are, in

09:31:02   10   clear contrast to the prior slide, the P series includes all

09:31:06   11   of those six choices and a direct linkage, which means none

09:31:12   12   of the above, meaning no P at all.

09:31:14   13          That specific direction is not given for the Z

09:31:18   14   groups.   The option of not having a permanent group in the Z

09:31:21   15   position is not indicated in this explicit language of this

09:31:25   16   claim.

09:31:26   17   Q.      Dr. Walensky, in staying with the P group for a

09:31:30   18   moment, did you rely on any other information in determining

09:31:33   19   how a POSA would interpret the meaning of the claim term P

09:31:37   20   in the context of the '7,803 patent?

09:31:40   21   A.      Yes.   So I summarized these also in PDX-3.10.

09:31:44   22          In terms of claim term P, my support for this

09:31:48   23   opinion is the explicit language of Claim 1, the examples,

09:31:52   24   and the biological data.

09:31:55   25   Q.      I think we have gone through the explicit language of

09:31:59    1    Claim 1.  If you could take a look, and you identified the

09:32:03    2    examples in the '7,803 patent, what did you consider with

09:32:07    3    respect to the examples of the '7,803 patent?

09:32:14    4    A.    So this patent lays out 26 examples in Columns 18 to

09:32:19    5    20.  And I want to pick out a few to highlight my point.

09:32:23    6          In Example 5, you will see that the Z, the

09:32:25    7    permanent Z position there is Fmoc.  And then in the P

09:32:29    8    position, the choice is to include epsilon-aminohexanoyl.

09:32:34    9    That is an example where both a Z and a P were selected to

09:32:38    10   be a part of the final product.

09:32:40    11          If you then go down the examples, example 14,

09:32:42    12   here is an example again where a permanent Z group Fmoc was

09:32:48    13   selected to be in the final composition of the product.  And

09:32:50    14   for the P position, another chemical of those choices for P

09:32:55    15   were selected, this one is called Aeg(Fmoc).

09:32:59    16          So this P position is Aeg(Fmoc.).  that P

09:33:03    17   position also happens to have an Fmoc as well as a permanent

09:33:08    18   feature of that P position.  This example is a peptide that

09:33:11    19   actually has two permanent Fmoc groups in it.

09:33:14    20          Then if you go down to Example 22, you see that

09:33:17    21   exact same scenario again, where the inventors made a

09:33:20    22   peptide where they picked Fmoc for the permanent Z position

09:33:23    23   and they picked Aeg(Fmoc) for the permanent P position,

09:33:28    24   another peptide that was designed to have two permanent Fmoc

09:33:31    25   groups in the final claimed product.

09:33:33   1   Q.     Dr. Walensky, you also state on PDX-3.10 that you

09:33:39   2   looked at the biological data in the '7,803 patent to

09:33:44   3   understand more about claim term P.  If you could turn to

09:33:47   4   DTX-059_0008 to 0009, how does that information inform your

09:33:58   5   opinion about the P group?

09:33:59   6   A.     Okay.  Let's look at the P biological data, which is

09:34:02   7   Column 14, Table 1.

09:34:05   8          The first thing to say is that every single

09:34:07   9   peptide listed in this table has a permanent Z group in it.

09:34:12   10  Some of them have permanent P groups in them as well.

09:34:15   11         If you look at 5, the example that I just read

09:34:19   12  that starts with the permanent Fmoc, and it has the P group

09:34:23   13  selected, epsilon-aminocaproyl, that has an IC50 or the

09:34:28   14  ability to block bradykinin activity at 50 percent by the

09:34:33   15  number 4.1 times 10 to the minus 9th.

09:34:36   16         I want to point out that that is the most potent

09:34:41   17  peptide in the table.  So if I was a POSA looking at this

09:34:46   18  table I would say, the best peptide of all of the ones

09:34:50   19  tested had a permanent Z group and a permanent P group.

09:34:54   20         That is another point that I want to highlight.

09:34:56   21         If you go down to another example, like 14,

09:34:59   22  there is an example where they have a permanent Fmoc in the

09:35:02   23  Z position, and they have a permanent P group in the

09:35:06   24  Aeg(Fmoc) chemical.  This is a peptide that has two

09:35:09   25  permanent Fmoc groups in it.  That, too, has bradykinin

Walensky - direct

09:35:13   1   antagonist activity.

09:35:15   2           So I just want to highlight that the P position,

09:35:18   3   although not having a P was certainly an option just for P,

09:35:22   4   the best compound in that list has a P in it.

09:35:26   5   Q.    Dr. Walensky, on one of your summary slides you also

09:35:32   6   said that you considered Table 2 in the '7,803 patent.  If

09:35:36   7   we could just turn to Table 2 at DTX-05_0009, could you

09:35:43   8   explain briefly how Table 2 informed your opinion with

09:35:47   9   respect to the P group?

09:35:48   10  A.    Sure.  I mean, this is a different assay now.  But

09:35:51   11  it's comparing 5 different peptides.  What you will notice

09:35:54   12  if you look at the right-hand column, in this case, the

09:35:57   13  bigger number means better, longer duration of action.

09:36:01   14          If you just picked out the top two performers in

09:36:04   15  this table, it's the one that says 253.3 minutes, and the

09:36:09   16  best is the one that says 314.4 minutes.

09:36:15   17          Compound 2 has a permanent Fmoc group and a

09:36:18   18  permanent P group of the choice Aoc.  And the best one in

09:36:22   19  the table, No. 5, has a permanent Fmoc group in the Z

09:36:26   20  position and a permanent P group selected from the chemical

09:36:29   21  choice epsilon-aminocaproyl.

09:36:32   22          So a POSA looking at this and the prior table

09:36:35   23  would say, some of the best performers in this patent have

09:36:38   24  the permanent Z group and a permanent chemical choice for

09:36:41   25  the P group.

Walensky - direct

| | |
|---|---|
| 09:36:43 | 1 |
| 09:36:49 | 2 |
| 09:36:53 | 3 |
| 09:36:56 | 4 |
| 09:37:00 | 5 |
| 09:37:04 | 6 |
| 09:37:07 | 7 |
| 09:37:10 | 8 |
| 09:37:12 | 9 |
| 09:37:16 | 10 |
| 09:37:20 | 11 |
| 09:37:20 | 12 |
| 09:37:24 | 13 |
| 09:37:30 | 14 |
| 09:37:33 | 15 |
| 09:37:37 | 16 |
| 09:37:40 | 17 |
| 09:37:44 | 18 |
| 09:37:49 | 19 |
| 09:37:52 | 20 |
| 09:37:54 | 21 |
| 09:37:59 | 22 |
| 09:38:05 | 23 |
| 09:38:05 | 24 |
| 09:38:10 | 25 |

Q.    Dr. Walensky, if you can just summarize, again,
briefly, your opinion as to the meaning of the claim term P
in this group, given your review of the claim language
itself and all the information in the specification?

A.    Simply put, P gives you six different chemical choices
to install into this composition or none of the above.  But
there is no prioritization of what I say, better or worse.
They tried a whole bunch of different things.  It turned out
that actually having a P group, not omitting it, gave you
some of the best peptides in the patent.  That is what I
wanted to point out.

Q.    Dr. Walensky, if you could turn back to your PDX-3.6.
Let's refocus on the meaning of the claimed peptide of
Formula I.  You said that you relied on other information in
the '7,803 patent beyond the language of Claim 1.  What
other information did you rely on beyond the language of
Claim 1 for the definition of a peptide of Formula I?

A.    So I summarize that in PDX-3.11.

The support that I relied on, in addition to the
plain claim language of claim 1 was the language in Claims 2
and 3, and within the specification the title, abstract,
examples, biological results, and the description of how the
peptides were actually, ade by the inventors.

Q.    So let's start with your first bullet point which says
that you relied on Claims 2 and 3.

Walensky - direct

09:38:15 1           Would you please turn to DTX-059_0011 at Column

09:38:22 2  20, Lines 50 through 57.  That should bring us to Claims 2

09:38:27 3  and 3 of the '7,803 patent.

09:38:31 4           Would you explain, Dr. Walensky, how Claims 2

09:38:34 5  and 3 informed your opinion as to the meaning of the Z and

09:38:37 6  the peptide of Formula I?

09:38:38 7  A.    Sure.  So Claim 2 says, "A method for the treatment of

09:38:42 8  inflammation in a mammal wherein the inflammation is

09:38:45 9  mediated, induced or assisted by bradykinin or peptides

09:38:50 10  related to bradykinin, which comprises administering to said

09:38:55 11  mammal an anti-inflammatorily effective amount" -- this is

09:38:57 12  where it gets important -- "of a peptide of the Formula I as

09:39:01 13  claimed in Claim 1."

09:39:04 14           It is very explicit.  It's claiming the

09:39:08 15  composition of the peptide formula as claimed in Claim 1,

09:39:13 16  which is shown above, of what that composition is.

09:39:15 17           Then it reiterates in Claim 3, "a pharmaceutical

09:39:19 18  composition," meaning the drugs, "containing a peptide of

09:39:22 19  the Formula I," and again, please underscore, "as claimed in

09:39:28 20  Claim 1."

09:39:29 21           That's the drug, what's claimed in Claim 1.

09:39:33 22  Q.   Dr. Walensky, you also said on PDX-3.11 that you

09:39:38 23  looked at the title of the '7,803 patent to form your

09:39:43 24  opinion.  Would you please turn to the title and inform us

09:39:48 25  about how that helped you with your opinion?

Walensky - direct

09:39:51   1   A.      Sure.   The title of the patent, simply reading the

09:39:55   2   words, Bradykinin Peptides With Modifications At The

09:39:58   3   N-Terminus.   So the title is telling you what this patent is

09:40:03   4   about.   It's about bradykinin peptides with modifications at

09:40:07   5   the N-terminus.

09:40:08   6   Q.      You also indicated that, on the face of the patent,

09:40:12   7   you relied on the abstract to help form your opinion.   Would

09:40:16   8   you please explain the bases for how the abstract informed

09:40:19   9   your opinion?

09:40:20   10  A.      If you read the abstract it lists that formula again,

09:40:22   11  which I won't re-read, and then it says they have an

09:40:26   12  excellent bradykinin antagonistic action.

09:40:29   13  Q.      You also stated that you looked at the examples of the

09:40:34   14  peptides in the '7,803 patent.   I know those examples are at

09:40:38   15  DTX-059_0010-_0011 --

09:40:46   16          THE COURT:   Counsel, it would be a lot quicker

09:40:48   17  if you referred to the column and the line.   I know my way

09:40:51   18  around a patent.

09:40:53   19          MS. KUZMICH:   Yes, Your Honor.

09:40:53   20  BY MS. KUZMICH:

09:40:54   21  Q.      If you would turn to those examples and explain

09:40:57   22  briefly how those examples informed your opinion as to the

09:40:59   23  meaning of the Z in the peptide Formula I?

09:41:02   24  A.      These are examples of all of the final peptides that

09:41:05   25  were made for this patent and all 26 have a permanent Z

09:41:09  1    group, every one.

09:41:10  2    Q.     Again, briefly, you said that the biological data

09:41:12  3    informed your opinion.  And if you can just turn to Columns

09:41:15  4    14 and 15 at Table 1, and explain how that data informed

09:41:19  5    your opinion?

09:41:20  6    A.     This is the same story.  It's the 26 peptides.  And

09:41:23  7    they test them all, in a biological activity assay, every

09:41:29  8    single peptide in this list has a permanent Z group.  Twelve

09:41:32  9    out of 26 of these have a permanent Fmoc group, selected as

09:41:35  10   the Z group, and every one of these that were tested has

09:41:42  11   bradykinin antagonistic action.

09:41:43  12   Q.     Dr. Walensky, finally, you identify that the synthesis

09:41:46  13   of the peptides described in the '7,803 patent support your

09:41:50  14   opinion as to what is the meaning of Z in the peptide of

09:41:54  15   Formula I.

09:41:56  16          If you could turn your attention to that point

09:41:59  17   and please let us know how the synthesis of the peptides in

09:42:03  18   the '7,803 patent informed your opinion?

09:42:05  19   A.     Right.  This is very important because this is

09:42:07  20   actually telling you how to make the peptide of the

09:42:10  21   invention.

09:42:11  22          I want to start out on Column 13 reading very

09:42:14  23   briefly, Ms. Debonis, this is the paragraph that starts out,

09:42:19  24   When Fmoc protected group was used for temporary protection

09:42:22  25   of the amino group.

Walensky - direct

09:42:24    1    I want to highlight on Column 13 the sentence

09:42:26    2    that starts with, "The Fmoc," "The Fmoc protective group was

09:42:31    3    eliminated with a 20 percent strength solution of piperidine

09:42:35    4    in DMF in the reaction vessel."

09:42:39    5    You can stop there.

09:42:41    6    This is the on and off aspect of Fmoc, where you

09:42:45    7    put it on, you take it off.  This is the reaction that's

09:42:48    8    used to remove Fmoc from a peptide while it's under

09:42:53    9    construction.

09:42:54   10    We are going to talk about this in a minute in

09:42:56   11    the context of a full-bore explanation of the synthesis.

09:42:59   12    Why don't we get right to that at Column 18.

09:43:05   13    If you go to Column 18, in Example 1, they

09:43:08   14    really expand upon this point to tell the reader how to make

09:43:12   15    this peptide.  I am going to just walk you through this very

09:43:15   16    briefly.

09:43:17   17    They list the sequence of the peptide and they

09:43:19   18    say that it was assembled step-wise using the Fmoc method on

09:43:22   19    a p -- benzyloxybenzyl alcohol-resin.

09:43:26   20    This is the concept of building a peptide on a

09:43:29   21    resin, putting pearls on a string.  That is what this is

09:43:32   22    referring to, building a peptide using the Fmoc method where

09:43:36   23    you take the Fmoc on and off and on and off as you build the

09:43:40   24    peptide under construction.

09:43:41   25    As you go on it talks about how you add an amino

09:43:45  1   acid at the time.  Let's go down, in the interests of time,

09:43:47  2   to that part where it says, "The resin which had previously

09:43:51  3   been deblocked."  It's around two-thirds of the way down

09:43:55  4   there.

09:43:56  5            We have been adding all these amino acids to the

09:43:59  6   resin which had previously been deblocked with 20 percent

09:44:02  7   piperidine.  That means we are ready to go to put on another

09:44:06  8   amino acid and we are taking the Fmoc group off with 20

09:44:09  9   percent piperidine.  That is the chemical that takes it off.

09:44:12  10           Here is the most important thing.

09:44:14  11           The last amino acid derivative coupled on was

09:44:19  12   Fmoc-D-Arg-Pmc-OH.  Now, in contrast to everything that has

09:44:26  13   been described up until this point, now we are adding the

09:44:29  14   last amino acid.  This is the one that is added to the

09:44:32  15   N-terminus of the peptide.

09:44:35  16           And that last amino acid has this Fmoc group on

09:44:38  17   it.

09:44:38  18           Here is the most important phrase, "which was

09:44:42  19   not subsequently deprotected with piperidine."

09:44:48  20           So although everything above that is talking

09:44:51  21   about on and off, on and off, Fmoc, as you make the peptide,

09:44:55  22   now we have a very clear distinction.  Now we are putting

09:44:58  23   the last one on, which has the Fmoc, and we are keeping it

09:45:02  24   on.  How do we know that?  Because it explicitly and clearly

09:45:06  25   states "which was not subsequently deprotected with

Walensky - direct

09:45:10    1    piperidine."

09:45:12    2        Then we are done.  After the synthesis was

09:45:14    3    complete, what does "being done" mean?  Let's highlight

09:45:18    4    this.  It means the peptide was cleaved off the resin with

09:45:22    5    simultaneous removal of the side chain protective groups.

09:45:27    6    Then we are done.  We have made our pure product.

09:45:31    7        This is a lot of language.  It's a lot of

09:45:34    8    methodology.  And I think what would be most helpful would

09:45:37    9    be to take this exact methodology that I have just read and

09:45:41   10    show a picture of what it is, to put it into clearest

09:45:46   11    possible context.

09:45:48   12        So I prepared basically a schematic of exactly

09:45:51   13    this language from the '7,803.  So this is the '7,803

09:45:56   14    patent's chemical process of constructing peptides on a

09:46:00   15    resin, so that you have permanent N-terminal Z groups.  On

09:46:04   16    the right is the resin, which, I am picturing that as a

09:46:10   17    brown ball.  The amino acid backbone is shown in blue.

09:46:13   18    Certain amino acid side chains need to be protected during

09:46:16   19    the synthesis or else they will react in an unwanted way.

09:46:20   20    So I am symbolizing that as a red side chain protecting

09:46:24   21    group.

09:46:25   22        Then we get to the N-terminus protecting group

09:46:27   23    of that amino acid, pictured as a green box.  That is your

09:46:32   24    Fmoc.  That is what comes on and off, on and off, during the

09:46:35   25    peptide synthesis that is under construction.

Walensky - direct

09:46:37  1        Now let's make this peptide.

09:46:39  2        We are going to remove the Fmoc group with 20

09:46:41  3    percent piperidine, pops right off, you add your next

09:46:45  4    subunit.  You are going to do it again, deprotect with

09:46:49  5    piperidine, remove the Fmoc group on the resin, add your

09:46:52  6    next subunit.

09:46:53  7        We are going to do it again.  Deprotect the

09:46:56  8    Fmoc.  Add the next subunit.  My last example of this same

09:46:59  9    process, automated process, remove the Fmoc, add the next

09:47:03  10   group, there you go.

09:47:04  11       So you keep doing this until you are done making

09:47:06  12   your peptide on the resin.

09:47:09  13       At that point, a decision is made.  Are we going

09:47:12  14   to have an N-terminal protecting group on this peptide?

09:47:15  15   This patent is about N-terminal modifications.  The answer

09:47:18  16   is, yes, we are.  The decision is made to establish a

09:47:21  17   permanent N-terminus protected peptide.  How do you do that?

09:47:25  18       Well, in this case, for some of the examples,

09:47:27  19   the inventors just left on the Fmoc group, which is what I

09:47:31  20   just read from '7,803, the last one, which was not removed.

09:47:35  21       So what do they do?  They leave it.  They cleave

09:47:38  22   the peptide off the resin.  And what they get as the final

09:47:41  23   pure product is an Fmoc protected peptide.

09:47:45  24       I specifically changed the color there from

09:47:47  25   green to purple because now we are in a final product.  We

Walensky - direct

09:47:52   1   have chosen not to remove the Fmoc.  We are leaving it on.

09:47:55   2            Once that decision is made, we finish off the

09:47:58   3   synthesis by cleaving, we remove the resin, we remove the

09:48:01   4   red groups, and we are done.

09:48:03   5            That is only one example of the Z group.  This

09:48:06   6   patent gave 11 examples.  What if we didn't want Fmoc.  What

09:48:09   7   if we wanted one of the other ten?  What do we do?

09:48:12   8            What they would do is they again remove that

09:48:15   9   Fmoc group while it's on the resin.  Everything is

09:48:18   10  protected.  And then they just stick on another N-terminal

09:48:21   11  modification and they say we like that acyl group, we pick

09:48:25   12  any of the ten out of the 11 acyl groups that are left over.

09:48:28   13  And we are done.

09:48:30   14           So we cleave.  We take the resin off.  We take

09:48:32   15  the protecting groups off.  And we end up with our final

09:48:35   16  product, an acyl peptide.

09:48:37   17           This is the process for making bradykinin

09:48:40   18  peptides with modifications at the N-terminus.

09:48:44   19           To summarize that in the clearest way that I

09:48:47   20  can, I have one more slide on this, which is PDX-3.13, I

09:48:52   21  think this is so important in this particular case.

09:48:55   22           Fmoc plays different functional roles in

09:49:00   23  different contexts.

09:49:02   24           One context is when a peptide is under

09:49:06   25  construction.  So you have a nascent peptide.  It is on the

Walensky - direct

09:49:10    1   resin.   It is being made.   The side chains are protected as

09:49:13    2   shown in red.   The N-terminal Fmoc group can be removed,

09:49:18    3   absolutely can be removed on and off and on and off.   And

09:49:20    4   that's what the '7,803 method says, The Fmoc protective

09:49:24    5   group was eliminated during construction when it was chosen

09:49:27    6   to be eliminated with this 20 percent piperidine.

09:49:17    7            That cannot be conflated, confused,

09:49:20    8   brushed under the rug to the second completely

09:49:24    9   scientifically precise alternative choice, which is that

09:49:27   10   when a peptide is complete, and you see an Fmoc or an acyl

09:49:32   11   group or any of those 11 choices that are the Z group, this

09:49:35   12   peptide is off the resin.   The side chains are deprotected.

09:49:40   13   The N-terminus Fmoc group is not removed or an acyl group is

09:49:44   14   put there in its place.

09:49:45   15            At this point we are dealing with a purple

09:49:48   16   permanent protecting group and the language that proves it

09:49:50   17   is the last amino acid derivative coupled on with Fmoc D-Arg

09:49:56   18   which was not subsequently deprotected.   It is clear as day,

09:50:00   19   and what's very important, if I could make one point that

09:50:04   20   everybody remembers from my time here is, do not be fooled

09:50:07   21   that there's only one functional role for Fmoc.   This patent

09:50:12   22   clearly states that Fmoc can do two completely different

09:50:16   23   things.   Yes, on/off, on/off, removable.   Everybody knows

09:50:22   24   it.   That was the discovery that gave you Fmoc solid-phase

09:50:26   25   synthesis, but that doesn't mean that when a chemist decides

Walensky - direct

09:50:30  1    to keep it there, that it's not doing a different role.   It

09:50:33  2    has a different function in that context, and that context

09:50:37  3    is summarized under number two, and that context applies for

09:50:40  4    Fmoc and every single Z group listed in this patent, and the

09:50:45  5    option of not having that is not there.

09:50:47  6    Q.     Dr. Walensky, if you could just summarize your opinion

09:50:50  7    as to the claim term a peptide of the formula I in claim 1?

09:51:00  8    A.     Those are -- those are peptides that have a Z group.

09:51:06  9    Q.     Moving on to your next topic, Dr. Walensky, you said

09:51:10  10   on PDX-3.6 that in view of the prior art as of January 1989,

09:51:16  11   a POSA would not have been motivated to remove the

09:51:19  12   N-terminal modification of the peptide in Claim 1 because it

09:51:23  13   was expressly taught to be included in bradykinin

09:51:26  14   antagonists.   And could you -- is that the case?

09:51:29  15   A.     Yes.

09:51:30  16   Q.     And what information did you consider in forming that

09:51:34  17   opinion?

09:51:34  18   A.     Okay.   So now we're moving on from how you actually

09:51:38  19   make these and how the inventors told us to make it with a

09:51:41  20   permanent Z group to a different question, which is, if you

09:51:44  21   saw that, would there be anything that would tell you to

09:51:46  22   take it off, and I'm going to show you the reasons why in

09:51:49  23   the literature there are multiple examples of why you would

09:51:52  24   absolutely keep that Z group in place, so that's what this

09:51:56  25   portion of my testimony is about.   And I summarize it on

09:51:59  1   PDX-3.14.  I use patent '963.  I use an article by Barabe

09:52:05  2   and Regoli.  I use patent '204 and a plain old chemistry

09:52:10  3   textbook.

09:52:10  4   Q.    Doctor, let's begin with the first reference, the

09:52:15  5   '963 patent.  And how did that document inform your

09:52:18  6   opinion?

09:52:18  7   A.    I looked at the general peptide structure and

09:52:21  8   modification.  I looked at the examples and biological

09:52:27  9   data.

09:52:29  10  Q.    What do you mean on PDX--3.15 by the general peptide

09:52:38  11  structure?

09:52:39  12  A.    Okay.  So if we go to Column 3 --

09:52:41  13  Q.    And, Dr. Walensky, you are at JTX-38.3; is that

09:52:44  14  correct?

09:52:44  15  A.    Yes.  I'm at Column 3 and I'm going all the way to the

09:52:47  16  bottom of 65, just to point out that that is a peptide of

09:52:50  17  the formula where here, the N-terminal position is called an

09:52:56  18  N.  And then we can go on and read what N is.

09:53:00  19        So N is a hydrogen atom -- now I'm up to the top

09:53:04  20  of Column 4.  N is a hydrogen atom or a single acidic, basic

09:53:12  21  or neutral aromatic amino acid residue of the D- or L-

09:53:18  22  configuration such as D-Arg, D-Lys, or L-Thi, an N-terminal

09:53:22  23  enzyme protecting group selected from the group comprising

09:53:25  24  acyl-type protecting groups, aromatic urethane-type

09:53:30  25  protecting groups, alkyl-type protecting groups, or

09:53:35    1    alternately N is a di- or polypeptide containing amino acids

            2    of the D- or L-configuration, such as Lys-Lys, Met-Lys, or

            3    Gly-Arg-Met-Lys.

09:53:40    4            The language should be very familiar now.  It

09:53:43    5    lists n-terminus protecting groups to include acyl type

09:53:47    6    protecting groups, which is a way to characterize all of

09:53:48    7    those Z groups that I discussed, and it even includes the

09:53:51    8    aromatic urethane option, which is when you combine that O

09:53:56    9    with the C double bond, the green and the purple that I

09:53:59   10    showed you.  That's called urethane.  It's even including

09:54:02   11    the aromatic urethane type, which is Fmoc.

09:54:05   12    Q.    Dr. Walensky, as of January 1989, would a POSA who was

09:54:09   13    creating a bradykinin antagonist have wanted to add a

09:54:12   14    protective barrier to enzymatic degradation?

09:54:16   15    A.    Yes.

09:54:17   16    Q.    If we would refer back to your earlier testimony, you

09:54:20   17    said that the acyl groups and aromatic urethane groups are

09:54:26   18    components of the Z group; is that correct?

09:54:27   19    A.    Yes.

09:54:28   20    Q.    You state on PDX-3.15 that at JTX-38.7 and 8, and

09:54:36   21    that's Columns 12, lines 1 through 3, and column 13, line 16

09:54:41   22    through 19, that there are included examples of N-terminally

09:54:46   23    modified bradykinin antagonists.

09:54:48   24            Could you discuss those examples, point them out

09:54:51   25    and discuss them and how they inform your opinion?

Walensky - direct

| | |
|---|---|
| 09:54:56 | 1 |

A.      Yes.  So very briefly, I just wanted to show there are

examples in this list of peptides that have acyl groups.  42

has an acetyl group.  52 has an acetyl group.  56 has an

acetyl group.

Q.      You also said there were biological implications of

the '963 patent, and if you could inform us as to how those

biological implications also informed your opinion.

A.      Yes.  So if you go over to Column 5, Table 2, and

there's a little arrow to N and then it tells you why we

have an N here.  That's Column 5, JTX-38.4.  There you go.

         So if you look under N, it says, additions

confer enzyme resistance.

Q.      And, Dr. Walensky, if you could turn to Table 5 on

JTX-38.10 to 11.  And how would the data in Table 5 at all

inform a POSA about the N-terminal modifications of a

bradykinin antagonist?

A.      So if you look at -- let's highlight Examples 51 and

52.  This is a data table telling about biological activity

of peptides, which is bradykinin antagonist blood pressure

assays.  I just want to mention, if you can just highlight

in the legend at the bottom just to define what Roman

Numeral I-B is.  That's just an indicator of bradykinin

antagonistic activity.  So that's what you are looking for

in this table.  If you see that, that means you got what you

want.

Walensky - direct

09:56:49  1    So we're looking at Examples 51 and 52.  They're

09:56:52  2  very comparable examples because 51 does not have the

09:56:57  3  N-acetyl group, doesn't have the N protection and 52 does.

09:57:00  4  Now, let's look at the results.

09:57:02  5    When you don't have the acetyl group, do you

09:57:05  6  have antagonist activity?  No.  At the interarterial?  No.

09:57:12  7  IV, do you have antagonist activity, next column?  No.  If

09:57:16  8  you go to the destruction column, how much destruction do

09:57:19  9  you have?  52 percent destruction.

09:57:21  10    So now you go to 52.  You say what happens to

09:57:24  11  that bad profile when I add an acetyl?  All of a sudden I've

09:57:30  12  added just acetyl group and I get what antagonist activity.

09:57:36  13    Do I get antagonist activity?  All of a sudden I

09:57:39  14  do.  How about destruction?  Do I have destruction anymore?

09:57:42  15  No, I don't.  So all they did was add this acetyl group to

09:57:47  16  the identical peptide in this example, and they've gone from

09:57:49  17  an agonist that gets destroyed to an antagonist that

09:57:53  18  doesn't.

09:57:53  19    And that's not a one hit wonder, because I can

09:57:56  20  show you the exact same thing.  I won't go through it all

09:57:59  21  again.  But 55 and 56 is the identical scenario.  55, no

09:58:05  22  N-terminal permanent acetyl group.  56, N-terminal permanent

09:58:11  23  acetyl group.  We go from a peptide that's an agonist that

09:58:15  24  gets destroyed to exactly what we want, bradykinin

09:58:17  25  antagonist that does not just by adding that N-terminal

09:58:21   1   modification.

09:58:21   2   Q.     Dr. Walensky, you also relied on the kinin antagonist

09:58:26   3   article, which is JTX-39 for your opinion that a POSA would

09:58:31   4   not have been motivated to remove an N-terminal modification

09:58:34   5   of a peptide of Claim 1 of the '7,803 patent.

09:58:37   6             Could you briefly describe for us how that

09:58:41   7   article, JTX 39, informs your opinion?

09:58:43   8   A.     Yes.  And I just want to keep reminding in my answer

09:58:47   9   that the reason why I'm going through all of this is because

09:58:51   10  Dr. Bachovchin said you see that group, you take it off.

09:58:53   11  You see that group, you take it off.  Well, I'm trying to

09:58:56   12  give examples from the literature prior to January of 1989

09:59:00   13  where there were explicit reasons not to take it off, so I

09:59:03   14  gave you my first one, which was this patent that showed you

09:59:06   15  put an acetyl group on the N-terminus, you get some great

09:59:09   16  antagonist activity.  Now I'm going to give you another

09:59:12   17  example in a completely different setting.

09:59:13   18            So in this paper they talk about, let's go to

09:59:16   19  the last, let's go to JTX-39.11.  You go to the last

09:59:20   20  paragraph.  It says, recent studies, reviewed by Regoli,

09:59:25   21  have shown that some B2 receptor antagonists are very active

09:59:29   22  histamine releasers.  So that's a bad thing.  You don't want

09:59:33   23  that.

09:59:34   24            But this effect -- that's a side effect.  You

09:59:36   25  have histamine release from your treatment, that's a bad

09:59:39  1  side effect, so you don't want it.  But this side effect can

09:59:44  2  be reduced or eliminated by acetylation of the N-terminal

09:59:48  3  amide.

09:59:49  4          Now, here's another reason why you would keep it

09:59:51  5  on.  In a totally different scenario, you would want to keep

09:59:55  6  that N-terminal acetyl group on.  Why?  Because you

09:59:58  7  eliminate a side effect, a bad side effect, which is

10:00:01  8  histamine release.

10:00:02  9          Now let's read on.  Those compounds maintain

10:00:04  10  agonistic effect.  Okay.  So these were not antagonists and

10:00:09  11  they promote catecholamine release.  These compounds have

10:00:15  12  other problems with them.

10:00:17  13          However, here's the story of peptide synthesis.

10:00:19  14  Having agonistic activity is, however, reduced by the

10:00:22  15  addition of a D-Arg at the N-terminal and by the replacement

10:00:28  16  of Pro by hydroxyproline.

10:00:31  17          So this is your very typical scenario where you

10:00:34  18  do something over here on one side and it helps you but it

10:00:37  19  may not fix everything, but you don't get rid of this, which

10:00:40  20  is doing something for you, and you just change a little bit

10:00:42  21  of this and a little bit of this, because you have all these

10:00:45  22  different positions in peptides to play around with to get

10:00:47  23  to where you want to go.

10:00:48  24          So this is an example where they got rid of a

10:00:51  25  side effect that they didn't want by sticking an acetyl

Walensky - direct

10:00:55   1   group over here at the N-terminus.  Didn't fix all of their

10:00:58   2   problems, but it fixed an important one, and then they fixed

10:01:02   3   others by making important changes.  This is where making an

10:01:05   4   N-terminal modification got rid of a side effect.

10:01:08   5   Q.    Doctor, you also identify Table 5 in the kinin

10:01:11   6   antagonist article.  Could you describe how that table

10:01:15   7   informed your opinion with respect to not removing

10:01:18   8   N-terminal modification?

10:01:19   9   A.    Right.  So this is just kind of more of the same here.

10:01:22   10  I'm trying to pick out comparable examples.  So if you look

10:01:24   11  at Example 4 and 5, if you can highlight that, these are two

10:01:28   12  peptides that are -- there you go, and then the one right

10:01:32   13  below it.

10:01:34   14         So what you are seeing here is by adding on that

10:01:37   15  acetyl group, you essentially maintain the activity of the

10:01:40   16  peptide.  Right.  So you can get rid of a side effect and

10:01:43   17  maintain the biological activity, that you want, and then

10:01:46   18  there's another example of that directly below.

10:01:49   19         So if you look at six and seven there, so

10:01:51   20  there's an example of a peptide that has a D-Arg at the

10:01:57   21  N-terminus, and then the one below that has an acyl group

10:02:01   22  added on top of the D-Arg.  And the activity in these assays

10:02:07   23  are essentially the same, but you get the added benefit of

10:02:11   24  not having the undesirable histamine release.

10:02:15   25  Q.    Dr. Walensky, you also relied on the '204 patent

Walensky - direct

| | |
|---|---|
| 10:02:19 | 1 |
| 10:02:23 | 2 |
| 10:02:27 | 3 |
| 10:02:31 | 4 |
| 10:02:36 | 5 |
| 10:02:37 | 6 |
| 10:02:51 | 7 |
| 10:02:53 | 8 |
| 10:02:58 | 9 |
| 10:03:02 | 10 |
| 10:03:02 | 11 |
| 10:03:04 | 12 |
| 10:03:07 | 13 |
| 10:03:10 | 14 |
| 10:03:15 | 15 |
| 10:03:18 | 16 |
| 10:03:20 | 17 |
| 10:03:25 | 18 |
| 10:03:30 | 19 |
| 10:03:34 | 20 |
| 10:03:37 | 21 |
| 10:03:41 | 22 |
| 10:03:44 | 23 |
| 10:03:48 | 24 |
| 10:03:51 | 25 |

1    in the prior art to inform your opinion as why the POSA

2    would not be motivated to remove the N-terminal modification

3    in the peptides of Claim 1 of the 7,803 patent.  And how

4    did the '204 patent inform your opinion?  And that is

5    JTX-40.

6    A.    Okay.  So I'm going to Column 3 and I'm starting at

7    the very top of the column there.

8          So this really reinforces the schematic and

9    the language of the method of synthesis in '7,803.  Let me

10   read.

11         The term N protecting group -- again, we're

12   talking about that N-terminal protecting group -- as used

13   herein, refers to those groups intended to protect the

14   N-terminus against undesirable reactions, emphasis added,

15   during synthetic procedures.

16         Okay.  So that part of the sentence refers to

17   the green functionality of Fmoc, on/off, on/off, on/off.

18   Okay.  Now we go, or -- so now we're talking about something

19   different, or to prevent the attack of exopeptidases on the

20   final compounds or to increase the solubility of the final

21   compounds.

22         Okay.  It toggles you down to the second half of

23   that slide, where we're talking about the purple function,

24   the permanent function of the Fmocs, and it gives two

25   examples of why that's useful here, and then it lists some

10:03:57  1    choices.  Including, but not limited to, acyl, which is what

10:03:59  2    we've been talking about all morning, acetyl, which I just

10:04:02  3    gave you an example of, and it goes on.  Pivaloyl,

10:04:07  4    T-butyloxycarbonyl.  Can come on and off and on and off

10:04:14  5    during synthesis, but when it's left on for a reason, it

10:04:17  6    stays on as part of the final product.  It lists that.

10:04:24  7    Carbobenzyloxycarbonyl or benzoyl groups.  You may remember

10:04:25  8    that benzoyl group was stated as one of the Z group options

10:04:29  9    as well or an L or D aminoacyl residue.  An example of that

10:04:33  10   one would be like D-arginine, which may itself be N

10:04:37  11   protected similarly.

10:04:38  12           Here they are saying you can add a D-arginine

10:04:41  13   type amino acid there and you can protect it, too.  We just

10:04:45  14   saw an example of that in the article in Example 7 where

10:04:48  15   they had that D-arginine at the position and then they stuck

10:04:51  16   an acetyl group on it as well, and that's exactly what it

10:04:54  17   says here as a recommendation for having an N protected

10:04:57  18   group that might prevent the attack of exopeptidase.

10:05:01  19   Q.    And finally, Dr. Walensky, you had a fourth piece of

10:05:04  20   prior art that you relied on to explain why a person of

10:05:07  21   ordinary skill in the art wouldn't be motivated to remove

10:05:10  22   the N-terminal modification, and that is JTX-15.

10:05:14  23           If we could turn to JTX-15, Dr. Walensky, and

10:05:18  24   would you please describe and explain why you relied on

10:05:22  25   JTX-15 for your opinion.

10:05:24  1    A.    So if you go to JTX-15.31, the last paragraph on the

10:05:30  2    page.  It says, several simple amine protecting groups

10:05:35  3    derived from carboxylic acids and commonly used in organic

10:05:39  4    synthesis are obviously not suitable in peptide synthesis.

10:05:46  5    And then they go on to give an example.  Emphasize the term

10:05:50  6    obvious.

10:05:50  7          For instance, acetylation or benzoylation, both

10:05:56  8    Z examples in the '7,803.  These groups are, what does it

10:06:01  9    say?  Impractical, and then it gives an explanation, because

10:06:04  10   the vigorous hydrolysis needed for deacylation cleaves

10:06:09  11   peptide bonds as well.

10:06:13  12         This speaks to permanence.  When you put on a

10:06:15  13   group that's a Z group, an acetyl group, a benzoyl group or

10:06:20  14   an Fmoc group or Boc group and your goal is to leave it on

10:06:24  15   there, you don't take it off.

10:06:25  16         Okay.  And if you put on ten out of eleven of

10:06:28  17   those Z groups, do you know what this says?  If you went on

10:06:31  18   and tried to take it off, you've destroyed the whole

10:06:33  19   peptide.  A person of ordinary skill in the art would know

10:06:36  20   without any question that when you put these Z groups on

10:06:39  21   there, they don't come off after the fact, because if you

10:06:42  22   took it off after the fact, what does it say here?  Cleaves

10:06:45  23   the peptide bonds as well.  That means destroy the peptide.

10:06:52  24   That's pretty clear.

10:06:53  25   Q.    Dr. Walensky, if we could turn back, all the way back

Walensky - direct

10:06:59   1   now to PDX-3.6.  You also stated, you had a broader opinion

10:07:04   2   there, your third point.

10:07:06   3           You state that as of January 1989, a POSA

10:07:08   4   confronted with D-Tic at position seven and Oic at position

10:07:13   5   eight in the context of a peptide that otherwise appears to

10:07:16   6   be a bradykinin analog would have had no reasonable

10:07:19   7   expectation of success that such a peptide would have

10:07:22   8   bradykinin antagonist activity.

10:07:24   9           I'd like to talk about position seven first, and

10:07:28   10  what are your bases for this opinion?

10:07:30   11  A.    So I summarized that on PDX--3.16.  If we can go to

10:07:36   12  that.  The reasons are, first, the literature did not teach

10:07:40   13  or suggest the use of the unnatural, conformationally

10:07:43   14  constrained amino acid Tic in any position of a bradykinin

10:07:46   15  antagonist.

10:07:47   16          The second point is that the literature did not

10:07:49   17  teach or suggest the use of a conformationally constrained

10:07:53   18  bycyclic amino acid like Tic in any position of a bradykinin

10:07:56   19  antagonist.

10:07:57   20          The third point is that the literature did not

10:08:00   21  teach or suggest the use of Tic to address the metabolic

10:08:03   22  instabililty of a bradykinin antagonist.

10:08:05   23          Four, not all D-aromatic amino acids at position

10:08:09   24  seven conferred bradykinin antagonist activity.

10:08:13   25          So a POSA confronted with D-Tic at position

Walensky - direct

10:08:18    1    seven in the context of a peptide that otherwise appears to

10:08:21    2    be a bradykinin analog, would have been motivated to

10:08:23    3    substitute the D amino acids expressly suggested in the

10:08:26    4    bradykinin literature for use at position seven to create a

10:08:30    5    bradykinin antagonist.

10:08:32    6    Q.      On PDX-3.16, you referred to conformationally

10:08:37    7    constrained.  What do you mean by conformationally

10:08:39    8    constrained?

10:08:40    9    A.      So what I mean by conformationally constrained, first,

10:08:44   10    I will start with the word "conformation."  Chemistry is a

10:08:46   11    three-dimensional art.  We talk about everything on a

10:08:49   12    two-dimensional plane, but this is a three-dimensional

10:08:51   13    science, and to add the other level of complexity, it's a

10:08:54   14    three-dimensional moving science.

10:08:56   15            So we're dealing with things that are

10:08:57   16    three-dimensional, and they're constantly moving and

10:09:00   17    spinning, and all -- they consume space, real space.  So

10:09:04   18    that's what I mean by conformation.

10:09:07   19            And so if we go to PDX--3.17, I could just

10:09:11   20    elaborate on this because I made a schematic that I think is

10:09:15   21    also critical.

10:09:32   22            I title my slide The Critical Difference Between

10:09:34   23    a Non-Constrained and a Constrained Amino Acid Side Chain.

10:09:39   24            What we are talking about here is the difference

10:09:42   25    between the D-phenylalanine and D-Tic.  We heard on Monday

Walensky - direct

10:09:47   1   that these things look the same.  You just look at them, and

10:09:52   2   they look the same.  These are two-dimensional depictions by

10:09:56   3   a chemistry drawing program that simplifies what these two

10:10:01   4   amino acids look like.

10:10:05   5        That is the beginning.  These are not

10:10:07   6   two-dimensional compounds that are sticks.  These are

10:10:10   7   three-dimensional entities.

10:10:12   8        Just because they on a very superficial level,

10:10:16   9   quote-unquote, look the same, I want to explain to you how

10:10:20  10   not the same they really are.

10:10:21  11        First, let's continue with two-dimensional

10:10:24  12   space.  Just by looking at them in two-dimensional space,

10:10:28  13   what you see here is D-Phe is a monocyclic system.  It is

10:10:31  14   one ring.  D-Tic is a bicyclic system.  That is two rings.

10:10:35  15   That is one difference.

10:10:36  16        Another difference.  D-Phe is a homocyclic ring.

10:10:40  17   That means every atom there is a carbon.  The main atom is a

10:10:44  18   carbon with some hydrogens.

10:10:46  19        D-Tic is heterocyclic, carbons, hydrogens, and

10:10:50  20   now you have also added in a different atom, nitrogen.

10:10:55  21        What I am going to talk about now,

10:10:56  22   D-phenylalanine is not constrained and D-Tic is

10:11:00  23   conformationally constrained.  What does that mean and why

10:11:03  24   do we care?

10:11:04  25        Okay.  Okay.  Let's start with D-phenylalanine.

Walensky - direct

10:11:08  1  D-phenylalanine in three-dimensional space as a moving

10:11:13  2  entity spins.  So those arrows are meant to detect spinning.

10:11:16  3        Let's make the analogy between a propeller on an

10:11:20  4  airplane.  So this thing can spin around like a propeller on

10:11:23  5  an airplane.  Why does that matter?

10:11:25  6        If you go to the next panel, when a peptide is

10:11:27  7  trying to bind to its target, if that thing is spinning like

10:11:31  8  a propeller on an airplane, what that means is it can adopt

10:11:36  9  innumerable conformations.  It can sample so many different

10:11:40  10  three-dimensional conformations in space until it finds just

10:11:43  11  the right one to fit into that receptor and it uses that

10:11:47  12  conformation and binds.

10:11:49  13        Let's go to the bottom.

10:11:51  14        Conformationally constrained means that now we

10:11:54  15  have added a methylene group that I have highlighted in

10:11:57  16  yellow, that CH-2 group that we have been discussing.  What

10:12:00  17  does that do?

10:12:01  18        That conformationally constrains the propeller.

10:12:05  19  So when you think about that as an airplane, yeah, it's

10:12:08  20  still a propeller, it's not the exact type of propeller,

10:12:13  21  what is the biggest difference?  It doesn't move very much.

10:12:15  22  That plane is not taking off.  That cannot spin on its axis.

10:12:19  23  That is a conformationally constrained amino acid.  Why do

10:12:22  24  we care?

10:12:24  25        Now think about what that peptide has to do to

10:12:26   1   bind to its receptor.  If you go to the next panel, now,

10:12:29   2   this peptide has very much reduced choices for how it can

10:12:34   3   interact with the receptor.  And if that's not the perfect

10:12:38   4   choice, then that peptide is in no way going to bind to that

10:12:42   5   receptor.

10:12:43   6            So you have gone from the ability to choose from

10:12:46   7   an innumerable number of conformations to completely

10:12:50   8   restrict your ability to move around in space,

10:12:53   9   conformationally constrained.  And a huge risk factor in

10:12:57   10  doing that is you may never find the right shape to fit into

10:13:02   11  that receptor because you are so limited in your ability to

10:13:05   12  move.

10:13:06   13           I want to summarize my point.  Conformational

10:13:08   14  constraint in three-dimensional space, where movement and

10:13:11   15  space occupation is critical to drug design, that is, I

10:13:15   16  cannot under-emphasize how big a difference that is, even

10:13:18   17  though, if you wanted to be oversimplifying, you can just

10:13:22   18  say, oh, yes, those two shapes, they kind of look the same.

10:13:25   19  A POSA knows better.

10:13:28   20  Q.    Dr. Walensky, moving on with regard to your opinions

10:13:33   21  Position 7 and D-Tic, you also stated that all the aromatic

10:13:38   22  amino acids at Position 7 don't confer bradykinin antagonist

10:13:43   23  activity.  What is the basis for that?  Again, that was on

10:13:50   24  your PDX3.16.

10:13:54   25  A.    You are going back.

Walensky - direct

10:13:55    1   Q.      You identified that point on 3.16.

10:13:59    2   A.      Yes.  If you go to the bottom there, what I wanted to

10:14:01    3   discuss is the concept that, the notion that not all

10:14:05    4   D-aromatic amino acids at Position 7 actually even confer

10:14:11    5   greater bradykinin antagonistic action.  And I wanted to go

10:14:16    6   to JTX-25 to point that out.

10:14:22    7           If you go to JTX-25, this is the breakthrough

10:14:26    8   article.  This was the Vavrek and Stewart article from 1985

10:14:31    9   that made the first discovery of making the first bradykinin

10:14:37   10   antagonist.  In the abstract I wanted to point out when they

10:14:39   11   replaced the proline residue at Position 7 of bradykinin

10:14:42   12   with D-phenylalanine, that was the conversion that converted

10:14:46   13   the BK agonist into the bradykinin antagonist.

10:14:49   14           This was really the beginning of the beginning

10:14:51   15   of this bradykinin antagonist field.

10:14:54   16           If you turn to Table 1, the point to be made

10:14:57   17   here is that that change was a needle in a haystack.  It was

10:15:02   18   an exception to the rule.

10:15:04   19           What makes me have that opinion?  If you go to

10:15:07   20   Table 1, and you look at all of the choices there, and there

10:15:10   21   is a lot of choices for D-amino acids, and there is also a

10:15:13   22   lot of choices for D-aromatic amino acids, the only choice

10:15:20   23   that had antagonistic action was one of the D-aromatic amino

10:15:25   24   acids that is listed there.  All the other choices do not

10:15:30   25   work.

10:15:31    1        So to over-generalize and say, yep, it's a

10:15:34    2   D-aromatic acid replacement, pick whichever one you want,

10:15:38    3   absolutely not.  D-phenylalanine in this table is the

10:15:42    4   exception to this rule.  It is the needle in the haystack.

10:15:46    5   And that's why this was such a big discovery.

10:15:48    6   Q.    Dr. Walensky, your last opinion on PDX-3.16 states

10:15:52    7   that a POSA when confronted with a D-Tic in Position 7 in

10:15:58    8   the context of a peptide which appears to be a bradykinin

10:16:01    9   analog would have been motivated to substitute the D-amino

10:16:05   10   acid expressly suggested in the bradykinin literature.

10:16:08   11        What literature did you rely on for this

10:16:10   12   opinion?

10:16:11   13   A.    If you go to PDX-3.18, I just list here the patents

10:16:16   14   that I referred to in the prior art, '963, '993, '613, this

10:16:23   15   is what I am relying on to show you that a POSA would have

10:16:26   16   substituted D-amino acids at Position 7 from among these

10:16:29   17   choices that we can go through.

10:16:31   18   Q.    If we can take a look at your first document that you

10:16:34   19   identify, JTX-28.  If you could identify on JTX-28 what you

10:16:40   20   are relying on for this opinion?

10:16:43   21   A.    In the interests of time, I basically put the relevant

10:16:45   22   parts on slides so we don't have to keep going back and

10:16:48   23   forth and highlighting and whatnot.

10:16:49   24        On PDX-3.19, in this patent, the 7 position is

10:16:54   25   called Y.  On the left are all the choices that these

Walensky - direct

| | |
|---|---|
| 10:16:57 | 1 |
| 10:17:00 | 2 |
| 10:17:02 | 3 |
| 10:17:04 | 4 |
| 10:17:10 | 5 |
| 10:17:18 | 6 |
| 10:17:20 | 7 |
| 10:17:23 | 8 |
| 10:17:27 | 9 |
| 10:17:30 | 10 |
| 10:17:32 | 11 |
| 10:17:36 | 12 |
| 10:17:41 | 13 |
| 10:17:43 | 14 |
| 10:17:44 | 15 |
| 10:17:50 | 16 |
| 10:17:53 | 17 |
| 10:17:55 | 18 |
| 10:17:57 | 19 |
| 10:18:00 | 20 |
| 10:18:03 | 21 |
| 10:18:08 | 22 |
| 10:18:11 | 23 |
| 10:18:15 | 24 |
| 10:18:17 | 25 |

1  inventors gave you for Y.  And then in the table on the

2  right, they give you their favorite choices that are

3  highlighted in yellow.

4  Q.    So, Dr. Walensky, you also identified the U.S. Patent

5  4,801,613.  And if you could then explain for us what you

6  relied on in that patent for your opinion?

7  A.    Same concept, PDX-3.20 here, here the formula is

8  shown, and again, Y is what they are calling 7 and they list

9  a whole bunch of amino acid choices for what you could

10  substitute in there at Position 7.

11  Q.    And so finally, you have the '963 patent that you are

12  relying on, JTX-38, for your opinion as to what would be

13  substituted at Position 7.  Could you just summarize that

14  for us?

15  A.    Yes.  Same situation.  PDX-3.21, yellow lists all the

16  different choice possibilities here.  And then again these

17  are Y choices, that is a different letter, but it is the

18  same position, No. 7.

19           If you actually turn to PDX-3.22, I just put

20  this all together, summarized it.  If you look at the

21  patents here, in the prior art, these are all the different

22  possible choices that were listed in these patents for what

23  you could do in substitution at Position 7.  Then the

24  asterisks are some preferred choices.

25           So this is kind of the whole menu.  In the '613

Walensky - direct

| | | |
|---|---|---|
| 10:18:20 | 1 | and '963 columns I didn't repeat everything from the first |
| 10:18:24 | 2 | column.  I just showed the new ones that were gleaned from |
| 10:18:27 | 3 | those two patents. |
| 10:18:28 | 4 | Q.     Thank you, Dr. Walensky. |
| 10:18:32 | 5 | In consideration of time, you also provided an |
| 10:18:34 | 6 | opinion as to, with respect to Position 8.  You state that a |
| 10:18:39 | 7 | person of ordinary skill in the art confronted with a |
| 10:18:42 | 8 | bradykinin analog with D-Tic at 7 and Oic at 8 would have |
| 10:18:50 | 9 | substituted the Oic with recommended amino acids in the |
| 10:18:54 | 10 | bradykinin literature.  Is that correct? |
| 10:18:56 | 11 | A.     That's right.  So my reasons for saying that a POSA |
| 10:18:58 | 12 | would not have kept Oic at Position 8 are as follows. |
| 10:19:02 | 13 | The literature did not teach or suggest the use |
| 10:19:05 | 14 | of the unnatural conformationally constrained amino acid Oic |
| 10:19:08 | 15 | in any position of a bradykinin antagonist.  The literature, |
| 10:19:12 | 16 | No. 2, did not teach or suggest the use of a |
| 10:19:14 | 17 | conformationally constrained bicyclic amino acid like Oic in |
| 10:19:20 | 18 | any position of a bradykinin antagonist. |
| 10:19:24 | 19 | Third, the literature did not teach or suggest |
| 10:19:26 | 20 | the use of Oic to address the problem of metabolic |
| | 21 | instability for a bradykinin antagonist. |
| 10:19:31 | 22 | Fourth, the literature did not teach or suggest |
| 10:19:33 | 23 | that the use of Oic in a peptide necessarily results in the |
| 10:19:37 | 24 | desired biological activity. |
| 10:19:38 | 25 | Finally, a POSA faced with a bradykinin analog |

10:19:42   1   **with D-Tic at Position 7 and Oic at Position 8 as of January**

10:19:47   2   **1989 would have been motivated to substitute the amino acids**

10:19:50   3   **expressly suggested in the bradykinin literature for**

10:19:53   4   **Position 8 to create a bradykinin antagonist.**

10:19:57   5   **Q.    Dr. Walensky, let's go right to your identification of**

10:20:02   6   **DTX-114.**

10:20:05   7   **You say that source indicates that the**

10:20:07   8   **literature did not teach or suggest the use of a**

10:20:09   9   **conformationally constrained bicyclic amino acid.  What are**

10:20:12   10  **you relying on in DTX-114?**

10:20:15   11  **A.    I summarize what I have relied on in PDX-3.24.**

10:20:19   12  **First, the information in this article, which is**

10:20:21   13  **titled The Inhibition of Glandular Kallikrein by Peptide**

10:20:26   14  **Analog Antagonists of Bradykinin, the author is Spragg.**

10:20:33   15  **Regarding Position 8 a bradykinin antagonist is limited to**

10:20:33   16  **amino acids that were not conformationally constrained, and**

10:20:37   17  **therefore could not teach or suggest anything about the**

10:20:39   18  **impact of the conformationally constrained amino acid like**

10:20:44   19  **Oic at Position 8 when designing a bradykinin antagonist.**

10:20:48   20  **That is No. 1.**

10:20:49   21  **No. 2 is that Spragg is not directed at**

10:20:52   22  **developing a bradykinin antagonist that binds to the**

10:20:56   23  **bradykinin receptor.  Instead, Spragg talks about bradykinin**

10:20:59   24  **antagonists that are evaluated for their ability to inhibit**

10:21:02   25  **kallikreins.  Information related to design of an inhibitor**

10:21:05    1    of a kallikrein, which is a protease that acts on a high

10:21:09    2    molecular weight kininogen and its pathway, kallikrein-kinin

10:21:16    3    system, would not have informed a POSA on how to design a

10:21:19    4    bradykinin antagonist that must interact with the bradykinin

10:21:24    5    receptor.

10:21:24    6              To keep that very simple, if you were designing

10:21:26    7    a key to open a lock, if I am locked out of my house and I

10:21:30    8    call a locksmith to open my front door, I don't send them to

10:21:34    9    the neighbor.  What he learns about the lock on my

10:21:37   10    neighbor's front door has nothing to do with the lock on my

10:21:40   11    front door.

10:21:41   12              So if you are trying to glean information about

10:21:43   13    how to come up with a bradykinin antagonist, you don't go to

10:21:47   14    the neighbor kallikrein, who has a different receptor with a

10:21:52   15    different function, and ask him to make a lock for that.

10:21:56   16    That is not going to open my front door.

10:21:58   17              It may open his but not mine.  I am still going

10:22:02   18    to be locked out.

10:22:02   19    Q.    You said that Position 8 in the literature in Spragg

10:22:06   20    is limited to amino acids that were not conformationally

10:22:09   21    constrained?

10:22:09   22    A.    Yes.

10:22:10   23    Q.    What is your support for that?

10:22:12   24    A.    If you go to Spragg, DTX-114, Page 7, which in the

10:22:18   25    Spragg article is 205 in the upper right there, let's just

10:22:22    1    read from substitution, which is the upper right column.

10:22:27    2            Substitution at the P2 position with bulky

10:22:31    3    analogs such as cyclohexylalanine indicates that minimal

10:22:36    4    steric restraints are observed at this position.  The

10:22:38    5    bradykinin analog antagonists examined here contain

10:22:42    6    substitutions that meet these steric criteria at Positions

10:22:45    7    P1 to P3.  Namely, they have L-Arginine at P1,

10:22:50    8    L-phenylalanine or Beta-2-thienyl-L-alanine at P2, and

10:22:56    9    D-phenylalanine at P3.

10:22:57    10           The numbers and naming is unfortunately

10:23:00    11   different.  If you zoom up to the table, P2 in this table is

10:23:03    12   the 8 position.

10:23:05    13           The only choices that are discussed in this

10:23:07    14   article are listed in P2.  They are talking about

10:23:11    15   phenylalanine, thienylalanine, in the section I just told

10:23:16    16   you, read to you, they talk about cyclohexylalanine as well.

10:23:21    17   None of these are conformationally constrained.

10:23:23    18           Why does that matter?  I kind of prepared a

10:23:26    19   simplified slide like I did before to explain why this is so

10:23:30    20   important and why this article does not speak at all to

10:23:34    21   conformational constraint.

10:23:34    22           This is by analogy what I showed before with the

10:23:37    23   spinning propellers.  PDX-3.25.

10:23:40    24           On the left are the amino acids that are

10:23:42    25   described in Spragg.  Phenylalanine, which we already beat

Walensky - direct

10:23:46   1   the dead horse on, that is a non-conformationally

10:23:49   2   constrained amino acid.  It spins on its axis.

10:23:52   3          Spragg also talks about cyclohexylalanine.  That

10:23:55   4   also spins.  Then it talks about beta-2-thienylalanine.

10:24:00   5   That also spins.  This paper does not talk at all about Oic.

10:24:03   6   But if we want to talk about Oic, let's see how those three

10:24:07   7   things compare to Oic.

10:24:09   8          Oic is on the right.  So Oic is a bicyclic ring

10:24:12   9   system.  Nothing on the left is bicyclic.

10:24:15   10          What is different about Oic?  It does not spin.

10:24:17   11   It's conformationally constrained.  Completely different.

10:24:20   12   So you can argue that the only difference between this one

10:24:24   13   on the right, it kind of looks like one of them on the left.

10:24:27   14   You can say, does that look like cyclohexylalanine in two

10:24:31   15   dimensions?  Sure.

10:24:32   16          You can say the chemical structure of these two

10:24:34   17   things kind of look the same.  Is that the level of a POSA,

10:24:37   18   is that the level of sophistication that we are talking

10:24:39   19   about in drug development?  Of course not.  The

10:24:41   20   sophistication is we are making three-dimensional drugs for

10:24:44   21   three-dimensional targets.  Everything on the left spins.

10:24:47   22   The compound on the right Oic is conformationally

10:24:50   23   constrained.  That is a completely different function and

10:24:52   24   role in the design of a drug.

10:24:56   25          To say that those Spragg compounds inform the

Walensky - direct

10:24:58    1    choice of Oic is just, in my opinion, completely wrong.

10:25:04    2    Q.    Dr. Walensky, at PDX-3.23, you said that the

10:25:09    3    literature didn't teach or suggest the use of Oic in a

10:25:12    4    peptide necessarily results in the desired biological

10:25:16    5    activity and you referred to DTX-58?

10:25:24    6    A.    This is Blankley?

10:25:26    7    Q.    Yes.

10:25:26    8    A.    So I summarized my thoughts about Blankley, 3.26.

10:25:32    9    Blankley is an article that is titled Synthesis and

10:25:35   10    Structure-Activity Relationships of Potent New Angiotensin

10:25:39   11    Converting Enzyme Inhibitors Containing Saturated Bicyclic

10:25:42   12    Amino Acids.

10:25:44   13          First I want to point out again, my locksmith is

10:25:46   14    at the neighbor's front door.  We are not working on the

10:25:49   15    relevant lock here.

10:25:50   16          Be that as it may, let's continue.

10:25:53   17          Blankley contains in vitro and in vivo icatibant

10:25:56   18    comparing ACE inhibitors with proline versus a series of ACE

10:26:00   19    inhibitors containing bicyclic amino acids in place of

10:26:02   20    proline.

10:26:03   21          What we are doing here is comparing compounds

10:26:05   22    that have a proline versus ones that have a bicyclic

10:26:08   23    conformationally constrained structure.

10:26:15   24    Q.    Dr. Walensky, if you could move on to your examples of

10:26:18   25    the in vitro and in-vivo data that you used to support your

Walensky - direct

10:26:22    1    opinion?

10:26:22    2    A.    Sure.

10:26:23    3             In PDX-3.27, there is a whole lot of constructs

10:26:27    4    and a whole lot of data in this paper.  I am going to try to

10:26:30    5    go through it quickly but make the key points.

10:26:32    6             In Table 1, this is in-vitro data.  If you look

10:26:35    7    at the top row, there is a whole bunch of different

10:26:38    8    structures.  One of those is Oic.  Oic is, under the column

10:26:41    9    that says X, you will see that there is a bunch of A's.

10:26:44   10    Those A's mean Oic.

10:26:47   11             Everything that I have highlighted in yellow are

10:26:50   12    Oic-containing compounds.  What we are doing here is we are

10:26:53   13    comparing them to the drug, which is captopril.  It is a

10:26:58   14    blood pressure lowering drug.

10:26:59   15             I took one this morning.

10:27:02   16             So 1A is captopril.  And so we are trying to do

10:27:06   17    better.  We are trying to look at ways to do better.

10:27:09   18             If you look at all the Oic compounds and their

10:27:12   19    biological results, I think it is safe to say that those

10:27:14   20    results are all over the park.

10:27:16   21             Some are barely better.  Some are no better.

10:27:19   22    And some are worse.

10:27:20   23             A POSA looking at that and saying let me see how

10:27:23   24    those Oic substitutions do, they walk away from that saying,

10:27:27   25    Who knows?

Walensky - direct

10:27:28    1          Now, if you want to be as fair as you possibly

10:27:31    2    could be, you want to compare the compound that is as close

10:27:34    3    in structure to captopril as you possibly can from that grab

10:27:40    4    bag of compounds, if you do that, which is scientifically

10:27:43    5    precise, I would pick 9f.  The only difference in my opinion

10:27:48    6    between 9f and captopril is the difference of Oic versus

10:27:51    7    proline.

10:27:52    8          What do you see?  You see that the

10:27:54    9    Oic-containing compound is around 2.3 times better than

10:27:59   10    captopril.

10:28:02   11          If I am a drug designer, I am not jumping off my

10:28:05   12    seat, but it's a little better.  So now we continue.

10:28:11   13          On the next table -- we keep going on.  We keep

10:28:14   14    doing this.  Again in yellow are all the Oic compounds.

10:28:17   15    Here we are comparing it to another drug, enalaprilat.  If

10:28:22   16    you look at the yellow compounds, same story, all over the

10:28:26   17    park.  Here actually nothing is better.  Not one

10:28:29   18    Oic-containing compound is better.

10:28:30   19          And they are all over the place.  Some are

10:28:32   20    barely not better.  Some are totally not better.  Some are

10:28:36   21    unmeasurably poor, greater than a hundred.  So if you make

10:28:40   22    the fair comparison again, the most scientifically precise

10:28:44   23    comparison is 11B to enalaprilat.  .0023 is your goalpost.

10:28:49   24    You are barely there at .0024.  You don't make it.  You are

10:28:53   25    not even the same.  You are a tad worse.

10:28:56    1    For all intents and purposes, it's the same.

10:28:59    2    Now let's look at the next one, 3.29.  Now we

10:29:03    3    are getting a little bit more sophisticated because we are

10:29:05    4    going in vivo.  One might argue that in vivo is important,

10:29:08    5    because that is where you are injecting this thing into a

10:29:11    6    mammal.

10:29:12    7    The fairest comparison that you can make in this

10:29:15    8    table, and you really have to find that, because there is

10:29:18    9    not a lot of head-to-heads, the only one I could find here

10:29:21    10   is 9f at a dose of 30 milligrams per kilogram orally versus

10:29:27    11   captopril, which was given at the same dose.  Again, the

10:29:30    12   only difference between those two things are Oic and

10:29:34    13   proline.

10:29:34    14   We are trying to be convinced that, you see

10:29:37    15   proline, let's just hit away, that is the home run.  Well,

10:29:41    16   here, what you are reading out is the maximum change in

10:29:43    17   lowering the blood pressure.  Captopril does minus 101 at

10:29:49    18   six hours.  See that?  And 9f does minus 72.  So in this

10:29:55    19   assay the lower the number, the more you lower blood

10:29:58    20   pressure, the better you do, and Oic does way worse.

10:29:47    21   So a POSA that looked at this data taken

10:29:50    22   together to summarize it, they would see a whole bunch of

10:29:53    23   compounds.  There would be one out of all of these compounds

10:29:56    24   that was a tad better, two, three times better, all the

10:30:01    25   other ones were all over the park and the in vitro data in

Walensky - direct

10:30:04   1   the other table.  There isn't any of them that's better.

10:30:07   2   And then when you go to the in vivo data, the Oic

10:30:10   3   substitution makes it worse.  So what does a POSA say?  No,

10:30:14   4   thanks.

10:30:15   5   Q.     Dr. Walensky, moving on, we're in the home stretch

10:30:21   6   here.  You said on PDX-3.23 that as of January 1989, a POSA

10:30:28   7   would have been motivated to substitute in position eight

10:30:30   8   where Oic would be the amino acids that had been recommended

10:30:35   9   for position eight.

10:30:37  10            And if you could summarize your opinion there

10:30:39  11   and the information specifically that you relied on.

10:30:42  12   A.     Right.  So, again, this is going to go quickly because

10:30:46  13   I just want to show you the same type of thing I showed you

10:30:49  14   before.  Two patents, '993, '963 gives a bunch of choices

10:30:54  15   for position eight, and we can go right through this.

10:30:57  16            If you look at 3.31, if you go to these

10:30:59  17   patents, position eight here is called Z.  Bottom left

10:31:05  18   there, all of choices for position eight.  Right-hand table,

10:31:10  19   the inventor's preferred choices for preferred compounds for

10:31:14  20   substitution at position eight.

10:31:15  21            You can go right to the next page, 3.32,

10:31:18  22   and move on to the '963 patent, the same situation.  And

10:31:23  23   that patent, again, they call position 8, Z, and they say

10:31:26  24   that Z, which is position eight, is a phenylalanine residue

10:31:30  25   of the   D or L configuration, or, and it lists the choice

Walensky - direct

10:31:34  1   of substitutes, other aromatic or aromatic amino acid

10:31:39  2   residues such as Leu, Thi, or Pal or a cyclic amino acid

         3   such as D or L Pro.

10:31:46  4              And then I summarized those choices on

10:31:51  5   PDX-3.33 and these are the choices that the inventors

10:31:54  6   suggested could be substitutions for position eight.

10:31:57  7   Q.    Doctor --

10:31:59  8   A.    After these preferred choices, among the choices.

10:32:03  9   Q.    Dr. Walensky, at the outset of the testimony, you

10:32:05  10   stated that you reached the opinion that Claim 14 of the

10:32:08  11   '333 patent is not invalid for obviousness-type double

10:32:12  12   patenting over Claim 1 of the '7,803 patent in view of the

10:32:16  13   prior art.  Given your direct testimony today, could you

10:32:20  14   please summarize why your opinion, this is the case?

10:32:24  15   A.    Sure.  So I just listed my simple positions starting

10:32:27  16   at PDX-3.34 and I want to read them into the record.

10:32:30  17              The first one is, the language of Claim 1

10:32:32  18   of the '7,803 patent makes clear that the N-terminal

10:32:35  19   modifications represented by the Z group are permanent

10:32:40  20   components of the peptides, not to be removed, and there is

10:32:42  21   no option listed for not having a "Z" component.

10:32:45  22              Number two, the specification of the '7,803

10:32:51  23   patent confirms that the Z groups are an integral part of

10:32:53  24   the final peptide, not to be removed.

10:32:55  25              Three, the bradykinin antagonist literature

10:32:59   1   expressly taught to put aromatic urethane-type groups like

10:33:05   2   Fmoc and acyl-type groups at the N-terminus of bradykinin

10:33:08   3   antagonists to improve metabolic stability or confer other

10:33:12   4   beneficial biological activity.

10:33:15   5           Number four, a POSA confronted with a bradykinin

10:33:19   6   analog having D-Tic at position seven and Oic at position

10:33:23   7   eight would have had no reasonable expectation of success

10:33:26   8   that this peptide would have bradykinin antagonist activity.

10:33:32   9           Five, not only would a POSA not have been able

10:33:35   10  to predict how one or more changes in the amino acid

10:33:38   11  sequence of a bradykinin analog would impact the antagonist

10:33:42   12  potency of a peptide, a POSA would have had no idea how that

10:33:47   13  change would impact other characteristics of the molecule

10:33:51   14  aside from potency, such as metabolic stability.

10:33:55   15          And to reinforce that point, I wanted to excerpt

10:33:58   16  straight from the horse's mouth the discoverer of the first

10:34:03   17  bradykinin antagonist, Stewart.  This is what he said on

10:34:06   18  page PDX-3.36 from his article, which I think I referred to

10:34:11   19  Stewart 4.  It is clear from examination of these analogs

10:34:15   20  that there is no correlation between bradykinin potency of

10:34:19   21  analogs and their susceptibility to pulmonary kininases.

10:34:26   22  Some of the totally resistant analogs have very high potency

10:34:31   23  while others have very low inherent potency.  Substrate

10:34:35   24  specificity requirements for the kininases thus are totally

10:34:40   25  different from receptor binding requirements.  Simply put,

10:34:47   1   clearly said.

10:34:49   2            And finally, my point 6 on PDX-3.37.   Based on

10:34:55   3   the explicit teachings of Dr. Stewart and the compilation of

10:34:59   4   prior art, a POSA would have known that the design

10:35:02   5   principles derived for targeting a particular receptor with

10:35:05   6   a peptide composition were generally not applicable for

10:35:09   7   developing a peptide to target a different receptor.   For

10:35:13   8   example, introducing conformational constraint could

10:35:17   9   facilitate the binding of a peptide to a particular

10:35:20   10   receptor, but making the same change in a different

10:35:23   11   peptide could completely destroy the activity towards its

10:35:27   12   receptor.

10:35:30   13            And I don't want to end with my words, I want to

10:35:34   14   end with the discoverer's words.   Stewart wrote, in Stewart

10:35:41   15   four, first paragraph.   Extensive work on analogs of peptide

10:35:46   16   hormones over more than two decades has demonstrated clearly

10:35:50   17   that few generalizations can be made in this field.   The

10:35:56   18   different hormones are very individualistic, and their

10:36:00   19   receptors demonstrate very different specificity

10:36:03   20   requirements.   As a consequence, principles operating in the

10:36:08   21   design of inhibitors of the action of one peptide hormone

10:36:12   22   are generally not applicable to other peptide systems.

10:36:18   23            And then he gives an example, almost a prophetic

10:36:23   24   example for what we're talking about here.   Replacement of

10:36:28   25   phenylalanine by N-methylphenylalanine in angiotensin 2,

10:36:37   1   which is not a peptide we've been discussing, yielded an

10:36:40   2   excellent inhibitor.   The conformational restriction imposed

10:36:43   3   upon the molecule by this methylation apparently prevented

10:36:46   4   the aromatic ring (which is the trigger for intrinsic

10:36:49   5   activity) from interacting properly with the receptor.

10:36:54   6          So what that says is that when they introduce

10:36:56   7   conformational constraint by changing the phenylalanine to a

10:37:00   8   conformationally restricted one, they got a home run on that

10:37:03   9   receptor.   It worked beautifully.   However, I will read on.

10:37:08   10   Similar replacement of phenylalanine in bradykinin, which is

10:37:13   11   what we're talking about, served only to destroy all

10:37:17   12   activity.

10:37:20   13          What was a good conformational constraint for

10:37:23   14   the neighbor's lock doesn't open my door.   Addition of an

10:37:28   15   alpha methyl group to the phenylalanine, this was a

10:37:32   16   different style of introducing conformational constraint,

10:37:34   17   which also severely restricts the conformational flexibility

10:37:38   18   of the molecule, had a much less deleterious effect than the

10:37:43   19   other inhibitor above.

10:37:45   20          What happened?   It did not produce an inhibitor.

10:37:49   21   Failure.   So taking a learning from one peptide, where

10:37:54   22   conformational constraint gave them a home run, you

10:37:57   23   apply that to bradykinin, destroy all activity.   Not

10:38:02   24   applicable.

10:38:04   25          MS. KUZMICH:   No further questions on direct,

Walensky - cross

10:38:06     1    Your Honor.

10:38:06     2              THE COURT:  All right.  Let's take a stretch.

10:38:08     3              (Short recess taken.)

10:52:00     4              THE COURT:  All right.  Take your seats, please.

10:52:01     5              Mr. James?

10:52:02     6              MR. JAMES:  Good morning, Your Honor.

10:52:03     7              THE COURT:  Good morning.

10:52:04     8              MR. JAMES:  With your permission, we'll hand up

10:52:07     9    some cross-examination binders.

10:52:08    10              THE COURT:  Yes, indeed.

10:52:13    11              (Binders handed to the Court and to the

10:52:17    12    witness.)

10:52:21    13              MR. JAMES:  There are two binders.

10:52:23    14              THE COURT:  I see it.

10:52:23    15              MR. JAMES:  Deposition transcripts and report.

10:52:25    16              THE COURT:  Got it.

10:52:46    17              Doctor, you can move the side here.  Move other

10:52:49    18    stuff out of your way.

10:52:50    19                        CROSS-EXAMINATION

10:52:51    20    BY MR. JAMES:

10:52:52    21    Q.    Good morning, Dr. Walensky.

10:52:53    22    A.    Good morning.

10:52:54    23    Q.    I'd like to talk to you about your opinion on claim

10:52:57    24    construction.

10:53:00    25              MR. JAMES:  Could we put up Claim 14 of the '333

Walensky - cross

| 10:53:03 | 1 | patent? |

BY MR. JAMES:

10:53:04  2

10:53:05  3   Q.    You understand that this is the claim in suit?

10:53:07  4   A.    Yes.

10:53:07  5   Q.    Correct?

10:53:08  6   A.    Yes.

10:53:08  7   Q.    And Claim 14 is directed to a peptide; right?

10:53:12  8   A.    Yes.

10:53:12  9   Q.    It's a ten amino acid peptide?

10:53:15  10   A.    Yes.

10:53:15  11   Q.    And the amino acids are outlined in the claim; is that

10:53:19  12   right?

10:53:19  13   A.    Yes.

10:53:20  14   Q.    You understand the amino acid sequence of that

10:53:23  15   peptide; is that right?

10:53:24  16   A.    Yes.

10:53:25  17   Q.    And we can agree that's the sequence of icatibant; is

10:53:30  18   that right?

10:53:30  19   A.    If that's what you are telling me.  From that, I'm

10:53:34  20   looking at the sequence and I can see what the sequence is.

10:53:36  21   Q.    So you don't know whether or not that's the sequence

10:53:39  22   of icatibant?

10:53:40  23   A.    Are we talking about me reading that claim to you as

10:53:43  24   it stands or are we interpreting more about trade names of

10:53:46  25   medications?

Walensky - cross

10:53:47   1   Q.     I'm asking you if you know that that is the sequence

10:53:49   2   of icatibant so that you and I can use the word icatibant to

10:53:53   3   talk about that sequence?

10:53:53   4   A.     Absolutely.   I thought you were asking me a different

10:53:56   5   question.

10:53:56   6   Q.     You understand that's the sequence of icatibant?

10:53:58   7   A.     Yes.   Icatibant is listed in the claim.

10:54:02   8   Q.     And then below the sequence of icatibant, the claim

10:54:05   9   talks about physiologically tolerable salt of said peptide;

10:54:10   10   right?

10:54:10   11   A.     Yes.

10:54:10   12   Q.     And you understand what that means; is that right?

10:54:13   13   A.     Yes.

10:54:14   14   Q.     There's not any ambiguity in that phrase, is there?

10:54:19   15   A.     There isn't.

10:54:19   16   Q.     And the claim, Claim 14, does not recite any

10:54:22   17   biological activity whatsoever; right?

10:54:24   18   A.     Right.

10:54:25   19   Q.     If we can put up demonstrative PDX-3.4.   This is a

10:54:32   20   demonstrative that you used on your direct examination; is

10:54:35   21   that right?

10:54:35   22   A.     Correct.

10:54:36   23   Q.     And you are, as it shows at the bottom of that slide,

10:54:41   24   reading in the phrase "with bradykinin antagonist activity";

10:54:45   25   right?

Walensky - cross

10:54:45  1    A.    Correct.

10:54:46  2    Q.    If we could look at the next demonstrative, PDX-3.5,

10:54:53  3    the bases for you reading in that activity, that language,

10:55:03  4    the bases are laid out on PDX-3.5?

10:55:07  5    A.    Correct.

10:55:07  6    Q.    So you read into the claim based on the language in

10:55:10  7    the specification, the title, the abstract, and biological

10:55:15  8    data in the '333 patent; is that right?

10:55:17  9    A.    When I was asked to look at that claim, my

10:55:20  10   understanding is that one that does that analysis begins

10:55:22  11   with the explicit claim term language and then continues

10:55:25  12   on.

10:55:26  13   Q.    But the claim term language unambiguously defines the

10:55:36  14   peptide.  Is that correct?

10:55:38  15   A.    Correct.

10:55:40  16   Q.    Now, let's look at Claim 1 of the '7,803 patent.  And

10:55:54  17   Claim 1 of the '7,803 patent lists 13 different positions;

10:55:58  18   right?

10:55:59  19   A.    Correct.

10:55:59  20   Q.    And for nine of those positions, it only lists a

10:56:03  21   single option; right?  That's B, C, E, F, K, Q, M, and F'

10:56:14  22   and I; right?

10:56:15  23   A.    Correct.

10:56:16  24   Q.    And for A, it lists five positions, five different

10:56:23  25   options.  I'm sorry?

Walensky - cross

10:56:24  1   A.     Correct.

10:56:24  2   Q.     And for G, there are three different options; is that

10:56:27  3   right?  Those are cis-indo, cis-exo and tran-octahydroindole

       4   2-carboxylic acid; right?

10:56:41  5   A.     I believe that's correct.

10:56:41  6   Q.     So for the sequence A through I, there are five times

10:56:45  7   3 or 15 peptides outlined; correct?

10:56:48  8   A.     I believe so, yes.

10:56:54  9   Q.     And then there's a set of options at the Z position;

10:56:58  10  right?

10:56:58  11  A.     Correct.

10:57:02  12  Q.     And the Z position, there's no ambiguity about the

10:57:07  13  compounds that are identified in the Z group; is that

10:57:09  14  right?

10:57:10  15  A.     Correct.

10:57:10  16  Q.     And then with respect to the P position, there are

10:57:16  17  seven different options; right?

10:57:17  18  A.     Right.

10:57:18  19  Q.     And there's no ambiguity there either; right?  A

10:57:21  20  person of skill in the art could sit down and write up

10:57:24  21  every single peptide that is delineated in that claim;

10:57:29  22  correct?

10:57:30  23  A.     Correct.  Over 1100.

10:57:31  24  Q.     Now, you are also reading into this claim the activity

10:57:38  25  with bradykinin antagonist activity; right?

Walensky - cross

10:57:42    1    A.      No.   I was asked to analyze the claim terms Z and P in

10:57:46    2    the context of Dr. Bachovchin's interpretation of these

10:57:49    3    claim terms, which I disagreed with.

10:57:51    4    Q.      Okay.

10:57:53    5    A.      That was my analysis, I was asked to look at those

10:57:56    6    claim terms because Dr. Bachovchin in my opinion read into

10:58:00    7    things in terms of language that wasn't there.   He read into

10:58:03    8    Z as you know, and he read into P that no linkage, no option

10:58:10    9    is preferred.   I was asked to make that analysis.

10:58:12   10    Q.      He testified, there's a transcript, but you'll agree

10:58:14   11    that P does allow for a direct linkage; is that correct?

10:58:18   12    A.      It does.

10:58:19   13    Q.      And that would mean that there would be nothing at the

10:58:21   14    P position; right?

10:58:22   15    A.      That's a choice.

10:58:23   16    Q.      All right.

10:58:25   17    A.      He said it was the preferred choice.

10:58:27   18    Q.      Now, am I correct that the claim of the '7,803 patent

10:58:43   19    does not recite any particular biological activity?

10:58:46   20    A.      Correct.   I was asked to analyze Z and P.

10:58:51   21    Q.      Right.   But my question is, Doctor:   It does not

10:58:53   22    recite any particular biological activity, does it?

10:58:56   23    A.      That's correct.

10:58:57   24    Q.      So let's look at DDX-5-1.

10:59:16   25              Now, Dr. Walensky, if you take Claim 1 of the

Walensky - cross

| | | |
|---|---|---|
| 10:59:21 | 1 | '7,803 patent and you select the very first option for each |
| 10:59:25 | 2 | of the 13 groups, the result is Fmoc-icatibant; is that |
| 10:59:32 | 3 | correct? |
| 10:59:32 | 4 | A.    If you want to -- if you want to agree that we're |
| 10:59:35 | 5 | calling that sequence icatibant, then I'm happy to call it |
| 10:59:38 | 6 | that, but I want to make sure that when you call it |
| 10:59:40 | 7 | icatibant, you mean the final product icatibant, because you |
| 10:59:43 | 8 | used that in two different ways, and I want to make sure |
| 10:59:46 | 9 | that we are precise that we're calling icatibant the final |
| 10:59:49 | 10 | drug. |
| 10:59:49 | 11 | Q.    Well, I will ask the questions.  Okay?  We agreed |
| 10:59:54 | 12 | earlier the sequence that was in Claim 14 of the '333 patent |
| 10:59:57 | 13 | is icatibant; is that right? |
| 10:59:58 | 14 | A.    Right.  But I want to be very precise with my answers |
| 11:00:01 | 15 | because you use icatibant in two different ways, and I want |
| 11:00:04 | 16 | to make sure we're defining it and I'm agreeing to the |
| 11:00:06 | 17 | correct way, and I'm just saying that the correct way that I |
| 11:00:09 | 18 | would use icatibant as the amino acid sequence pictured |
| 11:00:13 | 19 | there as the final peptide throughout. |
| 11:00:15 | 20 |         THE COURT:  Mr. James, why don't you agree on |
| 11:00:17 | 21 | convention so that the fact-finder doesn't get lost. |
| 11:00:19 | 22 |         MR. JAMES:  Okay. |
| 11:00:20 | 23 |         THE COURT:  Okay? |
| 11:00:21 | 24 | BY MR. JAMES: |
| 11:00:22 | 25 | Q.    Dr. Walensky, I think we agreed earlier, I don't think |

Walensky - cross

| | | |
|---|---|---|
| 11:00:25 | 1 | I've used this in two different ways, the sequence D-Arg, |
| 11:00:31 | 2 | D-Arginine, arginine, proline, hydroxyproline, glycine, |
| 11:00:37 | 3 | thienylalanine, serine, D-Tic, Oic, arginine is the sequence |
| 11:00:41 | 4 | of icatibant; correct? |
| 11:00:42 | 5 | A.    Correct. |
| 11:00:42 | 6 | Q.    Correct? |
| 11:00:43 | 7 | A.    Correct. |
| 11:00:43 | 8 | Q.    And the first entry in the Z group is Fmoc; right?  So |
| 11:00:50 | 9 | if one just takes the first entry of each of these groups, |
| 11:00:58 | 10 | one derives Fmoc-icatibant; is that correct? |
| 11:01:00 | 11 | A.    We can agree to that nomenclature. |
| 11:01:03 | 12 | Q.    Now, let's look at DDX-5-2.  DDX-5-2, I have put up |
| 11:01:25 | 13 | the sequence of Claim 14 of the '333 patent and juxtaposed |
| 11:01:32 | 14 | it with the sequence of Claim 1 of the '7,803 patent. |
| 11:01:36 | 15 | Do you see that? |
| 11:01:37 | 16 | A.    I do. |
| 11:01:37 | 17 | Q.    And you understand that what we're talking about in |
| 11:01:45 | 18 | this case is whether the sequence of Claim 14 of the '333 |
| 11:01:50 | 19 | patent is an obvious variant of this sequence of Claim 1 of |
| 11:01:55 | 20 | the '7,803 patent; is that correct? |
| 11:01:57 | 21 | A.    Correct. |
| 11:01:58 | 22 | Q.    Now, the only -- well, let me withdraw that. |
| 11:02:04 | 23 | The amino acid sequence of these two claims is |
| 11:02:09 | 24 | identical; right? |
| 11:02:11 | 25 | A.    Correct. |

11:02:11  1    Q.    The amino --

11:02:14  2    A.    As long as you are representing very clearly that --

11:02:18  3    this is important.  As long as you are representing very

11:02:20  4    clearly that those circles, which are a two-dimensional

11:02:25  5    schematic, are the final product where those circles don't

11:02:27  6    have protection or any other entities that are not being

11:02:31  7    listed there.

11:02:31  8                We can agree that those representations

11:02:34  9    could be made a schematic, that that is the final purified

11:02:38  10   product with no protection groups on the top and the same

11:02:42  11   holds for the bottom.  If we can discuss that specific clear

11:02:46  12   scientifically precise definition, then, yes, I'm happy to

11:02:49  13   go along with that.

11:02:50  14   Q.    Well, it's your position that it's directed to a final

11:02:54  15   product in Claim 1 of the '7,803 patent.  Correct?

11:02:59  16   A.    Let's call it composition then.

11:03:01  17   Q.    But I think we can agree that whatever these different

11:03:05  18   amino acids mean they have the same meaning in Claim 14 of

11:03:10  19   the '333 patent as they do in Claim 1 of the '7,803 patent;

11:03:14  20   is that right?

11:03:14  21   A.    Correct.  Can I explain why I think it's important?

11:03:18  22             THE COURT:  So, Doctor --

11:03:20  23             MR. JAMES:  Sorry, Your Honor.

11:03:20  24             THE COURT:  Their rules, just like in your case.

11:03:25  25   He gets to ask the questions.  If I think things are getting

Walensky - cross

11:03:29    1    out of whack, I will -- try your best to answer.

11:03:34    2                    THE WITNESS:  I will try to fit into my answer.

11:03:36    3                    THE COURT:  If you can't respond precisely, you

11:03:39    4    need to tell us.

11:03:40    5                    THE WITNESS:  It's kind of why I'm making this

11:03:42    6    point earlier.

11:03:42    7                    THE COURT:  All right.

11:03:44    8                    MR. JAMES:  Thank you, Your Honor.

11:03:45    9    BY MR. JAMES:

11:03:46    10   Q.    So you would agree with me that to the extent that

11:03:49    11   there are no side chain protecting groups identified in the

11:03:55    12   '333 patent claim sequence, there are likewise no such side

11:04:01    13   chain protecting groups identified in Claim 1 of the '7,803

11:04:04    14   patent; right?

11:04:05    15   A.    Now we're talking.  Yes.

11:04:07    16   Q.    Both sequences have D-Tic at the seven position;

11:04:17    17   right?

11:04:17    18   A.    Yes.

11:04:18    19   Q.    You spent a lot of time talking about that in your

11:04:20    20   testimony earlier; is that right?

11:04:21    21   A.    I did.

11:04:22    22   Q.    And both sequences have Oic at the eight position;

11:04:26    23   right?

11:04:26    24   A.    Correct.

11:04:27    25   Q.    So, and you offered the opinion that that sequence

Walensky - cross

| | | |
|---|---|---|
| 11:04:36 | 1 | would be understood to be from the claims in the context of |
| 11:04:40 | 2 | these claims bradykinin antagonists; right? |
| 11:04:43 | 3 | A.    Correct. |
| 11:04:43 | 4 | Q.    So they're both pointed at the same lock; right? |
| 11:04:48 | 5 | A.    I was asked to talk about Z and P, but I understand |
| 11:04:52 | 6 | your question. |
| 11:04:53 | 7 | Q.    Can you answer it?  They're both pointed at the same |
| 11:04:56 | 8 | lock, aren't they? |
| 11:04:57 | 9 | A.    I was asked to explain the compositions and what the |
| 11:05:00 | 10 | meaning of Z and P is.  And if you read beyond the claim, |
| 11:05:03 | 11 | then, yes. |
| 11:05:05 | 12 | Q.    The information in the -- well, let me withdraw that. |
| 11:05:13 | 13 | The only difference between the obviousness-type |
| 11:05:17 | 14 | double patenting reference claim, the '7,803 patent, Claim |
| 11:05:23 | 15 | 1, and Claim 14 of the '333 patent, the only difference is |
| 11:05:27 | 16 | Fmoc; right? |
| 11:05:28 | 17 | A.    In that example. |
| 11:05:29 | 18 | Q.    And you spent some time -- |
| 11:05:44 | 19 | THE COURT:  Mr. James, is this example directly |
| 11:05:47 | 20 | from the patent claims, the one that we're looking at? |
| 11:05:49 | 21 | MR. JAMES:  Yes, Your Honor.  If we could back |
| 11:05:52 | 22 | up one to DDX-5-1, Mr. Chase. |
| 11:05:59 | 23 | So, Your Honor, the witness and I agreed that if |
| 11:06:02 | 24 | you take from the '7,803 claims, if you take the very |
| 11:06:06 | 25 | first option, this is exactly the sequence you get there, |

Walensky - cross

11:06:09    1    and from the '333 patent claim, that you have the same

11:06:12    2    sequence.

11:06:13    3              THE COURT:   Okay.

11:06:13    4    BY MR. JAMES:

11:06:17    5    Q.    You spent some time in your testimony talking about

11:06:19    6    how nobody of skill in the art would have selected at the

11:06:23    7    seven position a conformationally contained amino acid like

11:06:29    8    D-Tic based on what was known at the time; right?

11:06:31    9    A.    Correct.

11:06:46   10    Q.    But in our case here, D-Tic has already been selected

11:06:49   11    in that claim, hasn't it?

11:06:51   12    A.    It depends what time and what knowledge you are

11:06:53   13    allowed to know about when you are making the answer to that

11:06:56   14    question.

11:06:56   15    Q.    The comparison that we are making here in this

11:07:00   16    obviousness-type double patenting case is between these

11:07:03   17    claims, and the selection of D-Tic at Position 7 has already

11:07:08   18    been made there.   Right?

11:07:09   19    A.    No.  My understanding of my decision and opinion based

11:07:13   20    upon the analysis is that I am supposed to take the explicit

11:07:17   21    claim language from '7,803, put it into the prior art, and

11:07:21   22    then answer the question, is the claim language in Claim 14

11:07:26   23    of the '333 patent invalid based upon the '7,803 language in

11:07:31   24    the context of the prior art.

11:07:34   25              That's what I was asked to render an opinion on.

Walensky - cross

| 11:07:37 | 1 | Q.    So you were looking at whether or not D-Tic and Oic, |
| 11:07:40 | 2 | the use of D-Tic and Oic, would have been obvious over the |
| 11:07:45 | 3 | prior art.  Right? |
| 11:07:45 | 4 | A.    No.  Taking the claim language from '7,803 and putting |
| 11:07:49 | 5 | that in the context of the prior art, that is what I was |
| 11:07:55 | 6 | asked to do.  It is about what information you are allowed |
| 11:07:57 | 7 | to use to analyze, to answer the question that you are |
| 11:07:59 | 8 | asking me. |
| 11:08:01 | 9 |        That has to be defined. |
| 11:08:02 | 10 | Q.    The information that we have in front of us, comparing |
| 11:08:06 | 11 | these two claims, is that we start with D-Tic at the 7 |
| 11:08:10 | 12 | position and Oic at the 8 position.  Right? |
| 11:08:13 | 13 | A.    Yes. |
| 11:08:13 | 14 | Q.    And those are both conformationally constrained amino |
| 11:08:17 | 15 | acids.  Right? |
| 11:08:18 | 16 | A.    Yes. |
| 11:08:18 | 17 | Q.    And they are exactly the same amino acids in Claim 14 |
| 11:08:24 | 18 | of the '333 patent.  Right? |
| 11:08:26 | 19 | A.    Yes.  But you are asking me to compare them on a slide |
| 11:08:28 | 20 | but you are not -- |
| 11:08:29 | 21 | Q.    I am just asking you whether you agree or not that |
| 11:08:32 | 22 | it's the very same amino acids at the 7 and 8 position of |
| 11:08:37 | 23 | those two claims. |
| 11:08:39 | 24 | A.    What's on the slide is the same.  We all agree to |
| 11:08:42 | 25 | that.  I am pointing out the analysis question, I am not a |

Walensky - cross

11:08:44   1    lawyer, but the analysis question is actually a different

11:08:47   2    question than what you are asking.

11:08:49   3                    THE COURT:  I think what you should anticipate

11:08:50   4    is that counsel for plaintiff will ask some followup

11:08:55   5    questions.  So you don't need to be concerned.

11:08:58   6                    THE WITNESS:  Okay.

11:09:00   7                    MR. JAMES:  Thank you, Your Honor.

11:09:01   8    BY MR. JAMES:

11:09:02   9    Q.    So looking at this difference between these two

11:09:05   10   claims, I think we agreed a moment ago that the only

11:09:08   11   difference between these two claims is the presence of this

11:09:11   12   Fmoc.  And in January of 1989, a person of ordinary skill in

11:09:20   13   the art would have known how to remove an Fmoc from the

11:09:24   14   N-terminus of Fmoc icatibant?

11:09:30   15   A.    During the construction of a peptide, yes, with that

11:09:33   16   qualification.

11:09:33   17   Q.    I believe what you said was we shouldn't be fooled,

11:09:38   18   that Fmoc can do two things.

11:09:41   19   A.    Correct.

11:09:41   20   Q.    Fmoc can be put on and taken off and put on and taken

11:09:46   21   off during construction of a peptide?

11:09:48   22   A.    Correct.

11:09:48   23   Q.    But it can also be left on at the end.  Right?

11:09:51   24   A.    On purpose.

11:09:52   25   Q.    But it is the very same Fmoc.  Right?

Walensky - cross

11:09:54    1    A.      Correct.

11:09:54    2    Q.      You could take it off, just like you could take it off

11:09:58    3    every other time during the synthesis of the peptide if you

11:10:01    4    wanted to.   Right?

11:10:01    5    A.      You are oversimplifying and conflating the two roles.

11:10:04    6    Q.      My question is, you could do it if you wanted to.

11:10:08    7    Right?

11:10:08    8    A.      In a particular context.   I must be precise.

11:10:20    9    Q.      It's true, is it not, that in a typical Fmoc synthesis

11:10:25   10    process, the Fmoc -- the Fmoc amino acids are put on one at

11:10:31   11    a time and every single time the Fmoc is taken off as you

11:10:35   12    build up that peptide chain.   Right?

11:10:38   13    A.      Not every time, because at the last time it was not.

11:10:43   14    Again, we can't oversimplify.   During peptide synthesis, you

11:10:47   15    are absolutely correct, on-off, on-off, during the

11:10:50   16    construction of peptides.   We don't disagree there.

11:10:53   17    Q.      And the portion of taking the Fmoc off of the amino

11:11:00   18    acid is carried out by exposure to a weak base that we call

11:11:04   19    piperidine.   Right?

11:11:06   20    A.      Correct.

11:11:06   21    Q.      If you exposed Fmoc-icatibant, like we have put up

11:11:11   22    here from Claim 1 of the '7,803 patent, to the weak base

11:11:17   23    piperidine, that Fmoc would come right off, wouldn't it?

11:11:20   24    A.      Tricky question, but that is not a reaction that is

11:11:23   25    done.   In the context -- this goes back, Your Honor, to my

11:11:27    1    clarification about peptides being, agreeing that peptide is

11:11:31    2    the final product with no protecting groups.  You are trying

11:11:34    3    to apply a chemical reaction that is done during peptide

11:11:37    4    synthesis to a peptide that is a final product.

11:11:40    5          The answer to that more precise question would

11:11:42    6    be no.

11:11:43    7    Q.    Dr. Walensky, I think what you are saying is that, if

11:11:49    8    you wanted to, you could leave the Fmoc on and it might have

11:11:52    9    some effect.  Right?

11:11:54   10    A.    The literature says that it does, yes.

11:11:55   11    Q.    But if you wanted to take it off, is it not true that

11:11:59   12    you could also do that?

11:12:00   13    A.    Not from that, what you picture on the slide.

11:12:02   14    Q.    You are saying you could not take the Fmoc off.  If

11:12:06   15    you exposed it to piperidine, the Fmoc would come off,

11:12:08   16    wouldn't it?

11:12:10   17    A.    No.  I am saying that a POSA, before January of 1989,

11:12:14   18    considering the question of would you remove Fmoc from that

11:12:17   19    peptide in its current form, the answer is no.

11:12:20   20    Q.    I understand it is your position that a POSA would not

11:12:24   21    take it off.  My question is a little different.  My

11:12:26   22    question is, if a person of skill in the art decided that

11:12:30   23    they wanted to take it off, they would have known how.

11:12:33   24    Right?

11:12:34   25    A.    Before the peptide was finished.  And we can keep

Walensky - cross

11:12:36   1   doing this.  But my opinion is going to be the same.  It

11:12:40   2   would be taken off before the peptide is finished.  That's

11:12:42   3   what the literature says.  You know what?  It hasn't

11:12:44   4   changed.

11:12:45   5            THE COURT:  After the peptide is finished could

11:12:47   6   a POSA, in the physical world, remove the Fmoc?

11:12:49   7            THE WITNESS:  It is not done in automated solid

11:12:54   8   phase peptide systems.

11:12:55   9            THE COURT:  Understood.  I think Mr. James was

11:12:56   10  trying to get at another point.  In the physical world would

11:12:59   11  a POSA be able to do that?

11:13:00   12            THE WITNESS:  That is a great question.  In the

11:13:02   13  physical world, if you hand me that peptide right now and I

11:13:06   14  threw in base, the Fmoc would probably fall off.  No one

11:13:09   15  would ever do that, there is actually a reason no one would

11:13:12   16  do it.

11:13:13   17            I haven't seen an example, maybe you will show

11:13:15   18  me one, but I haven't seen an example in any of the material

11:13:18   19  that I have reviewed in this case nor any of the material

11:13:21   20  that I have reviewed ever since becoming a peptide chemist

11:13:23   21  that that reaction would be done that way.

11:13:26   22            Let me answer why.  I think it's a very

11:13:28   23  important point.

11:13:29   24            THE COURT:  Well, I don't want to hijack Mr.

11:13:33   25  James's examination.

Walensky - cross

11:13:34    1          THE WITNESS:  Just to finish my answer --

11:13:37    2          THE COURT:  Doctor, let Mr. James pick up at

11:13:40    3  this point.

11:13:41    4  BY MR. JAMES:

11:13:41    5  Q.    So we are all on the same page, Dr. Walensky, if you

11:13:56    6  have Fmoc-icatibant, regardless of the context, if you

11:14:03    7  exposed it to a weak base, the Fmoc would come off.

11:14:08    8  Correct?

11:14:09    9  A.    You and I are not going to agree on the answer to that

11:14:12   10  question.  So I can tell you that you can create chemistry

11:14:16   11  for a nonrealistic world, what is done and not done.  We can

11:14:19   12  talk in the realm of fantasy.  And I am happy to answer your

11:14:23   13  question in the realm of fantasy.

11:14:25   14          I thought I was here to answer your question in

11:14:27   15  the realm of reality.  The answer in the realm of reality is

11:14:30   16  no.  In the realm of fantasy, could that possibly ever

11:14:34   17  happen if you just threw base into a final product?  That

11:14:37   18  could happen, and a whole lot of other things, which is why

11:14:41   19  it is not done.

11:14:41   20  Q.    Let's just go back to Claim 1 of the '7,803 patent for

11:14:46   21  a moment, Mr. Chase.

11:14:50   22          Now, I am correct that the words final product

11:14:54   23  don't appear anywhere in that claim, do they?

11:14:57   24  A.    That's correct.  The patent is claiming a peptide of

11:14:59   25  that specific and unequivocally clear composition.

Walensky - cross

11:15:03    1    Q.    Can we look at Breipohl, that is DTX-60, at Page 4.  I

11:15:11    2    believe this is a reference you have looked at in the course

11:15:14    3    of your studies in this case.  Right?

11:15:16    4    A.    Let me see here.

11:15:27    5          Yes.

11:15:27    6    Q.    And I recognize that it's a different peptide.  But at

11:15:41    7    the top of this page, there is a reaction arrow.  Correct?

11:15:46    8    A.    Are we on Page 19?

11:15:48    9    Q.    Yes.  Page 19, I believe Page 4 of the exhibit, there

11:15:52   10    is a reaction arrow there.  Right?

11:15:53   11    A.    Yes.

11:15:54   12    Q.    And it's talking about adding Fmoc protected amino

11:16:00   13    acids to the chain.  Right?

11:16:02   14    A.    Yes.

11:16:02   15    Q.    And it says there are 23 cycles there.  Right?

11:16:07   16    A.    Yes.

11:16:07   17    Q.    And in those 23 cycles, 20 percent piperidine is

11:16:15   18    added.  Right?

11:16:15   19    A.    Correct.

11:16:15   20    Q.    So in the real world, in every single one of those 23

11:16:19   21    cycles, that piperidine knocked that Fmoc right off the end

11:16:23   22    of the peptide, didn't it?

11:16:26   23    A.    We agree perfectly on that.  Peptide under

11:16:29   24    construction.

11:16:29   25    Q.    So let's look at the '7,803 patent specification.

Walensky - cross

| | | |
|---|---|---|
| 11:16:39 | 1 | Mr. Chase, if we could put up Column 1. |
| 11:16:44 | 2 | At the top of Column 1, Dr. Walensky -- you have |
| 11:16:52 | 3 | read the specification of the '7,803 patent.  Right? |
| 11:16:55 | 4 | A.    I have. |
| 11:16:55 | 5 | Q.    You see in the third paragraph from Lines 9 to 11 |
| 11:17:02 | 6 | there is a reference right about Line 10, European Patent |
| 11:17:06 | 7 | Application No. 370,453.  Do you see that? |
| 11:17:10 | 8 | A.    I do. |
| 11:17:10 | 9 | Q.    You recognize that as the European equivalent of the |
| 11:17:12 | 10 | '333 patent.  Right? |
| 11:17:15 | 11 | A.    If you tell me that's what it is. |
| 11:17:16 | 12 | Q.    So you don't know whether or not that is what it is? |
| 11:17:19 | 13 | A.    I don't know all the numbers, no. |
| 11:17:20 | 14 | Q.    You would agree with me, though, that the inventors of |
| 11:17:23 | 15 | the '7,803 patent, they started out with, one of the |
| 11:17:28 | 16 | compounds they started out with was icatibant.  Right? |
| 11:17:31 | 17 | A.    I don't know that. |
| 11:17:32 | 18 | Q.    Let's look at Example 1, Mr. Chase. |
| 11:17:57 | 19 | I will help you.  It's in your binder there, Dr. |
| 11:18:02 | 20 | Walensky, if you want to look at it, I can direct you to it |
| 11:18:05 | 21 | while we are finding it on the screen. |
| 11:18:24 | 22 | It's in Column 18, it begins at Line, I think |
| 11:18:29 | 23 | that's 43.  And in this example, it talks about the assembly |
| 11:18:37 | 24 | of Fmoc-D-Arginine-Arginine-Proline-hydroxyproline-glycine- |
| 11:18:46 | 25 | thienylalanine-serine-D-Tic-Oic-Arginine-Hydroxyl.  Right? |

Walensky - cross

11:18:55  1   A.   Column 18?

11:18:56  2   Q.   Column 18.

11:18:57  3   A.   Got it.

11:19:25  4            (Pause.)

11:19:33  5   Q.   Are you there?

11:19:34  6   A.   Yes.

11:19:35  7   Q.   That is Fmoc-icatibant.  Correct?

11:19:41  8   A.   It appears to be.

11:19:41  9   Q.   If we look at Column 10, Lines 31 to 33 --

11:19:56  10  A.   We are going back to Column 10?

11:19:58  11  Q.   Yes.

11:20:00  12  A.   Yes.

11:20:00  13  Q.   There it talks about urethane -- we are at about Line

11:20:08  14  31 -- urethane protective groups such as, for example, what

11:20:13  15  they refer to as Boc or Fmoc are used as temporary amino

11:20:19  16  protective groups.  Right?

11:20:20  17  A.   Correct.

11:20:21  18  Q.   There they are talking about during the peptide

11:20:24  19  synthesis.  Correct?

11:20:25  20  A.   Correct.

11:20:25  21  Q.   And if you look at Column 12, Mr. Chase, if you could

11:20:29  22  pull up Column 12, Line 65, to Column 13, Line 1 --

11:20:40  23  A.   What?

11:20:41  24  Q.   Column 12.  We will pull it up on the screen for you.

11:20:46  25  Column 12, Line 65 to Column 13, Line 1, there they are

Walensky - cross

| | | |
|---|---|---|
| 11:20:51 | 1 | talking about when they use the Fmoc protective group with |
| 11:20:59 | 2 | their Model 430A automatic peptide synchronizer.  Right? |
| 11:21:04 | 3 | A.    Yes, I have used that very one. |
| 11:21:06 | 4 | Q.    And that is a machine where you put in a sequence that |
| 11:21:13 | 5 | you want and it spits it out for you.  Right? |
| 11:21:17 | 6 | A.    It's a little more complicated than that.  But, sure. |
| 11:21:21 | 7 | Q.    Then if we look at Column 13, Lines 13 to 15 -- one |
| 11:21:32 | 8 | more thing here, you will see that Column 13, you will see |
| 11:21:46 | 9 | it says that the Fmoc protective group was eliminated with a |
| 11:21:50 | 10 | 20 percent strength solution of piperidine in DMF in the |
| 11:21:54 | 11 | reaction vessel.  Right? |
| 11:21:56 | 12 | A.    Correct. |
| 11:21:56 | 13 | Q.    So what this is teaching is that the Fmoc method could |
| 11:22:04 | 14 | be used with the automated synchronizer to make |
| 11:22:08 | 15 | Fmoc-icatibant.  Right? |
| 11:22:10 | 16 | A.    Yes. |
| 11:22:10 | 17 | Q.    And a person of skill, if they wanted to take off the |
| 11:22:14 | 18 | Fmoc, they could program the machine to do that at the end |
| 11:22:17 | 19 | of the synthesis as well.  Correct? |
| 11:22:19 | 20 | A.    That is correct, on the resin during the synthesis, if |
| 11:22:22 | 21 | that was the decision, to make it without it, absolutely. |
| 11:22:24 | 22 | Q.    So really, the only difference between those two |
| 11:22:28 | 23 | things would be punching the buttons in the machine.  Right |
| 11:22:32 | 24 | ? |
| 11:22:33 | 25 | A.    The only difference between those things is deciding |

11:22:35   1   what you want to make.  It's not about punching the buttons.

11:22:40   2   You punch the buttons to do what you want.  The only

11:22:43   3   decision is the scientist's decision to decide what they

11:22:46   4   want to make.

11:22:46   5          That's what you punch in the buttons.  If I want

11:22:49   6   to make a peptide that leaves the Fmoc on, then I program it

11:22:52   7   that way.  If I want to make a peptide that has it off, then

11:22:55   8   I program it a different way.

11:22:57   9          It's a computer program, a computer that's

11:23:00   10   attached to a machine.

11:23:01   11   Q.    So going back to what we were talking about earlier,

11:23:04   12   if one decided one wanted to make icatibant from

11:23:08   13   Fmoc-icatibant, one could do so?

11:23:10   14   A.    On the resin, yes.

11:23:12   15   Q.    You could do it off the resin as well, couldn't you?

11:23:16   16   A.    This is doing it on the resin.  So I am trying to

11:23:19   17   answer your question accurately.

11:23:20   18   Q.    I understand you want to stay -- you want to keep your

11:23:24   19   answer tied to that resin.  But I am asking you a different

11:23:28   20   question.  Whether it was on the resin or off the resin --

11:23:32   21   A.    Now you are asking --

11:23:33   22   Q.    If you decided you wanted to take Fmoc off of

11:23:39   23   Fmoc-icatibant to make icatibant, you could do so.  Right?

11:23:44   24   A.    No.  I am sorry.  I need to answer the question

11:23:47   25   precisely.

Walensky - cross

| 11:23:48 | 1 | THE COURT: Do your best, Doctor. |

THE COURT: Do your best, Doctor.

THE WITNESS: Even though there is a desire for me to be general and not precise. And I am kind of a precise guy.

He is asking me two questions. Am I allowed to answer the two questions?

THE COURT: I think it's one question.

BY MR. JAMES:

Q.    It's one question.

A.    It's one question if if you gloss over the fact that it's two, that's the problem. The answer to your first question is if you wanted to take the Fmoc off on the machine, if that was your desire, you would do so.

If you wanted to take the Fmoc off, off the machine, there is another way to do that that doesn't involve programming the machine. And if you would like me to explain how that works, that's a different answer to the same question, that is also chemically possible. But it's still not the answer that he wants me to say. But I am happy to explain it.

Q.    I think that we are on the same page, if you intended to make icatibant from Fmoc-icatibant, whether you had the Fmoc-icatibant on the resin or not on the resin, you could do so. Correct?

A.    As long as you continue to work on the peptide with

11:24:51  1    the resin.  You would have to do that with the resin to take

11:24:56  2    the Fmoc off if you wanted to not use the machine.  You can

11:25:00  3    definitely do that.  But you would still be taking the resin

11:25:03  4    off the machine and decide to do it manually.

11:25:05  5              The only reason that I want to be precise here,

11:25:08  6    besides the fact that it is important, is that I have done

11:25:11  7    it every way that you could imagine and so I want to be

11:25:14  8    precise on how you would do it and not to oversimplify so

11:25:17  9    that the wrong impression is given.

11:25:27  10             THE COURT:  I think essentially he has agreed

11:25:30  11   with you.

11:25:31  12             THE WITNESS:  What I have agreed with is you can

11:25:32  13   take the Fmoc group off, non-automatically, but still with

11:25:39  14   the resin --

11:25:40  15             THE COURT:  I think what I understand, Doctor,

11:25:41  16   is that wouldn't be your preference.

11:25:43  17             THE WITNESS:  I don't think it would be anyone's

11:25:45  18   preference.

11:25:45  19             THE COURT:  Or any POSA's preference.

11:25:47  20             THE WITNESS:  But I would like to make it clear

11:25:49  21   that if you want to do it old school, you could do it

11:25:53  22   non-automated old school.  But it is still on the resin or

11:25:57  23   even off the resin with protective groups.

11:25:59  24             That first example he pointed to was an example

11:26:01  25   of that.  But he stopped short of going to the end of that

11:26:05    1    reaction in that first article that he took me to.  We went

11:26:08    2    through the first half of the reaction scheme.  But he

11:26:10    3    stopped.  If we went through the rest of the reaction

11:26:14    4    scheme, we could talk about what he is asking.

11:26:17    5    BY MR. JAMES:

11:26:17    6    Q.    Dr. Walensky, as part of your work on this case, you

11:26:20    7    relied on an expert report by Dr. Jacobsen.  Correct?

11:26:25    8    A.    Correct.

11:26:26    9    Q.    Did you ever look at Dr. Jacobsen's deposition

11:26:29   10    transcript in this case?

11:26:30   11    A.    I don't think I did.

11:26:31   12    Q.    I would like to show you a very short excerpt from

11:26:35   13    that.

11:26:36   14            MR. JAMES:  I would like to hand it up, with the

11:26:38   15    Court's permission.

11:26:39   16            THE COURT:  To him, yes.  You are going to show

11:26:42   17    it on the screen.

11:26:46   18            MR. JAMES:  Yes.

11:26:51   19            THE WITNESS:  I wouldn't say I relied on it, but

11:26:53   20    I am aware of it.  I relied on my own opinions.

11:26:57   21    BY MR. JAMES:

11:26:58   22    Q.    You cited to his expert report in your expert report?

11:27:04   23    A.    Yes.  I am aware of him being a chemist and that he

11:27:06   24    provided information.  I am a peptide chemist.

11:27:09   25    Q.    Let's put up a very short excerpt from his deposition

| | | |
|---|---|---|
| 11:27:13 | 1 | transcript.  I will give you the citation. |
| 11:27:19 | 2 | Mr. Chase, if you could put up -- I will direct |
| 11:27:32 | 3 | you, Dr. Walensky. |
| 11:27:54 | 4 | MR. JAMES:  My apologies, Your Honor.  I just |
| 11:27:56 | 5 | didn't write down that page number in my outline. |
| 11:28:00 | 6 | (Pause.) |
| 11:28:05 | 7 | BY MR. JAMES: |
| 11:28:06 | 8 | Q.    All right.  Dr. Walensky, it's Page 198, and beginning |
| 11:28:11 | 9 | at line 13, and then running down to line 3 of Page 199. |
| 11:28:20 | 10 | And Dr. Jacobsen there said, he's asked: |
| 11:28:25 | 11 | "So going back to Paragraph 60 of your report -- |
| 11:28:27 | 12 | "Answer:  Yes. |
| 11:28:30 | 13 | "Question:  -- and that structure that you have |
| 11:28:31 | 14 | listed at the top there, Fmoc, D-Arginine, arginine, |
| 11:28:36 | 15 | proline, hydroxyproline, glycine, thienylalanine, serine, |
| 11:28:41 | 16 | D-Tic, Oic, arginine hydroxyl, that was one of the |
| 11:28:46 | 17 | structures that was in Claim 1 of the '7,803 patent, |
| 11:28:50 | 18 | correct? |
| 11:28:51 | 19 | "Answer:  Correct." |
| 11:28:51 | 20 | Right?  And so just so we're on the same page, |
| 11:28:56 | 21 | Dr. Walensky, there's no resin attached in that, to that |
| 11:29:00 | 22 | hydroxyl N in that question; right? |
| 11:29:02 | 23 | A.    Well, I don't know how you asked him the question.  I |
| 11:29:05 | 24 | mean, what his understanding of your question was. |
| 11:29:07 | 25 | Q.    There's no resin mentioned in that testimony, is |

Walensky - cross

11:29:10    1    there?

11:29:10    2    A.      You didn't mention it.   You gave a composition.

11:29:15    3    Q.      And then it says, as of 1989, a person of ordinary

11:29:17    4    skill in the art could remove the Fmoc from that structure

11:29:21    5    to obtain icatibant; correct?   And the answer was, yeah,

11:29:24    6    they would be familiar with the methodology to do that.

11:29:27    7    A.      If that --

11:29:28    8    Q.      You would agree with that; is that correct?

11:29:29    9    A.      Only if that was the plan to do that from the purposes

11:29:32   10    of constructing that peptide.   You're reading into that, I

11:29:35   11    believe, that, you know, you could go from A arrow to B.

11:29:39   12    That's not my read of what he's saying.   He's saying if you

11:29:41   13    wanted to make that peptide without the Fmoc, would a POSA

11:29:45   14    know how to do that?   Sure.   They would program in the

11:29:48   15    computer, the computer synthesizer differently.   I think you

11:29:50   16    are reading into that the question of can you chemically go

11:29:53   17    from A to B with that exact structure in a reaction vessel.

11:29:56   18    That's a little bit more than what you are asking.   You're

11:29:58   19    generally asking him, can you make a peptide with or without

11:30:02   20    Fmoc?   Sure.

11:30:03   21    Q.      Thank you.

11:30:08   22            I'd like to now turn to demonstrative 3.7 that

11:30:12   23    you put up on the screen earlier.   And you said that, you're

11:30:16   24    talking about the Z group in this slide.   Is that correct?

11:30:19   25    A.      Yes.

Walensky - cross

| | | |
|---|---|---|
| 11:30:19 | 1 | Q.    And you said that the common chemical feature of all |
| 11:30:23 | 2 | the Z groups indicates permanence? |
| 11:30:26 | 3 | A.    Right. |
| 11:30:26 | 4 | Q.    We look at the next demonstrative, which is 3.8.  And |
| 11:30:32 | 5 | I believe that you pointed out that although all of the |
| 11:30:38 | 6 | other groups are acyl groups, in fact, the Fmoc is a |
| 11:30:47 | 7 | urethane; is that correct? |
| 11:30:48 | 8 | A.    Correct. |
| 11:30:48 | 9 | Q.    Now, you talked about some reason why the prior art |
| 11:31:04 | 10 | would have suggested leaving on the Z group; right? |
| 11:31:07 | 11 | A.    Correct. |
| 11:31:07 | 12 | Q.    Now, there were prior art bradykinin antagonists in |
| 11:31:15 | 13 | the literature; is that correct? |
| 11:31:17 | 14 | A.    Correct. |
| 11:31:17 | 15 | Q.    And one of those, I think you're familiar with, is |
| 11:31:21 | 16 | B-3824? |
| 11:31:22 | 17 | A.    Correct. |
| 11:31:22 | 18 | Q.    So if we could look at DDX-2-77, just so we have |
| 11:31:30 | 19 | something to facilitate the discussion, Doctor.  We have |
| 11:31:37 | 20 | B-3824 from the '993 patent, Example 20, the sequence |
| 11:31:42 | 21 | there at the bottom compared to Claim 1 of the '7,803 |
| 11:31:48 | 22 | patent. |
| 11:31:49 | 23 |          Do you see that? |
| 11:31:49 | 24 | A.    I do. |
| 11:31:50 | 25 | Q.    Okay.  And Claim 1 of the '7,803 patent, we've said |

Walensky - cross

11:31:56  1   that the N protecting genus is at the Z group, and that's

11:31:59  2   all the groups that you talked about in your testimony;

11:32:01  3   right?

11:32:01  4   A.      Correct.

11:32:02  5   Q.      And then the P group; right?

11:32:04  6   A.      Correct.

11:32:04  7   Q.      Now, B-3824 is an example of a prior art bradykinin

11:32:08  8   antagonist that was potent; right?

11:32:12  9   A.      Correct.

11:32:12  10  Q.      And it has a D-arginine at the zero position?

11:32:17  11  A.      Correct.

11:32:18  12  Q.      And Claim 1 of the '7,803 patent, one of the options

11:32:22  13  you have there is D-arginine at the zero position?

11:32:24  14  A.      Correct.

11:32:25  15  Q.      And, in fact, all the rest is identical except for

11:32:30  16  the difference between the DPhe and the D-Tic, and the Thi

11:32:37  17  and the Oic?

11:32:37  18  A.      Yes.

11:32:37  19  Q.      You would agree with me that B-3824 is an example of a

11:32:42  20  bradykinin antagonist in the prior art that didn't have a Z

11:32:45  21  or a P group?

11:32:46  22  A.      Correct.  I mean, the bradykinin peptide doesn't have

11:32:52  23  a Z or a P group either, but it's what God made for our

11:32:55  24  bodies.

11:32:56  25  Q.      Well, if we look at the '963 patent, you talked about

Walensky - cross

11:32:59   1   the '963 patent in your direct testimony; correct?

11:33:02   2   A.    I did.

11:33:03   3   Q.    And if we could, Mr. Chase, if you could put up Column

11:33:07   4   4 at the top.  Well, before we look at that top, if we could

11:33:16   5   look at the bottom of Column 3.

11:33:17   6            I believe, Dr. Walensky, you talked about the

11:33:19   7   table at the bottom of Column 3; right?

11:33:22   8   A.    I did.

11:33:22   9   Q.    And the N that you are pointing out there, that's the

11:33:27   10  zero position; right?

11:33:29   11  A.    So that's --

11:33:36   12  Q.    It's on your screen as well?

11:33:37   13  A.    That's the position that they are calling before the

11:33:39   14  first amino acid, yes.  I mean, people use zero minus one

11:33:44   15  minus two in different ways.  Zero pretty much means if you

11:33:48   16  want to be very general, whatever comes before your amino

11:33:50   17  acid sequence.

11:33:51   18  Q.    Well, in this particular case, they are identifying N

11:33:55   19  at the zero position; right?  It says N-0.  Correct?

11:34:01   20  A.    Yes.  I'm just pointing out that we --

11:34:03   21  Q.    In fact, I will ask some questions, and you'll

11:34:06   22  get a chance on redirect to say what you want to say,

11:34:09   23  Doctor.

11:34:09   24            And then if you look at A through, A1 through

11:34:15   25  A9, those are the nine positions that correspond to the

Walensky - cross

11:34:17   1    sequence of bradykinin; right?

11:34:19   2    A.    Okay.

11:34:20   3    Q.    That's correct, isn't it?

11:34:23   4    A.    What are -- you are not showing me any residue.  Is A1

11:34:27   5    the arginine or is A1 the arginine?

11:34:29   6    Q.    I believe A1 is the arginine.

11:34:33   7    A.    The arginine or the D-arginine?

11:34:35   8    Q.    The arginine?

11:34:36   9    A.    The arginine of a natural sequence?

11:34:38   10   Q.    Yes.

11:34:38   11   A.    Okay.

11:34:39   12   Q.    And if you, you can feel free to look at the patent to

11:34:44   13   correct me if I'm wrong.  A1 is the arginine?

11:34:46   14   A.    Okay.  I want to be sure.  Hold on.

11:34:49   15   Q.    You can look right there in Column 4, in the second

11:34:52   16   paragraph, it talks about A1; right?

11:34:55   17   A.    Yes.  So that's the natural beginning arginine without

11:35:00   18   the D-Arg in front.  Okay.  Got you.

11:35:03   19   Q.    So I think we're on the same page now that N is the

11:35:07   20   zero position.

11:35:08   21   A.    Yes.

11:35:08   22   Q.    Right?

11:35:09   23   A.    Yes.

11:35:10   24   Q.    And in what we just looked at earlier, that was where

11:35:13   25   the D-arginine was in B-3824; right?

584

Walensky - cross

| | | |
|---|---|---|
| 11:35:16 | 1 | A.    Yes. |
| 11:35:16 | 2 | Q.    Okay.  Now, let's look at what it says about the N. |
| 11:35:20 | 3 | It says at the top of Column 4 that the N can be a D- or |
| 11:35:27 | 4 | L-amino acid such as D-Arg, D-lysine, or L-thienylalanine, |
| 11:35:34 | 5 | an N-terminal enzyme protecting group selected from the |
| 11:35:37 | 6 | group consisting of, comprising acyl-type protecting groups, |
| 11:35:43 | 7 | aromatic urethane-type protecting groups, alkyl-type |
| 11:35:48 | 8 | protecting groups, or alternately, N is a di- or polypeptide |
| 11:35:52 | 9 | containing amino acids of the D or L configuration, such as |
| 11:35:57 | 10 | Lys-Lys, Met-Lys or Gly-Arg-Met-Lys; right? |
| 11:36:01 | 11 | A.    Yes. |
| 11:36:01 | 12 | Q.    Now, it doesn't say it can be D-arginine and an acyl |
| 11:36:05 | 13 | protecting group; correct? |
| 11:36:06 | 14 | A.    Actually, not really, because, can I explain why I say |
| 11:36:10 | 15 | no to that? |
| 11:36:11 | 16 | Q.    The grammar of the sentence is that it's an or, it's |
| 11:36:14 | 17 | an alternate; is that correct? |
| 11:36:15 | 18 | A.    Let me just point out - -- |
| 11:36:17 | 19 | Q.    Am I correct? |
| 11:36:18 | 20 | A.    It's all or. |
| 11:36:20 | 21 | Q.    It's all or.  Yes? |
| 11:36:21 | 22 | A.    At the end of the last or, it listed a whole bunch of |
| 11:36:26 | 23 | choices which are more than one thing.  I need to answer |
| 11:36:28 | 24 | your question in an honest, truthful, precise way.  You are |
| 11:36:31 | 25 | trying to say there's only one thing out there and my answer |

Walensky - cross

11:36:35   1   to that is no.  And even if there are ors, if you look at

11:36:39   2   what the ors are, you look at the last or.  Gly-Arg-Met-Lys.

11:36:45   3   How many amino acids is that?  Four.  Can you have more than

11:36:50   4   one thing?  My answer is yes.

11:36:51   5   Q.     My question wasn't, Doctor, whether or not there could

11:36:53   6   be more than one thing there.  My question was:  It doesn't

11:36:53   7   disclose D-Arg and an acyl-type protecting group; is that

11:36:58   8   correct?

11:36:58   9   A.     Correct, but it implies that you could have more.

11:37:02  10   Q.     It doesn't suggest D-arginine and a urethane-type

11:37:05  11   protecting group; right?

11:37:06  12   A.     In this example, it doesn't, but this is not the only

11:37:10  13   option here.

11:37:14  14   Q.     If we look at Table 4, Column 16, I think you drew the

11:37:18  15   Court's attention to that.  These are examples of bradykinin

11:37:26  16   antagonists that were tested in the patent; right?

11:37:29  17   A.     Correct.

11:37:30  18   Q.     And you can look at Table 4 and you can look at

11:37:33  19   Table 5, and can you just confirm for me that there's not a

11:37:36  20   single example there where there is an acyl protecting group

11:37:41  21   on the N-terminus of a D-agonism?

11:37:44  22   A.     Not in this particular patent, but there are

11:37:46  23   definitely in others and also other literature before

11:37:49  24   1989.

11:37:50  25   Q.     Now, you pointed the Judge to some examples in Table

Walensky - cross

11:38:01   1   5; is that correct?

11:38:02   2   A.    Correct.

11:38:02   3   Q.    And in particular, Mr. Chase, if you could in Table 5

11:38:08   4   bring out Examples 55, 56 and 57.  Let's expand those,

11:38:22   5   please.

11:38:22   6          And these are three examples you brought to the

11:38:24   7   Court's attention; right?

11:38:26   8   A.    I believe I was talking about two of them.

11:38:32   9   Q.    Well, I wrote it down.  You talked about 55, 56 and

11:38:37  10   57?

11:38:37  11   A.    No.

11:38:38  12   Q.    Sorry.  I don't have a transcript.

11:38:39  13   A.    No, I didn't.  I talked about 51 and 52 and I compared

11:38:43  14   55 and 56.

11:38:45  15   Q.    Okay.  Well, you compared 55 and 56.  Yes.

11:38:49  16   A.    But that's the comparison.

11:38:50  17   Q.    Right.  Okay.  Right.  So you did not talk about 57;

11:38:56  18   right?

11:38:56  19   A.    No, but I'm happy to if you would like.

11:38:58  20   Q.    Okay.  So let's look at 55.  That's the sequence.

11:39:01  21   That's a BK antagonist that does not have an N-terminal acyl

11:39:07  22   or D-arginine; right?

11:39:09  23   A.    Correct.

11:39:09  24   Q.    And it shows, just to shortcut things here, a little

11:39:15  25   bit of arginine; right?

Walensky - cross

11:39:17  1   A.    Correct.

11:39:18  2   Q.    That's what those positive numbers mean over there in

11:39:20  3   the first two columns.  And it's also broken down; is that

11:39:25  4   right?

11:39:25  5   A.    Correct.

11:39:25  6   Q.    That's what the 61 percent means?

11:39:27  7   A.    Yes.

11:39:28  8   Q.    And then 56 is that very same sequence with the acyl

11:39:33  9   group on it?

11:39:34  10  A.    Right.

11:39:35  11  Q.    And you get antagonism; right?

11:39:37  12  A.    Correct.

11:39:37  13  Q.    That's what IB means?

11:39:39  14  A.    Yes.

11:39:40  15  Q.    Right?  And then in 57, you have D-arginine at the

11:39:46  16  N-terminus of that same sequence; right?

11:39:48  17  A.    Yes.

11:39:49  18  Q.    And it accomplishes antagonism as well; right?

11:39:52  19  A.    Correct.

11:39:53  20  Q.    So it has the same effect according to this table that

11:39:57  21  putting on the acyl group did?

11:39:59  22  A.    In that one example, yes.  Now, when you say the same

11:40:05  23  effect, there's no way to know how different they are.

11:40:10  24  There's no data there.

11:40:11  25  Q.    The data -- well, all the data we have are that

Walensky - cross

| 11:40:14 | 1 | they're both antagonists; right? |
| 11:40:15 | 2 | A.    Right. |
| 11:40:16 | 3 | Q.    And either they didn't test it or it wasn't broken |
| 11:40:18 | 4 | down at all; right? |
| 11:40:19 | 5 | A.    You got it. |
| 11:40:20 | 6 | Q.    So let's look at Barabe.  I think that you brought |
| 11:40:25 | 7 | Barabe to the Court's attention as well.  Right? |
| 11:40:30 | 8 | A.    Yes, I did. |
| 11:40:31 | 9 | Q.    Okay.  It's the very last page of Barabe, the very |
| 11:40:41 | 10 | last paragraph? |
| 11:40:41 | 11 | A.    Do you have that in your book or should I go back to |
| 11:40:44 | 12 | mine? |
| 11:40:44 | 13 | Q.    I have it in my book.  It's JTX-39.  Oh, I don't.  I'm |
| 11:40:48 | 14 | sorry.  I don't. |
| 11:40:49 | 15 | A.    Okay. |
| 11:40:50 | 16 | Q.    It's in your binder. |
| 11:40:51 | 17 | A.    I've got it.  I'm with you. |
| 11:41:03 | 18 | Q.    Okay.  And we talked a little bit about this.  I just |
| 11:41:10 | 19 | want to make sure we're on the same page.  That there was |
| 11:41:13 | 20 | some sign of histamine release by these bradykinin |
| 11:41:16 | 21 | antagonists; right? |
| 11:41:18 | 22 | A.    Yes. |
| 11:41:18 | 23 | Q.    And so they acetylated the N-terminal amide; is that |
| 11:41:24 | 24 | right? |
| 11:41:24 | 25 | A.    Yes. |

Walensky - cross

11:41:24    1    Q.      That means they, to put it in parlance we've been

11:41:28    2    using, they added the acyl group to the N-terminus of

11:41:32    3    the peptide; right?  And here it was an acetyl group;

11:41:36    4    right?

11:41:36    5    A.      Yes.

11:41:36    6    Q.      Okay.  And acetyl group, that's not one of the groups

11:41:39    7    that's listed specifically in the Z group of '7,803 claim,

11:41:43    8    is it?

11:41:44    9    A.      It's actually within a bunch of them.

11:41:47   10    Q.      It's not one of the ones that's specifically

11:41:49   11    identified; correct?

11:41:50   12    A.      By itself, correct.

11:41:51   13    Q.      And what it says at the bottom is, after the

11:41:58   14    acetylation that they reduced that agonistic activity,

11:42:03   15    right, which was a good thing.  Right?

11:42:06   16    A.      They reduced the histamine release.  That was the good

11:42:09   17    thing.

11:42:09   18    Q.      Well, but they also, they had some agonistic activity

11:42:13   19    with the acetylation?

11:42:15   20    A.      They had the D-Arg for that.

11:42:17   21    Q.      They added some other changes to get rid of that

11:42:20   22    problem; right?

11:42:21   23    A.      Yes.

11:42:21   24    Q.      But it doesn't say anything about getting rid of that

11:42:24   25    catecholamine release problem?

Walensky - cross

| | | |
|---|---|---|
| 11:42:26 | 1 | A.    It does not speak to it. |
| 11:42:27 | 2 | Q.    Now, let's look at Bodanszky.  That's DTX-182.  You |
| 11:42:33 | 3 | also talked about Bodanszky; right? |
| 11:42:35 | 4 | A.    Yes. |
| 11:42:35 | 5 | Q.    Okay.  That's at Page JTX-15.31, and I think there are |
| 11:43:03 | 6 | two different exhibits of Bodanszky. |
| 11:43:22 | 7 | In your binder, DTX--- which -- you did DTX-182; |
| 11:43:27 | 8 | is that correct, for Bodanszky? |
| 11:43:31 | 9 | A.    I have it in your binder as, I have JTX-15. |
| 11:43:36 | 10 | Q.    That will work.  So we'll talk about JTX-15.  If you |
| 11:43:41 | 11 | turn to the page that in the lower right-hand corner has |
| 11:43:45 | 12 | FKIA-0032178 on it, which I believe is JTX-15.31. |
| 11:43:55 | 13 | A.    Yes. |
| 11:43:55 | 14 | Q.    Okay.  And you've pointed the Court to that paragraph |
| 11:43:58 | 15 | at the bottom of the page; right? |
| 11:43:59 | 16 | A.    Yes. |
| 11:44:00 | 17 | Q.    And in that, the sentence that you focused on was, for |
| 11:44:07 | 18 | instance, acetylation and benzoylation of amino groups is |
| 11:44:11 | 19 | impractical.  Right? |
| 11:44:13 | 20 | A.    Right. |
| 11:44:13 | 21 | Q.    And acetylation and benzoylation again means adding an |
| 11:44:17 | 22 | acetyl group or a benzoyl group to these amino groups; |
| 11:44:21 | 23 | right? |
| 11:44:22 | 24 | A.    Yes.  That's acylation. |
| 11:44:25 | 25 | Q.    It says acetylation.  It doesn't say acylation? |

Walensky - cross

| 11:44:29 | 1 | A.   Right.  I'm saying acylation is a general term for |
| 11:44:31 | 2 | both of those things. |
| 11:44:32 | 3 | Q.   Right.  But this is a more specific term, acetylation |
| 11:44:35 | 4 | and benzoylation? |
| 11:44:36 | 5 | A.   Yes.  Because it says, for instance.  It's an example. |
| 11:44:39 | 6 | Q.   But Fmoc is neither of those things, is it? |
| 11:44:41 | 7 | A.   Not those two. |
| 11:44:42 | 8 | Q.   And then, finally, you pointed the Court to the '204 |
| 11:44:49 | 9 | patent; right?  JTX-40? |
| 11:44:51 | 10 | A.   Yes. |
| 11:44:54 | 11 | Q.   And, in particular, you -- Mr. Chase, if you could |
| 11:45:04 | 12 | pull up Column 3, lines 1 to 10. |
| 11:45:11 | 13 | And, Dr. Walensky, the paragraph at the top |
| 11:45:15 | 14 | is what you brought to the Court's attention; is that |
| 11:45:17 | 15 | right? |
| 11:45:18 | 16 | A.   Yes. |
| 11:45:18 | 17 | Q.   And there's a discussion of N-terminal protecting |
| 11:45:23 | 18 | groups in that passage? |
| 11:45:24 | 19 | A.   Yes. |
| 11:45:25 | 20 | Q.   And there's no mention of Fmoc in that passage; |
| 11:45:29 | 21 | right? |
| 11:45:30 | 22 | A.   That's correct.  It doesn't exclude them though, |
| 11:45:32 | 23 | because it says, it is not limited to, and it lists them |
| 11:45:35 | 24 | all, and actually, the verbiage for Fmoc is oxycarbonyl. |
| 11:45:40 | 25 | You can see the Boc, the one after that, has the same |

Walensky - cross

11:45:44  1    group.

11:45:44  2    Q.    Well, Boc and Fmoc are different compounds?

11:45:46  3    A.    I'm just saying in terms of the class, the

11:45:48  4    oxycarbonyls are listed there as examples.

11:45:52  5    Q.    Again, it says at the end, it can be a D aminoacyl

11:45:57  6    residue?

11:45:58  7    A.    You got it.

11:46:02  8    Q.    And, again, the N protecting group here is in the

11:46:05  9    alternative, it can be this or that, one of these things;

11:46:09  10   right?

11:46:09  11   A.    Yes, it does.  It tells you that you can do it.

11:46:13  12   Q.    Now, you've talked a little bit about the fact that

11:46:25  13   if you were to take off -- you can take that down,

11:46:29  14   Mr. Chase.

11:46:29  15         If you were to take off the Z and P group of the

11:46:36  16   '7,803 claim, or just look at the peptide that would be left

11:46:38  17   over, that you wouldn't expect it to be a bradykinin

11:46:41  18   antagonist; right?

11:46:43  19   A.    If you took that in the context of the prior art and

11:46:46  20   you handed it to someone in January of 1989, then you would

11:46:49  21   not recognize that.  That was my opinion.

11:46:52  22   Q.    But it is your opinion that a person of skill in the

11:46:55  23   art would interpret the peptides of Claim 1 of the '7,803

11:47:00  24   patent to be bradykinin antagonists with modifications at

11:47:04  25   the N-terminus; right?

Walensky - cross

| | | |
|---|---|---|
| 11:47:07 | 1 | A.      '7,803? |
| 11:47:08 | 2 | Q.      Yes. |
| 11:47:08 | 3 | A.      If you read around -- if we're going outside the |
| 11:47:11 | 4 | specific language of the claim in the context, yes.  I mean, |
| 11:47:14 | 5 | you have this patent with a title that says the bradykinin |
| 11:47:16 | 6 | antagonist with N-terminal modification. |
| 11:47:19 | 7 | Q.      So you would only view it as a bradykinin antagonist |
| 11:47:22 | 8 | if you looked at the remainder of the claims of the patent. |
| 11:47:26 | 9 | Right? |
| 11:47:26 | 10 | A.      I want to be clear.  Are you asking me before 1989, |
| 11:47:31 | 11 | put in the context of the prior art or are you asking me |
| 11:47:35 | 12 | to look at them side by side?  That's two different |
| 11:47:37 | 13 | questions. |
| 11:47:43 | 14 | Q.      I think your testimony has been that you are offering |
| 11:47:54 | 15 | the opinion that you would view them as bradykinin |
| 11:47:58 | 16 | antagonists when you looked at the title and the |
| 11:48:00 | 17 | specification and the data in the patent.  Right? |
| 11:48:02 | 18 | A.      Yes, when I am analyzing the patent. |
| 11:48:11 | 19 | Q.      Now, you also brought the Court's attention to Claim 2 |
| 11:48:16 | 20 | of the '7,803 patent.  Right? |
| 11:48:18 | 21 | A.      Yes. |
| 11:48:18 | 22 | Q.      And if we could put up Claim 2, just for context, |
| 11:48:28 | 23 | Claim 1 of the '7,803 patent doesn't say anything about |
| 11:48:32 | 24 | administering the compound.  Right? |
| 11:48:34 | 25 | A.      That's correct. |

Walensky - cross

| | | |
|---|---|---|
| 11:48:36 | 1 | Q.    Claim 2 is a method claim.  Correct? |
| 11:48:40 | 2 | A.    Correct. |
| 11:48:41 | 3 | Q.    And it's a method for the treatment of inflammation, |
| 11:48:47 | 4 | et cetera, that's caused by bradykinin or peptides related |
| 11:48:54 | 5 | to bradykinin, which comprises administering the peptide of |
| 11:48:58 | 6 | the Formula I as claimed in Claim 1.  Right? |
| 11:49:01 | 7 | A.    Correct. |
| 11:49:01 | 8 | Q.    And based on Claim 2, a person of skill in the art |
| 11:49:08 | 9 | would understand that the peptides of Claim 1 had bradykinin |
| 11:49:13 | 10 | antagonist activity.  Right? |
| 11:49:14 | 11 | A.    It doesn't say that in that, no.  It says related to |
| 11:49:21 | 12 | bradykinin.  In terms of the explicit language, no, it |
| 11:49:24 | 13 | doesn't say that in that language you just read. |
| 11:49:25 | 14 | Q.    If you look at Claim 2, a person of skill in the art |
| 11:49:30 | 15 | would understand that the peptide of the Formula I as |
| 11:49:33 | 16 | claimed in Claim 1 was being used as a bradykinin |
| 11:49:38 | 17 | antagonist? |
| 11:49:38 | 18 | A.    They might intuit that.  But I want to be clear that |
| 11:49:42 | 19 | is not stated in that English language.  They could |
| 11:49:44 | 20 | interpret that for sure.  But that's not said.  It doesn't |
| 11:49:47 | 21 | say bradykinin antagonist in Claim 2. |
| 11:49:50 | 22 | Q.    Right.  But a person of skill in the art would |
| 11:49:52 | 23 | understand that that is what is being conveyed, that it's |
| 11:49:55 | 24 | acting as a bradykinin antagonist.  Correct? |
| 11:49:58 | 25 | A.    If they were reading other things.  If they were just |

Walensky - cross

11:50:01  1    reading that, it doesn't really say what the purpose is.  It

11:50:03  2    is just saying that it's going to treat inflammation.  There

11:50:06  3    is lots of ways to treat inflammation.

11:50:15  4              MR. JAMES:  Your Honor, if I could, I would like

11:50:17  5    to draw his attention to his deposition transcript.

11:50:19  6              THE COURT:  Sure.

11:50:20  7    BY MR. JAMES:

11:50:20  8    Q.    You have another binder up there with your deposition

11:50:23  9    transcript in it.

11:50:24  10   A.    Sure.

11:50:42  11   Q.    If you turn to Page 315, Line 19?

11:51:22  12   A.    Yes.

11:51:23  13   Q.    I asked you, "I'm just saying, if you look at Claim 2,

11:51:30  14   a person of skill in the art would understand that the

11:51:32  15   peptide of the Formula I as claimed in Claim 1 was being

11:51:36  16   used as a bradykinin antagonist, right?

11:51:40  17            "Answer:  It doesn't say bradykinin antagonist."

11:51:42  18   A.    That's what I just said.

11:51:44  19   Q.    "Question:  What would they understand it to be doing

11:51:47  20   if it was being given for the treatment of inflammation in

11:51:50  21   conditions that are mediated, induced or assisted by

11:51:53  22   bradykinin?

11:51:54  23            "Answer:  Well, I'm just saying you could

11:51:55  24   interpret that.  But I'm just saying if you want me to say

11:51:58  25   what's actually in there, it doesn't say the words

596

Walensky - cross

| | | |
|---|---|---|
| 11:52:01 | 1 | bradykinin antagonist, but you could have made that |
| 11:52:05 | 2 | interpretation. |
| 11:52:06 | 3 | "Question:  That is the interpretation a person |
| 11:52:08 | 4 | of skill would make, correct? |
| 11:52:10 | 5 | "Answer:  I'm just answering you yes." |
| 11:52:13 | 6 | A.    Right.  That's what I just said. |
| 11:52:17 | 7 | Q.    So the person of skill in the art looking at Claim 2 |
| 11:52:21 | 8 | would understand that the peptides of Claim 1 of the '7,803 |
| 11:52:24 | 9 | patent were acting as bradykinin antagonists.  That would be |
| 11:52:28 | 10 | the understanding they would have? |
| 11:52:29 | 11 | A.    They could make that interpretation.  But it doesn't |
| 11:52:31 | 12 | say it explicitly, that's all. |
| 11:52:33 | 13 | Q.    So the D-Tic that's in the 7 position of Claim 1 of |
| 11:52:37 | 14 | the '7,803 patent didn't destroy the bradykinin antagonist |
| 11:52:42 | 15 | activity of that peptide, did it? |
| 11:52:44 | 16 | A.    Are you asking me to answer that today or before 1989? |
| 11:52:47 | 17 | Because before 1989 there was no evidence of that. |
| 11:52:50 | 18 | Q.    Doctor, you testified that the person of skill in the |
| 11:52:53 | 19 | art would understand the peptides of Claim 1 to act as a |
| 11:52:58 | 20 | bradykinin antagonist.  Right? |
| 11:53:01 | 21 | A.    I don't understand your question. |
| 11:53:03 | 22 | Q.    In light of Claim 2, the person of skill in the art |
| 11:53:07 | 23 | would understand that the peptides of Claim 1 of the '7,803 |
| 11:53:10 | 24 | patent were acting as bradykinin antagonists.  I think we |
| 11:53:13 | 25 | just went through this. |

Walensky - cross

| | | |
|---|---|---|
| 11:53:15 | 1 | A.    If you have a retrospectroscope.  But if you are |
| 11:53:18 | 2 | answering that before January of 1989 they would not have |
| 11:53:22 | 3 | recognized that as having a bradykinin antagonist -- |
| 11:53:26 | 4 | Q.    I don't know what that is, a retrospectroscope.  I am |
| 11:53:30 | 5 | asking, if you are looking at Claim 2 and interpreting Claim |
| 11:53:34 | 6 | 1 in view of Claim 2, you would understand that those |
| 11:53:37 | 7 | peptides would act as bradykinin antagonists? |
| 11:53:41 | 8 | A.    If you were asking me today or asking me what a POSA |
| 11:53:44 | 9 | would interpret before January 1989, those are two different |
| | 10 | answers. |
| 11:53:48 | 11 | Q.    I am not asking you that.  We are looking at the |
| 11:53:51 | 12 | '7,803 claims.  Correct? |
| 11:53:53 | 13 | A.    Correct. |
| 11:53:54 | 14 | Q.    Regardless of the time frame, Claim 2 says to a person |
| 11:53:58 | 15 | of skill in the art that the peptides are acting as |
| 11:54:01 | 16 | bradykinin antagonists.  Right? |
| 11:54:02 | 17 | A.    If that was their interpretation. |
| 11:54:04 | 18 | Q.    You said that was their interpretation. |
| 11:54:06 | 19 | A.    I said it can be an interpretation. |
| 11:54:07 | 20 | Q.    No.  You said that would have been the interpretation |
| 11:54:10 | 21 | of the person of skill in the art.  Right?  Are you going to |
| 11:54:13 | 22 | take your testimony back? |
| 11:54:14 | 23 | A.    I don't intend to.  I am trying to explain to you that |
| 11:54:17 | 24 | if you were looking at that composition before 1989 you |
| 11:54:19 | 25 | would not recognize that as a bradykinin antagonist. |

Walensky - cross

11:54:22  1   Q.    I am not asking you about before 1989.  I am just

11:54:26  2   saying, you are looking at the two claims together, the

11:54:29  3   person of skill in the art would understand that the

11:54:31  4   peptides of Claim 1 were acting as bradykinin antagonists?

11:54:35  5   A.    Based upon looking at that patent.

11:54:37  6   Q.    Based upon looking at Claim 2.  Correct?

11:54:40  7   A.    It doesn't explicitly state that.  I don't know what

11:54:43  8   more you want me to say.  There is a difference between

11:54:47  9   reading it and interpreting it.

11:54:54  10  Q.    Okay.  Now, let's look at PDX-3.22.  This is a slide

11:55:04  11  that you put up in your direct examination.  Correct?

11:55:08  12  A.    Correct.

11:55:08  13  Q.    And this shows, I think, what the title says is that

11:55:14  14  the person of skill in the art would have substituted the D

11:55:17  15  amino acids at Position 7.  Right?

11:55:20  16  A.    Correct.

11:55:20  17  Q.    So in your view, the person of skill in the art

11:55:25  18  looking at the sequence of icatibant would have made the

11:55:30  19  substitutions that are laid out there for the '993 patent,

11:55:33  20  the '613 patent and the '963 patent.  Right?

11:55:37  21  A.    Correct.

11:55:37  22  Q.    And -- let me ask you this:  Why did you look at the

11:55:42  23  '993, the '613 and the '963 patents?

11:55:45  24  A.    Because they are in the prior art and they are patents

11:55:47  25  that describe bradykinin antagonists.

Walensky - cross

11:55:50　1　　Q.　　Right.　You looked at them because you would have

11:55:53　2　　understood that sequence to be a bradykinin antagonist?

11:55:56　3　　A.　　No.　Because that's what those patents said when I did

11:55:59　4　　the search and pulled up patents that said here are

11:56:03　5　　bradykinin antagonists that were reported before 1989.

11:56:06　6　　Q.　　If we look at PDX-3.33, these are the substitutions

11:56:14　7　　you say the person of skill in the art would have made at

11:56:17　8　　the 8 position.　Right?

11:56:18　9　　A.　　Yes.

11:56:18　10　　Q.　　And again, you looked at the '993 and the '963

11:56:26　11　　patents.　Right?

11:56:27　12　　A.　　Yes.

11:56:27　13　　Q.　　Those are Stewart patents related to bradykinin

11:56:31　14　　antagonists.　Right?

11:56:33　15　　A.　　Right, dated before '89.

11:56:34　16　　Q.　　Yes.　I have made a slide where I put these two things

11:56:37　17　　together, Slides 3.22 and 3.33, the sequence at the top is

11:56:46　18　　icatibant.　Right?

11:56:48　19　　A.　　Yes.

11:56:49　20　　Q.　　If you make at the 7 position the D-Phe substitution

11:56:57　21　　for D-Tic.　Right?

11:56:59　22　　A.　　I wouldn't say you would, but if you wanted to do one.

11:57:04　23　　Q.　　You said it was one of the preferred substitutions at

11:57:06　24　　7.　Right?

11:57:08　25　　A.　　You are taking away the D-Tic and you are putting in

Walensky - cross

| 11:57:11 | 1 | the D-Phe.  Is that what you want me to do? |
| 11:57:13 | 2 | Q.    I am asking you if that's what you said a person of |
| 11:57:17 | 3 | skill in the art would do, they would put in at the D-Tic |
| 11:57:20 | 4 | position, instead of using D-Tic, they would use one of |
| 11:57:23 | 5 | these amino acids as disclosed in the Stewart patents. |
| 11:57:25 | 6 | Right? |
| 11:57:26 | 7 | A.    Right, and you are picking D-Phe. |
| 11:57:28 | 8 | Q.    I am picking D-Phe. |
| 11:57:31 | 9 | A.    Got it. |
| 11:57:31 | 10 | Q.    If we put D-Phe there, and then if at the 8 position |
| 11:57:35 | 11 | from the '993 and the '963 patent, Thi I think was the first |
| 11:57:41 | 12 | option there.  Right? |
| 11:57:41 | 13 | A.    Yes. |
| 11:57:42 | 14 | Q.    If we put that in for Oic, what we get is the sequence |
| 11:57:45 | 15 | of B-3824.  Right? |
| 11:57:47 | 16 | A.    Yes. |
| 11:57:47 | 17 | Q.    So your opinion is a person of skill in the art would |
| 11:57:50 | 18 | look at the sequence of icatibant and go backwards to the |
| 11:57:53 | 19 | prior art? |
| 11:57:54 | 20 | A.    It's not backwards.  It's definitely not backwards. |
| 11:57:57 | 21 | Q.    B-3824 was in the prior art.  Right? |
| 11:58:00 | 22 | A.    Right.  But he would go to something that was familiar |
| 11:58:02 | 23 | and was recommended by the inventors. |
| 11:58:15 | 24 | Q.    You talked a little bit about a Vavrek article in your |
| 11:58:20 | 25 | direct examination.  Right? |

Walensky - cross

11:58:21  1    A.    Yes.

11:58:22  2    Q.    If we could put that up, it's JTX-25.  This is an

11:58:32  3    article that's authorized by Stewart and Vavrek.  Right?

11:58:36  4    A.    Yes.

11:58:36  5    Q.    This is that same Stewart group we have all been

11:58:40  6    talking about in this case that was doing the work at the

11:58:42  7    University of Colorado on BK antagonists.  Right?

11:58:45  8    A.    Yes.

11:58:48  9    Q.    If we look at the table that you directed the Court's

11:58:53  10   attention to -- I apologize -- Table 1 at the top of

11:59:02  11   JTX-25.2, so we understand this table, this table is

11:59:08  12   measuring agonist activity.  Right?

11:59:11  13   A.    Correct.

11:59:11  14   Q.    That's why at the top, bradykinin has a proline at the

11:59:18  15   7, it has 100 for its measurement.  Right?

11:59:22  16   A.    That's correct.

11:59:22  17   Q.    So everything else is normalized to that.  Right?

11:59:25  18   A.    Right.

11:59:25  19   Q.    So everything else is compared to that to see whether

11:59:29  20   or not it's working as an agonist or not.  And you pointed

11:59:32  21   the Court to, I think, tryptophan?

11:59:35  22   A.    No.  I just talked about D-phenylalanine and there are

11:59:39  23   a bunch of D-aromatic amino acids there that didn't make it

11:59:43  24   an antagonist.

11:59:44  25   Q.    Let's look at tryptophan.  Tryptophan takes it down to

Walensky - cross

| | | |
|---|---|---|
| 11:59:48 | 1 | **4?** |
| 11:59:48 | 2 | A.    Yes. |
| 11:59:49 | 3 | Q.    That is a 96-percent decrease? |
| 11:59:52 | 4 | A.    Yep.  Zero percent antagonist. |
| 11:59:54 | 5 | Q.    This is from 1985, this paper.  Right? |
| 11:59:58 | 6 | A.    Yes. |
| 11:59:59 | 7 | Q.    There was more known by 1989, like the '963 and the |
| 12:00:04 | 8 | '993 patent.  Right? |
| 12:00:05 | 9 | A.    Correct. |
| 12:00:09 | 10 | Q.    And tryptophan is an aromatic amino acid.  Right? |
| 12:00:12 | 11 | A.    It's a non-constrained aromatic amino acid, yes. |
| 12:00:15 | 12 | Q.    If we could go to your Slide 3.19, in fact, Doctor, |
| 12:00:34 | 13 | this is an excerpt from the '993 patent.  Correct? |
| 12:00:36 | 14 | A.    Correct. |
| 12:00:37 | 15 | Q.    And the '993 patent again is authored by Stewart and |
| 12:00:40 | 16 | Vavrek.  Right? |
| 12:00:42 | 17 | A.    Right. |
| 12:00:42 | 18 | Q.    And you have shown the claim here, the claim, the Y is |
| 12:00:49 | 19 | selected from the group comprising, that group that you have |
| 12:00:52 | 20 | there, that is from Claim 17.  Right? |
| 12:00:54 | 21 | A.    Yes. |
| 12:00:54 | 22 | Q.    And Claim 17 -- perhaps we should put it up on the |
| 12:00:58 | 23 | screen if we could.  It's the very last page, Mr. Chase. |
| 12:01:24 | 24 | On the right-hand side, Claim 17 is a modified |
| 12:01:28 | 25 | bradykinin type peptide antagonist having the formula, and |

Walensky - cross

| | | |
|---|---|---|
| 12:01:32 | 1 | then there is a formula with a Y group.  Right? |
| 12:01:34 | 2 | A.    Yes. |
| 12:01:35 | 3 | Q.    Y group at 7? |
| 12:01:36 | 4 | A.    Yes. |
| 12:01:37 | 5 | Q.    And so these are antagonists.  Right? |
| 12:01:39 | 6 | A.    They are now, with all the other changes in there, |
| 12:01:42 | 7 | yes. |
| 12:01:42 | 8 | Q.    And one of the things they list there is D-tryptophan. |
| 12:01:46 | 9 | Right? |
| 12:01:46 | 10 | A.    Right, but you can't -- |
| 12:01:48 | 11 | Q.    That was one of the examples that had agonist activity |
| 12:01:53 | 12 | in that table, but they are actually claiming it as an |
| 12:01:56 | 13 | antagonist.  Right? |
| 12:01:56 | 14 | A.    That proves my point.  The point that I make there is |
| 12:02:00 | 15 | you can take -- this is basically a combination lock with |
| 12:02:03 | 16 | ten positions, and at each position you have all these |
| 12:02:06 | 17 | choices.  And you are trying to spin your wheels at each |
| 12:02:08 | 18 | position to come up with an antagonist. |
| 12:02:11 | 19 | And you could put D-tryptophan in some peptides |
| 12:02:14 | 20 | where it is an antagonist and you can put D-tryptophan in |
| 12:02:17 | 21 | other peptides where it is an agonist.  That is simply |
| 12:02:21 | 22 | because when you design peptides, what you do at one |
| 12:02:23 | 23 | position can be dramatically altered by what you do at the |
| | 24 | other position. |
| 12:02:25 | 25 | I can show you peptides where D-tryptophan is |

12:02:28    1    good.   I can show you peptides where D-tryptophan is bad.

12:02:36    2              You can make peptides where D-tryptophan in that

12:02:39    3    position is in the context of a good peptide.

12:02:42    4              You could put D-tryptophan in that same position

12:02:45    5    and have a peptide that is a bad peptide.   That is because

12:02:48    6    you can't look at one position in isolation.   What you do in

12:02:52    7    one position can be dramatically affected by what you do in

12:02:55    8    different positions.

12:02:56    9              Just because in one assay in one context it was

12:02:59   10    in a peptide that was an agonist, and then you could have

12:03:02   11    that exact same residue in the context of another peptide

12:03:06   12    sequence and it be an antagonist, that is the story of

12:03:10   13    peptide drug development.

12:03:11   14              This is a combination lock with ten different

12:03:14   15    wheels.   And you are trying to find that combination among

12:03:16   16    1100-plus peptide positions and combinations to find the

12:03:20   17    winner.

12:03:20   18              What you do in one position doesn't mean it's

12:03:22   19    always going to give you an agonist.   And what you do in

12:03:25   20    that position doesn't always mean you are going to get an

12:03:28   21    antagonist.

12:03:28   22              That is a really nice example of that.

12:03:31   23    Q.    I have one last topic I would like to touch on with

12:03:35   24    you.

12:03:36   25              If you could turn in the '7,803 patent, Column

605

Walensky - cross

| | | |
|---|---|---|
| 12:03:40 | 1 | 16, Lines 55 to 57? |
| 12:03:45 | 2 | A.    What is the JTX again for that?  59? |
| 12:03:52 | 3 | Q.    Yes.  DTX. |
| 12:03:58 | 4 | A.    What column? |
| 12:03:59 | 5 | Q.    Column 16, Lines 55 to 57.  Okay? |
| 12:04:13 | 6 | A.    Okay. |
| 12:04:13 | 7 | Q.    You see there that it says that the invention relates |
| 12:04:17 | 8 | to the use of peptides of the Formula I as medicines and to |
| 12:04:23 | 9 | pharmaceutical products which contain these compounds.  Do |
| 12:04:26 | 10 | you see that? |
| 12:04:26 | 11 | A.    Yes. |
| 12:04:26 | 12 | Q.    The peptides of Formula I, those are the ones that are |
| 12:04:29 | 13 | claimed in Claim 1.  Right? |
| 12:04:31 | 14 | A.    Yes. |
| 12:04:31 | 15 | Q.    And if you look at, just down below that, at Line 62 |
| 12:04:38 | 16 | of Column 16, you see that it says that the administration |
| 12:04:43 | 17 | of these -- I skipped over something.  It says that the |
| 12:04:48 | 18 | pharmaceutical products contain an effective amount of the |
| 12:04:51 | 19 | active substance of Formula I, singly or in combination, |
| 12:04:56 | 20 | together with an inorganic or organic pharmaceutically |
| 12:04:58 | 21 | utilizable excipient. |
| 12:05:01 | 22 |          Do you see that? |
| 12:05:02 | 23 | A.    I do. |
| 12:05:02 | 24 | Q.    That is saying that the compounds of Formula I can be |
| 12:05:05 | 25 | formulated as pharmaceuticals.  Right? |

Walensky - cross

| 12:05:07 | 1 | A.    Yes. |

Q.    And then, if we look at Line 62, it says that you can administer these compounds enterally, that means by mouth. Right?

A.    Yes.

Q.    Parenterally, that means by injection.  Right?

A.    Yes.

Q.    You can give them subcutaneously.  Right?

A.    Yes.

Q.    Or intramuscularly?

A.    Yes.

Q.    Or intravenously?

A.    Yes.

Q.    And a lot of other ways.  Right?

A.    Yes.

Q.    And then if we look at Column 17, Lines 1 to 3, it says that these pharmaceutical products are prepared, and it says in dissolving, mixing, granulating and coating processes known per se.  Right?

A.    Yes.

Q.    And that's part of the formulation process.  Right?

A.    Yes.

Q.    And then down below that, at Column 17, Lines 36 to 43?

A.    Yes.

Walensky - cross

| | | |
|---|---|---|
| 12:06:17 | 1 | Q.    It says, "For intravenous, subcutaneous, epicutaneous, |
| 12:06:22 | 2 | or intradermal administration, the active compounds or the |
| 12:06:25 | 3 | physiologically tolerated salts thereof are converted, if |
| 12:06:29 | 4 | required, with the pharmaceutically customary ancillary |
| 12:06:32 | 5 | substances, for example, for rendering isotonic or adjusting |
| 12:06:36 | 6 | the pH, as well as solubilizers, emulsifiers or other |
| 12:06:40 | 7 | ancillary substances, into a solution, suspension or |
| 12:06:43 | 8 | emulsion." |
| 12:06:45 | 9 | Right? |
| 12:06:45 | 10 | A.    Yes. |
| 12:06:46 | 11 | Q.    That is just saying a person of skill in the art could |
| 12:06:48 | 12 | formulate these products to administer in any way they |
| 12:06:51 | 13 | wanted to.  Right? |
| 12:06:52 | 14 | A.    Yes.  It's kind of stock patent language. |
| 12:07:09 | 15 | MR. JAMES:  Your Honor, I have no further |
| 12:07:11 | 16 | questions. |
| 12:07:12 | 17 | THE COURT:  All right.  Counsel. |
| 12:07:15 | 18 | MS. KUZMICH:  Your Honor, a short redirect. |
| 12:07:26 | 19 | THE COURT:  Yes. |
| 12:07:28 | 20 | REDIRECT EXAMINATION |
| 12:07:28 | 21 | BY MS. KUZMICH: |
| 12:07:29 | 22 | Q.    Mr. Chase, if you could please put up, I think the |
| 12:07:33 | 23 | demonstrative was DDX-5.2, it was the Fmoc-icatibant to |
| 12:07:40 | 24 | icatibant. |
| 12:07:41 | 25 | Thank you. |

Walensky - redirect

12:07:43   1        Dr. Walensky, Mr. James asked you a question

12:07:47   2   earlier about interpreting his schematic at the top for the

12:07:53   3   icatibant and then the Fmoc-icatibant.  Just so we are

12:07:58   4   clear, before I continue, I believe you and Mr. James agreed

12:08:01   5   that the bottom peptide was Fmoc-icatibant where it was not

12:08:08   6   on the resin and it had no side chain protecting groups.  Is

12:08:12   7   that correct?

12:08:13   8   A.    Yes.  That's where we found an agreement.

12:08:15   9   Q.    Okay.  Thank you, Mr. Chase.

12:08:19   10        I am going to switch to the slides.  Ms.

12:08:21   11   Debonis, would you please bring up DTX-60.

12:08:30   12        If we could turn to the scheme that Mr. James

12:08:34   13   brought up, DTX-60, Page 4, we also have that on the screen,

12:08:47   14   but it would be in the binder that Mr. James gave you?

12:08:50   15   A.    I have it.

12:08:35   16   Q.    My first question is:  The arrow, the first arrow that

12:08:40   17   you see moving down up to the 23 cycles --

12:08:44   18   A.    Yes.

12:08:45   19   Q.     -- when Fmoc was removed each time, was that peptide

12:08:50   20   on the resin?

12:08:51   21   A.    Yes.

12:08:52   22   Q.    And each time that Fmoc was removed, was there a

12:08:55   23   protecting group on that peptide?

12:08:57   24   A.    Yes.

12:08:57   25   Q.    And then if you take a look at the next arrow down,

Walensky - redirect

| | | |
|---|---|---|
| 12:09:06 | 1 | under those conditions, when the peptide was treated with |
| 12:09:09 | 2 | 20 percent piperidine, did that remove the Fmoc? |
| 12:09:12 | 3 | A.    It should. |
| 12:09:13 | 4 | Q.    When that reaction was done, was the peptide on the |
| 12:09:17 | 5 | resin? |
| 12:09:17 | 6 | A.    Yes. |
| 12:09:18 | 7 | Q.    When that reaction was done, were the side chain |
| 12:09:21 | 8 | protecting groups on the peptide? |
| 12:09:22 | 9 | A.    Yes. |
| 12:09:22 | 10 | Q.    And how does that condition differ, or how does the |
| 12:09:27 | 11 | peptide structure differ when Fmoc was removed as compared |
| 12:09:32 | 12 | to the schematic that you and Mr. James agreed on? |
| 12:09:35 | 13 | A.    He was asking me about removing Fmoc from a pure |
| 12:09:38 | 14 | product.   The scheme he took me to was removing Fmoc from a |
| 12:09:44 | 15 | peptide under construction on the resin with protecting |
| 12:09:45 | 16 | groups in place. |
| 12:09:46 | 17 | Q.    And if you could bring up JTX-39, please, and turn to |
| 12:09:59 | 18 | Table 5 at JTX-39.11.   And if you would please highlight the |
| 12:10:11 | 19 | peptide that is the seventh peptide down.   It has the N acyl |
| 12:10:17 | 20 | or acetyl group on that.   Thank you. |
| 12:10:19 | 21 |          Dr. Walensky, do you have that in front of you? |
| 12:10:22 | 22 | A.    Yes. |
| 12:10:22 | 23 | Q.    And would you please explain the structure at that |
| 12:10:26 | 24 | peptide at the N-terminus? |
| 12:10:28 | 25 | A.    It has an acetyl group sitting on top of the |

Walensky - redirect

12:10:33   1   D-arginine.  So it's basically an acylated or acetylated

12:10:37   2   D-arginine.  So there's an N-terminal protection group on

12:10:41   3   the D-arginine itself.

12:10:43   4   Q.   And would you please bring up JTX-40 and turn to

12:10:50   5   Column 3, lines 1 through 10, and highlight that on the

12:10:56   6   screen, please.

12:10:59   7            And, Dr. Walensky, I turn your attention to the

12:11:02   8   very last part of Column 1 to 10, which is about columns, or

12:11:10   9   lines 8 through 9, excuse me.

12:11:12   10           And what does it mean when it says, which may

12:11:15   11   itself be N protected similarly?  How does a person of

12:11:19   12   ordinary skill in the art interpret that?

12:11:21   13   A.   That they can acetylate or acylate or put any other

12:11:25   14   chemical modification onto the N-terminus of that D-arginine

12:11:29   15   residue.

12:11:31   16           MS. KUZMICH:  No further questions, Your Honor.

12:11:32   17           THE COURT:  Doctor, thank you.  Be careful

12:11:34   18   stepping down there.

12:11:36   19           (Witness excused.)

12:11:37   20           THE COURT:  I think this would be a good time

12:11:38   21   for lunch.  Let's take an hour.

12:11:40   22           (Luncheon recess taken.)

13:12:48   23                    - - -

13:12:48   24           Afternoon Session - 1:12 p.m.

13:12:49   25           THE COURT:  All right, counsel.  Please take

13:12:50  1    your seats.  Let's resume.

13:12:58  2                    Mr. Haug?

13:13:00  3                    MR. HAUG:  Good afternoon, Your Honor.

13:13:01  4                    THE COURT:  Good afternoon.

13:13:02  5                    MR. HAUG:  The next witness that the plaintiffs

13:13:04  6    will call by, presented by deposition, will be Dr. Kyle,

13:13:10  7    Donald Kyle, who was employed at Nova Pharmaceutical

13:13:15  8    beginning in 1986, and Dr. Kyle was research team leader of

13:13:21  9    the kinin antagonist program at Nova from 1990 to '95 and

13:13:26  10   director of medicinal chemistry.

13:13:28  11                    And I think the clip is about one hour.

13:13:37  12                    THE COURT:  All right.  Do you have a

13:13:38  13   transcript?

13:13:38  14                    MR. HAUG:  Yes, we do.

13:14:04  15                    (The videotaped deposition of Donald Kyle was

13:14:06  16   played as follows.)

13:14:08  17                    "Question:  Would you please state your full

13:14:10  18   name for the record.

13:14:10  19                    "Answer:  Yes.  My name is Donald James Kyle.

13:14:13  20                    "Question:  And what is your current address?

13:14:34  21                    "Answer:  173 North Main Street in Yardley,

13:14:36  22   Pennsylvania.

13:14:37  23                    "Question:  Is there any reason why you can't

13:14:43  24   testify fully and completely today?

13:14:45  25                    "Answer.  No.

13:14:46  1          "Question:  Is there any reason why you can't

13:14:50  2      testify truthfully today?

13:14:52  3                  "Answer:  No.

13:14:55  4                  "MS. KUZMICH:  This is going to be marked,

13:14:57  5      again, as Kyle Exhibit 3.  Thank you.  Will.

13:15:01  6                  "(Kyle Exhibit 3, curriculum vitae, marked for

13:15:07  7      identification).

13:15:07  8                  "Question:  So if you would take a moment, Dr.

13:15:10  9      Kyle, and take a look at Exhibit 3, and it is marked as

13:15:14  10     Bates numbers Kyle 000032 to Kyle 000066.

13:15:24  11                 "Answer:  Okay.

13:15:25  12                 "Question:  Do you recognize this document, Dr.

13:15:30  13     Kyle?

          14                 "Answer:  Yes.

13:15:32  15                 "Question:  What is this document?

13:15:34  16                 "Answer:  It looks like my resumé.

13:15:36  17                 "Question:  It looks like in 1986, you received

13:15:42  18     a Ph.D. in chemistry from Texas Tech University.

13:15:47  19                 "Is that correct?

13:15:49  20                 "Answer:  That's correct.

13:15:49  21                 "Question:  Did you receive a Ph.D. in any

13:15:52  22     particular field of chemistry?

          23                 "Answer:  Yes.

13:15:55  24                 "Question:  What was that field?

13:15:58  25                 "Answer:  Synthetic organic chemistry.

13:16:01    1         "Question:  And if look at your resumé, it

13:16:03    2   appears that in 1986, you received your Ph.D. and then you

13:16:11    3   also began what appears to be an employment with the company

13:16:17    4   Nova Pharmaceutical Corporation; is that correct?

13:16:19    5         "Answer:  That's right.

13:16:20    6         "Question:  Dr. Kyle, the company that I see on

13:16:25    7   your resumé that's called Nova Pharmaceutical Corporation,

13:16:33    8   is it acceptable to you if today we just refer to that

13:16:37    9   company as Nova?

           10         "Answer:  Yes.

13:16:42   11         "Question:  Your resume, which is Exhibit 3,

13:16:45   12   indicates that from 1986 to 1988, your title was research

13:16:51   13   associate medicinal chemistry; is that correct?

           14         "Answer:  Yes.

13:16:55   15         "Question:  So what were your job

13:16:57   16   responsibilities as a research associate when you started

13:17:01   17   with Nova in 1986?

13:17:03   18         "Answer:  I was one of several chemists working

13:17:08   19   in the laboratory synthesizing molecules, you know, and

13:17:15   20   synthesizing, purifying, analyzing for, you know, proper

13:17:19   21   purity and structure proof, molecules as potential

13:17:26   22   therapeutic agents that would be handed off to our

13:17:29   23   pharmacologist in the company for various types of in vitro

13:17:34   24   and in vivo testing.

13:17:36   25         "Question:  So before we talk about your title

13:17:39 | 1 | as director of medicinal chemistry, there's another entry on

13:17:44 | 2 | your resume that says from 1990 to 1995 --

13:17:49 | 3 | "Answer:  Yeah.

13:17:51 | 4 | "Question:  -- you were research team leader

13:17:54 | 5 | kinin antagonist.  Do you see that?

| 6 | "Answer:  Yes.

13:17:57 | 7 | "Question:  So what was the job responsibility

13:18:01 | 8 | in 1990 of research team leader kinin antagonist?

13:18:09 | 9 | "Answer:  There could have been more than one

13:18:10 | 10 | research team leader, you know, the way things were set up.

13:18:13 | 11 | My specific role was to lead the chemistry, the

13:18:19 | 12 | design synthesis of compounds for the kinin program.

13:18:24 | 13 | "Question:  Thank you.  So on your resumé, when

13:18:28 | 14 | it says 'research team leader kinin antagonist,' was the

13:18:32 | 15 | kinin antagonist a particular program at Nova?

| 16 | "Answer:  Yes.

13:18:38 | 17 | "Question:  And what was the objective of the

13:18:39 | 18 | kinin antagonist program as of 1990 when you became research

13:18:49 | 19 | team leader?

13:18:50 | 20 | "Answer:  Well, there was sort of two prongs to

13:18:54 | 21 | the program.  There was a lead part of the project that was

13:18:59 | 22 | developing a lead compound in clinical -- in early clinical

13:19:03 | 23 | trials.  And then the part that I was more associated with

13:19:07 | 24 | was the search for an alternative second-generation compound

13:19:14 | 25 | that could have improved properties.

| | | |
|---|---|---|
| 13:19:21 | 1 | "Question:  When you talk about a second |
| 13:19:33 | 2 | generation compound, are you referring to bradykinin |
| 13:19:38 | 3 | antagonist s? |
| | 4 | "Answer:  Yes. |
| 13:19:40 | 5 | "Question:  What is your definition of a |
| 13:19:43 | 6 | bradykinin antagonist? |
| 13:19:45 | 7 | "Answer:  That is a molecule that binds to the |
| 13:19:53 | 8 | bradykinin receptor and stabilizes a conformation of the |
| 13:19:58 | 9 | receptor that will not signal.  So it basically shuts the |
| 13:20:02 | 10 | receptor off, blocks the action of the endogenous agonist. |
| 13:20:10 | 11 | "Question:  You said that there were two prongs |
| 13:20:13 | 12 | to the kinin project. |
| 13:20:16 | 13 | "Answer:  Yes. |
| 13:20:17 | 14 | "Question:  And the first one was moving |
| 13:20:18 | 15 | forward, I guess, with the lead compound, clinical phase? |
| 13:20:22 | 16 | "Answer:  Yeah. |
| 13:20:23 | 17 | "Question:  And the second one was where you |
| 13:20:25 | 18 | were more involved for -- searching for an alternative |
| 13:20:29 | 19 | second generation product with better properties? |
| 13:20:32 | 20 | "Answer:  Yes. |
| 13:20:48 | 21 | "Question:  Were both of those projects, though, |
| 13:20:53 | 22 | involving bradykinin antagonists? |
| 13:20:55 | 23 | "Answer:  Yes. |
| 13:20:55 | 24 | "Question:  Your resume also defines you as from |
| 13:21:01 | 25 | 1992 to 1995 director of medicinal chemistry. |

13:21:08    1               "Do you see that?

13:21:10    2               "Answer:  Uh-huh.  Yes.

13:21:12    3               "Question:  So when you described the two prongs

13:21:18    4    of the kinin antagonist project --

13:21:21    5               "Answer:  Yes.

13:21:22    6               "Question:  -- is it the case that where you

13:21:26    7    were focused was the chemistry and coming up with a second

13:21:29    8    generation lead compound and further?

13:21:40    9               "Answer:  Yes.

13:21:40   10               "Question:  At any point in time in your career

13:21:42   11    from when you started at Nova in 1986 to leaving Scios in

13:21:50   12    '98, was there a termination of the bradykinin antagonist

13:21:56   13    program?

13:21:56   14               "Answer:  Actually, I don't recall if there was

13:21:59   15    a 'hard' termination of the program.

13:22:03   16               "Question:  Would you say throughout your time

13:22:06   17    at Nova much of your work was involved in the bradykinin

13:22:11   18    antagonist program?

13:22:12   19               "Answer:  Probably, yeah, a significant amount

13:22:14   20    of time.

13:22:18   21               "Question:  Did Dr. Steranka have involvement in

13:22:23   22    the bradykinin antagonist program?

13:22:25   23               "Answer:  I mean, as the head of research, you

13:22:28   24    know, yes.

13:22:29   25               "Question:  At any point did you report directly

13:22:33  1    to Dr. Enna?

13:22:35  2                    "Answer:  No.

13:22:36  3                    "Question:  Was Dr. Burch at Nova when you were

13:22:40  4    there?

13:22:40  5                    "Answer:  Yes.

13:22:41  6                    "Question:  What was Dr. Burch's role at Nova?

13:22:50  7                    "Answer:  I think he was the head of

13:22:52  8    pharmacology.

13:22:53  9                    "Question:  Did you work with Dr. Burch on the

13:22:59  10   bradykinin antagonist program?

13:23:06  11                   "Answer:  Yes.  I learned a lot from him.

13:23:09  12                   "Question:  Do you recall at meetings that you

13:23:11  13   went to, say, while you were at Nova, meetings where Hoechst

13:23:18  14   was presenting on their bradykinin antagonist program?

13:23:22  15                   "Answer:  No.

13:23:23  16                   "Question:  Do you know if there was any formal

13:23:33  17   agreement between Hoechst and Nova to work on bradykinin

13:23:41  18   antagonist compounds?

13:23:47  19                   "Answer:  I'm unaware of any agreement like that

13:23:51  20   between Nova and Hoechst.

13:23:58  21                   "Question:  When you were working at Nova, did

13:24:09  22   anyone from Hoechst -- strike that.

13:24:12  23                   "When you were working at Nova, do you recall

13:24:15  24   anyone at Hoechst coming to Nova and visiting Nova's

13:24:19  25   facilities?

13:24:20    1              "Answer:  No.

13:24:24    2              "Question:  Do you know if anyone at Nova

13:24:27    3   visited Hoechst during the time frame that you were working

13:24:36    4   at Nova to discuss the bradykinin antagonist program?

13:24:50    5              "Answer:  I don't know anybody who did that.

13:24:52    6              "Question:  Did you consider Hoechst a

13:24:54    7   competitor in the bradykinin antagonist field?

13:24:59    8              "Answer:  Not really.  Yeah, not really.

13:25:02    9              "Question:  Why not?

13:25:06   10              "Answer:  I mean, I personally worked in the

13:25:11   11   bradykinin field, you know, for a number of years, you know,

13:25:15   12   starting fairly early on in my time at Nova.  And, you know,

13:25:20   13   I was reading -- I mentioned earlier, you know, I was

13:25:24   14   reading the literature.  I was searching, you know, things

13:25:29   15   and going to conferences and being an active member of sort

13:25:33   16   of the scientific peer process, and I never saw them there.

13:25:37   17              "I mean, like the competitor -- you asked me

13:25:40   18   earlier who some of the other players in the field were.  I

13:25:45   19   knew that, because it was a small group and we were all sort

13:25:48   20   of attending regularly at conferences and you'd see the same

13:25:52   21   presenters.  And there was nobody really from Hoechst in

13:25:56   22   that group, you know.

13:25:57   23              "Many, many years later, you know, when they

13:26:02   24   started publishing on their compound, then I became aware

13:26:05   25   that, you know, they had a bradykinin program, and -- but I

13:26:10   1   still didn't really view it as a competitor because I was

13:26:13   2   more interested in a second-generation better type of a

13:26:17   3   compound than, you know, these first -- what I would

13:26:21   4   consider to be these first-generation molecules.  So my

13:26:28   5   focus was really changing -- you know, changing the first

13:26:32   6   generation into the second generation.

13:26:39   7           "Question:  While you were at Nova working in

13:26:41   8   the bradykinin antagonist field, was there anything that

13:26:44   9   Hoechst did with respect to their work that impacted the

13:26:47   10   direction of Nova's bradykinin antagonist research?

13:27:05   11           "Answer:  No, not that I recall.

13:27:09   12           "Question:  Do you recall if any of the patents

13:27:11   13   that were issued in the bradykinin antagonist field while

13:27:14   14   you were at Nova impacted the direction of your bradykinin

13:27:17   15   antagonist work?

13:27:19   16           "Answer:  Not really, no.

13:27:20   17           "Question:  When you say 'Not really,' was there

13:27:26   18   something that you do recall about a competitor's patent?

13:27:34   19           "Answer:  No.  I'm sorry; I didn't mean not

13:27:37   20   really.  I mean no.

13:27:39   21           "I felt like I was a pioneer, you know.  So

13:27:43   22   there weren't a lot of other things in the literature that

13:27:46   23   were influencing me because there wasn't much there.

13:27:58   24           "Ms. Kuzmich:  We're going to mark what is going

13:28:03   25   to be Kyle Exhibit 6, and that's going to be the 1989 annual

13:28:11 1    report from Nova, and it's marked with Bates numbers Kyle

13:28:19 2    000319 to Kyle 000352.

13:28:27 3            "Once again, I would ask you, Dr. Kyle, if you

13:28:32 4    could just take a look at this document and tell me if you

13:28:35 5    recognize the document?

13:28:36 6            "Answer:  Yes, I do.

13:28:37 7            "Question:  And what is the document?

13:28:42 8            "Answer:  It's the Nova 1989 annual report.

13:28:46 9            "Question:  Dr. Kyle, if you could turn to Page

13:28:50 10   322.  It's 000322?

13:28:54 11           "Answer:  Okay.

13:28:55 12           "Question:  And on the right-hand column there

13:29:01 13   is a subsection entitled 'pain and inflammation.'

13:29:08 14           "Do you see that?

13:29:10 15           "Answer:  Yes.

13:29:10 16           "Question:  And then right before the bottom of

13:29:15 17   that column where the new paragraph starts, there's a last

13:29:22 18   sentence:

13:29:24 19           "Although the common cold trials with NPC567

13:29:30 20   were ended in Phase II, we are continuing our research in

13:29:33 21   this field and expect to develop compounds with greater

13:29:36 22   potency.'

13:29:38 23           "My first question is the lead compound that you

13:29:41 24   had been referring to earlier on in clinical trials, is that

13:29:46 25   NPC567?

13:29:48   1          "Answer:  Yes, it is.

13:29:53   2          "Question:  In trying to develop another lead

13:29:59   3   compound after NPC567, what were the properties of that

13:30:06   4   compound that you were looking for?

13:30:10   5          "Answer:  Generally looking for high affinity

13:30:13   6   binding to the receptor, good metabolic stability so it

13:30:21   7   could have a long half-life and properties that would

13:30:28   8   ideally make it orally bioavailable.

13:30:34   9          "Question:  I guess now putting aside the time

13:30:42   10  frame, I guess looking now at any time while you were at

13:30:46   11  Nova, do you recall that your group had synthesized

13:30:52   12  bradykinin antagonists that were much more potent than

13:30:58   13  NPC-567?

13:30:59   14         "Answer:  Yes.

13:31:00   15         "Question:  Do you recall what structure those

13:31:03   16  compounds had generally?

13:31:05   17         "Answer:  Generally, yes.

13:31:06   18         "Question:  What was that structure that those

13:31:11   19  compounds had generally?

13:31:19   20         "Answer:  What was the structure?

13:31:21   21         "Question:  Yeah.

13:31:22   22         "Answer:  So, again, just backing up to what we

13:31:24   23  talked about earlier, my group, you know, from the beginning

13:31:28   24  was taking very much of a structure-based drug design

13:31:31   25  approach that started with the analysis of 'now I'm just

13:31:37   1   going to call it NPC567 the antagonist but also bradykinin,

13:31:42   2   you know, the endogenous agonist.'

13:31:46   3          "So we did NMR work and computational work to

13:31:50   4   look at what we believed was the three-dimensional

13:31:54   5   conformation or structure of those peptides that we felt

13:31:57   6   were the most relevant for high affinity binding to the

13:32:01   7   receptor.

13:32:02   8          "Subsequent peptides that we were making were

13:32:06   9   deliberately prepared to introduce what we would call

13:32:10   10  conformational constraints or chemical structural

13:32:13   11  modifications that limit the flexibility of the peptide, if

13:32:17   12  that makes sense to you.

13:32:18   13         "Question:  Yes.

13:32:22   14         "Answer:  And the goal -- our goal was to try to

13:32:25   15  find limitations or to restrict the conformation of the

13:32:28   16  peptide to be highly preferential for what we thought the

13:32:35   17  receptor bound state should be, and there was a certain

13:32:38   18  structural motif that we were after.

13:32:42   19         "And as we began to move into certain

13:32:46   20  conformational constraints in the key area of the molecule,

13:32:49   21  that's when we began to identify, you know, changes in the

13:32:52   22  potency of the compounds.

13:32:54   23         "Question:  And so do you recall what generally

13:32:58   24  those structures were that gave you the compounds with

13:33:02   25  better potency?

13:33:05   1        "Answer:  Yes.

13:33:06   2                "Question:  What were they?

13:33:16   3        "Answer:  What were the structures?

13:33:18   4                "Question:  Yeah, generally.

13:33:19   5        "Answer:  I mean, how do you want me to explain

13:33:21   6    that to you?

13:33:22   7                "Question:  Well, I think you were talking about

13:33:24   8    how you were focused on the part of the molecule that seemed

13:33:27   9    I'm going to say more relevant --

13:33:30  10        "Answer:  Yes.

13:33:30  11                "Question:  -- and talked about the

13:33:33  12    conformational constraints.  And so can you describe to me

13:33:37  13    in general what those compounds looked like in that part of

13:33:40  14    the antagonist that was more potent.

13:33:49  15        "Answer:  Yeah.  So our hypothesis, you know,

13:33:52  16    from the NMR work was that -- and I'm going to call it the

13:33:56  17    C-terminal end of the peptide.  Is that okay for you?

13:34:01  18                "Question:  Yes.

13:34:01  19        "Answer:  Our hypothesis was that at the

13:34:04  20    C-terminal end of the peptide, specifically the last four

13:34:07  21    residues at the C-terminus, that there was a turn structure

13:34:11  22    there known as a beta-turn.

13:34:13  23                "And when we started introducing conformational

13:34:17  24    constraints into the -- really into the only two places

13:34:22  25    where you can put conformational constraints in an amino

| | |
|---|---|
| 13:34:25 | 1 |
| 13:34:27 | 2 |
| 13:34:31 | 3 |
| 13:34:35 | 4 |
| 13:34:38 | 5 |
| 13:34:42 | 6 |
| 13:34:46 | 7 |
| 13:34:48 | 8 |
| 13:35:01 | 9 |
| 13:35:05 | 10 |
| 13:35:12 | 11 |
| 13:35:15 | 12 |
| 13:35:16 | 13 |
| 13:35:20 | 14 |
| 13:35:22 | 15 |
| 13:35:29 | 16 |
| 13:35:31 | 17 |
| 13:35:36 | 18 |
| 13:35:41 | 19 |
| 13:35:45 | 20 |
| 13:35:49 | 21 |
| 13:35:55 | 22 |
| 13:36:00 | 23 |
| 13:36:06 | 24 |
| 13:36:10 | 25 |

acid -- that's either in the backbone or in the side

chain -- and the types of constraints that would favor the

formation of a beta-turn structure, those are the types of

constraints that we were putting there, side chain and

backbone modifications particularly at Position 7 and 8

which would be the two center positions of the beta-turn.

          "Question:  Beta-turn.

          "Do you recall in particular what types of amino

acids you were putting into Position 7 and 8 of the molecule

to give you that beta-turn that gave you an antagonist that

was more potent than in NPC567?

          "Answer:  Some.

          "Question:  Which ones do you recall?

          "Answer:  I recall the correct chemical name for

one of them is tetrahydroisoquinoline carboxylic acid.  The

acronym is TIQ.

          "John Stewart had previously shown through this

NPC567 that a D-amino acid configuration at Position 7 was

preferential for antagonism, and our NMR studies -- you

know, through our NMR studies, we had proposed the different

types of beta-turns based on that configuration would be

important to differentiate agonism versus antagonism, and

there is some publications that explain some of that.

          "So putting the D isomer of TIQ into Position 7

is one of the changes.  Also, the natural position at --

13:36:14  1   sorry, it's been a long time on the sequence -- but the

13:36:18  2   natural position at 8 in bradykinin is a phenylalanine.

13:36:24  3   Phenylalanine is very, very similar to a TIQ residue, one

13:36:30  4   carbon different but conformationally constrained.  So

13:36:34  5   putting TIQ at Position 7 and 8 is one combination.

13:36:39  6           "We also used what we called ethers of

13:36:43  7   hydroxyproline for structural purposes, also kind of

13:36:47  8   interesting because they are non-aromatic amino acid -- it's

13:36:52  9   a non-aromatic amino acid, and prior to that there were no

13:36:56  10  examples of non-aromatic amino acids, you know, in the

13:36:59  11  literature.  So it's another conformationally constrained

13:37:04  12  amino acid with a side chain.

13:37:07  13          "So those are probably the most significant

13:37:09  14  building block pieces that I recall.

13:37:11  15          "Question:  Dr. Kyle, I'm going to have the

13:37:14  16  court reporter mark what is going to be Kyle Exhibit 8, and

13:37:25  17  it is a book chapter titled 'Conformational Properties of

13:37:33  18  Bradykinin and Bradykinin Antagonists,' and it's marked with

13:37:37  19  Bates numbers Kyle 000122 to Kyle 000130.

13:37:50  20          "Dr. Kyle, if you could just take a moment to

13:38:01  21  take a look at that exhibit and tell me if you recognize it.

13:38:05  22          "Answer:  Yes, I do.

13:38:06  23          "Question:  And what do you recognize it as?

13:38:09  24          "Answer:  It's a chapter that I wrote with these

13:38:12  25  co-authors that are listed as part of a book that was edited

13:38:16    1    by Ron Burch.  It had multiple chapters, and this is one

13:38:21    2    chapter out of the book.

13:38:23    3         "Question:  So the very last sentence of Page

13:38:28    4    134 states, 'Although bradykinin has been the subject of

13:38:34    5    intensive investigations over the past 20 years,

13:38:38    6    surprisingly little is known about its mechanisms of action

13:38:42    7    at the molecular level.'

13:38:44    8         "Do you see that?

13:38:45    9         "Answer:  Yes.

13:38:45    10        "Question:  What is meant by that statement?

13:38:49    11        "Answer:  'Mechanism of action at the molecular

13:38:52    12   level.'  It's similar to what I was describing earlier.  You

13:38:56    13   know, bradykinin is a 9 amino acid residue peptide, and it

13:39:03    14   conceivably could exist in a lot of different conformational

13:39:06    15   states.

13:39:07    16        "Which one is the one that binds to the receptor

13:39:11    17   and where is it binding, which amino acids in the receptor

13:39:15    18   are holding it in place, you know, what are the key contact

13:39:19    19   points, what is the electrostatic interactions, you know,

13:39:23    20   that are holding it in place -- that's the -- that's what's

13:39:27    21   meant by mechanism of action at the molecular level.  How

13:39:32    22   and why and where does bradykinin bind to its receptor.

13:39:36    23        "Question:  And I guess what is being stated

13:39:37    24   here is that there's surprisingly little known before those

13:39:43    25   aspects of bradykinin.

13:39:45   1          "Answer:  That's right.  At the time of this,

13:39:48   2     yes.

13:39:48   3          "Question:  That paragraph that's at the top of

13:39:53   4     Page 135, it talks a little bit about conformationally

13:40:02   5     constrained analogs of bradykinin that have been prepared

13:40:08   6     and tested --

13:40:18   7          "Answer:  Yes.

13:40:18   8          "Question:  -- that are mostly weak or inactive

13:40:22   9     agonists.  Do you see that?

13:40:23   10         "Answer:  Yes.

13:40:24   11         "Question:  There's a sentence that follows the

13:40:28   12    structure of NPC567 in that paragraph, and it states:  'As

13:40:36   13    one approach toward understanding the conformational

13:40:39   14    differences between NPC567 and bradykinin, we are pursuing

13:40:45   15    an examination of this antagonist in a fashion similar to

13:40:49   16    that described previously for bradykinin.'

13:40:53   17         "Do you see that?

13:40:55   18         "Answer:  Yes.

13:40:55   19         "Question:  Can you describe what those studies

13:40:57   20    were?

13:40:58   21         "Answer:  That we were pursuing?

13:41:04   22         "Question:  Yes.

13:41:06   23         "Answer:  Some of them are described in what

13:41:09   24    comes next in that paragraph.  That's the primary beginning

13:41:13   25    of the work.  It's using NMR spectroscopy, specific

13:41:20   1   experiments, you know, multi-dimensional experiments in NMR

13:41:26   2   spectroscopy to measure distance through space, distances

13:41:30   3   between hydrogen atoms in the protein and then using those

13:41:36   4   distances in computer simulations to figure out what the

13:41:45   5   conformation of the three-dimensional structure is.  And so

13:41:53   6   that -- that is some of what he tells -- that -- that is

13:41:59   7   some of what's talking -- what's being talked about there.

13:41:20   8           "Question:  Was this the first publication of

13:41:49   9   your work regarding this type of studies on the conformation

13:41:52  10   of NPC567?

          11           "Answer:  Yes.

13:41:59  12           "Question:  So when Dr. Stewart and Vavrek were

13:42:02  13   designing, however they did, NPC567, they didn't have the

13:42:06  14   benefit of what you were doing here; is that correct?

13:42:09  15           "Answer:  No -- oh, sorry.

13:42:13  16           Yeah.  No, they did not.  They were taking a

13:42:17  17   different approach.

13:42:17  18           "Question:  Dr. Kyle, we're going to mark what's

13:42:20  19   going to be Kyle Exhibit 9, and it's an article titled,

13:42:34  20   'D-Arg[Hyp3,Thi5,D-Tic7,Tic8]-bradykinin, a potent

13:42:35  21   antagonist of smooth muscle BK2 receptors and BK3 three

13:42:39  22   receptors.'

13:42:40  23           "Answer:  Okay.

13:42:41  24           "Question:  That's Kyle Exhibit 9.

13:42:43  25           "Answer:  Okay.  Got it.

13:42:44   1              **(Kyle Exhibit 9, article titled,**

13:42:47   2   **D-Arg[Hyp3-Thi5-D-Tic7-Tic8]-bradykinin, a potent antagonist**

13:42:54   3   **of smooth muscle BK2 receptors and BK3 receptors,' marked**

13:42:59   4   **for identification.)**

13:43:01   5              **"Question:  Do you recognize this publication,**

13:43:03   6   **Dr. Kyle?**

13:43:04   7              **"Answer:  I mean, I'm an author on the**

13:43:06   8   **publication from 1991.  So, you know, yes, I recognize it in**

13:43:10   9   **general terms, but, you know, it's been a long time since**

13:43:13  10   **I've looked at this.**

13:43:14  11              **"Question:  And so I was asking more along the**

13:43:16  12   **lines of how did the actual peptide sequence of 16731 come**

13:43:21  13   **about?**

13:43:22  14              **"Answer:  You mean, how was it designed, or**

13:43:24  15   **where did we come from it, or where did we get it?**

13:43:28  16              **"Question:  Yeah, how did that sequence come**

13:43:30  17   **about?  I mean, who -- who chose it?  On what basis?  Do you**

13:43:41  18   **have any recollection?**

13:43:42  19              **"Answer:  I mean, not specifically, but just in**

13:43:44  20   **general, it incorporates things that we've been talking**

13:43:47  21   **about, so far, you know.**

13:44:04  22              **So, I mean, starting at the N-terminal end, the**

13:44:08  23   **D-Arg -- my memory is that's kind of a holdover from some of**

13:44:14  24   **John Stewart's earlier work.  He started putting a D-Arg at**

13:44:19  25   **the N-terminus but the D amino acid would be more stable**

13:44:23  1   against enzymatic degradation.  As a D amino acid, it's not

13:44:30  2   recognized by the enzyme.  So D-Arg is there for that

13:44:33  3   reason.

13:44:33  4          "In the sequence of bradykinin, that third

13:44:36  5   position is proline.  It's not hydroxyproline.  And I think

13:44:47  6   that's another John Stewart -- John Stewart made a lot of

13:44:50  7   analogs over a long period of time of just changing amino

13:44:53  8   acids in the sequence.

13:44:54  9          So putting a hydroxyproline over there, you

13:45:01  10  know, he had reasons for that.  I don't remember what they

13:45:03  11  were, and I don't remember how significant they were.  It

13:45:05  12  seems like sometimes in our peptides when we were taking

13:45:09  13  things, we'd put it in and sometimes we didn't put it in,

13:45:12  14  but I don't really remember much about that.

13:45:14  15         "The thienylalanine at position five, I'm not a

13:45:18  16  hundred percent sure, but I kind of remember that that's

13:45:22  17  also something that John Stewart had also worked on.  That's

13:45:24  18  kind of a mimic of phenylalanine.

13:45:32  19         "Phenylalanine has a six-membered aromatic

13:45:37  20  phenyl ring in its side chain connected by one carbon to the

13:45:41  21  backbone alpha carbon.  Thienylalanine is exactly the same

13:45:45  22  except it's only a five membered ring and it has sulfur in

13:45:48  23  it, but it's still aromatic.  And so it's a little bit

13:45:52  24  smaller, and the aromaticity is a little more robust.

13:45:55  25         "And so that's also something that John

13:45:57    1    Stewart -- you know, that's a holdover from his and that we

13:46:01    2    use that from time to time as well.

13:46:02    3              "The D-Tic, that's a conformationally

13:46:06    4    constrained D-phenylalanine at position seven.  The side

13:46:10    5    chain is constrained from rotation because it's tied back to

13:46:13    6    the backbone, and by tying it to the backbone, then one of

13:46:17    7    the backbone dihedrals is also constrained.

13:46:21    8              So D-Tic7 and Tic8 are a pair of amino acids

13:46:28    9    basically mimicking phenylalanine but with conformational

13:46:32   10    constraints that, you know, we had reason to believe gave us

13:46:35   11    the beta-turn -- preferential beta turn structure that we

13:46:40   12    had seen previously by NMR.

13:46:44   13              Question:  So --

13:46:46   14              "Answer:  And then -- I'm sorry.  And then,

13:46:49   15    yeah, the last residue would be the arginine at the

13:46:52   16    c-terminus.

13:46:53   17              "Question:  So --

13:46:54   18              "Answer:  So it's designed -- I'm sorry.  So it

13:46:56   19    comes out of our -- it comes out of our structure based, you

13:47:00   20    know, approach building on the book chapter NMR work.

13:47:08   21              C terminal beta-turn is important for binding,

13:47:12   22    and we were going through a lot of work to figure out

13:47:14   23    what kinds of amino acids to put in there, too, to impose

13:47:18   24    that.

13:47:18   25              "Question:  So the replacement in the 7 and 8

13:47:20  1   positions of D-Tic and Tic respectively reflects what came

13:47:25  2   out of your work that we talked about in the previous

13:47:28  3   exhibit; is that correct?

          4               "Answer:  Yes.

13:47:30  5               "Question:  If you look at Page 7 87, at the

13:47:32  6   very bottom on the right-hand side, it says, 'Received

13:47:36  7   October 26, 1990.'

13:47:38  8               "Do you see that?

13:47:39  9               "Answer:  Did you say 787?

13:47:41  10              "Question:  Yeah, 787, the next page at the

13:47:44  11  top:

13:47:45  12              "Answer:  Yes.

13:47:46  13              "Question:  Was this work then conducted prior

13:47:48  14  to October 26, 1990?

13:47:50  15              "Answer:  Yes, it must have been.

13:47:52  16              "Question:  Do you have any idea when this work

13:47:54  17  began, this study that's reported in what's marked as Kyle

13:47:57  18  Exhibit 9?

13:47:58  19              "Answer:  I mean, definitely before October

13:48:01  20  the 26th of 1990, but I mean, other than that, I'm really

13:48:04  21  not sure.

13:48:04  22              "Question:  Okay.

13:48:05  23              "Answer:  You know, there's quite a bit of work

13:48:07  24  reported in this pharmacology work in that it takes time.

13:48:11  25  So, you know, there would have been some time to generate

633

13:48:14  1    the data and all that, so.  But it's unknown what the time

13:48:18  2    is.

13:48:18  3            "Question:  So, Dr. Kyle, we're going to mark as

13:48:23  4    what's going to be Kyle Exhibit 10, and it was produced to

13:48:26  5    us as Kyle 000162 to Kyle 000166.

13:48:32  6            "Answer:  Okay.

13:48:33  7            "Question:  It's a paper titled, 'Design and

13:48:37  8    conformational analysis of several highly potent bradykinin

13:48:40  9    receptor antagonists.'

13:48:43  10           "(Kyle Exhibit 10, paper titled design and

13:48:49  11   conformational analysis of several highly potent bradykinin

13:48:53  12   receptor antagonists, marked for identification.)

13:48:57  13           "Question:  And, Dr. Kyle, if you could just

13:48:59  14   take a look at it and let me know if you recognize this

13:49:01  15   document.

13:49:02  16           "Answer:  I do.

13:49:03  17           "Question:  Is it the case if you look back on

13:49:08  18   Page 1233, the last page of the article, Dr. Kyle, it says

13:49:12  19   the article was received on December 10, 1990.

13:49:15  20           "Does that mean that the work that's described

13:49:18  21   in this article would have been completed by that date?

          22           "Answer:  Yes.

13:49:22  23           "Question:  So if you could turn back to Kyle

13:49:23  24   Exhibit 10.

13:49:24  25           "Answer:  Okay.

13:49:25  1          "Question:  And we were looking at Page 1231 of
13:49:28  2      the article.
13:49:28  3              "Answer:  Okay.
13:49:29  4              "Question:  And if you could go to the
13:49:31  5      right-hand column at the very bottom, there's the last
13:49:33  6      sentence.  And it reads, 'Although peptides 1 and 3 have
13:49:37  7      been recently disclosed in a European patent application
13:49:40  8      describing them as bradykinin antagonists, the former was
13:49:44  9      discovered coincidentally and independently in our
13:49:49  10     laboratories.'
13:49:50  11             "Do you see that?
          12             "Answer:  Yes.
13:49:54  13            "Question:  Did you insert that language into
13:49:55  14     this article?
13:49:57  15            "Answer:  I don't know.
13:49:57  16            "Question:  Why was this language inserted into
13:49:59  17     this article?
13:50:00  18            "Answer:  Probably because it's, you know, it's
13:50:02  19     a scientific article, and it's proper to, you know,
13:50:05  20     reference, you know, other relevant work.  You know, there's
13:50:10  21     other references in the paper as well.  So it's probably for
13:50:13  22     that reason.
13:50:14  23            "Question:  That statement says that 'The former
13:50:17  24     was discovered coincidentally and independently in our
13:50:21  25     laboratories.'

13:50:22   1              "Answer:  Mm-hmm.

13:50:23   2              "Question:  And is that referring to peptide

13:50:27   3     one?

13:50:28   4              "Answer:  That's how I would interpret it,

13:50:30   5     yes.

13:50:30   6              "Question:  Is it your view that peptides 1 and

13:50:32   7     3 were designed by Nova based upon Nova's earlier work that

13:50:36   8     you talked about, about the beta turns and the NMR data and

13:50:42   9     the sequence were designed by Nova?

13:50:45   10             "Answer:  Yes.  And that -- that's sort of

13:50:47   11    what's written.  I was just reading on a little bit.  You

13:50:50   12    know, that's how, that's how they're described, you know,

13:50:53   13    each one is, you know, considered likely to stabilize the

13:50:56   14    beta turn structure, so, yes.

13:51:03   15             "Question:  Right.  I have the understanding

13:51:07   16    that there's a general view based upon your early work that

13:51:11   17    you need conformational constraints there.  And my question

13:51:14   18    was now:  There were specific amino acids put in Position 7

13:51:18   19    and 8, and I'm asking how does one -- how did Nova get to

13:51:21   20    those specific amino acids?

13:51:24   21             "Answer:  I don't really recall that

13:51:25   22    specifically, you know.  But in, but in general terms, you

13:51:28   23    know, we were -- and I don't remember a lot of the specific

13:51:32   24    examples, but we were -- you know, we had a strategy to make

13:51:41   25    conformationally constrained peptides which incorporated

13:51:46  1    conformationally constrained amino acids.

13:51:49  2              "So these were, these were amino acids that fit

13:51:52  3    the category.  There were probably others, you know, not

13:51:56  4    these, that, you know, played a similar role, not the

13:51:59  5    subject matter of this publication, that were tried.  Some

13:52:02  6    of them probably had a similar effect with pharmacological

13:52:07  7    activity.  Some of them probably didn't, you know, that's

13:52:10  8    part of the process of design, you know, put something in

13:52:13  9    there and see, see if it works properly.

13:52:15  10             "So also -- I mean, specifically for the, for

13:52:18  11   the test for tetrahydro-isoquinoline amino acid, you know,

13:52:30  12   again, sort of following on from NPC567, at the Position 7

13:52:35  13   and 8, those are phenylalanine residues.  And, you know,

13:52:41  14   the -- you know, the -- it's a very short step to go from a

13:52:45  15   phenylalanine to a Tic as a very close structural mimetic

13:52:50  16   with all the same side chain characteristics but less

13:52:57  17   flexibility in the backbone and in the side chain.

13:53:00  18             "So I don't remember all of the different things

13:53:03  19   that we tried at Position 7 and 8, but those could be, you

13:53:06  20   know, some of the guiding principles when we were looking at

13:53:09  21   what we put in there.

13:53:11  22             "Question:  Dr. Kyle, we're going to mark

13:53:13  23   as Kyle Exhibit 11 European patent application 89121498.3.

13:53:20  24             "(Kyle Exhibit 11, European patent application

13:53:25  25   89121498.3, marked for identification.)

13:53:36  1      "Question:  And, Dr. Kyle, if you would just

13:53:38  2  take a look at that, what we've marked as Kyle Exhibit 11,

13:53:41  3  and let me know if you recognize the document.

13:53:43  4      "Answer:  I don't, I don't really recog -- I

13:53:47  5  mean, I recognize it as a patent application, I guess, just

13:53:51  6  because of its content.  But if I've seen it before, it's

13:53:55  7  been a really, really long time, so...

13:54:05  8      "Question:  If you would take a look at footnote

13:54:08  9  17 in what's Kyle Exhibit 10.

13:54:10  10      "Answer:  Okay.

13:54:11  11      "Question.  And is this, what we've marked as

13:54:14  12  Exhibit 11, the European patent application that is being

13:54:18  13  cited in Footnote 10 in Kyle -- Footnote 17, excuse me, in

13:54:23  14  Kyle Exhibit 10?

13:54:26  15      "Answer:  It looks like it is, yes.

13:54:32  16      Wait a minute.  Why is the date -- wait a

13:54:36  17  minute.  I'm not quite sure how to read the cover of this.

13:54:40  18  It looks like the date in my reference -- I mean, the

13:54:43  19  number 891 and so forth is the same.  That date is 1990,

13:54:51  20  but then there's a stamp on this of 1989.  Is that, is that

13:54:54  21  unrelated to the, to the document, or is there another date

13:54:59  22  on this?

13:55:00  23      "Question:  Well, Dr. Kyle, I was going to

13:55:02  24  actually ask you why it was -- the date on Footnote 17 was

13:55:07  25  1990 when if you look at the date of the cover of Exhibit

| | |
|---|---|
| 13:55:10 | 1 |

11, it says, 'Date of receipt,' and there's '21.11.1989.'

2   "Answer:  Yeah.  I don't know.

3   "Question:  If on Exhibit 11, if you could turn

4   to Page 29.

5   "Answer:  29.  Okay.

6   "Question:  And at the top of 29, there is what

7   looks to be Example 24, and there's a peptide sequence.

8   "Do you see that?

9   "Answer:  Yes.

10  "Question:  Is that peptide sequence the same as

11  the peptide sequence -- the sequence of peptide three on

12  Page 1231 of Kyle Exhibit 10?

13  "Answer:  I mean, yeah, assuming what they're

14  calling T-h-i-a, Thi, assuming that that is thienylalanine,

15  which is what we used for thia, assuming that's the same,

16  then it looks like the same sequence.

17  "Question:  Okay.  Thank you.

18  "And if you could turn to page 33 of Kyle

19  Exhibit 11.  And if you look down almost -- well, the second

20  example from the bottom, Exhibit 48 --

21  "Answer:  Mm-hmm.

22  "Question:  -- is that sequence the same as

23  peptide one in Kyle Exhibit 10?

24  "Answer:  Yeah, it looks the same.

25  "Question:  We're going to mark as Kyle Exhibit

13:56:55   1   12 the European patent application publication 370453.

13:57:27   2               "(Kyle Exhibit 12, European patent application

13:57:31   3   publication 0370453, marked for identification.

13:57:38   4               "Question:  And, Dr. Kyle, if you could take a

13:57:41   5   look at Exhibit 12 and let me know if you recognize that

13:57:43   6   document.

13:57:44   7               "Answer:  I mean, I recognize it as a European

13:57:47   8   patent application or issue patent.  I'm not sure.  But,

13:57:50   9   yes, I recognize it as that.

13:57:55   10              "Question:  And if you'd look at the front

13:58:03   11  cover of Exhibit 12 and also the front cover of Exhibit 11.

13:58:06   12              "Answer:  Mm-hmm.

13:58:07   13              "Question:  On Exhibit 11 do you see where it

13:58:12   14  says, 'Application number,' and then it has '89121498.3'?

           15              "Answer:  Yes.

13:58:31   16              "Question:  And then if you would look at

13:58:33   17  Exhibit 12, and there is -- for entry number 21 at the top

13:58:37   18  there is the No. 89121498.3.

13:58:43   19              "Do you see that?

13:58:44   20              "Answer:  Yes.

13:58:47   21              "Question:  And if you would take a look at

13:58:52   22  Exhibit 11.  Do you see the date of receipt is 21.11.1989?

13:59:00   23  It's the stamp.

13:59:01   24              "Answer:  Yes, I see it.  Yes.

13:59:03   25              "Question:  And if you would take a look at

13:59:07    1    Exhibit 12, and do you see that entry number 22 at the top

13:59:11    2    is 21.11.89?

13:59:16    3                    "Answer:  Yes, I see it.

13:59:17    4                    "Question:  And do you see the entry for No. 43

13:59:20    5    on Exhibit 12 has the date of 30.05.90?

13:59:36    6                    "Answer:  Yes, I see it, 30.05.90, yes.  Why is,

13:59:44    7    what is that?

13:59:59    8                    "Question:  That is the date of publication of

14:00:02    9    registration.

14:00:02   10                    "Answer:  Oh, okay.  Yeah, I see it.

14:00:05   11                    "Question:  So I will represent to you that that

14:00:08   12    is the date of the publication, which is Exhibit 12, of the

14:00:14   13    application that is in Exhibit 11.

14:00:17   14                    "Answer:  Oh, okay.

14:02:40   15                    "Question:  So, Dr. Kyle, if you would turn to

14:03:28   16    Page 14 of Exhibit 12.  And do you see Example 24, about

14:03:34   17    the --

14:03:36   18                    "Answer:  Did you say Page -- sorry.  Did you

14:03:40   19    say Page 12?

14:03:54   20                    "Question:  Page 14?

14:03:56   21                    "Answer:  Oh, 14.  Oh, yes.  Example 24.  Sorry.

14:04:03   22    I was looking at the -- I think they're the other numbers.

14:04:08   23                    "Question:  Oh, that's okay.

14:04:10   24                    "Answer:  Okay.  Yeah, I see it.  24.

14:04:13   25                    "Question:  Is that the same amino acid sequence

14:04:15  1    that is peptide 3 in Kyle Exhibit 10?

14:04:21  2            "Answer:  Yes, looks the same.

14:04:26  3            "Question:  If you would turn to Page 17 of Kyle

14:04:30  4    Exhibit 12.  And if you would look at exhibit -- excuse

14:04:35  5    me -- Example 48, and is that amino acid sequence the same

14:04:59  6    as the amino acid sequence in Kyle Exhibit 10 for peptide 1

14:05:05  7    at Figure 1?

14:05:07  8            "Answer:  Looks the same, yes.

14:05:10  9            "Question:  So isn't it the case that the

14:05:14  10   peptide 1 and peptide 3 that were reported in Kyle Exhibit

14:05:22  11   10 were already in a published patent application which is

14:05:28  12   Exhibit 12, on May 30th of 1990?

14:05:35  13           "Answer:  Would you just say that one more time?

14:05:38  14   Isn't it the case what?

14:05:41  15           "Question:  Sure.  Isn't it the case that the

14:05:44  16   peptide 1 and peptide 3 --

14:05:47  17           "Answer:  Uh-huh.

14:05:48  18           "Question:  -- that were reported in Kyle

14:05:51  19   Exhibit 10 --

14:05:52  20           "Answer:  Uh-huh.

14:05:53  21           "Question:  -- were already in a published

14:05:55  22   patent application, which is Exhibit 12, on May 30th of

14:05:59  23   1990?

14:06:00  24           "Answer:  Yes, looks that way.

14:06:03  25           "Question:  When you submitted this manuscript

14:06:09  1    at Kyle Exhibit 10, were you aware of what was disclosed in

14:06:18  2    Exhibit 12?

14:06:22  3              "Answer:  I don't have a clear memory of that, I

14:06:28  4    don't believe so.

14:06:38  5              "Question:  And you don't have a recollection of

14:06:41  6    who inserted the language in Kyle Exhibit 10 that refers to

14:06:46  7    the European patent application that's referenced at

14:06:50  8    Footnote 17?

14:06:52  9              "Answer:  I do not have a clear, a clear memory

14:06:55  10   of that, no.

14:06:56  11             "Question:  Do you have any memory of it at all?

14:07:03  12             "Answer:  Not really.  Like what -- you why is

14:07:06  13   it, why is it there?  Not really.

14:07:11  14             "Question:  And is it your view that, still that

14:07:15  15   peptides 1 through 5 were developed in your laboratory based

14:07:26  16   upon the earlier conformationally constrained data that you

14:07:33  17   had generated?

14:07:35  18             "Answer:  Yes.  That was the purpose, that was

14:07:38  19   the -- that was our strategy, and these are some of our

14:07:44  20   peptides.

14:07:45  21             "Ms. Kuzmich:  I'm going to have you mark as

14:07:48  22   Kyle Exhibit 13 a letter dated March 25, 1991, from an S.J.

14:07:59  23   Enna, Ph.D., to a Dr. Wingefeld.

14:08:05  24             "And, Dr. Kyle, if you could take a moment and

14:08:14  25   let me know if you recognize Exhibit 13.

14:08:18　　1　　　　　　　　"Answer:  Yes, I recognize it as a memorandum

14:08:21　　2　　from Nova.  I recognize that it's from Sam Enna, who is, you

14:08:28　　3　　know, the vice president of research from the time.  I don't

14:08:32　　4　　have any specific recollection of the memo from when I was

14:08:38　　5　　there.  I see that I'm cc'd on it.  I recognize all the

14:08:42　　6　　names on the cc list.  So, yes, I do recognize it.

14:08:46　　7　　　　　　　　"Question:  Do you have any recollection of

14:08:56　　8　　discussions within Nova with respect to drafting this letter

14:09:01　　9　　to Dr. Wingefeld?

14:09:05　　10　　　　　　　　"Answer:  No recollection of that.

14:09:07　　11　　　　　　　　"Question:  Were you involved in any of the

14:09:11　　12　　discussions, if there were any, that dealt with whether a

14:09:17　　13　　letter to Dr. Wingefeld should be sent with an apology for

14:09:23　　14　　failing to cite the original disclosure by Hoechst?

14:09:28　　15　　　　　　　　"Mr. Stull:  Objection to form.

14:09:32　　16　　　　　　　　"Answer:  No, I don't remember that.

14:09:34　　17　　　　　　　　"Question:  The last sentence on the first full

14:09:38　　18　　paragraph states, 'Like you, I trust this incident will not

14:09:44　　19　　affect our relationship.'

14:09:48　　20　　　　　　　　"Do you see that?

14:09:49　　21　　　　　　　　"Answer:  I do, yes.

14:09:50　　22　　　　　　　　"Question:  Do you have any understanding of

14:09:51　　23　　what relationship Dr. Enna was referring to?

14:09:55　　24　　　　　　　　"Answer:  No.  I'm reading, I'm reading that

14:09:59　　25　　right now and I'm sort of surprised and wondering because I

| | |
|---|---|
| 14:10:04 | 1 |
| 14:10:08 | 2 |
| 14:10:11 | 3 |
| 14:10:15 | 4 |
| 14:10:18 | 5 |
| 14:10:26 | 6 |
| 14:10:34 | 7 |
| 14:10:41 | 8 |
| 14:10:47 | 9 |
| 14:10:50 | 10 |
| 14:10:55 | 11 |
| 14:10:58 | 12 |
| 14:11:00 | 13 |
| 14:11:03 | 14 |
| 14:11:13 | 15 |
| 14:11:18 | 16 |
| 14:11:26 | 17 |
| 14:11:31 | 18 |
| 14:11:33 | 19 |
| 14:11:35 | 20 |
| 14:11:37 | 21 |
| 14:11:41 | 22 |
| 14:11:46 | 23 |
| 14:11:46 | 24 |
| 14:11:50 | 25 |

have no recollection of a relationship with them in the

bradykinin space, at my level.  I have no recollection of

that.  So I really don't know what relationship.  Maybe it's

a personal relationship.  I'm not sure.

        "Question:  Is the structure of the bradykinin

analog that is identified in Kyle Exhibit 13, is that

peptide 1 of -- in Figure 1 of Kyle Exhibit 10?

        "Answer:  Yes.

        "Question:  As you sit here today, you have no

recollection of a relationship in the bradykinin antagonist

space between Nova and Hoechst; is that correct?

        "Answer:  Yeah, no recollection of that.

        "Question:  Dr. Kyle, I'm going to have the

court reporter mark as Kyle Exhibit 16 a U.S. Patent No.

6,288,036.

        "And, Dr. Kyle, if you would just take a moment

to take a look at what we've marked as Exhibit 16 and let me

know if you recognize this document.

        "Answer:  I do recognize it.

        "Question:  And what is the document?

        "Answer:  I mean, I recognize it as an issued

U.S. patent for bradykinin peptides where I'm one of the

inventors.

        "Question:  Dr. Kyle, if you could turn to the

last page of Exhibit 16.

14:11:56   1          "Answer:  Okay.

14:11:56   2           "Question:  And in Column 36 at Line 14 begins

14:12:04   3     'Claim 14.'  Do you see that?

14:12:09   4          "Answer:  Yes.

14:12:09   5          "Question:  And the first structure identified

14:12:15   6     in Claim 14 is a structure that has D-Tic at Position 7 and

14:12:23   7     the hydroxy proline ether at Position 8; is that correct?

14:12:31   8          "Answer:  Yes.

14:12:31   9          "Question:  If you could turn also to now Page

14:12:39   10    10 of Exhibit 12, Dr. Kyle.

14:12:43   11         "Answer:  10 of Exhibit 12.  Okay.

14:12:45   12         "Question:  And if you would take a look,

14:12:49   13    there's a table.

14:12:56   14         "Answer:  Uh-huh.

14:12:58   15         "Question:  And at Line 24, on the colored Line

14:13:04   16    24 there's a peptide.  It's a bit hard to get the lines

14:13:09   17    together sometimes with the structure, so I'll read out the

14:13:13   18    structure.  "It's

14:13:26   19    H-(D-Arg)-Arg-Pro-Hyp-Gly-Thia-Ser-(D)-Tic-Aoc-Arg-OH.

14:13:28   20         "Do you see that?

14:13:29   21         "Answer:  Yes.

14:13:29   22         "Question:  And what is the difference between

14:13:32   23    that peptide sequence and the peptide sequence at Claim 14

14:13:39   24    of your '036 patent, which is marked as Exhibit 16.

14:13:46   25         "Answer:  You're asking me what is the

14:13:47   1   difference between the two peptides?

14:13:50   2            "Question:  Yes.

14:13:55   3            "So what is the significant difference, if any,

14:13:58   4   between Compound -- the first compound listed in Claim 14 of

14:14:03   5   Exhibit 16 and the compound that we read into the record

14:14:11   6   that's at Line 24 of Exhibit 12, if we assume that the

14:14:18   7   hydroxyproline at amino acid 3 is four hydroxyproline?

14:14:26   8            "Answer:  Sorry.  My head is spinning a little

14:14:29   9   bit on the Line 15 of Page 14 and all that.  So could I just

14:14:35   10  sort of clarify?

14:14:37   11            "Question:  Sure.

14:14:38   12            "Answer:  You're asking me what is the

14:14:39   13  difference between the Aoc and the transmethyl ether of

14:14:44   14  hydroxy proline?

14:14:46   15            "Question:  Well, if those are the only

14:14:48   16  differences.

14:14:49   17            "Answer:  Yeah.

14:14:49   18            "Question:  That's the only difference between

14:14:51   19  what you see in Compound 1 of Claim 14?

14:14:54   20            "Answer:  Yeah.

14:14:54   21            "Question:  And the amino acid sequence at Line

14:15:02   22  24 of Exhibit 12, is there any significant difference

14:15:06   23  between the two molecules?

14:15:08   24            "Answer:  Well, they're different, they're

14:15:11   25  different molecules.  They're different because they're

14:15:15   1   different.  You know, a different number of atoms, different

14:15:19   2   size.  The stereochemistry is different.

14:15:23   3            "For example, if you look at the -- okay,

14:15:26   4   sorry -- in Document 10, Kyle 164 --

14:15:33   5            "Question:  Yeah, yeah.

14:15:34   6            "Answer:  -- if you look at the top right corner

14:15:37   7   of, like, of 3A, for example, that structure 3A.

14:15:43   8            "Question:  One minute.

14:15:45   9            "Answer:  It's this, this one.

14:15:47   10            "Question:  Got it.

14:15:49   11            "Answer:  Yeah.  So if you look at the

14:16:00   12   structure, so the stereochemistry, if you'll notice that the

14:16:09   13   bridgehead carbons of the two fused five numbered rings,

14:16:16   14   there is a dot.  That just means that it's a cis, it's a cis

14:16:19   15   geometry.  The hydroxyproline ether, even though it is a

14:16:25   16   completely different molecule, but still if you tried to

14:16:27   17   make a similarity, it's a transgeometry, so it's opposite

14:16:32   18   geometric isomer.  That's one difference.

14:16:35   19            There is no, there's no oxygen in the Aoc

14:16:41   20   molecule.  There is no heteroatom, in the hydroxyproline

14:16:46   21   ether there is an oxygen heteroatom.  So that is a different

14:16:51   22   size and a different electrostatic than would be, like, in a

14:16:57   23   carboxylic like Aoc, you know.  And then the hydroxyproline

14:17:03   24   ether, in this example, is the transmethyl ether.  That's

14:17:09   25   one carbon.  There are more carbons in the Aoc residue.  So

Bell - direct

14:17:17   1   sort of at the atomic scale there is differences between the

14:17:20   2   two, and those would be some of the key differences.

14:17:23   3           "Question:  Is there anything that you can

14:17:29   4   recall that Hoechst was doing through their patent

14:17:36   5   application process that impacted Nova's research in

14:17:42   6   bradykinin antagonists in any way?

14:17:44   7           "Answer:  I don't think I would have any way to

14:17:47   8   know anything about their patent application process."

14:17:55   9           MR. HAUG:  Thank you, Your Honor.

14:17:58   10          Plaintiffs will next call Dr. Bell, Dr. Gregory

14:18:02   11  Bell.  Mr. Blumenfeld will conduct the examination.

14:18:17   12          MR. WIESEN:  Your Honor, if I may, Mr. Sherry

14:18:19   13  from my office will be conducting the cross-examination.  So

14:18:22   14  we are going to switch seats to put him in the right spot.

14:18:26   15          THE COURT:  Mr. Blumenfeld, do you have some

14:18:28   16  binders?

14:18:29   17          MR. BLUMENFELD:  I do.

14:18:30   18          ... GREGORY KNOX BELL, having been duly sworn as

14:18:36   19  a witness, was examined and testified as follows ...

14:18:48   20          THE COURT:  Good afternoon, Doctor.

14:18:51   21          THE WITNESS:  Good afternoon.

14:18:53   22          THE COURT:  Doctor, I will caution you, when you

14:18:54   23  step down from that stand, be careful of that step.  Not

14:18:59   24  much space there.

14:19:19   25                  DIRECT EXAMINATION

Bell - direct

14:19:20   1   **BY MR. BLUMENFELD:**

14:19:33   2   Q.    Good afternoon, Dr. Bell.

14:19:34   3   A.    Good afternoon.

14:19:35   4   Q.    Can you tell us where you work?

14:19:41   5   A.    Oh, I am a group vice president at Charles River

14:19:44   6   Associates.   It's a global economics and management

14:19:48   7   consulting firm.

14:19:48   8   Q.    And are you an economist?

14:19:51   9   A.    I am, yes.

14:19:51   10   Q.    What do you do at Charles River Associates?

14:19:56   11   A.    I have certain admin responsibilities.   I lead the

14:20:00   12   global life sciences practice.   In that context, I work on

14:20:06   13   strategy assignments, launching products in the

14:20:10   14   pharmaceutical industry and the like, and work in expert

14:20:17   15   witness litigation settings.

14:20:18   16   Q.    Can you give us just a little bigger view of what

14:20:22   17   Charles River Associates does, what types of things they do?

14:20:25   18   A.    Well, as a consulting firm on the strategy side, for

14:20:31   19   instance, we would help companies launch products.   I have

14:20:35   20   launched probably 30 pharmaceuticals.   The practice has

14:20:39   21   launched maybe close to 80 now.   Working with physicians to

14:20:48   22   decide or to determine how they make prescribing decisions,

14:20:52   23   with payors on how they make decisions on which products to

14:20:56   24   cover on their formularies and the like.   With patients on

14:21:01   25   their willingness to pay, how they use the products.   So

Bell - direct

| | | |
|---|---|---|
| 14:21:03 | 1 | it's a fairly broad set of commercialization strategy |
| 14:21:07 | 2 | consulting work. |
| 14:21:09 | 3 | On the expert witness side, I testify in a |
| 14:21:14 | 4 | variety of different venues on a wide variety of issues |
| 14:21:19 | 5 | related to economics, damages, valuation, that sort of |
| 14:21:22 | 6 | thing. |
| 14:21:22 | 7 | Q.    How long have you been at Charles River Associates? |
| 14:21:26 | 8 | A.    25 years. |
| 14:21:26 | 9 | Q.    And can you just briefly go through your educational |
| 14:21:31 | 10 | background prior to the 25 years? |
| 14:21:34 | 11 | A.    Sure.  So I have a Bachelor's degree in business |
| 14:21:43 | 12 | administration, a minor in economics, with highest honors |
| 14:21:47 | 13 | from Simon Fraser University.  That's in British Columbia, |
| 14:21:52 | 14 | Canada.  I have a Master's in business administration from |
| 14:21:55 | 15 | Harvard University, also with highest honors.  And I have a |
| 14:21:59 | 16 | Ph.D. in business economics, also from Harvard University. |
| 14:22:02 | 17 | Q.    And have you testified as an expert witness before? |
| 14:22:07 | 18 | A.    I have. |
| 14:22:07 | 19 | Q.    Do you have in front of you your CV?  I think it's |
| 14:22:15 | 20 | PTX-80 in your notebook. |
| 14:22:19 | 21 | A.    Yes. |
| 14:22:19 | 22 | Q.    And does that set forth your educational and |
| 14:22:24 | 23 | professional background? |
| 14:22:25 | 24 | A.    It does, yes. |
| 14:22:28 | 25 | MR. BLUMENFELD:  Your Honor, we offer Dr. Bell |

Bell - direct

14:22:30    1    as an expert in economics and strategy in the life sciences

14:22:36    2    industry.

14:22:38    3                   MR. SHERRY:  No objection.

14:22:38    4                   THE COURT:  The doctor is accepted as an expert

14:22:40    5    in those fields.

14:22:42    6                   MR. BLUMENFELD:  Thank you, Your Honor.

14:22:42    7    BY MR. BLUMENFELD:

14:22:43    8    Q.    Have you prepared some slides to help you with your

14:22:45    9    testimony today?

14:22:46   10    A.    I have.

14:22:29   11    Q.    And can you tell us -- put up the first slide, which

14:22:45   12    is 4.1.  Can you tell us briefly what issues you looked at

14:22:48   13    and what opinions you've reached?

14:22:51   14    A.    So I'm looking at the issue of whether or not Firazyr

14:22:55   15    is a commercial success.  In that context, assessing whether

14:23:01   16    or not there was a market opportunity for the product, in

14:23:05   17    that respect, looking at sales, growth of sales,

14:23:09   18    profitability in terms of profits made by Shire, sales in

14:23:15   19    comparison to other products that have been indicated for

14:23:18   20    the treatment of acute attacks of HAE, and then the extent

14:23:25   21    to which that market opportunity has a nexus with or is due

14:23:29   22    to the patented invention, which I understand to be the

14:23:34   23    icatibant molecule.

14:23:34   24    Q.    And have you reached an opinion as to whether Firazyr

14:23:38   25    is a commercial success?

Bell - direct

| | |
|---|---|
| 14:23:38 | 1 |
| 14:23:43 | 2 |
| 14:23:45 | 3 |
| 14:23:52 | 4 |
| 14:23:56 | 5 |
| 14:23:57 | 6 |
| 14:24:00 | 7 |
| 14:24:06 | 8 |
| 14:24:08 | 9 |
| 14:24:12 | 10 |

A.    I have, and I have concluded that it is with respect
to both the market opportunity and the nexus.

Q.    Let's talk about some of those issues, and let's start
with the first one that's sales.  What sales data did you
look at?

A.    The sales data from Shire's books and records.

Q.    And did you look at sales data for Firazyr and for
other products?

A.    I did.  Books and records of Shire just addressed
Firazyr.  In that respect, I was looking at sales in dollars
and sales in units.

Q.    Okay.  Let's look at Demonstrative Exhibit 4, the next
one, 4.3.

        And can you tell us what is shown on 4.3?

A.    So this is showing a graph of the net sales, net of
any discounts, et cetera, realized by Shire in the U.S.  So
2011 was the first year, so the product was on the market
for about four months.  Came on in August.  The first full
year of sales about 90 million, and that has grown to $511
million in sales by 2016.  So that was about a 50 percent
per year growth rate year on year.

        And then the green line there is showing
the syringes sold.  So it is sold as a syringe.  And through
2015, up to 48,000 syringes, and then through, I think I
have data to November of 2016, I think that's up to around

Bell - direct

14:25:25    1    52,000 syringes.

14:25:28    2            The other point I guess I would just draw

14:25:30    3    attention to on this graph, you sort of see that the dollar

14:25:34    4    sales are going up faster than the unit sales, and that

14:25:40    5    basically is indicating that sales are growing as the price

14:25:45    6    is increasing, and that's clearly feeding into my opinion

14:25:49    7    regarding the obvious existence of a significant market

14:25:53    8    opportunity for this product.

14:25:55    9    Q.    And the data that you used on PDX-4.3, is that in

14:26:02   10    PTX-81, 82, 143 and 144 that are listed at the bottom?

14:26:07   11    A.    Yes, that's correct.

14:26:08   12    Q.    And are those all in your notebook?

14:26:10   13    A.    Yes, they are.

14:26:11   14    Q.    Now, when you have looked at this data, what does it

14:26:19   15    tell you about the commercial success of the Firazyr

14:26:23   16    product?

14:26:23   17    A.    Well, again, as I indicated, you know, sales have

14:26:28   18    grown in excess of half a billion after five years on the

14:26:35   19    market, five full years on the market.  Those sales have

14:26:39   20    grown as the price has increased.

14:26:42   21            There clearly is a significant demand for

14:26:45   22    this product in U.S. market, and that is this point about,

14:26:50   23    you know, the first half of commercial success is, is there

14:26:54   24    market opportunity for the product.

14:26:56   25    Q.    Now, in addition to actual sales, did you consider

Bell - direct

14:27:01  1   sales expectations?

14:27:02  2   A.    Yes.   That was another thing I looked at, sure.

14:27:05  3   Q.    And did you look at Shire's expectations in the

14:27:11  4   market?

14:27:11  5   A.    Yes.   There were sort of two sets of Shire

14:27:14  6   expectations.   They had expectations at launch and then you

14:27:17  7   got the year on year budget.

14:27:18  8   Q.    Let's put up the next demonstrative, 4.4.   And can you

14:27:25  9   tell us what is shown on Exhibit 4.4?

14:27:27  10  A.    Well, 4.4, that's the pale blue bars, those are the

14:27:35  11  budgeted sales, so the expectation each year developed by

14:27:42  12  Shire, and that's, as you can imagine, updated each year.

14:27:46  13  So the 2012 budget expectation is set in 2011.   The 2013 set

14:27:52  14  in 2012, et cetera.

14:27:53  15        And what you see is the dark blue bar is

14:27:57  16  the actual sales, and then each year but for 2015, actual

14:28:01  17  sales have outperformed even Shire's continually updated

14:28:08  18  expectations.   Again, indicating the, supporting the idea of

14:28:14  19  the market opportunity for the product.

14:28:17  20        The expectations that Shire set just prior to

14:28:20  21  launch, I think if I recall correctly, had 2016 sales that

14:28:26  22  were, you know, well less than 300 million, and in

14:28:30  23  comparison, you know, we've got actual sales greater than

14:28:33  24  500 million.   And that's, again, just the U.S.

14:28:37  25  Q.    And, again, at the bottom of slide 4.4, there's

Bell - direct

14:28:40　1　a list of exhibits, PTX-145, 146, 147, 378, 379, and 380.

14:28:50　2　And is that where you got the information for this chart?

14:28:53　3　A.　Yes, that's right.  Each one corresponds to a year.

14:28:56　4　Q.　And are those also in your notebook?

14:28:59　5　A.　They are, yes.

14:29:00　6　Q.　Did you also consider the expectations versus the

14:29:06　7　performance by third parties?

14:29:09　8　A.　Yes, I did.

14:29:11　9　Q.　And can you turn to PTX-148.

14:29:21　10　A.　Okay.

14:29:22　11　Q.　And can you tell us what Exhibit 148 is?

14:29:25　12　A.　Oh, well, this is the sort of standard investment

14:29:30　13　analyst report.  This one is by William Blair, one of the

14:29:34　14　investment firms.  It's dated October 24th, 2013.

14:29:39　15　Q.　And if you look at the second paragraph, do you see

14:29:53　16　that there is a reference to Firazyr being the standout in

14:29:59　17　the human genetic therapies unit of Shire?

14:30:03　18　A.　Yes, and it's making the point that the actual sales

14:30:05　19　were at the time well ahead of the William Blair estimate of

14:30:12　20　40 million in terms of expected sales, and then a consensus

14:30:16　21　of 50 million.  The consensus is sort of the consensus of

14:30:22　22　all other analysts that are following Shire and reporting

14:30:25　23　expectations of Firazyr sales.

14:30:27　24　Q.　And how did this affect your opinion about the

14:30:30　25　commercial success of Firazyr?

Bell - direct

14:30:32   1   A.    Well, it is simply more support for the fact that

14:30:36   2   there was a market opportunity for this product and, in

14:30:41   3   fact, an opportunity that exceeded expectations.

14:30:44   4   Q.    Did you also consider analyses by other third parties

14:30:50   5   on expectations for the sales of Firazyr?

14:30:53   6   A.    Yes.

14:30:56   7   Q.    And how did those affect your opinion?

14:30:58   8   A.    Again, just more support for basically the same point.

14:31:03   9   Q.    In addition to sales and expectations, did you also

14:31:10   10   consider the profitability of Firazyr?

14:31:13   11   A.    Yes.

14:31:14   12   Q.    And looking at the profitability information, did you

14:31:18   13   reach any conclusions?

14:31:19   14   A.    I did.  I mean, this is a product that has generated

14:31:23   15   significant profits for Shire.

14:31:29   16   Q.    Can we go back to the demonstratives?  And let's put

14:31:32   17   up 4.5.

14:31:33   18           And can you tell us what is shown on

14:31:37   19   Demonstrative Exhibit 4.5?

14:31:39   20   A.    Sure.  Basically, what we're seeing here is the

14:31:45   21   operating income, that's the light blue bars.  On top of

14:31:49   22   that is operating expenses.  That's the yellow part.  On top

14:31:53   23   of that is cost of goods sold.  That's the green part.  And

14:31:56   24   the total height of the bar refers to the global net sales

14:32:01   25   of Firazyr.

Bell - direct

14:32:02    1              So this is a global picture and Shire's

14:32:07    2    global profits.  You can see in 2016, the profit return at

14:32:15    3    the bottom line for Shire due to sales of, global sales of

14:32:19    4    Firazyr, was 427 million.  That was in the neighborhood of

14:32:22    5    about a 74 percent profit margin.

14:32:26    6              And over this five-year -- well, from 2011

14:32:32    7    forward, six-year time span, you know, the product has

14:32:37    8    returned $1.2 billion to Shire.  That's shown on the graph

14:32:41    9    on the far right, which is just adding together the total

14:32:46   10    global sales, total global cost of sales, operating

14:32:49   11    expenses, et cetera.

14:32:49   12    Q.    And this was only through 2016; is that right?

14:32:53   13    A.    Oh, yes.  That's correct.  And, you know, obviously,

14:32:57   14    the product continues to sell in 2017 and expectations

14:33:02   15    continue to mount for 2018.

14:33:05   16    Q.    And, again, if you look at the source, you have listed

14:33:08   17    PTX-87 and 143.  Are those the documents showing this

14:33:14   18    information?

14:33:15   19    A.    They are, yes.

14:33:16   20    Q.    And are those in your notebook?

14:33:18   21    A.    They are, yes.

14:33:20   22    Q.    And I think you may have already answered this at

14:33:24   23    least in part, but how does this global profitability

14:33:28   24    information affect your opinion about the commercial success

14:33:33   25    of Firazyr?

Bell - direct

14:33:34   1   A.     Well, again, it's supporting the fact that there's a

14:33:37   2   clear market opportunity for the product, generating

14:33:43   3   $1.2 billion in profit.

14:33:44   4   Q.     And in addition to looking at the sales and

14:33:48   5   profitability of Firazyr alone, have you analyzed Firazyr's

14:33:54   6   performance in the market relative to other treatments for

14:33:59   7   acute attacks of hereditary angioedema?

14:34:04   8   A.     Yes, I have.   Particularly, the indicated products,

14:34:06   9   yes.

14:34:07   10   Q.    And what data did you look at?

14:34:10   11   A.     Well, there's a service, one of the compilers of

14:34:15   12   information in the pharmaceutical industry called

14:34:19   13   EvaluatePharma, and they prepare reports on different

14:34:22   14   therapeutic categories, and one of their reports had to do

14:34:27   15   with treatments for HAE.

14:34:30   16   Q.    Let me put up Demonstrative 4.6.   And can you tell us

14:34:36   17   what is shown on 4.6?

14:34:38   18   A.     Well, this is just graphing the information that was

14:34:42   19   provided by EvaluatePharma for each year that Firazyr was

14:34:49   20   available for sale in the U.S., so starting in 2011.   And

14:34:55   21   then the other three products that are indicated by the FDA

14:34:58   22   for the treatment of acute attacks of HAE are Berinert,

14:35:06   23   Kalbitor and Ruconest.

14:35:10   24             You can see Berinert by 2012, Firazyr is

14:35:14   25   the lead product in the marketplace, and certainly by 2016,

Bell - direct

| 14:35:20 | 1 | it's selling considerably more than the other products |
| 14:35:24 | 2 | combined. |
| 14:35:25 | 3 | Q.    And, again, the source information shown is PTX-88 and |
| 14:35:30 | 4 | 125.  Are those in your notebook? |
| 14:35:32 | 5 | A.    Yes.  I'm sorry.  Yes, they are. |
| 14:35:34 | 6 | Q.    A couple questions about this.  The Berinert data |
| 14:35:38 | 7 | looks like it starts in 2013.  Why do you not have |
| 14:35:43 | 8 | information about the sales of Berinert in the U.S. before |
| 14:35:49 | 9 | 2013? |
| 14:35:50 | 10 | A.    Well, that wasn't reported on EvaluatePharma -- wasn't |
| 14:35:55 | 11 | reported, I'm sorry, by EvaluatePharma, and CSL Behring, we |
| 14:36:01 | 12 | could not find information where it was separately reporting |
| 14:36:05 | 13 | U.S. sales of Berinert.  So it just would appear that the |
| 14:36:09 | 14 | data were not made publicly available. |
| 14:36:12 | 15 | Certainly, Berinert was on the market.  I |
| 14:36:14 | 16 | think you probably heard earlier that Berinert was |
| 14:36:17 | 17 | introduced around 2008 to 2009 in the U.S. |
| 14:36:21 | 18 | Q.    One other question and we heard yesterday about |
| 14:36:24 | 19 | Firazyr, Berinert and Kalbitor.  The fourth product you have |
| 14:36:29 | 20 | listed there, Ruconest, I'm not sure we have heard anything |
| 14:36:33 | 21 | about that.  Can you tell us what that is? |
| 14:36:35 | 22 | A.    Oh.  Well, that's another C1 inhibitor.  It has to be |
| 14:36:40 | 23 | reconstituted and then an IV infusion, much like, much like |
| 14:36:47 | 24 | Berinert.  And it was -- I believe it's currently being |
| 14:36:51 | 25 | marketed by a company called Pharming. |

Bell - direct

14:36:58   1   Q.     And just one more question on this, Doctor.  What does

14:37:02   2   this tell you about the commercial success of Firazyr in the

14:37:05   3   market?

14:37:07   4   A.     Well, again, it's pointing to the significant market

14:37:10   5   opportunity for this product.  It obviously took significant

14:37:13   6   sales and share from Berinert and Kalbitor that had been

14:37:18   7   available in the U.S. market prior to the arrival of

14:37:23   8   Firazyr.  And physicians are obviously continuing to

14:37:27   9   prescribe the product because it works.  Patients are

14:37:32   10   continuing to use the product and payors are obviously

14:37:37   11   continuing to pay for it, all supporting this point about a

14:37:40   12   significant market opportunity.

14:37:41   13   Q.     Do you have an understanding, Dr. Bell, of what the

14:37:47   14   patented invention is in this case?

14:37:48   15   A.     Well, I understand that the patented invention is the

14:37:53   16   molecule icatibant.

14:37:56   17   Q.     And in your opinion, is the commercial success of

14:38:00   18   Firazyr due to that molecule, icatibant?

14:38:05   19   A.     I believe, I believe it is due to that based on the

14:38:10   20   work I've done and the opinions expressed by others.  It is

14:38:17   21   the attributes of that icatibant molecule that make it a

14:38:20   22   safe and efficacious treatment for the acute attacks of HAE

14:38:24   23   as labeled by the FDA, and it's the attributes of the

14:38:31   24   icatibant molecule that make it self administered or able to

14:38:34   25   be self-administered and able to be self-administered

Bell - direct

14:38:39    1    subcutaneously, i.e., by an injection.

14:38:42    2    Q.    Now, have you had an opportunity --

14:38:44    3                THE COURT:  Hold on a second.

14:38:45    4                Yes?

14:38:46    5                MR. SHERRY:  Objection to the last question.

14:38:48    6    It's a little beyond the scope of the economist.

14:38:50    7                THE COURT:  Beyond the scope of what?

14:38:52    8                MR. SHERRY:  His expertise as an economist.

14:38:54    9                THE COURT:  I don't remember the question, quite

14:38:56   10    frankly.  What was the question?

14:38:57   11                MR. BLUMENFELD:  The question was whether in his

14:38:59   12    opinion, the commercial success was due to the icatibant.  I

14:39:03   13    don't think that's beyond the economist's --

14:39:07   14                MR. SHERRY:  It was the testimony that the

14:39:10   15    molecule itself was responsible for the features that were

14:39:14   16    responsible for the success.

14:39:15   17                THE COURT:  Doesn't he likely rely on the

14:39:20   18    opinions of others?

14:39:20   19                MR. BLUMENFELD:  We're about to get to that,

14:39:22   20    Your Honor.

14:39:23   21                MR. SHERRY:  That's fine.

14:39:24   22    BY MR. BLUMENFELD:

14:39:25   23    Q.    Dr. Bell, have you had the opportunity to review Dr.

14:39:30   24    Kaplan's testimony from yesterday?

14:39:32   25    A.    I have, yes.

Bell - direct

14:39:33   1   Q.    And yesterday he put up this chart, which is PDX-4.7.

14:39:40   2   Have you had an opportunity to review this?

14:39:43   3   A.    Yes.

14:40:00   4   Q.    And did you consider Dr. Kaplan's testimony and this

14:40:08   5   chart in forming your opinion that the commercial success of

14:40:14   6   Firazyr was due to the icatibant?

14:40:18   7   A.    Well, yes.  Again, my understanding, you know, it is

14:40:23   8   the attributes of that icatibant molecule that make it a

14:40:28   9   safe and effective treatment for acute attacks of HAE.  The

14:40:35   10  no anaphylaxis is a reference to the immunogenicity.

14:40:42   11  Kalbitor, one of those other treatments, has that black box

14:40:46   12  warning and actually must be administered under the

14:40:49   13  supervision of a health care professional, partly for that

14:40:52   14  reason.

14:40:53   15          No systemic side effects.  Again, that means

14:40:55   16  that it is a product that patients can use for themselves,

14:41:00   17  by themselves, without the direction of a medical

14:41:05   18  professional, once, you know, they are taught how to inject.

14:41:09   19          The dosage form, again, it is a property of the

14:41:12   20  molecule, as I understand it, that enables it to be packaged

14:41:16   21  in a prefilled syringe.  You don't have to refrigerate it.

14:41:19   22  So it's something that the patient can have near them.

14:41:24   23          One of the things that Dr. Kaplan was talking

14:41:26   24  about, and it has been in other information, is that the

14:41:31   25  sooner one is able to treat one of these acute attacks, the

Bell - direct

14:41:34    1    better off the patient is going to be.

14:41:37    2            So this is a product that, once the patient

14:41:41    3    feels an attack coming on, is hopefully within arm's reach

14:41:48    4    and they are able to use it, as opposed to potentially

14:41:51    5    having to go see a medical professional for Kalbitor or

14:41:54    6    having to set up an infusion apparatus and sort of

14:41:58    7    reconstitute the stuff, which is the case for Berinert and

14:42:06    8    Ruconest.

14:42:06    9            That leads to that third sort of set of bullets

14:42:10   10    there on administration.  It is a subcutaneous injection.

14:42:13   11    You don't have to find the vein, stick yourself.

14:42:17   12            And again, you can do it on your own.  And since

14:42:21   13    these attacks, as I understand it, you know, you can't

14:42:26   14    predict when they are going to come, you don't know how

14:42:28   15    severe they are going to be, you don't know exactly where

14:42:31   16    they might afflict the patient, having a product that the

14:42:39   17    patient is able to make the decision to use and use quickly,

14:42:45   18    given that addressing these attacks quickly is important,

14:42:50   19    goes directly to this whole issue of why this product,

14:42:55   20    Firazyr, is such a success in the marketplace.

14:42:57   21            It is that nexus to the attributes of the

14:43:01   22    molecule.

14:43:03   23            THE COURT:  Counsel, what is your name again?

14:43:05   24            MR. SHERRY:  Mr. Sherry.

14:43:07   25            THE COURT:  You should get Mr. Wiesen to take

Bell - direct

| | | |
|---|---|---|
| 14:43:10 | 1 | you to dinner for instigating that objection.  That's all |
| 14:43:14 | 2 | right. |
| 14:43:15 | 3 | BY MR. BLUMENFELD: |
| 14:43:15 | 4 | Q.    Dr. Bell, on these last two points, the subcutaneous |
| 14:43:19 | 5 | injection and self-administration, have you seen information |
| 14:43:36 | 6 | with regard to the product? |
| 14:43:37 | 7 | A.    Well, sure.  There is a fair amount of market research |
| 14:43:41 | 8 | that is done every year on market studies that reflects the |
| 14:43:47 | 9 | information on physicians and patients, the physicians who |
| 14:43:48 | 10 | are prescribing these products and patients who are using |
| 14:43:51 | 11 | these products. |
| 14:43:52 | 12 | Q.    Can you turn to PTX-155 in your book.  Can you tell us |
| 14:44:07 | 13 | what PTX-155 is? |
| 14:44:09 | 14 | A.    This is another one of these investment analyst |
| 14:44:12 | 15 | reports.  This one is dated December 2010.  So it is prior |
| 14:44:16 | 16 | to the launch of Firazyr and the FDA approval of Firazyr for |
| 14:44:22 | 17 | the U.S. marketplace. |
| 14:44:22 | 18 | Q.    And the analysts here is someone called Evolution? |
| 14:44:27 | 19 | A.    Evolution Securities. |
| 14:44:28 | 20 | Q.    And the title of this is Firazyr - Under-appreciated |
| 14:44:31 | 21 | Product Opportunity. |
| 14:44:32 | 22 |          Do you see that? |
| 14:44:33 | 23 | A.    I do, yes. |
| 14:44:34 | 24 | Q.    Can you turn to Page 5, to 155.5.  Did you review the |
| 14:44:43 | 25 | data on this page and the next page? |

Bell - direct

14:44:46   1   A.     I did, yes, sure.

14:44:47   2   Q.     And if you could just go through a little of this.

14:44:51   3   Let's start with the title of this page.  Can we highlight

14:44:55   4   the title.

14:44:59   5           It says Firazyr - Treatment - Paradigm Shift.

14:45:03   6   What did that mean to you?

14:45:04   7   A.     Well, it is, again, the expectation that this is going

14:45:11   8   to be self admin, subcu, available to be with the patient,

14:45:16   9   that indicates a paradigm shift.  You don't have to get to a

14:45:23   10  medical professional.  At this time, well, Ruconest wasn't

14:45:28   11  in the market but Berinert and Kalbitor actually were both

14:45:32   12  under the supervision of a medical professional for

14:45:34   13  administration.

14:45:34   14  Q.     And if you go down farther on the first page, is there

14:45:39   15  a discussion of the importance of self-administration?

14:45:42   16  A.     Well, yes.  It's one of these three aspects that these

14:45:48   17  market analysts are calling out as what sets Firazyr apart

14:45:53   18  from the competition, which at that time in the U.S., for

14:45:56   19  those products indicated, for the treatment of acute attacks

14:46:02   20  of HAE, were Berinert and Kalbitor.

14:46:05   21  Q.     Can you go down a little farther under

14:46:08   22  Self-Administration, what did Evolution say in 2010 about

14:46:12   23  self-administration?

14:46:13   24  A.     Well, I will just quote:  "We mark the ability to

14:46:21   25  self-administer a room temperature, stable, pre-filled

14:46:25   1   syringe upon initiation of an attack as the most significant

14:46:29   2   differentiating factor for Firazyr versus its competition."

14:46:35   3           That is again getting at this point that the

14:46:38   4   product is available for the patient when needed.   No

14:46:42   5   special prep or refrigeration or anything like that is

14:46:47   6   required.

14:46:47   7   Q.     Can you turn to the next page, please.   Can you

14:46:58   8   highlight the second paragraph at the top.

14:47:01   9           What does that say about self-administration?

14:47:03   10  A.     Well, this is that point that I was making.   "The

14:47:08   11  whole point of the addition of the 'self-administration'

14:47:13   12  indication to the label is that an HAE sufferer will be able

14:47:17   13  to keep the syringe in their handbag, or backpack, and use

14:47:21   14  it when they feel an attack coming on, rather than to have

14:47:25   15  to drive to the hospital and request a medical professional

14:47:28   16  to infuse the product.

14:47:33   17          Again, this goes back to this issue of the

14:47:36   18  sooner one is able to address one of these attacks, as I

14:47:39   19  understand it, the more -- the better that is going to be

14:47:43   20  for the patient.

14:47:44   21  Q.     And can you go down to the heading in the middle of

14:47:47   22  the page called Convenience.

14:47:52   23          What did Evolution say about the convenience of

14:47:54   24  the product?

14:47:55   25  A.     Well, it's echoing some of the same advantages again,

Bell - direct

| | |
|---|---|
| 14:48:00 | 1 |
| 14:48:03 | 2 |
| 14:48:08 | 3 |
| 14:48:11 | 4 |
| 14:48:15 | 5 |
| 14:48:17 | 6 |
| 14:48:22 | 7 |
| 14:48:24 | 8 |
| 14:48:28 | 9 |
| 14:48:35 | 10 |
| 14:48:40 | 11 |
| 14:48:45 | 12 |
| 14:48:49 | 13 |
| 14:48:54 | 14 |
| 14:48:59 | 15 |
| 14:49:02 | 16 |
| 14:49:10 | 17 |
| 14:49:12 | 18 |
| 14:49:16 | 19 |
| 14:49:21 | 20 |
| 14:49:22 | 21 |
| 14:49:28 | 22 |
| 14:49:31 | 23 |
| 14:49:31 | 24 |
| 14:49:34 | 25 |

1   it's the fact that the patients can easily carry Firazyr

2   with them -- I am quoting -- and therefore, they will be

3   well prepared to deal with an attack, because again, these

4   attacks come on, there is no obvious triggers, as I

5   understand it.

6   Q.    And, finally, right at the bottom of the page, what is

7   the third heading?

8   A.    Well, that's efficacy and side effects.  And, of

9   course, you know, a product must be efficacious and safe in

10  order to have the opportunity to get on the market at all.

11  And they are simply commenting on the fact that the product

12  is likely to be shown to be as efficacious, at least

13  equivalent efficacy to its competitors is the quote, and

14  have an advantage in terms of safety, which is related to

15  this immunogenicity issue as I understand it.

16  Q.    Dr. Bell, how did that affect your opinion on the

17  things that made Firazyr successful?

18  A.    Again, it simply supports the nexus point.  These are

19  the various attributes of the icatibant molecule that I have

20  identified.

21  Q.    Can we next turn to JTX-13.  It's also in your

22  notebook.  I think it's the first document in your notebook?

23  A.    Okay.

24  Q.    Can you tell us what JTX-13 is?

25  A.    This is another investment analyst report.  This one

Bell - direct

1   is Cowen and Company.  It's actually dated August 25, 2011,

2   pretty much coincident with the announcement of the FDA's

3   approval for the product and its launch in the U.S.

4   marketplace.

5   Q.    Can we highlight the first paragraph.

6           What did Cowen have to say about Firazyr at the

7   time it was launched?

8   A.    Well, they are talking about the important aspect that

9   the FDA has allowed for the inclusion of self-administration

10  in the label.  And then they have underlined that, "This is

11  critical to the commercial success, as our consultants have

12  previously referred to self-administration as the 'holy

13  grail' for acute HAE treatment."

14  Q.    And how does this affect your opinion on the reasons

15  for the commercial success of Firazyr?

16  A.    Again, it's simply more support for the same points.

17  Having that product within arm's reach and desire, so that

18  patients are able to use it when needed.

19  Q.    Now, Dr. Bell, are you aware that Fresenius has

20  suggested that the success of Firazyr is due to pricing and

21  marketing strategy?

22  A.    Yes.  I believe that's a broad characterization, I am

23  sure.

24  Q.    Have you looked at those issues as well?

25  A.    I have.

Bell - direct

14:51:09    1    Q.      Can we go back to the demonstratives.    Thank you.

14:51:17    2            This is Demonstrative 4.8.  Can you tell us what

14:51:19    3    this is?

14:51:20    4    A.      So this is a plot over time of the list price for

14:51:27    5    these four products that are approved by the FDA for the

14:51:30    6    treatment of acute attacks of HAE.    And it's -- what I have

14:51:35    7    done is made it a price per attack based on the labels for

14:51:40    8    each of the products in terms of how much use, how many

14:51:44    9    vials are required per attack.

14:51:49    10           For Kalbitor, it's three.    For Firazyr, it's

14:51:53    11   one.   For Berinert and Ruconest, they are actually

14:51:57    12   weight-based dosings.    I am using the expectations of

14:52:01    13   average weights in the U.S.

14:52:03    14   Q.      What does this data tell you about Firazyr's

14:52:07    15   commercial success and its relationship to the pricing of

14:52:10    16   the products?

14:52:11    17   A.      Well, Firazyr does have the lowest list price per

14:52:18    18   attack.   But the price differential is not dramatic or

14:52:25    19   significant from my perspective.    And I don't see that,

14:52:34    20   i.e., this lower list price per attack, as being a primary

14:52:37    21   driver of the product's market opportunity.

14:52:42    22           In fact, there is suggestion out there in the

14:52:45    23   marketplace that it's actually Berinert that is the least

14:52:50    24   expensive treatment per attack.

14:52:52    25   Q.      On that subject, can we turn to PTX-170.

Bell - direct

1    Can you highlight the title of this in the third

2    paragraph, please.

3    Can you tell us what this is, Dr. Bell?

4    A.    Well, this is just a report from CSL Behring, that is

5    the company that markets Berinert.  The title was CSL

6    Behring Study shows Berinert is least costly on demand.

7    They are using "on demand" to refer to these products that

8    are approved by the FDA for the treatment of acute attacks

9    of HAE.

10   And in the paragraph that is highlighted, it's

11   making the point about looking at average utilization per

12   attack, rather than a labeled indication.  Maybe just

13   showing, there, the sentence that starts, Berinert was the

14   least costly on demand treatment option for HAE in a typical

15   patient with 75 kilogram per body weight needing three vials

16   per treatment episode.  Per attack, Berinert was estimated

17   to save patients 79.29 to $4,659 compared to Firazyr and

18   2,628 to $7,208 compared to Kalbitor.

19   Q.    Turning to Fresenius's other point about Firazyr or

20   Shire's marketing practices, have you looked at the level of

21   aggressiveness of Shire's marketing practices?

22   A.    Sure.  Sort of looked at their spend, their -- yes.

23   Q.    Could you put up 4.9, Demonstrative 4.9.  What is

24   shown on Demonstrative 4.9?

25   A.    What I am looking at here is I am comparing what I

Bell - direct

14:55:06  1   call share of voice to sort of share of sales.

14:55:11  2           The idea is that one company's got a 50-percent

14:55:16  3   share of sales.  It typically wouldn't surprise one to learn

14:55:20  4   that they have, they account for 50 percent of the

14:55:24  5   advertising in the category as an example.

14:55:26  6           And so we talk about share of voice kind of

14:55:33  7   relative to share of sales.  So what you see here is the

14:55:36  8   share of voice is the blue bars, and that's based, these

14:55:41  9   data, on visits to physicians in terms of discussing the

14:55:47  10   products.

14:55:48  11           And that's the share of visits to physicians in

14:55:52  12   the blue bars.  And in the green bars are the share of

14:55:59  13   sales.

14:56:00  14           And what is patently obvious is the green bars

14:56:07  15   for Firazyr far outweigh the blue bars, making it quite

14:56:11  16   clear Firazyr is in no way -- or Shire is no way, shape or

14:56:16  17   form, having a share of voice, calling on physicians more

14:56:22  18   aggressively than its share of sales would warrant.

14:56:27  19           In fact, it accounts for substantially fewer of

14:56:31  20   those calls than its share of sales would warrant.

14:56:35  21   Q.    For example, if you would look at the share of voice

14:56:38  22   between Firazyr, Berinert, Kalbitor for 2013, and their

14:56:45  23   relative sales in the market, what does that tell you?

14:56:48  24   A.    Well, basically, the share of voice for those three

14:56:51  25   products was about the same, but, obviously, the share of

Bell - direct

14:56:55  1   sales was massively different in favor of Firazyr.

14:57:01  2           So I just don't see how one is able to support a

14:57:05  3   conclusion that, you know, Shire was unduly aggressive in

14:57:12  4   terms of promoting Firazyr.  And I will note, obviously, in

14:57:15  5   2013, which is what we were just looking at, that was before

14:57:20  6   Shire had acquired Cinryze and before Shire had acquired

14:57:26  7   Kalbitor.

14:57:26  8   Q.   And is the source for this chart the exhibits that are

14:57:33  9   listed at the bottom, PTX-88, 94, 125 and 381?

14:57:39  10  A.   That's correct, yes.

14:57:40  11  Q.   And are those all in your notebook?

14:57:43  12  A.   Yes.

14:57:31  13  Q.   Now, can we put up what I think is our last slide,

14:57:36  14  4.10, and can you just walk through and explain in summary

14:57:44  15  your opinion about commercial success of Firazyr?

14:57:47  16  A.   Yes.  So I have concluded it's a commercial success

14:57:51  17  due to the attributes of the icatibant molecule.  So from a

14:57:59  18  sales perspective, again, up at half a billion dollars of

14:58:03  19  sales in 2016 and continuing to grow, and that's just in the

14:58:07  20  U.S.  Global profits for Shire of $1.2 billion through 2016,

14:58:14  21  again continuing to grow.  And as indicated by that graph

14:58:20  22  that we saw earlier, clearly accounting for the vast

14:58:24  23  majority of sales of products that are indicated by the FDA

14:58:28  24  for acute attacks of HAE.

14:58:31  25           And I really do see those as being due to the

Bell - cross

| | | |
|---|---|---|
| 14:58:36 | 1 | attributes of the product.  It's the attributes of icatibant |
| 14:58:40 | 2 | that render it to be safe and efficacious for its |
| 14:58:47 | 3 | indication, treatment of acute attacks of HAE, and it's that |
| 14:58:51 | 4 | convenience issue, that arm's reach desire, that enable or |
| 14:58:57 | 5 | the attribute of icatibant enable the product to be |
| 14:59:01 | 6 | subcutaneous dosing and self-administration.  It does not |
| 14:59:05 | 7 | have to be refrigerated.  If the patient feels an attack |
| 14:59:10 | 8 | coming on, they can treat themselves promptly, and that's |
| 14:59:16 | 9 | simply not the case with respect to the other products. |
| 14:59:19 | 10 | MR. BLUMENFELD:  Thank you, Dr. Bell. |
| 14:59:20 | 11 | THE COURT:  Thank you, Mr. Blumenfeld.  We'll |
| 14:59:22 | 12 | take a stretch and then have cross-examination. |
| 14:59:24 | 13 | (Short recess taken.) |
| 15:17:48 | 14 | THE COURT:  All right.  Please take your seats. |
| 15:17:50 | 15 | Your witness, counsel.  Do you have some |
| 15:17:53 | 16 | binders? |
| 15:17:56 | 17 | MR. SHERRY:  Yes. |
| 15:18:00 | 18 | (Binders handed to the Court and to the |
| 15:18:03 | 19 | witness.) |
| 15:18:16 | 20 | CROSS-EXAMINATION |
| 15:18:17 | 21 | BY MR. SHERRY: |
| 15:18:21 | 22 | Q.    Good afternoon, Dr. Bell. |
| 15:18:22 | 23 | A.    Good afternoon. |
| 15:18:26 | 24 | Q.    Can we have PDX-4.8.  This is one of the slides we |
| 15:18:36 | 25 | were looking at earlier? |

Bell - cross

15:18:37    1    A.    Yes.

15:18:38    2    Q.    And this is a slide that you put together showing the

15:18:40    3    average list price per attack?

15:18:43    4    A.    Yes.

15:18:43    5    Q.    And that's for the Firazyr as well as Ruconest,

15:18:52    6    Berinert and Kalbitor?

15:18:53    7    A.    Yes.

15:18:54    8    Q.    These are your calculations?

15:18:55    9    A.    Yes, based on the indications on the labels.

15:18:57   10    Q.    Right.  And over here we have thousands of dollars on

15:19:00   11    the left?

15:19:01   12    A.    That's right.

15:19:02   13    Q.    Is that right?

15:19:03   14    A.    Correct.

15:19:03   15    Q.    Is it fair to say that there's about a, you know, one

15:19:08   16    to $3,000 difference per attack between Firazyr and its

15:19:14   17    competitors, roughly?

15:19:15   18    A.    I don't know so much about three, but I would buy, you

15:19:23   19    know, it's around 15 -- somewhere between 15 to 20 percent,

15:19:28   20    potentially.

15:19:29   21    Q.    Right.  And that's several thousand dollars?

15:19:33   22    A.    Yes.  Well, it's one --

15:19:38   23    Q.    This is around eight; right?  This is around eleven;

15:19:45   24    right?

15:19:45   25    A.    Yes.  Firazyr to Berinert line might be eight to maybe

Bell - cross

| | | |
|---|---|---|
| 15:19:50 | 1 | nine-and-a-half.  I could probably just look it up in my |
| 15:19:53 | 2 | report.  It has got all the numbers on it. |
| 15:19:55 | 3 | Q.    You're referring to PTX-093? |
| 15:20:00 | 4 | A.    I have no idea.  I said I could probably look it up in |
| 15:20:07 | 5 | my report. |
| 15:20:08 | 6 | Q.    Well, if you turn to PTX-093, I believe that's in your |
| 15:20:11 | 7 | cross binder. |
| 15:20:12 | 8 | A.    Oh, sorry.  Yes. |
| 15:20:13 | 9 | Q.    We have it on the screen, too. |
| 15:20:26 | 10 | A.    That's right.  Yes. |
| 15:20:27 | 11 | Q.    These are the numbers behind the demonstrative we were |
| 15:20:30 | 12 | looking at before; is that right? |
| 15:20:32 | 13 | A.    Correct.  And you can see sort of lines 13, 14 and 15 |
| 15:20:39 | 14 | for each year would give the list price a difference in |
| 15:20:45 | 15 | percentages. |
| 15:20:45 | 16 | Q.    Right.  Let's look at September 5th, 2014.  And here |
| 15:20:53 | 17 | we have the actual list price per attack. |
| 15:20:58 | 18 | A.    Yes. |
| 15:20:58 | 19 | Q.    And this is the first date on which we have all four |
| 15:21:03 | 20 | products; is that right? |
| 15:21:04 | 21 | A.    Represented in these data, that's correct.  Yes. |
| 15:21:06 | 22 | Q.    All right.  And so you have between a $1,500 |
| 15:21:10 | 23 | difference and a $3,000 difference between Firazyr and the |
| 15:21:14 | 24 | other products; right? |
| 15:21:16 | 25 | A.    Yes. |

Bell - cross

15:21:20  1    Q.    All right.  And if we turn to November of 2016, 2016

15:21:30  2    was the last day we had sales in your analysis; is that

15:21:35  3    right, Dr. Bell?  2016?

15:21:36  4    A.    Yes, correct.

15:21:37  5    Q.    And so if we look at -- next page.  Sorry.  Yes.

15:21:49  6    Here.  October 2016.  Again, here you see about a $2,000

15:21:58  7    difference between Firazyr and Ruconest and 3,000 in between

15:22:02  8    Firazyr and Kalbitor, and I guess it's another 2,000 again

15:22:07  9    between Firazyr and Berinert; right?

15:22:10  10   A.    Yes, those would be approximately correct, again,

15:22:13  11   based on list and indication.

15:22:16  12   Q.    So according to your calculations, Firazyr is the

15:22:21  13   lower list price per attack than any of the accused HAE

15:22:25  14   products for the entire time it has been on the market.  Is

15:22:28  15   that right?

15:22:28  16   A.    I believe that's what my graph showed, yes.

15:22:31  17   Q.    All right.  And you also discussed in your direct a

15:22:34  18   study by CSL Behring?

15:22:38  19   A.    That's correct.

15:22:39  20   Q.    And that concerned the price of Berinert; right?

15:22:42  21   A.    The price of Berinert, Kalbitor, and Firazyr.

15:22:46  22   Q.    Right.  And you were saying under that study, Berinert

15:22:49  23   was less expensive than Firazyr; is that right?

15:22:51  24   A.    That's what CSL Behring was reporting, yes.

15:22:55  25   Q.    And CSL Behring is the manufacturer of Berinert?

Bell - cross

15:22:58    1    A.    Sure.

15:22:58    2    Q.    And it was able to show a lower price because it was

15:23:01    3    calculating with three vials per attack whereas here you

15:23:06    4    were calculating with four vials per attack?

15:23:10    5    A.    Yes.  As I indicated, I was being conservative, and

15:23:13    6    the information on the CSL press release I believe was based

15:23:20    7    on actual utilization, number of vials per attack.  As I

15:23:24    8    indicated, my calculations are based on the, on the label,

15:23:29    9    and I believe I indicated in the report, Berinert might be

15:23:33   10    three vials for women, four vials for men.

15:23:40   11    Q.    You have four vials here because Berinert requires

15:23:43   12    four vials if the patient is over 75 kilos; right?

15:23:47   13    A.    I don't exactly recall.  I think that's right.

15:23:50   14    Q.    Yes.  And average American patients are above

15:23:54   15    75 kilos.  Right?  That's why you picked four vials in your

15:23:56   16    analysis?

15:23:57   17    A.    My recollection is that's true for men and not so much

15:24:03   18    true for women.  Yes.

15:24:04   19    Q.    If I --

15:24:05   20    A.    At the median, as indicated in my footnotes to the

15:24:10   21    exhibit, females would require three vials.

15:24:15   22    Q.    And at the mean, they would require four?

15:24:18   23    A.    As I sit here, I don't recall.

15:24:20   24    Q.    If you look at the last page of this exhibit, it will

15:24:23   25    say four.

Bell - cross

15:24:25  1      Can I have the last page of this exhibit?

15:24:32  2      The mean body weight for an American female is

15:24:37  3  76.4 kilos?

15:24:38  4  A.    Yes, that would be correct.

15:24:40  5  Q.    And that's what you wrote in this exhibit to your

15:24:42  6  report?

15:24:43  7  A.    Yes.

15:24:44  8  Q.    Now, you also said that the 2016 net sales of Firazyr

15:24:57  9  were over $510 million; is that right?

15:24:59  10  A.    Yes.  I think it was 511, but, sure.

15:25:02  11  Q.    And although you didn't mention it in your direct, in

15:25:05  12  your report you calculated the number of patients on Firazyr

15:25:08  13  in 2016; is that right?

15:25:10  14  A.    Yes.  That's, that's correct based on the market

15:25:14  15  research I believe.

15:25:15  16  Q.    And there are approximately 2300 patients on Firazyr

15:25:19  17  in 2016?

15:25:21  18  A.    I would have to refer to my report to recollection.

15:25:25  19  Q.    May I have PTX-083.  And we're looking at this number

15:25:35  20  here.

15:25:38  21  A.    Yes.  That adds up to 22,016.  I believe that to be

15:25:44  22  correct, yes.

15:25:45  23  Q.    There were 2,283 patients supporting those $510

15:25:50  24  million in sales; right?

15:25:51  25  A.    Correct.

Bell - cross

15:25:53  1   Q.    And that's over $200,000 per patient; is that right,

15:25:57  2   Dr. Bell?

15:25:57  3   A.    That's about right, yes.

15:26:09  4   Q.    Now, Shire holds a leadership position in the HAE

15:26:14  5   market; right?

15:26:16  6   A.    Well, it has three therapies as of 2016, Firazyr,

15:26:27  7   Cinryze and Kalbitor, yes.

15:26:29  8   Q.    And that's an industry leading portfolio; is that

15:26:33  9   correct?

15:26:33 10   A.    I believe it has been characterized that way, sure.

15:26:37 11   Q.    Now, Shire acquired Firazyr in 2008; is that right?

15:26:43 12   A.    Yes, I believe that's correct.

15:26:46 13   Q.    And it acquired Cinryze at the beginning of 2014?

15:26:49 14   A.    That's my understanding, yes.

15:26:50 15   Q.    And it acquired Kalbitor at the beginning of 2016?

15:26:54 16   A.    Sure.

15:26:55 17   Q.    Today Shire controls the marketing efforts in the U.S.

15:26:57 18   for all three of those drugs; right?

15:27:01 19   A.    I believe that's correct.

15:27:02 20   Q.    Firazyr is the leading brand in the treatment of acute

15:27:05 21   attacks of HAE?

15:27:06 22   A.    For those products that are so indicated, yes.

15:27:10 23   Q.    And Cinryze is the leading brand for the prophylactic

15:27:14 24   treatment of HAE; is that right?

15:27:15 25   A.    Well, I -- I believe so at this point in time, yes.

Bell - cross

| | | |
|---|---|---|
| 15:27:21 | 1 | Q.    In fact, Cinryze sells even more than Firazyr; right? |
| 15:27:25 | 2 | A.    I think so.  I don't know that it's dramatically more, |
| 15:27:28 | 3 | but I believe so. |
| 15:27:29 | 4 | Q.    So Shire has controlled leading brands for both acute |
| 15:27:33 | 5 | and prophylactic treatment of HAE since January of 2014; is |
| 15:27:38 | 6 | that right? |
| 15:27:40 | 7 | A.    I think that's a fair characterization, yes. |
| 15:27:43 | 8 | Q.    Okay.  Can I have PDX-4.5, please.  This is the |
| 15:28:04 | 9 | operating income and profits? |
| 15:28:05 | 10 | A.    Yes. |
| 15:28:06 | 11 | Q.    As discussed in your direct.  So here the blue is the |
| 15:28:09 | 12 | profits, right, on this graph? |
| 15:28:11 | 13 | A.    Correct.  Each year, yes. |
| 15:28:13 | 14 | Q.    Right.  So these three years, 2014 to 2016, were the |
| 15:28:22 | 15 | years in which Shire controlled the leading brand in both |
| 15:28:26 | 16 | acute and prophylactic treatment? |
| 15:28:28 | 17 | A.    Sure. |
| 15:28:29 | 18 | Q.    And over 80 percent of the profits that you considered |
| 15:28:33 | 19 | were in those years; is that right? |
| 15:28:34 | 20 | A.    I think that's -- I think that's correct.  Of course, |
| 15:28:41 | 21 | the profit profile is very similar to most pharmaceuticals. |
| 15:28:48 | 22 | As they're three, four, five, six years out, that's where |
| 15:28:52 | 23 | they tend to make their most money. |
| 15:28:55 | 24 | Q.    Right.  In this case, this is after Shire acquires the |
| 15:28:57 | 25 | leading drugs in both sides of the HAE market; is that |

Bell - cross

15:29:01   1   right?

15:29:01   2   A.    Well, sure, but, of course, also significant profits

15:29:03   3   in 2013 and sales.

15:29:05   4   Q.    Can we turn to PDX-4.4.

15:29:16   5         You also addressed expectations in your -- sales

15:29:23   6   expectations in your direct; is that correct?

15:29:25   7   A.    Yes.

15:29:26   8   Q.    And the sales expectations we're looking at here,

15:29:30   9   these were all created by Shire; is that right?

15:29:32   10  A.    Yes.

15:29:32   11  Q.    And it shows, you know, that the sales exceeded the

15:29:36   12  expectations in all but one of those years?

15:29:40   13  A.    Correct.

15:29:40   14  Q.    And it's good for Shire when Shire exceeds its

15:29:42   15  expectations; right?

15:29:44   16  A.    Sure.

15:29:46   17  Q.    All right.  And you also looked at a third-party

15:29:50   18  estimate for expectations from William Blair.  That's

15:29:55   19  PTX-148.

15:30:00   20        And you said that Shire exceeded William Blair's

15:30:11   21  expectations as well; right?

15:30:13   22  A.    Yes, and the consensus expectations.

15:30:17   23  Q.    Right.  Can I have 148.9.

15:30:31   24        And here, this report says William Blair is a

15:30:35   25  market maker in the security of Shire and may have a long or

Bell - cross

15:30:38   1   short position.

15:30:39   2   A.   Well, it says a market leader.

15:30:40   3   Q.   Right.  A market maker.  It says, William Blair

15:30:44   4   intends to seek investment banking compensation in the next

15:30:47   5   three months from the subject company covered in this

15:30:50   6   report.

15:30:50   7   A.   Sure.

15:30:52   8   Q.   Can we go back to PDX-4.5.

15:31:08   9        Now, these are worldwide products; right?  Not

15:31:15   10  U.S. products?

15:31:16   11  A.   Yes.

15:31:17   12  Q.   Is it your opinion that there's a nexus between the

15:31:21   13  '333 patent and sales outside the U.S.?

15:31:23   14  A.   I've not formed an opinion in that regard.  I've not

15:31:33   15  formed an opinion in that regard.  I don't believe it's

15:31:36   16  necessary for me to reach my conclusions in this matter.

15:31:40   17  Q.   You don't have an opinion that all of these profits

15:31:43   18  should be attributed to the '333 patent; is that right?

15:31:46   19  A.   Well, I have an opinion that all of these profits are

15:31:51   20  derived from the sales of icatibant and whether it's in the

15:31:56   21  U.S. or globally, the attributes of icatibant are what has

15:32:02   22  made it safe and efficacious for the treatment of acute

15:32:05   23  attacks of HAE.

15:32:06   24  Q.   Let's discuss the cost side of this as well.  These

15:32:31   25  are the costs that are the difference between net sales and

Bell - cross

15:32:34　1　operating income?

15:32:35　2　A.　Yes, for the period from 2011 forward.

15:32:39　3　Q.　And here, in 2011, this blue line below the horizontal

15:32:46　4　black line, that indicates a loss in 2011.  Is that right?

15:32:50　5　A.　That's correct, yes.

15:32:50　6　Q.　Now, in preparing your report, you had access to Shire

15:32:59　7　costs from 2008 to 2010.  Right?

15:33:02　8　A.　Yes.

15:33:03　9　Q.　And you didn't include those costs in the calculations

15:33:06　10　you provided here.  Right?

15:33:07　11　A.　That's correct.  These are from the start of sales,

15:33:12　12　year of sales in the U.S.

15:33:13　13　Q.　You also don't include costs associated with R&D from

15:33:17　14　before 2008.  Correct?

15:33:19　15　A.　Correct, although in that respect I don't believe I

15:33:23　16　had data or information.

15:33:24　17　Q.　Right.  You didn't include R&D costs incurred by

15:33:28　18　Hoechst and Aventis concerning the development of icatibant

15:33:32　19　before it was licensed to Jerini.  Right?

15:33:35　20　A.　Yes.

15:33:35　21　Q.　You didn't include Shire and Jerini's R & D costs

15:33:40　22　through 2011?

15:33:41　23　A.　Correct.

15:33:41　24　Q.　Again, that wasn't a conscious decision to exclude

15:33:44　25　that information, you wanted to provide that information.

Bell - cross

15:33:46  1   **Right?**

15:33:46  2   A.   **Correct.**

15:33:47  3   Q.   **New pharmaceuticals have to be approved by the FDA as**

15:34:02  4   **being safe and efficacious before they can be sold in the**

15:34:06  5   **U.S.  Right?**

15:34:07  6   A.   **That's true, for prescription drugs, yes.**

15:34:08  7   Q.   **When the FDA approved Firazyr it approved the use of**

15:34:12  8   **Firazyr to treat acute attacks of HAE?**

15:34:16  9   A.   **Yes, that is my understanding.**

15:34:17  10  Q.   **And it's that method of use that was shown to be safe**

15:34:20  11  **and effective and therefore the reason the FDA approved the**

15:34:23  12  **product?**

15:34:24  13  A.   **Well, that use of icatibant to treat that condition,**

15:34:29  14  **sure.**

15:34:29  15  Q.   **And that approval is what led to the sales and profits**

15:34:33  16  **that you testified about in your direct?**

15:34:35  17  A.   **I think that's a fair characterization.**

15:34:37  18  Q.   **And in that respect, it's the method of use that was**

15:34:40  19  **tested and approved and enabled the sales and profits to be**

15:34:44  20  **made?**

15:34:44  21  A.   **No.  In that respect, it is the molecule that has the**

15:34:48  22  **attributes that allows it to be safe and effective for the**

15:34:51  23  **treatment of acute attacks of HAE.**

15:34:57  24         **MR. SHERRY:  Your Honor, I would like to call**

15:34:59  25  **Mr. Bell's attention to some prior testimony.**

Bell - cross

15:35:02  1     THE COURT:  Sure.  Just point him in the

15:35:04  2  direction so he can review it.

15:35:23  3     Is this a prior deposition?

15:35:25  4     MR. SHERRY:  It is prior testimony here, Your

15:35:27  5  Honor.

15:35:33  6     THE COURT:  Given that he has been here four or

15:35:36  7  five times, that wouldn't surprise me.

15:35:39  8  BY MR. SHERRY:

15:35:39  9  Q.    Did you provide testimony in September 2016 in this

15:35:42  10  court regarding a 40-milligram version of the drug Copaxone?

15:35:46  11  A.    I believe so, with no representation as to the date,

15:35:49  12  but, yes.

15:35:49  13  Q.    Fair enough.  And we have your testimony from there

15:35:53  14  today.  This is from the binder that has the transcript of

15:35:59  15  the fifth day of the Copaxone trial, which is when you

15:36:02  16  testified.  And I will just direct you to Page 1204.

15:36:20  17     MR. SHERRY:  Would you like us to give him a

15:36:22  18  chance to review before we put this on the screen?

15:36:24  19     THE COURT:  I would, yes.  If you could direct

15:36:26  20  him to the lines.

15:36:27  21  BY MR. SHERRY:

15:36:28  22  Q.    If you could review the lines between 1204, Line 16,

15:36:33  23  and -- 1205, Line 16?

15:36:38  24  A.    I am sorry.  16 to 16?

15:36:39  25  Q.    16 to 16.  Once you have read that, I will ask you a

Bell - cross

15:36:50    1    more specific question.

15:37:02    2    A.    Okay.

15:37:03    3    Q.    Again, the Copaxone case concerned a method-of-use

15:37:08    4    patent.  Right?

15:37:09    5    A.    Yes, it did.

15:37:10    6            MR. SHERRY:  Can we bring that up on the screen,

15:37:12    7    Your Honor?

15:37:12    8            THE COURT:  Yes.

15:37:13    9    BY MR. SHERRY:

15:37:14   10    Q.    I would like to direct your attention to Lines 5

15:37:19   11    through 12 on 1205.  And you testified that "It's the method

15:37:31   12    of use that was shown to be safe and efficacious and

15:37:34   13    therefore the reason for the FDA to approve the product, and

15:37:37   14    hence, that approval leads to the sales and profits in the

15:37:41   15    U.S. that I have seen.  In that respect, the nexus, IV, the

15:37:45   16    method of use of the patent is the immediate method of use

15:37:49   17    that was tested and approved and enabled the sales and

15:37:50   18    profits to be made."

15:37:50   19    A.    I did, yes, as appropriate in that circumstance.

15:37:53   20    Q.    The FDA approved Firazyr with a single labeled

15:37:56   21    indication, which was to treat acute attacks of HAE.  Right?

15:38:00   22    A.    Yes.

15:38:00   23    Q.    Without that approval for treatment of acute attacks

15:38:03   24    of HAE, there would have been no sales or profits associated

15:38:06   25    with Firazyr.  Right?

Bell - cross

15:38:07   1     A.      Certainly not for that indication, sure, yes.

15:38:10   2     Q.      There are no other indications that have been

15:38:12   3     approved.   Correct?

15:38:13   4     A.      Correct.

15:38:13   5     Q.      In your analysis, you didn't attempt to attribute any

15:38:21   6     of -- you can take that down.

15:38:23   7              In your analysis, you didn't attempt to

15:38:25   8     attribute any of Firazyr's commercial performance for the

15:38:29   9     development of a method of using icatibant to treat HAE as

15:38:33   10    distinct from properties intrinsic to the icatibant

15:38:35   11    molecule?

15:38:36   12    A.      Not as distinct from, correct.

15:38:38   13    Q.      You didn't attribute any of Firazyr's commercial

15:38:41   14    performance to the formulation of Firazyr as distinct from

15:38:44   15    properties intrinsic to the icatibant molecule.   Correct?

15:38:47   16    A.      Again, not as distinct from, I think that's a fair

15:38:50   17    characterization.

15:38:51   18             MR. SHERRY:   No further questions, sir.

15:38:53   19             THE COURT:   All right.

15:38:57   20             MR. BLUMENFELD:   Just a couple of questions,

15:38:59   21    Your Honor.

15:39:00   22                        REDIRECT EXAMINATION

15:39:01   23    BY MR. BLUMENFELD:

15:39:01   24    Q.      You were asked, Dr. Bell, some questions about, right

15:39:08   25    at the beginning of your cross-examination, about the price

Bell - redirect

15:39:13   1   of Firazyr compared to other acute attack drugs.  Do you

15:39:17   2   remember that?

15:39:18   3   A.    Yes.

15:39:21   4           MR. BLUMENFELD:  Your Honor, can I show the

15:39:22   5   witness and hand up PTX-141?

15:39:29   6           THE COURT:  Yes.

15:39:45   7   BY MR. BLUMENFELD:

15:39:46   8   Q.    Dr. Bell, can you tell us what PTX-141 is?

15:39:53   9   A.    This is one of the standard reports that Shire would

15:39:58   10   produce from ZoomRx, which was the market research firm that

15:40:04   11   was used for what we call tracking studies, which would be

15:40:08   12   regular work with patients, regular market research work

15:40:16   13   with patients and physicians.

15:40:17   14   Q.    Would you turn to Page 141.57.  Can you tell us what

15:40:28   15   is shown on this page?

15:40:32   16   A.    These are reasons for prescribing the different

15:40:42   17   products indicated for the treatment of acute attacks of HAE

15:40:48   18   on the left.  And then on the right, issues that -- well,

15:40:55   19   specifically access issues that would prevent more

15:40:58   20   physicians from using each of the products.

15:41:01   21   Q.    Let me ask you about the left side.  What are the

15:41:04   22   acute attack products that are involved?

15:41:08   23   A.    Here, they are looking at Firazyr, Berinert, and

15:41:11   24   Kalbitor.

15:41:12   25   Q.    Do you see, a few lines below that it says, "The above

Bell - redirect

15:41:17    1    chart presents the primary reason for prescribing that drug,

15:41:21    2    not necessarily the relative attribute ratings."

15:41:24    3            Do you see that?

15:41:25    4    A.    Yes.

15:41:25    5    Q.    Who was being asked the question about the reasons for

15:41:30    6    prescribing the drug?

15:41:32    7    A.    Physicians.

15:41:33    8    Q.    And do you see any indication anywhere on this chart

15:41:40    9    of physicians, prescribing physicians listing price as the

15:41:44    10   primary reason?

15:41:46    11   A.    No.   It's not listed for any of the products,

15:41:51    12   certainly not for Firazyr, and on the right-hand side, it's

15:41:53    13   actually making the point that access issues, which

15:41:57    14   potentially may have something to do with price, are reasons

15:42:00    15   why MD's aren't using more of the product.

15:42:03    16   Q.    In the bar for Firazyr on the left side, there is 67

15:42:08    17   percent.  Do you see that, Primary Reason?  And what was

15:42:12    18   that reason?

15:42:13    19   A.    Well, that's ease of administration.

15:42:17    20            MR. BLUMENFELD:  Thank you very much.   No

15:42:18    21   further questions.

15:42:18    22            THE COURT:  All right.  Thank you, Doctor.  See

15:42:20    23   you again.

15:42:21    24            (Witness excused.)

15:42:27    25            MR. HAUG:  Your Honor, we have one more short

Dron - depo.

15:42:38  1  deposition transcript of 15 minutes.  I can play that.  And

15:42:42  2  we have another live witness, if that is all right.

15:42:45  3            THE COURT:  Yes.

15:42:46  4            MR. HAUG:  The next testimony by deposition will

15:42:49  5  be of Aditi Dron, who is the regulatory affairs manager at

15:42:57  6  Fresenius, and was their designated 30(b)(6) witness on the

15:43:02  7  topic of Fresenius's decision to pursue and develop a

15:43:06  8  generic version of Firazyr.

15:43:19  9            May I hand up some binders?

15:43:21  10            THE COURT:  Yes.

15:43:32  11            "Question:  Could you please state your name

15:43:33  12  and address for the record?

15:43:35  13            "Answer:  Aditi Dron, 5312 Galloway Drive,

15:43:41  14  Hoffman Estates, Illinois  60192.

15:43:46  15            "Question:  Is there any reason that you can't

15:43:48  16  provide true and accurate answers today?

15:43:50  17            "Answer:  No.

15:43:51  18            "Question:  And I'm now handing you what's been

15:43:54  19  marked as Exhibit 3.  It's the notice of deposition for

15:44:03  20  Fresenius Kabi, the 30(b)(6) notice.  Do you recognize this

15:44:08  21  document?

15:44:09  22            "Answer:  Yes.

15:44:18  23            "Question:  Do you understand that you have been

15:44:20  24  designated as a witness to testify about certain topics

15:44:24  25  within this notice of deposition?

Dron - deposition reading

15:44:25    1        "Answer:  Yes.

15:44:29    2        "Question:  Do you understand that you were

15:44:30    3   designated to testify concerning Topic 8?

15:44:42    4        "Answer:  Yes.

15:44:43    5        "Question:  Well, Ms. Dron is also here in her

15:44:47    6   individual capacity, so Ms. Dron, to the extent you can tell

15:44:54    7   me from your personal knowledge, your interaction with Ms.

15:45:01    8   Schladt and her department, what's the -- what are the

15:45:06    9   typical stages of Fresenius's assessment of new products?

15:45:15   10        "Answer:  At Fresenius Kabi USA new products are

15:45:19   11   assessed by -- or at least the responsibility for

15:45:22   12   coordination of these assessments lies with the portfolio

15:45:28   13   management group; however, it is a collective activity and

15:45:32   14   decision involving multiple departments and roles.

15:45:41   15        "Question:  Okay.  And how typically -- who

15:45:48   16   presents typically a new idea from the beginning?

15:45:58   17        "Answer:  For example, for icatibant portfolio,

15:46:04   18   management follows the process called new project approval.

15:46:11   19   There are multi-faceted information that are collected about

15:46:19   20   the target molecule and they are compiled into a new project

15:46:34   21   approval package.  This package is reviewed and assessed by

15:46:38   22   a multi-disciplinary high level team and based on their

15:46:42   23   assessment either these get approved or they do not get

15:46:53   24   approved.

15:46:54   25        "Question:  With respect to icatibant prior to

Dron - deposition reading

15:47:03  1    undergoing the new product approval process, where does the

15:47:08  2    idea of -- well, strike that.

15:47:12  3            "Prior to the new product approval process for

15:47:19  4    icatibant, what department was responsible at Fresenius for

15:47:30  5    deciding icatibant should undergo that process?

15:47:43  6            "Answer:  I think it initiates there in

15:47:45  7    portfolio management.

15:47:47  8            "Question:  So it initiates with Ms. Schladt's

15:47:50  9    group?

15:47:51  10           "Answer:  I believe so.

15:47:56  11           "Question:  And do you know what type of

15:48:00  12   research Ms. Schladt's group, portfolio management,

15:48:04  13   undertook with respect to icatibant in terms of deciding

15:48:08  14   icatibant would undergo the new product approval process?

15:48:12  15           "Answer:  Yes.

15:48:17  16           "Question:  Okay.  And what -- what did they do?

15:48:22  17           "Answer:  It involves detailed financial

15:48:24  18   analysis, regulatory review, active pharmaceutical

15:48:27  19   ingredient sourcing, legal review and assessment,

15:48:30  20   manufacturing and operations review and assessment,

15:48:42  21   strategic fit within the portfolio assessment, and there may

15:49:05  22   be some that I may have missed.

15:49:07  23           "Question:  Okay.  And what documentation is

15:49:17  24   generally -- or is generated with respect to this new

15:49:25  25   product approval process, and we can focus on icatibant?

Dron - deposition reading

15:49:29  1    "Answer:  It's called the NPA.  I mentioned new

15:49:32  2    project approval before.  So that's the terminology that's

15:49:36  3    used for that information package.

15:49:43  4         "Question:  Oh, I've been told that I'm calling

15:49:47  5    it new product approval.  Is it new product approval or new

15:49:51  6    project approval process?

15:49:54  7         "Answer:  I believe it's new project.

15:50:03  8         "I am calling it NPA.

15:50:06  9         "Question:  We can -- how about we call it NPA,

15:50:10  10   and whether it's project or product, I think we were all

15:50:12  11   talking about the same thing, so I think we're clear.

15:50:16  12         "And when was the NPA approved, do you know?

15:50:20  13         "Answer:  Yes, the NPA was approved in July

15:50:23  14   2014.

15:50:26  15         "Question:  Ms. Dron, I'm going to hand you now

15:50:30  16   what's been marked as Exhibit 7.  It's Bates-stamped as FKIA

15:50:36  17   4572 through 4575.

15:50:44  18         "Ms. Dron, this is -- excuse me -- a January

15:50:53  19   3rd, 2014 e-mail from Jay Kao at Fresenius.  Do you

15:51:02  20   recognize this e-mail?

15:51:04  21         "Answer:  Yes, I do.

15:51:06  22         "Question:  Oh, and how do you recognize the

15:51:13  23   e-mail?

15:51:16  24         "Answer:  What I meant is that I can -- I can

15:51:19  25   read it.  I have not seen it before.

Dron - deposition reading

15:51:21  1        "Question:  Oh, thank you.

15:51:23  2        "In what department is Lindsay Thomas in at

15:51:28  3  Fresenius?

15:51:29  4        "Answer:  Lindsay Thomas is in marketing.

15:51:31  5        "Question:  Thank you.

15:51:33  6        "Do you have an understanding, Ms. Dron, of what

15:51:36  7  Fresenius was doing in its pursuit of icatibant from

15:51:41  8  September 2013, which was the time frame of Exhibit 6, until

15:51:50  9  the date of this e-mail in January of 2014?

15:52:01  10       "Answer:  I believe Fresenius was collecting

15:52:03  11  data and preparing assessment for the new project's

15:52:06  12  approval.

15:52:07  13       "Question:  And, Ms. Dron, I have marked

15:52:12  14  Exhibit 10, which is an e-mail with three attachments,

15:52:18  15  ranging from FKIA 18,646 to 19,554.

15:52:36  16       "Actually, I just called it an e-mail, but it's

15:52:41  17  a meeting invite, excuse me.  If you could just tell me,

15:52:45  18  have you seen this meeting invite before?  You don't need to

15:52:49  19  look at all the attachments.  Just let me know if you have

15:52:53  20  seen the meeting invite.

15:52:59  21       "Answer:  No, I have not seen this before.

15:53:00  22       "Question:  The subject says icatibant pre-feas.

15:53:08  23  My understanding is that pre-feas would be pre-feasibility.

15:53:14  24  Is that your understanding?

15:53:17  25       "Answer:  Yes, it is.

Dron - deposition reading

15:53:19   1      "Question:  Do you know what pre-feasibility

15:53:22   2   stands -- means?  Is that a stage of your NPA process?

15:53:28   3      "Answer:  Pre-feasibility in my understanding

15:53:34   4   would be referring to a time during which an NPA packet is

15:53:40   5   being proposed, research is being conducted, so it's a

15:53:47   6   different time frame before -- before -- while the product

15:54:02   7   is being considered and it has actually not been approved as

15:54:10   8   a project to actually start working on.

15:54:14   9      "Question:  -- you can see that he mentions,

15:54:19   10   dear all, and then he goes on to say this one has an urgent

15:54:24   11   NCE-1 date of August 2015; do you see that?

           12      "Answer:  Yes.

15:54:34   13      "Question:  Is the NCE-1 date the date that

15:54:43   14   Fresenius was seeking to meet for submitting their icatibant

15:54:51   15   ANDA to the FDA?

15:54:53   16      "Answer:  Yes.

15:54:53   17      "Question:  And is -- NCE-1 is the first date

15:54:57   18   that a generic could file for icatibant; correct?

15:55:05   19      "Answer:  Yes, that is my understanding.

15:55:07   20      "BY MS. CHUBB:

15:55:16   21      "Question:  Ms. Dron, I am marking Exhibit 27,

15:55:19   22   which is Bates numbered FKIA 27532 to 533.  It's a

15:55:27   23   September 1st, 2014, e-mail from Nicole Pansy.  Do you

15:55:32   24   recognize this e-mail, Ms. Dron?

           25      "Answer:  Yes.

Dron - deposition reading

15:55:38    1        "Question:  And the subject is icatibant PFS

15:55:53    2   U.S. start workshop dates.  What is a start workshop, Ms.

15:56:18    3   Dron?

15:56:19    4        "Answer:  I would describe a start workshop as

15:56:23    5   one of the first meetings or a kickoff meeting for a project

15:56:31    6   where all the core team members are invited, and it is a

15:56:36    7   first in a series of meetings that are held for achieving a

15:56:45    8   certain goal of the project.

15:56:48    9        "Question:  Okay.  And in terms of kind of a

15:57:02   10   timeline of a project's stages, is it fair to say that there

15:57:06   11   is a feasibility stage that then moves to an approved stage,

15:57:13   12   that then begins with this start workshop once the project

15:57:19   13   is approved?  Or if that's not an accurate portrayal, can

15:57:28   14   you help with the general stages that begin before the start

15:57:37   15   workshop or that happen before that?

15:57:40   16        "Answer:  So I agree with what you said.

15:57:43   17   Starts with feasibility and then moves on to becoming a

15:57:46   18   project once the NPA's approved, and then the project work

15:57:51   19   begins and start workshop would be in the beginning of the

15:57:56   20   actual work to develop the project -- or to develop the

15:57:59   21   product.

15:58:00   22        "Question:  Okay.  And, Ms. Dron, you have no

15:58:04   23   reason to doubt this is a true and accurate copy of an

15:58:07   24   e-mail created and maintained by Fresenius in the ordinary

15:58:19   25   course of this business?

Wingefeld - direct

| | | |
|---|---|---|
| 15:58:20 | 1 | "Answer:  No doubt." |
| 15:58:21 | 2 | (End of videotaped deposition.) |
| 15:58:31 | 3 | MR. HAUG:  Plaintiffs call as their next witness |
| 15:58:36 | 4 | Dr. Renate Wingefeld. |
| 15:58:39 | 5 | THE COURT:  Okay. |
| 15:58:59 | 6 | ... RENATE WINGEFELD, having been duly |
| 15:59:24 | 7 | sworn as a witness, was examined and testified |
| 15:59:26 | 8 | as follows ... |
| 15:59:37 | 9 | THE COURT:  Good afternoon. |
| 15:59:38 | 10 | THE WITNESS:  Good afternoon. |
| 15:59:41 | 11 | MR. HAUG:  We have some heavy binders.  I'm |
| 15:59:43 | 12 | sorry. |
| 15:59:43 | 13 | (Binders handed to the Court and to the |
| 15:59:45 | 14 | witness.) |
| 16:00:28 | 15 | MR. HAUG:  May I begin, Your Honor? |
| 16:00:31 | 16 | THE COURT:  Yes. |
| 16:00:32 | 17 | DIRECT EXAMINATION |
| 16:00:34 | 18 | BY MR. HAUG: |
| 16:00:35 | 19 | Q.    Good afternoon, Dr. Wingefeld. |
| 16:00:36 | 20 | A.    Good afternoon. |
| 16:00:37 | 21 | Q.    Where do you reside? |
| 16:00:38 | 22 | A.    I reside in Geisenheim in Germany. |
| 16:00:45 | 23 | Q.    And what is your current occupation? |
| 16:00:46 | 24 | A.    I'm a senior counsel at Sanofi, Sanofi Aventis Pharma |
| 16:00:54 | 25 | Deutschland.  I'm in the intellectual property department in |

Wingefeld - direct

16:01:02   1   the Pharma Group in Frankfurt, Germany.

16:01:06   2   Q.    How long have you been with Sanofi Aventis Deutschland

16:01:11   3   GmbH?

16:01:13   4   A.    I have been with this company and predecessor

16:01:16   5   companies for more than 30 years now.

16:01:18   6   Q.    And were you in a particular department at Sanofi

16:01:21   7   Aventis?

16:01:22   8   A.    Yes.   I started in the Pharma Patents Department.

16:01:28   9   That's the same department as I'm now.   Now it's called the

16:01:31   10   Global Intellectual Property Department.

16:01:33   11   Q.    And what are your basic responsibilities as senior

16:01:38   12   counsel in the Pharma Patents Or Intellectual Property

16:01:43   13   Department?

16:01:44   14   A.    I oversee drafting, filing and prosecution of the

16:01:50   15   patent applications worldwide.   I handle also petition

16:01:58   16   papers and patent registration papers and also license

16:02:02   17   agreements with regard to IP matters on the project I'm

16:02:07   18   working with.

16:02:08   19          I communicate with outside prosecution counsel,

16:02:16   20   and I advise and counsel the scientists and other clients

16:02:21   21   from our company on IP matters.

16:02:24   22   Q.    What is your educational background following the

16:02:29   23   equivalent of high school?

16:02:30   24   A.    After high school, in 1976 I started studying

16:02:40   25   chemistry at the University of Giessen in Germany.   I

Wingefeld - direct

16:02:45   1   received my diploma in 1982.  And then I started a Ph.D.

16:02:54   2   program also at this University.  I received my Ph.D. in

16:03:00   3   inorganic chemistry in 1985, and in 1993, I became a

16:03:08   4   European patent attorney.

16:03:10   5   Q.    Do you have to take an exam of any kind to become a

16:03:15   6   European patent attorney?

16:03:17   7   A.    Yes.  I had to take an exam, and I also had to work in

16:03:23   8   a patent department for several years.

16:03:26   9   Q.    What did you study as you were becoming a Ph.D.?

16:03:31   10  A.    I studied chemistry and I received my diploma in

16:03:38   11  inorganic chemistry.

16:03:43   12  Q.    Approximately, how many U.S. patent applications have

16:03:46   13  you been involved in prosecuting during your career?

16:03:52   14  A.    Those are approximately 300 U.S. patent applications.

16:03:59   15  Q.    How many of those applications have been in the

16:04:01   16  pharmaceutical area?

16:04:02   17  A.    That would be almost all.

16:04:06   18  Q.    Are you familiar with U.S. Patent 5,648,333?

16:04:16   19  A.    Yes.

16:04:17   20  Q.    And you can actually, if you would please look at one

16:04:21   21  of your binders, JTX-1.  That's the smallest one.

16:04:31   22  A.    Yes.

16:04:31   23  Q.    Volume 3 of 3.  It's the smallest one.

16:04:35   24  A.    Yes.

16:04:41   25  Q.    And do you recognize JTX-1?

Wingefeld - direct

16:04:45    1   A.    I'm sorry.

16:04:54    2   Q.    Right.  It's the smaller binder.

16:04:56    3   A.    Oh.

16:04:58    4   Q.    The tabs are on the side.  Do you see that, JTX?

16:05:02    5   A.    One?

16:05:02    6   Q.    One.

16:05:06    7   A.    Oh, I'm sorry.  Yes.

16:05:09    8   Q.    Okay.  Do you recognize that document?

16:05:12    9   A.    Yes.

16:05:13   10   Q.    What is it?

16:05:15   11   A.    This is the certified copy of the U.S. Patent

16:05:21   12   5,648,333.

16:05:23   13   Q.    Is it okay, is it acceptable to you if I refer to this

16:05:28   14   document as the '333 patent?

16:05:30   15   A.    Yes.

16:05:32   16   Q.    Thank you.

16:05:33   17         How did you become familiar with the '333

16:05:35   18   patent, Dr. Wingefeld?

16:05:37   19   A.    I was the in-house prosecuting attorney for this '333

16:05:50   20   patent.  I was responsible for the initial filing of this

16:05:59   21   priority document, so I think from the beginning.

16:06:01   22   Q.    Who drafted the original patent application which

16:06:05   23   ultimately became the '333 patent?

16:06:08   24   A.    I did.

16:06:10   25   Q.    Were you responsible for prosecuting the '333 patent

Wingefeld - direct

16:06:14    1    from initial filing in the U.S. to issuance?

16:06:18    2    A.    Yes.  However, there was some point when I was on

16:06:25    3    maternity leave, where I didn't work at all.

16:06:30    4    Q.    Do you recall when that was?

16:06:31    5    A.    Yes.  That was from July '92 until July '93.

16:06:38    6    Q.    Dr. Wingefeld -- withdrawn.

16:06:44    7          I would like you to go to JTX-1.2.  That's the

16:06:48    8    second page.

16:06:50    9    A.    Yes.

16:06:51   10    Q.    Do you know when the first application was filed that

16:06:56   11    led to the '333 patent?

16:06:58   12    A.    Yes.  The first application was filed in the U.S. on

16:07:07   13    June 30th, 1989.

16:07:09   14    Q.    And do you know when the patent issued?

16:07:12   15    A.    Yes.  It issued on July 15th, 1997.

16:07:16   16    Q.    And looking still at this page of JTX-1.2, who are the

16:07:25   17    inventors?

16:07:26   18    A.    The inventors are Stephen Henke, Gerhard Briepohl,

           19    Jochen Knolle, Jens Stechl, Bernward Scholkens, Hans-Wolfram

16:07:43   20    Fehlhaber, Hermann Gerhards and Franz Hock.

16:07:45   21    Q.    Do you know where the inventors were residing at the

16:07:48   22    time of the filing of this patent application?

16:07:50   23    A.    All were residing in Germany.

16:07:54   24    Q.    And do you know, are you familiar with a company

16:07:57   25    called Hoechst?

Wingefeld - direct

16:07:58    1    A.    Yes, of course.

16:08:00    2    Q.    And what is Hoechst?

16:08:01    3    A.    Hoechst is a pharmaceutical company.  At that time, it

16:08:06    4    was a chemical company.

16:08:09    5    Q.    Is it related to Sanofi?

16:08:11    6    A.    Yes.  It's the predecessor company of Sanofi.

16:08:14    7    Q.    And where was Hoechst AG located at the time of the

16:08:17    8    filing of the patent application?

16:08:19    9    A.    It was located in Frankfurt Main, in Germany.

16:08:27   10    Q.    Can you tell me who were the U.S. prosecuting

16:08:30   11    attorneys for the '333 patent?

16:08:33   12    A.    Yes.  This was the Finnegan firm.  Finnegan,

16:08:42   13    Henderson, Farabow, Garrett & Dunner.

16:08:42   14    Q.    And if you would stay on this page and go to the

16:08:44   15    left-hand column where it says, related U.S. applications

16:08:47   16    data.

16:08:48   17          Do you see that?

16:08:49   18    A.    Yes.

16:08:49   19    Q.    It's also on the screen in front of you.

16:08:53   20          And what is this section of the patent informing

16:08:57   21    you?

16:08:57   22    A.    Oh, those show all of the patent applications which

16:09:03   23    finally led to the '333 patent.

16:09:10   24    Q.    And based on your experience in prosecuting U.S.

16:09:13   25    patents, was the '333 patent prosecution more or less

Wingefeld - direct

16:09:19  1  complicated than the average application you handled as far

16:09:23  2  as the number of applications that were filed?

16:09:25  3  A.    Yes.  It definitely was.

16:09:27  4  Q.    Definitely was what?

16:09:29  5  A.    Was more complicated.

16:09:31  6  Q.    Okay.  Please move down on the left-hand column to the

16:09:38  7  next section where it says foreign application priority

16:09:42  8  data.

16:09:42  9        Do you see that?

16:09:43  10  A.    Yes.

16:09:43  11  Q.    And what is the information contained there?  What

16:09:46  12  does that say?

16:09:46  13  A.    This shows the priority data which were filed before

16:09:54  14  those patent applications were filed in the U.S., and those

16:10:00  15  were the initial filings which led to the '333 patent.

16:10:07  16  Q.    Are these patent applications that were filed in

16:10:11  17  Germany?

16:10:12  18  A.    Yes.

16:10:12  19  Q.    What was Hoechst's goal in the prosecution of the '333

16:10:23  20  patent, if you know?

16:10:24  21  A.    The goal was, as it is always, to get all claims

16:10:31  22  allowed where a patent application is applied for.

16:10:41  23  Q.    Did you meet with the inventors when you were drafting

16:10:44  24  the first patent application?

16:10:45  25  A.    Yes, I did.  We had a designated inventor out of this

Wingefeld - direct

16:10:55    1    group, who I mainly was working with.

16:10:58    2    Q.     And you mentioned that it was the goal of Hoechst to

16:11:07    3    acquire patent protection for all of the claims that they

16:11:11    4    were applying for; is that right?

16:11:12    5    A.     Yes.

16:11:13    6    Q.     And were the actions taken during the prosecution of

16:11:16    7    the '333 patent consistent with that goal?

16:11:19    8    A.     Yes.

16:11:20    9    Q.     What was the general approach used by Hoechst at this

16:11:29   10    time at the filing of this patent application to protect

16:11:32   11    inventions within the company?

16:11:34   12    A.     Oh, the procedure was that the, all the inventors,

16:11:43   13    they are required to file an information disclosure to the

16:11:48   14    company, and then the company will decide if they want to

16:11:54   15    claim it and want to file it at present.  If they don't

16:11:59   16    decide to file it, then it's up to the inventor.  They can

16:12:04   17    go for filing and pursuing a patent on their invention.

16:12:11   18         So in this case we decided to file a patent on

16:12:18   19    this one, and then we -- so I did then work together with

16:12:27   20    the designated inventor, to work out the specification and

16:12:33   21    drafting the claims for the first initial German priority

16:12:38   22    filing.

16:12:45   23    Q.     Do the inventors for this patent -- withdrawn.

16:13:00   24         Are the inventors for this patent entitled to

16:13:01   25    any remuneration?

Wingefeld - direct

16:13:04    1    A.    Yes, they are.

16:13:04    2    Q.    Just generally, what is your understanding of

16:13:07    3    remuneration to which they are entitled?

16:13:11    4    A.    They get reimbursed later on, on the profit, what

16:13:17    5    comes out of the patent.

16:13:19    6    Q.    Do the inventors have any say during the prosecution?

16:13:24    7    A.    Yes.  So when they file this invention disclosure and

16:13:33    8    they would show what the invention is, then when we want to

16:13:39    9    limit the claims perhaps, then we have to ask them first,

16:13:44   10    because we cannot just do it as a company from ourselves to

16:13:49   11    make any changes to the claim and to what's in the

16:13:53   12    specification, what's in the -- what the invention was, we

16:13:57   13    cannot limit the invention ourselves.

16:14:00   14    Q.    So still looking at JTX-1, which is the cover page of

16:14:08   15    the '333 patent, can you tell us what the first priority

16:14:13   16    document was that you prepared?

16:14:16   17    A.    The first priority document that was filed on November

16:14:22   18    24th, 1988, it has the German Patent Application No.

16:14:38   19    3839581.9.

16:14:41   20    Q.    Does the '333 patent as it issued, does it include the

16:14:47   21    disclosures from each of these five foreign German

16:14:51   22    applications?

16:14:52   23    A.    Yes, it does.

16:14:53   24    Q.    And the inventors, which we saw before, are they the

16:14:58   25    inventors that participated in the disclosures in one or

Wingefeld - direct

| | | |
|---|---|---|
| 16:15:05 | 1 | more of these five applications? |
| 16:15:06 | 2 | A.    Yes. |
| 16:15:07 | 3 | Q.    So is it the case that the inventors may not be |
| 16:15:11 | 4 | inventors on all the claims that ultimately issued? |
| 16:15:14 | 5 | A.    Yes. |
| 16:15:14 | 6 | Q.    Did you prepare -- did you review the file histories |
| 16:15:24 | 7 | for all of these -- all of these file histories which are |
| 16:15:27 | 8 | listed in the '333 patent, have you reviewed these file |
| 16:15:31 | 9 | histories in preparation for this testimony? |
| 16:15:32 | 10 | A.    Yes, I did. |
| 16:15:33 | 11 | Q.    I am not going to ask you how many pages they are. |
| 16:15:36 | 12 | But I would ask you how you reviewed them and analyzed them |
| 16:15:42 | 13 | in preparation for your testimony today? |
| 16:15:46 | 14 | A.    I looked at the file histories in these two binders, |
| 16:15:55 | 15 | and I looked through all these pages, and -- and prepared |
| 16:16:01 | 16 | for this. |
| 16:16:03 | 17 | Q.    Did you prepare a summary? |
| 16:16:06 | 18 | A.    Yes. |
| 16:16:07 | 19 | Q.    You should have a white binder. |
| 16:16:12 | 20 | A.    Yes.  I did this because, as I told you earlier, it's |
| 16:16:22 | 21 | a very complex situation, the file history.  So I did this, |
| 16:16:32 | 22 | which I think this chart, which is PDX5.1, will help me to |
| 16:16:44 | 23 | explain what happened. |
| 16:16:48 | 24 |         MR. HAUG:  Your Honor, may I put a blowup of |
| 16:16:51 | 25 | this particular chart up? |

Wingefeld - direct

16:16:53   1          THE COURT:  Yes.

16:16:54   2          MR. HAUG:  Thank you very much.

16:17:10   3   BY MR. HAUG:

16:17:10   4   Q.    This is just an enlarged copy of PDX-5.1, if that is

16:17:16   5   easier to see, I am not sure it is.  It is a little bit far

16:17:19   6   away.

16:17:26   7          I would like you to turn to Volume 1 of 3.  This

16:17:29   8   is one of the big binders.  And there are a number of

16:17:41   9   exhibits in this binder.  Let's start with the first one.

16:17:45  10   And can you -- do you know what JTX-2 is?

16:17:50  11   A.    Yes.

16:17:50  12   Q.    What is it?

16:17:52  13   A.    JTX-2 is the file history of the U.S. Application

16:18:03  14   08/487,442, and this includes, also, this is the file

16:18:14  15   history of this section that's shown on this chart in purple

16:18:24  16   at the very end of Group 1.

16:18:26  17   Q.    What is the number on that chart that you have?  5.1?

16:18:32  18   A.    5.1.

16:18:33  19   Q.    What is the U.S. serial number, just so the record is

16:18:36  20   clear?

16:18:38  21   A.    U.S. Serial Number is 08/487,442.

16:18:42  22   Q.    What is the next exhibit in this binder, which is

16:18:46  23   JTX-6?

16:18:52  24   A.    This is the file history of U.S. Serial No.

16:18:58  25   07/982,052.

Wingefeld - direct

16:19:05   1    Q.    Where does that appear on your chart PDX-5.1?

16:19:10   2    A.    This appears on the chart in the Group 1, which is

16:19:15   3    depicted in green.

16:19:23   4    Q.    There is one more exhibit in this big binder, JTX-7.

16:19:28   5    What is that, if you know?

16:19:31   6    A.    That is the file history of U.S. Patent Application

16:19:36   7    08/236,018.  That's the file history of those two

16:19:45   8    applications depicted in purple, which are shown as U.S.

16:19:53   9    Serial No. 08/236,018 and U.S. Serial No. 08/012,849.

16:20:00   10   Q.    Now, looking at your chart, PDX-5.1, you set forth

16:20:09   11   Group 1, Group 2 and Group 3.  Do you see that?

16:20:12   12   A.    Yes.

16:20:12   13   Q.    Could you please explain to the Court what Group 1,

16:20:14   14   Group 2 and Group 3 represent?

16:20:18   15   A.    Okay.  So we have filed three groups of independent

16:20:29   16   and distinct inventions, the Group 1 depicted in green, the

16:20:39   17   Group 2, depicted in blue, and the Group 3, depicted in

16:20:45   18   pink.  And at a certain point during prosecution, we

16:20:51   19   consolidated those three groups into a patent application,

16:20:58   20   and this consolidated group is depicted in purple here.

16:21:02   21   Q.    What is the serial number of the consolidated patent

16:21:06   22   application?

16:21:08   23   A.    The serial number is U.S. 08/012,849.

16:21:15   24   Q.    And when was that filed?

16:21:16   25   A.    This was filed on February 3rd, 1993.

16:21:20    1    Q.    What is the first application that you filed that

16:21:28    2    contains all of the subject matter which is contained in the

16:21:32    3    '333 patent which issued?

16:21:36    4    A.    The first application was filed containing, comprising

16:21:40    5    all the subject matter of those invention -- of the three

16:21:45    6    inventions, was the U.S. Application No. 08/012,849.

16:21:53    7    Q.    And that's all the one at -- the top one in purple.

16:21:58    8    Is that right?

16:21:58    9    A.    Yes.

16:21:58    10   Q.    And you said that the Groups 1, 2 and 3 represent

16:22:04    11   independent and distinct inventions.  What do you mean by

16:22:08    12   that?

16:22:10    13   A.    Those -- so we had received three independent

16:22:18    14   invention disclosure forms.  So we filed three independent

16:22:24    15   groups of priority applications, and we also prosecuted them

16:22:31    16   outside the U.S. as independent patent groups.

16:22:37    17              MR. WIESEN:  Your Honor, I don't mean to cut off

16:22:38    18   the witness.  I have a discovery-related objection.  To the

16:22:41    19   extent we get into the invention disclosures as a basis, I

16:22:45    20   don't believe they have been produced in the case.

16:22:48    21              MR. HAUG:  Other than asking the witness what

16:22:49    22   the process was, I am not asking anything about them.

16:22:52    23              MR. WIESEN:  With that, that's fine.  I didn't

16:22:54    24   know whether we were about to get into the details, Your

16:22:57    25   Honor.

Wingefeld - direct

| 16:22:57 | 1 | THE COURT:  Apparently not. |

16:23:02    2        THE WITNESS:  So we prosecuted Groups 1, 2 and 3

16:23:08    3    separately, because they were related to the different

16:23:18    4    invention disclosure forms.

16:23:21    5    BY MR. HAUG:

16:23:22    6    Q.    Groups 1, 2 and 3 were being prosecuted separately.

16:23:26    7    Is that what you are saying?

16:23:27    8    A.    Yes.

16:23:27    9    Q.    And then did all three of these groups come together

16:23:31   10    in the consolidated application which you just referred to

16:23:35   11    as the '849 application?

16:23:37   12    A.    Yes.

16:23:37   13    Q.    That was in February of 1993.  Is that correct?

16:23:42   14    A.    That's correct.

16:23:42   15    Q.    Do the three groups have different priority dates?

16:23:57   16    A.    Yes, they have.

16:24:01   17        So Group 1 has three different priority dates.

16:24:07   18    The first one is DE P 38 39 581.9 filed on November 24th,

16:24:19   19    1988.

16:24:23   20        The second one in this Group 1 is DE P 39 16

16:24:34   21    291.5, filed on May 19th, 1989.  And the third one to Group

16:24:45   22    1 is DE P 39 18 225.8, filed on June 3rd, 1989.

16:24:57   23        Those three priority patent applications

16:25:01   24    resulted in the first U.S. patent application with Serial

16:25:08   25    No. 07/374,162.

Wingefeld - direct

| | | |
|---|---|---|
| 16:25:18 | 1 | Q.    Are you finished?  What is the priority date for the |
| 16:25:20 | 2 | Group 2 applications? |
| 16:25:21 | 3 | A.    For Group 2, the priority date is August 14th, 1989. |
| 16:25:30 | 4 | It was filed as German Patent Application 39 26 822.5. |
| 16:25:38 | 5 | Q.    And what is the priority date for the Group 3 |
| 16:25:41 | 6 | applications? |
| 16:25:42 | 7 | A.    Group 3 was filed, priority application was filed on |
| 16:25:47 | 8 | April 26th, 1990, in a German priority patent application |
| 16:25:54 | 9 | with the No. 40 13 270.6. |
| 16:25:59 | 10 | Q.    And was the inventorship different for Groups 1, 2 and |
| 16:26:03 | 11 | 3? |
| 16:26:04 | 12 | A.    Yes. |
| 16:26:09 | 13 | Q.    Was this -- was the filing of separate groups and |
| 16:26:16 | 14 | separate prosecution, was that a typical practice in your |
| 16:26:19 | 15 | experience? |
| 16:26:19 | 16 | A.    Yes. |
| 16:26:20 | 17 | Q.    Dr. Wingefeld, please turn to the first binder, which |
| 16:26:29 | 18 | I gave you, that has JTX -- let me try to do this |
| 16:26:36 | 19 | differently. |
| 16:26:37 | 20 |         I am going to try to be as quick as we can.  We |
| 16:26:40 | 21 | are not going to walk through all of these applications.  I |
| 16:26:43 | 22 | think the Court has already seen the applications. |
| 16:27:00 | 23 |         Turning back to your chart, on PDX5.1, do you |
| 16:27:05 | 24 | see the designation of CIP? |
| 16:27:08 | 25 | A.    Yes. |

Wingefeld - direct

16:27:09    1    Q.    What do you mean by CIP?

16:27:12    2    A.    CIP is a continuation-in-part application.

16:27:18    3    Q.    What is a continuation-in-part application?

16:27:21    4    A.    That's an application where you add new matter, and

16:27:28    5    you claim the priority of the prior application.

16:27:32    6    Q.    What do you mean by new matter?

16:27:36    7    A.    New matter can be, for instance, new examples, it

16:27:44    8    could also be new data, like IC50 data.

16:27:51    9          We also, new matter -- so we added new claims,

16:27:56   10    you can add new claims or amend claims.

16:28:01   11    Q.    Was the use -- withdrawn.

16:28:03   12          Was the filing of continuation-in-part

16:28:06   13    applications a common practice that you engaged in?

16:28:10   14    A.    Yes, very.

16:28:14   15    Q.    Did you add data and examples when you filed the '149

16:28:34   16    CIP application?

16:28:35   17    A.    Yes, we did.

16:28:37   18    Q.    Can you identify where the '149 application is on your

16:28:45   19    chart?

16:28:46   20    A.    On my chart, the '149 application is in Group 1, the

16:28:52   21    third one, in the middle row from the top.

16:29:00   22    Q.    Was the '149 -- is that a CIP application?

16:29:03   23    A.    Yes, it is a CIP.

16:29:04   24    Q.    And was that filed after receiving an office action in

16:29:08   25    the '162 application?

Wingefeld - direct

16:29:11    1    A.    Yes.

16:29:11    2    Q.    What was the next application that Hoechst filed in

16:29:16    3    Group 1?

16:29:17    4    A.    In Group 1 we filed then a continuation application,

16:29:22    5    which led to the U.S. patent application 07/982,052, and we

16:29:30    6    filed this on November 25th, 1992.

16:29:34    7    Q.    Now, you mentioned a continuation application.   Is

16:29:38    8    that represented by "Con" here?

16:29:40    9    A.    Yes.

16:29:40   10    Q.    What is a continuation application?

16:29:43   11    A.    That is an application where you maintain the priority

16:29:52   12    date, and this application then becomes automatically -- the

16:29:59   13    prior application becomes automatically abandoned.

16:30:02   14    Q.    Was it a common practice to file continuation

16:30:05   15    applications?

16:30:05   16    A.    Yes, very.

16:30:06   17    Q.    Can you approximate, of the 300 or so patent

16:30:10   18    applications that you have prosecuted in the U.S., how many

16:30:13   19    times would you file continuation applications in each of

16:30:16   20    those, or any of those?

16:30:21   21    A.    We did this at the time when we prosecuted the '333

16:30:31   22    patent about -- we did this like maybe 80 percent.

16:30:36   23    Q.    80 percent --

16:30:38   24    A.    60-80 percent, yeah.

16:30:41   25    Q.    Now, are you familiar with the appeal process in the

16:30:57    1    Patent Office?

16:30:58    2    A.    Yes.

16:30:58    3    Q.    And so if you received -- you received office actions

16:31:03    4    in the '333 patent prosecution.  Isn't that right?

16:31:06    5    A.    Yes.

16:31:06    6    Q.    Okay.  When you receive an office action, did you ever

16:31:10    7    appeal any of those office actions?

16:31:14    8    A.    Yes, I did.

16:31:15    9    Q.    I mean in the '333 patent?

16:31:19    10   A.    In the '333, no.  In the '333 we didn't do it because

16:31:25    11   it was the Hoechst strategy not to -- to go on with the

16:31:40    12   prosecution, and not to step into an appeal process, which

16:31:47    13   is a very lengthy process.

16:31:49    14   Q.    Well, based on your experience, in the time frame of

16:31:53    15   1990 to 1995, how long would an appeal take from an office

16:31:59    16   action if you didn't agree with the office action?

16:32:03    17   A.    To my experience, it was around, depending on the

16:32:10    18   specific case, but around three years it took to get a

16:32:15    19   decision.

16:32:15    20   Q.    So if you filed an appeal from an office action, would

16:32:19    21   the prosecution just stop?

16:32:21    22   A.    Yes.

16:32:21    23   Q.    During the pendency of the appeal?

16:32:23    24   A.    Yes.

16:32:23    25   Q.    So what is an alternative to filing an appeal if you

16:32:28    1   receive an office action that you don't agree with?

16:32:31    2   A.    The alternative is definitely to file a continuation

16:32:40    3   application, and there are -- yes.

16:32:51    4   Q.    Now, I would like to focus your attention --

16:32:55    5              MR. WIESEN:  Your Honor, I hate to object.

16:32:57    6   Could we be heard at sidebar on an issue that I am afraid we

16:33:00    7   might get into, if Mr. Haug -- I don't want to do it in

16:33:03    8   front of the witness.

16:33:04    9              (Sidebar conference held as follows.)

16:33:04   10              THE COURT:  Yes, Mr. Wiesen?

16:33:06   11              MR. WIESEN:  I'm afraid we're going to go into

16:33:08   12   an explanation that was not provided in discovery for why

16:33:13   13   the prosecution took as long as it did.

16:33:15   14              Dr. Wingefeld was the 30(b)(6) deponent, the

16:33:19   15   designee of the company, and when we asked her why they

16:33:22   16   didn't respond to particular applications and why they filed

16:33:24   17   continuations and CIPs, all we got was an "I don't know" and

16:33:28   18   "I don't recall."  To the extent what he's doing is setting

16:33:31   19   the foundation for a new explanation that we've not heard

16:33:34   20   before, I think that's inappropriate, especially in the

16:33:38   21   context of a 30(b)(6) designee.

16:33:41   22              MR. HAUG:  I'm only asking, I was only asking

16:33:44   23   the witness based on her experience what typical response

16:33:47   24   would be to an office action.  It wasn't specific to the

16:33:51   25   '333.

Wingefeld - direct

16:33:53    1    MR. WIESEN:  I certainly agree with that, and if

16:33:55    2    he's representing that that is not going to be the testimony

16:33:58    3    she gives and the argument that they make, then that's fine,

16:34:01    4    but if she's going to go further --

16:34:03    5    THE COURT:  It doesn't sound like he intends to

16:34:05    6    do that.

16:34:06    7    MR. HAUG:  I don't.

16:34:06    8    MR. WIESEN:  That was why I wanted to do it at

16:34:08    9    sidebar, and if that's the representation, then I have no

16:34:11   10    objection.

16:34:12   11    THE COURT:  Okay.

16:34:28   12    (End of sidebar conference.)

16:34:38   13    BY MR. HAUG:

16:34:38   14    Q.    I'd like to focus your attention on the '052

16:34:41   15    application in the Group 1.

16:34:43   16    Do you see that?

16:34:43   17    A.    Yes.

16:34:44   18    Q.    Okay.  And your chart says that you filed the '849

16:34:52   19    CIP.

16:34:52   20    Do you see that?

16:34:53   21    A.    Okay.  I see it.

16:34:54   22    Q.    Okay.  Again, why did you file the '849 CIP

16:34:58   23    application?

16:34:58   24    A.    We received obvious-type double patenting rejections

16:35:10   25    in this, in this '052, this Group 1 application, and we also

Wingefeld - direct

16:35:16    1    received obvious-type double patenting rejections and office

16:35:22    2    actions from the Group 2 and Group 3 patent applications,

16:35:27    3    which were pending.  And so we -- we, from reviewing the

16:35:34    4    files, we decided to file this, a patent application and as

16:35:43    5    a consolidated patent application wherein we combined the

16:35:50    6    claims of Group 1, Group 2 and Group 3 applications.

16:35:55    7    Q.    So are the three groups consolidated in order to

16:36:01    8    overcome the obviousness-type double patenting rejection

16:36:04    9    that was raised by the office; is that right?

16:36:06   10    A.    Yes.  This is right, and we also did this to expedite

16:36:12   11    the prosecution of the independent patent application.

16:36:21   12    Q.    Would you please turn to JTX-7.11, Page 11.

16:36:31   13    A.    Yes.

16:36:32   14    Q.    That's in Volume 1 of 3.

16:36:51   15    A.    Yes.

16:36:52   16    Q.    Okay.  And if you turn, what claims are in this

16:36:59   17    application?  This is the '849 application; is that right?

16:37:01   18    A.    This is the '849 application, which was filed on

16:37:06   19    February 3rd, 1993.  And there were the claims from      the

16:37:17   20    previous patent application from Group 1, Group 2     and

16:37:21   21    Group 3.  All the claims were combined in the main claim.

16:37:28   22    Q.    And do the claims that eventually issued in the '333

16:37:32   23    patent cover all three of these groups as consolidated into

16:37:36   24    this application?

16:37:37   25    A.    Yes.

Wingefeld - direct

16:37:38  1    Q.     After combining the three groups, what happened next

16:37:49  2    in the prosecution?

16:37:49  3    A.     Thereafter, we filed a continuation application, which

16:37:58  4    is the '018 patent application.  We filed this on May 2nd,

16:38:08  5    1994.

16:38:08  6    Q.     And did you take any additional actions in the '018

16:38:11  7    application with respect to the office action that had been

16:38:17  8    issued by the Patent Office?

16:38:19  9    A.     Yes, we did.

16:38:20  10   Q.     What were your next steps?

16:38:22  11   A.     The next step was that we conducted an examiner

16:38:33  12   interview.

16:38:34  13   Q.     Where was the interview held?

16:38:36  14   A.     This interview was held in Washington, at the USPTO.

16:38:40  15   Q.     Was it a common practice of yours to conduct

16:38:42  16   interviews with examiners at the USPTO?

16:38:45  17   A.     No.  That was the only time that in my more than

16:38:52  18   30-year career that I conducted personally an interview at

16:38:57  19   the USPTO.

16:38:58  20   Q.     So you traveled to Washington, D.C. for that?

16:39:01  21   A.     Yes.

16:39:01  22   Q.     Who went to that interview?

16:39:03  23   A.     Oh, that was me and the -- my counsel from Finnegan

16:39:13  24   Henderson.

16:39:13  25   Q.     Please turn to JTX-7.261, please.

Wingefeld - direct

16:39:31   1   A.   Okay.

16:39:31   2   Q.   And do you recognize this document?

16:39:35   3   A.   Yes.

16:39:36   4   Q.   What is it?

16:39:37   5   A.   That is the examiner interview summary record of this

16:39:44   6   interview, which was held in this case.

16:39:52   7   Q.   Can you tell when the interview was?  Does it

16:39:56   8   indicate?

16:39:56   9   A.   No.  It's not on this paper, but I -- I recall it.

16:40:05   10   Q.   What do you recall?  When do you recall the interview

16:40:08   11   took place?

16:40:09   12   A.   This was on May 30th, 1995.

16:40:12   13   Q.   And if we could go to where the handwriting is in the

16:40:17   14   middle.

16:40:17   15   A.   Yes.

16:40:18   16   Q.   It's difficult to read.  Can you read it?

16:40:22   17   A.   Yes.  It says, "applicants would present arguments in

16:40:29   18   the present application," and then it says in parentheses,

16:40:36   19   "may file a continuation, to rebut the 101 and 103

16:40:42   20   rejections and may possibly submit declaration for the 112

16:40:46   21   rejection as well as publications.  Applicants may also

16:40:55   22   submit some prior art, such as the Chile patent to show they

16:41:03   23   are not prior art over the claims."

16:41:06   24   Q.   Who wrote that?

16:41:08   25   A.   Examiner Wessendorf.

Wingefeld - direct

16:41:12    1    Q.    So what was the result of the interview?

16:41:15    2    A.    The result was that we want to rebut the 101 and 103

16:41:26    3    rejections and that we may possibly submit a declaration.

16:41:34    4    Q.    And did you file any applications following this

16:41:37    5    interview?  In other words, did you file a response, a

16:41:43    6    further response after this interview?

16:41:45    7    A.    Yes, we did.

16:41:46    8    Q.    What was the next application that you filed?

16:41:48    9    A.    We filed a response in this '018 application and after

16:41:59    10   that, we filed another application, a continuation

16:42:05    11   application, the '442 application, which was filed on

16:42:11    12   June 7, 1995.

16:42:13    13   Q.    Dr. Wingefeld, are you aware that the defendant in

16:42:30    14   this case has alleged that there was an unreasonable or

16:42:33    15   unexplained delay during the prosecution of the '333 patent

16:42:39    16   during the period of May 31, 1991, to June 6, 1995?

16:42:45    17   A.    Yes.

16:42:46    18   Q.    Dr. Wingefeld, at any time did you ever take any

16:42:51    19   action to delay anything in this prosecution or the issuance

16:42:56    20   of the '333 patent?

16:42:57    21   A.    No.

16:42:59    22   Q.    Are you aware of anyone else at Hoechst in the patent

16:43:03    23   department or elsewhere that took any action to try to delay

16:43:08    24   the prosecution of this patent?

16:43:10    25   A.    No.

Wingefeld - direct

| 16:43:11 | 1 | Q.    Did anyone at the company ever tell you or ask you to |
| 16:43:15 | 2 | take action to delay anything? |
| 16:43:16 | 3 | A.    No. |
| 16:43:18 | 4 | Q.    Based on your more than 30 years of experience in U.S. |
| 16:43:27 | 5 | patent prosecution, have you ever taken steps to delay a |
| 16:43:32 | 6 | patent application? |
| 16:43:34 | 7 | A.    No. |
| 16:43:34 | 8 | Q.    Let's talk now about icatibant.  Do you know what |
| 16:43:40 | 9 | icatibant is? |
| 16:43:41 | 10 | A.    Yes. |
| 16:43:41 | 11 | Q.    What is it? |
| 16:43:42 | 12 | A.    It's a bradykinin.  It has peptides having ten amino |
| 16:43:52 | 13 | acids.  Shall I say the sequence? |
| 16:43:59 | 14 | Q.    No. |
| 16:43:59 | 15 | THE COURT:  No. |
| 16:44:02 | 16 | BY MR. HAUG: |
| 16:44:03 | 17 | Q.    You wrote the application on it.  Right? |
| 16:44:05 | 18 | A.    Yes, I did. |
| 16:44:06 | 19 | Q.    Okay.  Do you know which group between Groups 1, 2 and |
| 16:44:12 | 20 | 3 that you've testified about, do you know which group |
| 16:44:16 | 21 | icatibant was in? |
| 16:44:16 | 22 | A.    Yes.  It was in group, it is in Group 1. |
| 16:44:21 | 23 | Q.    Do you know which priority filing would relate to |
| 16:44:25 | 24 | icatibant? |
| 16:44:27 | 25 | A.    Yes, I know this.  This is in Group 1, the second |

Wingefeld - direct

| | | |
|---|---|---|
| 16:44:31 | 1 | filing.  The patent, priority patent application filed on |
| 16:44:36 | 2 | May 19, 1989. |
| 16:44:41 | 3 | Q.    I'd like to turn now to JTX-6.23. |
| 16:44:59 | 4 | A.    Sorry. |
| 16:44:59 | 5 | Q.    Yes. |
| 16:45:00 | 6 | A.    JTX-6? |
| 16:45:07 | 7 | Q.    230, Page 230. |
| 16:45:25 | 8 | A.    Yes. |
| 16:45:26 | 9 | Q.    Are you with me?  Do you know what this document is |
| 16:45:29 | 10 | that I've directed you to? |
| 16:45:30 | 11 | A.    Yes.  This is an amendment, which we filed in the -- |
| 16:45:45 | 12 | which was filed on February 19th, '91. |
| 16:45:50 | 13 | Q.    And did you make any arguments in this response to the |
| 16:45:54 | 14 | first office action in the '162 file? |
| 16:45:58 | 15 | A.    Yes, we did. |
| 16:46:00 | 16 | Q.    And were those arguments in response to the |
| 16:46:04 | 17 | rejections -- withdrawn. |
| 16:46:07 | 18 |         I'd like you to turn to Page 232 and the last |
| 16:46:11 | 19 | sentence. |
| 16:46:12 | 20 | A.    Yes.  Yes. |
| 16:46:16 | 21 | Q.    And you see where it says, "applicants respectfully |
| 16:46:22 | 22 | submit that the in vitro data of the instant specification |
| 16:46:26 | 23 | is in accord with accepted methods of establishing utility |
| 16:46:29 | 24 | by in vitro testing of Bradykinin antagonist action using |
| 16:46:34 | 25 | the modeling disclosed in the specification?" |

Wingefeld - direct

16:46:36    1              Do you see that?

16:46:37    2    A.      No.   I'm sorry.

16:46:46    3    Q.      Okay.   Are you on Page 233?

16:46:52    4    A.      No.   I was on 232.   Sorry.

16:46:56    5    Q.      Probably because I misspoke.   Did I say 232?   I

16:47:00    6    apologize.

16:47:00    7    A.      I'm sorry.

16:47:01    8    Q.      233?

16:47:02    9    A.      Yes.

16:47:02   10    Q.      And it's the section right below --

16:47:04   11    A.      Yes, I see it.

16:47:05   12    Q.      Where it's indented.

16:47:06   13    A.      Yes.

16:47:07   14    Q.      Are you with me now?

16:47:09   15    A.      Yes.

16:47:13   16    Q.      Do you recall what you were saying here in this

16:47:17   17    application response?

16:47:19   18    A.      Yes.   We were saying the in vitro data, which are

16:47:29   19    already in this specification, they will establish the

16:47:36   20    utility of those, of the compounds and concept in this

16:47:43   21    patent application.

16:47:43   22    Q.      What is the in vitro data?

16:47:47   23    A.      In vitro data are data which show efficacy of a

16:47:57   24    compound which, which were not -- those data which didn't

16:48:05   25    come from testing in a living animal.   In a living thing,

Wingefeld - direct

| | | |
|---|---|---|
| 16:48:12 | 1 | not animal. |
| 16:48:13 | 2 | Q.    Was it common practice to include in vitro data in a |
| 16:48:17 | 3 | patent specification? |
| 16:48:20 | 4 | A.    Yes. |
| 16:48:21 | 5 | Q.    During this time, the prosecution of the '333 patent, |
| 16:48:23 | 6 | was it common practice to include in vivo data? |
| 16:48:26 | 7 | A.    No. |
| 16:48:26 | 8 | Q.    Why not? |
| 16:48:27 | 9 | A.    Those -- we thought according to the rules, to have |
| 16:48:40 | 10 | those in vitro data in, and in vivo data are not necessary |
| 16:48:46 | 11 | to establish this utility. |
| 16:49:03 | 12 | Q.    Based on your experience in prosecuting the many cases |
| 16:49:13 | 13 | during the time period of 1991 to 1995, how often did you |
| 16:49:19 | 14 | get a utility, lack of utility, a 101 rejection from the |
| 16:49:26 | 15 | U.S. PTO? |
| 16:49:26 | 16 | A.    In those times, that was quite often.  So I think that |
| 16:49:36 | 17 | might be approximately in 80 percent of the cases I was |
| 16:49:41 | 18 | involved in prosecution. |
| 16:49:42 | 19 | Q.    Did the practice from the U.S. PTO, based on your |
| 16:49:46 | 20 | experience, ever change with respect to rejecting claims for |
| 16:49:51 | 21 | lack of utility under 101? |
| 16:49:53 | 22 | A.    Yes. |
| 16:49:53 | 23 | Q.    And how did it change? |
| 16:49:58 | 24 | A.    Now the U.S. examiners, they don't require in vivo |
| 16:50:04 | 25 | data for showing utility.  So in vitro data are sufficient |

Wingefeld - direct

16:50:09    1    to show this utility requirement.

16:50:14    2    Q.    Please turn to JTX-6.323.  What is this document?

16:50:27    3    A.    This is a preliminary amendment we filed on August

16:50:33    4    14th, 1991, in the '149 patent application.  In this

16:50:46    5    preliminary amendment, we added new examples, those were

16:50:54    6    Examples 165 through 195.  We also submitted additional

16:51:05    7    data, IC50 data for those compounds and also for other

16:51:11    8    compounds, which were already disclosed in the

16:51:16    9    specification.

16:51:18    10          And we did, also, add new claims, 14 through 17,

16:51:27    11    to this application.

16:51:29    12   Q.    Now, you mentioned that you were now adding 165 to 195

16:51:36    13   examples.  Is that right?

16:51:37    14   A.    Yes.

16:51:38    15   Q.    What were those 195 examples directed to?

16:51:43    16   A.    They were all directed to the claims where we applied

16:51:52    17   for.

16:51:52    18   Q.    Were these examples directed to individual compounds

16:51:55    19   or species?

16:51:57    20   A.    Yes.  Those examples were directed to specific

16:52:01    21   compounds, yes.

16:52:02    22   Q.    And was icatibant one of those examples, do you

16:52:06    23   recall?

16:52:07    24   A.    No, it was not one of those additional examples.

16:52:12    25   Icatibant was already disclosed in the specification.

Wingefeld - direct

16:52:15   1   Q.    It was one of the original examples with the

16:52:18   2   application?

16:52:18   3   A.    Yes.

16:52:19   4   Q.    But it was one of the 195 examples now in the case.

16:52:23   5   Right?

16:52:23   6   A.    Yes.

16:52:23   7   Q.    Was in vivo data submitted in connection with any of

16:52:30   8   those 195 examples?

16:52:32   9   A.    No.

16:52:32   10   Q.    Based on your experience, how difficult -- was it

16:52:43   11   difficult to get in vivo data?

16:52:45   12   A.    Yes.

16:52:45   13   Q.    Why?

16:52:49   14   A.    It just was not allowed to do animal testing for each

16:52:58   15   and every compound, was one.  So it was allowed to do animal

16:53:07   16   testing only for those compounds where there was a need to,

16:53:12   17   for instance, development compounds, or for those compounds

16:53:18   18   which we most likely were -- will be elected as a

16:53:28   19   development compound.

16:53:30   20   Q.    Looking at again Page 323 in the upper left corner, it

16:53:35   21   says "Rule 62 CIP."  Do you see that?

16:53:38   22   A.    Yes.

16:53:39   23   Q.    Do you know what that means, Rule 62 CIP?

16:53:42   24   A.    Yes.  Rule 62 is a specific number of an application.

16:53:58   25   And Rule 62 is, usually Hoechst did file mainly Rule 62

16:54:07   1   applications because we thought this will result in an

16:54:12   2   earlier response from the Patent Office, and also, the prior

16:54:18   3   patent application was then automatically abandoned.

16:54:25   4   Q.    Why did you file additional data and examples in this

16:54:29   5   application after receiving the May 31, 1991 final office

16:54:37   6   action?

16:54:39   7   A.    We did this in response to this open final office

16:54:47   8   action, because we at that time thought we had already

16:54:56   9   brought to the examiner our arguments on this.  So we wanted

16:55:03   10   to show the examiner that we could underline our patent

16:55:13   11   application with new data and new examples.

16:55:17   12   Q.    Please turn to JTX-6.  Page 468.

16:55:30   13         Do you recognize this document?

16:55:33   14   A.    Yes.

16:55:34   15   Q.    What is it?

16:55:37   16   A.    This is an office action in the '149 case, which was

16:55:45   17   mailed on July 1st, '92.

16:55:49   18   Q.    And does this office action reject Claim 13?

16:55:57   19   A.    Yes.

16:55:58   20   Q.    Do you know what Claim 13 was directed to at this

16:56:00   21   time?

16:56:00   22   A.    At this time, Claim 13 was directed to icatibant.

16:56:05   23   Q.    And was Claim 13 rejected on more than one ground in

16:56:08   24   this office action?

16:56:10   25   A.    Yes, it was, on various grounds.

Wingefeld - direct

16:56:13   1   Q.    Please turn to JTX-6.476.

16:56:20   2   A.    Yes.

16:56:20   3   Q.    And if we go right below the indent, it says Claims 5

16:56:28   4   to 17 are rejected under 35 U.S.C. 102(f) because the

16:56:35   5   applicant did not invent the claimed subject matter.

16:56:38   6         Do you see that?

16:56:38   7   A.    Yes, I see it.

16:56:39   8   Q.    What is your understanding of that rejection?

16:56:42   9   A.    The examiner -- those claims were not -- cannot be

16:56:54   10   allowed because somebody else did invent this claimed

16:56:59   11   subject matter.  And the examiner goes on and cites two

16:57:06   12   references, which were published in the British Journal of

16:57:12   13   Pharmacology.  And those were the articles Hock, et al., and

16:57:18   14   Wirth, et al.

16:57:22   15   Q.    Are you saying that the examiner rejected Claim 13 for

16:57:26   16   icatibant under 102(f) based on the argument that they did

16:57:33   17   not invent the subject matter and she was relying on the

16:57:37   18   Wirth article?  Is that right?

16:57:38   19   A.    Yes.

16:57:38   20   Q.    If we go on in the prosecution, why did you file the

16:57:55   21   '052 continuation application, which I believe is the next

16:58:01   22   one.  Right?

16:58:02   23   A.    Yes.  That's the next one.

16:58:04   24         So at that time, from the file history, you can

16:58:16   25   see we had various rejections in also the other groups of

Wingefeld - direct

16:58:25   1   patent applications on obviousness-type double patenting.

16:58:32   2           So we were just considering what to do, because

16:58:36   3   we couldn't overcome those rejections in each of those

16:58:43   4   different Groups 1, 2 and 3 on their own.  So we were, yes,

16:58:51   5   trying to change strategy and maybe combining those three

16:58:56   6   patent applications.

16:59:00   7           At that time --

16:59:01   8           MR. WIESEN:  Your Honor, just to be clear, we

16:59:04   9   are talking about the '052 application?

16:59:09   10          MR. HAUG:  That was my question.  And she was

16:59:11   11  talking about that and also related to Groups 2 and 3.

16:59:15   12          MR. WIESEN:  For the '052 application we have an

16:59:18   13  issue related to the question we raised at sidebar.

16:59:21   14          THE COURT:  Well, I think we will take it up

16:59:23   15  tomorrow.  If you have a question, we will talk about it.

16:59:31   16          MR. HAUG:  I will speak to Mr. Wiesen when we

16:59:35   17  finish.

16:59:36   18          THE COURT:  Did you want to ask a final question

16:59:37   19  for the day?

16:59:39   20          MR. HAUG:  I think we can break now.

16:59:42   21          THE COURT:  Thank you, Doctor.  Be careful

16:59:44   22  stepping down.  I need to talk to the lawyers for a moment.

16:59:49   23          (Witness steps down from the stand.)

16:59:51   24          THE COURT:  So where are we?

16:59:52   25          MR. HAUG:  Dr. Wingefeld, obviously, we will

| | | |
|---|---|---|
| 16:59:57 | 1 | finish Dr. Wingefeld tomorrow morning.  We have -- |
| 17:00:00 | 2 | THE COURT:  We may not do it tomorrow morning. |
| 17:00:03 | 3 | We may not.  That's why I want to ask. |
| 17:00:06 | 4 | MR. HAUG:  We only have to finish Dr. Wingefeld, |
| 17:00:09 | 5 | and then we have short testimony from our last witness, Dr. |
| 17:00:14 | 6 | Ellis.  Then we are finished.  We rest. |
| 17:00:16 | 7 | THE COURT:  Mr. Wiesen? |
| 17:00:18 | 8 | MR. WIESEN:  Your Honor, we have a very short |
| 17:00:21 | 9 | deposition to play from a Shire marketing witness.  I think |
| 17:00:25 | 10 | it's less than ten minutes.  Then witnesses responding on |
| 17:00:29 | 11 | commercial success.  So potentially a doctor and an |
| 17:00:32 | 12 | economist. |
| 17:00:33 | 13 | THE COURT:  How much time? |
| 17:00:34 | 14 | MR. WIESEN:  Short.  Two hours maybe total? |
| 17:00:39 | 15 | That may even include the crosses, two and a half maybe, |
| 17:00:43 | 16 | with the crosses. |
| 17:00:44 | 17 | THE COURT:  If we begin at 10:30 on Friday, can |
| 17:00:47 | 18 | we get this done? |
| 17:00:49 | 19 | MR. HAUG:  I don't think there is any problem |
| 17:00:50 | 20 | with respect to that. |
| 17:00:52 | 21 | MR. WIESEN:  If Mr. Haug says so, then I believe |
| 17:00:55 | 22 | so, yes. |
| 17:00:57 | 23 | THE COURT:  If I don't have any difficulty |
| 17:00:59 | 24 | getting back from the airport, then, and we can resume |
| 17:01:03 | 25 | earlier, just be available. |

17:01:05    1                    Let's plan on 10:30.   I would say be here by

17:01:09    2    10:00, yes.  All right.

17:01:11    3                    Good evening.

17:01:13    4                     (Court recessed.)

            5

            6

            7

            8

            9

            10

            11

            12

            13

            14

            15

            16

            17

            18

            19

            20

            21

            22

            23

            24

            25