09:47:22

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                 -   -   -

4    SHIRE ORPHAN THERAPIES LLC and  )     Civil Action
     SANOFI-AVENTIS DEUTSCHLAND      )
5    GMBH,                           )
                                     )
6              Plaintiffs,           )
                                     )
7         v.                         )
                                     )
8    FRESENIUS KABI USA, LLC,        )
                                     )
9              Defendant.            )     No. 15-1102-GMS

10                                -   -   -

11                      Wilmington, Delaware
                       Friday, February 2, 2018
12                          10:12 a.m.
                         Trial Day 4
13                                -   -   -

14

15   BEFORE:   HONORABLE GREGORY M. SLEET, Senior Judge, U.S.D.C.,
                                      District of Delaware
16

17   APPEARANCES:

18           JACK B. BLUMENFELD, ESQ., and
             DAREN J. FAHNESTOCK, ESQ.
19           Morris, Nichols, Arsht & Tunnell LLP
                      -and-
20           EDGAR H. HAUG, ESQ.,
             SANDRA KUZMICH, Ph.D., ESQ.,
21           LAURA A. CHUBB, ESQ., and
             ELIZABETH MURPHY, ESQ.
22           Haug Partners LLP
             (New York, NY)
23
                            Counsel for Plaintiffs
24

25

1     APPEARANCES CONTINUED:

2              KAREN E. KELLER, ESQ.
               Shaw Keller LLP
3                   -and-
               DARYL L. WIESEN, ESQ.
4              WILLIAM G. JAMES, ESQ.,
               JOHN COY STULL, ESQ., and
5              SAMUEL SHERRY, ESQ.
               Goodwin Procter LLP
6              (Washington, DC)

7                                  Counsel for Defendant

8                              -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 10:15:19 | 1 | THE COURT:  Good morning, counsel.  Please, take |
| 10:15:20 | 2 | your seats. |
| 10:15:22 | 3 | Let's see.  Where were we? |
| 10:15:39 | 4 | MR. HAUG:  Your Honor, good morning.  Before we |
| 10:15:42 | 5 | call our witness, who is on direct, Dr. Wingefeld, I wanted |
| 10:15:46 | 6 | to bring to your attention that after Dr. Wingefeld we have |
| 10:15:49 | 7 | one more witness.  And then the defendant's have a video |
| 10:15:52 | 8 | clip, a short one.  And one of their other witnesses is not |
| 10:15:56 | 9 | coming.  So there is only going to be one witness after |
| 10:15:59 | 10 | that.  And we should be finished. |
| 10:16:01 | 11 | THE COURT:  Okay.  And we will talk about |
| 10:16:03 | 12 | post-evidence matters. |
| 10:16:27 | 13 | Good morning, Doctor. |
| 10:16:28 | 14 | THE WITNESS:  Good morning. |
| 10:16:30 | 15 | ... RENATE WINGEFELD, having been previously |
| 10:16:36 | 16 | sworn as a witness, was examined and testified further as |
| 10:16:39 | 17 | follows ... |
| 10:16:40 | 18 | THE COURT:  You are still under oath. |
| 10:16:43 | 19 | DIRECT EXAMINATION CONTINUED |
| 10:16:45 | 20 | BY MR. HAUG: |
| 10:16:46 | 21 | Q.    Good morning, Dr. Wingefeld. |
| 10:16:48 | 22 | A.    Good morning. |
| 10:16:49 | 23 | Q.    I would like to resume with some questions, and start |
| 10:16:53 | 24 | with exhibit JTX-7A, which is in Volume 1 of 3.  I would |
| 10:17:07 | 25 | like you to please turn to JTX-7AG736. |

| | | |
|---|---|---|
| 10:17:19 | 1 | A.    Yes. |
| 10:17:19 | 2 | Q.    Do you recognize this document? |
| 10:17:21 | 3 | A.    Yes. |
| 10:17:21 | 4 | Q.    What is it? |
| 10:17:23 | 5 | A.    This is the specification, the newly signed |
| 10:17:32 | 6 | specification we filed, we filed on February 3rd, 1993.  And |
| 10:17:44 | 7 | this is the '849 case. |
| 10:17:47 | 8 | Q.    Thank you.  Do you know how many compounds are set |
| 10:17:50 | 9 | forth in the examples? |
| 10:17:53 | 10 | A.    Oh, more than -- I can look it up. |
| 10:17:56 | 11 |         More than 200. |
| 10:17:59 | 12 | Q.    Do you know how many claims were filed in this |
| 10:18:01 | 13 | application? |
| 10:18:03 | 14 | A.    Yes.  There were new claims, more than 30 -- yes, 34. |
| 10:18:14 | 15 | Q.    Among those more than 200 examples, do you know which |
| 10:18:17 | 16 | one is for icatibant? |
| 10:18:22 | 17 | A.    The example number? |
| 10:18:24 | 18 | Q.    Yes, please, if you know. |
| 10:18:26 | 19 | A.    Oh, I think 59.  May I double-check? |
| 10:18:40 | 20 |         Yes.  59. |
| 10:18:42 | 21 | Q.    Was it your goal at the time during the prosecution to |
| 10:18:47 | 22 | get allowed claims for all of the compounds set forth in the |
| 10:18:51 | 23 | specification? |
| 10:18:51 | 24 | A.    Yes, all. |
| 10:18:52 | 25 | Q.    Was it also your goal to get all of the claims that |

10:18:55  1   were submitted with this application allowed?

10:18:57  2   A.    Yes, it was.

10:18:59  3   Q.    Was in vivo data ever submitted for all of the

10:19:03  4   compounds set forth in the examples?

10:19:05  5   A.    No.

10:19:06  6   Q.    Please turn to JTX-7A.124.  Can you identify this

10:19:19  7   document?

10:19:19  8   A.    Yes.  This is a table of compounds, including IC50

10:19:25  9   data on this page for Examples 1 to 32.

10:19:33  10  Q.    Thank you.  Can you briefly tell us what IC50 data is?

10:19:39  11  A.    IC50 data gives you the activity of a compound in an

10:19:45  12  in vitro model.

10:19:48  13  Q.    So is this in vitro data set forth on this page?

10:19:52  14  A.    Yes.

10:19:52  15  Q.    Please turn to JTX-7A.197.  Do you recognize this

10:20:01  16  document?

10:20:06  17  A.    Yes.

10:20:06  18  Q.    What is it?

10:20:08  19  A.    Those are preliminary remarks we sent out to the

10:20:13  20  Patent Office on April 5th, 1993 in the '849 case.

10:20:19  21          THE COURT:  So the record is clear, we are at

10:20:21  22  7A.  Right?

10:20:23  23          MR. HAUG:  Yes, Your Honor.  The 7A, the A's are

10:20:26  24  just a more legible copy.

10:20:29  25          THE COURT:  I understand.  You said 7, and you

10:20:31  1    are making your record.

10:20:33  2                 MR. HAUG:  Thank you very much, Your Honor.  7.

10:20:35  3    BY MR. HAUG:

10:20:36  4    Q.    I would like you to turn to the next page, JTX-7A.198.

10:20:53  5    A.    Yes.

10:20:53  6    Q.    Do you see, I am going to read the first couple

10:20:58  7    sentences:  "By the filing of the present CIP application,

10:21:02  8    applicants do not acquiesce to any of the rejections made in

10:21:06  9    any of the pending and abandoned parent applications.

10:21:10  10   Although, to expedite prosecution, the present application

10:21:13  11   has been filed and the three pending parent applications

10:21:16  12   will be abandoned, by such action, applicants do not

10:21:19  13   acquiesce to any rejection made in any of the parent

10:21:24  14   applications and expressly reserve the right to contest the

10:21:27  15   propriety of any rejection."

10:21:29  16                 Did I read that correctly?

10:21:31  17   A.    Yes, you did.

10:21:32  18   Q.    And what are you telling the Patent Office here?

10:21:37  19   A.    We are telling the Patent Office that we want to

10:21:40  20   expedite prosecution on those cases, and that, and also we

10:21:55  21   want to -- we want to expedite, and we want to make clear

10:22:04  22   that was the reason we filed the consolidated patent

10:22:08  23   application.

10:22:09  24   Q.    Please turn to JTX-7A.246.  Do you recognize this

10:22:17  25   document?

Wingefeld - direct

| | | |
|---|---|---|
| 10:22:24 | 1 | A.    Yes. |
| 10:22:25 | 2 | Q.    What is it? |
| 10:22:27 | 3 | A.    This is an office action made in the '018 case on |
| 10:22:33 | 4 | December 6, 1994. |
| 10:22:35 | 5 | Q.    Were all of the claims rejected? |
| 10:22:38 | 6 | A.    Yes. |
| 10:22:38 | 7 | Q.    Were the claims rejected for lack of utility under |
| 10:22:42 | 8 | 101? |
| 10:22:43 | 9 | A.    They were rejected for various reasons, and they were |
| 10:22:47 | 10 | rejected under 101, lack of utility, yes. |
| 10:22:52 | 11 | Q.    Did the examiner cite to the Wirth article from 1991? |
| 10:22:59 | 12 | And I would direct your attention JTX-7A.259. |
| 10:23:13 | 13 | A.    Yes, he did. |
| 10:23:14 | 14 | Q.    Please turn to JTX-7A.261? |
| 10:23:22 | 15 | A.    Yes. |
| 10:23:22 | 16 | Q.    Is this the examiner interview summary record? |
| 10:23:26 | 17 | A.    Yes, it is. |
| 10:23:27 | 18 | Q.    You spoke about that last time? |
| 10:23:30 | 19 | A.    Yes. |
| 10:23:31 | 20 | Q.    Please turn to JTX-7A.263.  Do you recognize this |
| 10:23:37 | 21 | document? |
| 10:23:37 | 22 | A.    Yes. |
| 10:23:37 | 23 | Q.    What is it? |
| 10:23:39 | 24 | A.    This is the response to the office action, and also |
| 10:23:47 | 25 | after the interview, which took place in May, this is the |

Wingefeld - direct

| 10:23:51 | 1 | response dated on June 6, 1995 in this '018, in the '018 |
| 10:24:01 | 2 | case. |
| 10:24:01 | 3 | Q.    Thank you.  Please turn now to JTX-7A.298.  I invite |
| 10:24:12 | 4 | your attention to where it says the No. 2, "Rejection under |
| 10:24:17 | 5 | 35 U.S.C. Section 101."  Do you see that? |
| 10:24:22 | 6 | A.    Yes. |
| 10:24:22 | 7 | Q.    Did the applicant, Hoechst, disagree with the |
| 10:24:26 | 8 | examiner's reasoning to support her 101 utility rejection |
| 10:24:31 | 9 | throughout the prosecution of the '333 patent? |
| 10:24:34 | 10 | A.    Yes, we did. |
| 10:24:35 | 11 | Q.    Did the examiner ever change her position on the 101 |
| 10:24:39 | 12 | utility rejection? |
| 10:24:40 | 13 | A.    No.  Not until this point. |
| 10:24:50 | 14 | Q.    Was the last answer up until this point in time? |
| 10:24:54 | 15 | A.    Yes. |
| 10:24:54 | 16 | Q.    My question is a little broader than that.  Did the |
| 10:24:57 | 17 | examiner ever change her position on lack of utility under |
| 10:25:00 | 18 | 101 during this prosecution? |
| 10:25:02 | 19 | A.    Yes. |
| 10:25:02 | 20 | Q.    That happened after this response? |
| 10:25:04 | 21 | A.    Right. |
| 10:25:04 | 22 | Q.    Thank you.  Please go to JTX-7A.299, the next page? |
| 10:25:11 | 23 | A.    Yes. |
| 10:25:11 | 24 | Q.    Do you see where -- I am sorry.  Do you have it? |
| 10:25:15 | 25 | A.    Yes, I have it. |

10:25:17   1   Q.    The first full paragraph, I will read this one:

10:25:20   2   "According to the Guidelines For Examination of Applications

10:25:22   3   For Compliance With the Utility Requirement (Fed. Reg.,

10:25:27   4   Volume 60, Page 98), '[a] rejection under Section 101 should

10:25:35   5   not be maintained if an asserted utility for the claimed

10:25:39   6   invention would be considered credible by a person of

10:25:41   7   ordinary skill in the art in view of all evidence of

10:25:45   8   record.'"

10:25:48   9            Did I read that correctly?

10:25:49   10   A.    Yes.

10:25:49   11   Q.    Now, do you recall what you were referring to by the

10:25:54   12   Guidelines For Examination of Applications For Compliance?

10:25:59   13   A.    Sorry?

10:25:59   14   Q.    Do you recall what this is, what you are referring to

10:26:01   15   here, the Guidelines for Examination?

10:26:06   16   A.    I know what guidelines -- what those guidelines are in

10:26:11   17   principle, yes.

10:26:12   18   Q.    Please go to JTX-7A.301 and 302.

10:26:25   19            We will start with Page JTX-7A.301?

10:26:31   20   A.    Yes.

10:26:32   21   Q.    Do you see where there are a number of publications

10:26:35   22   cited?

10:26:36   23   A.    Yes.

10:26:36   24   Q.    And do you know why these publications were cited

10:26:40   25   here?

Wingefeld - direct

| | | |
|---|---|---|
| 10:26:40 | 1 | A.    Yes. |
| 10:26:41 | 2 | Q.    Why? |
| 10:26:42 | 3 | A.    They were cited to further support the activity which |
| 10:26:51 | 4 | we wanted to demonstrate that we already have shown utility |
| 10:26:55 | 5 | in our specification. |
| 10:26:56 | 6 | Q.    What years were those publications from? |
| 10:27:00 | 7 | A.    Oh, those were from '94, 1993, and 1992. |
| 10:27:10 | 8 | Q.    Please turn to JTX-7A.327.  Do you recognize this |
| 10:27:28 | 9 | document? |
| 10:27:29 | 10 | A.    Yes, I do. |
| 10:27:30 | 11 | Q.    What is it? |
| 10:27:31 | 12 | A.    This is the declaration of one of the inventors, |
| 10:27:36 | 13 | Bernward Scholkens, which was presented in this '018 case, |
| 10:27:49 | 14 | in addition to the response to office action on June 6. |
| 10:27:56 | 15 | Q.    Please turn to JTX-7A.329? |
| 10:28:01 | 16 | A.    Yes. |
| 10:28:02 | 17 | Q.    Are there any publications cited here in the Scholkens |
| 10:28:07 | 18 | declaration? |
| 10:28:08 | 19 | A.    Yes. |
| 10:28:08 | 20 | Q.    What publication is cited? |
| 10:28:11 | 21 | A.    There is cited the Wirth article, which was published |
| 10:28:18 | 22 | in the British Journal of Pharmacology in 1992 -- in 1991, |
| 10:28:24 | 23 | sorry. |
| 10:28:25 | 24 | Q.    And if we go to the next page, JTX-7A.330, is there |
| 10:28:31 | 25 | another publication cited here? |

10:28:32  1    A.    Yes.   There is also cited another Wirth article from

10:28:36  2    1993.

10:28:39  3    Q.    Is the Wirth 1991 article the same article as was

10:28:46  4    earlier cited by the examiner during this prosecution?

10:28:51  5    A.    Yes.

10:28:53  6    Q.    Dr. Wingefeld, I am going to move now to the '7,803

10:29:02  7    patent.   I am going to ask you a few questions from the

10:29:05  8    smaller binder, Volume 3 of 3.   First I ask you to go to

10:29:13  9    DTX-059.   It is at the back of the binder.

10:29:23  10   A.    Yes.

10:29:23  11   Q.    Do you recognize this patent?

10:29:26  12   A.    Yes.

10:29:26  13   Q.    What is it?

10:29:27  14   A.    This is the copy of the U.S. patent 5,597,803.

10:29:36  15   Q.    Did you prosecute the '803 patent?

10:29:42  16   A.    Yes, I was the in-house prosecution counsel.

10:29:45  17   Q.    Looking at DTX-59.1, which is the cover page of the

10:29:49  18   patent, do you know when the priority application was filed

10:29:52  19   for the '7,803 patent?

10:29:53  20   A.    Yes.   It was filed on April 4th, 1992.

10:30:01  21          It was first filed in a German priority document

10:30:05  22   4211406.3.

10:30:08  23   Q.    Continuing to stay on this page, do you know when the

10:30:12  24   first U.S. application was filed that led to the '7,803

10:30:15  25   patent?

| 10:30:16 | 1 | A.    Yes.  It was filed first on April 1st, 1993, in this |
| 10:30:28 | 2 | U.S. application Serial No. 41,176. |
| 10:30:31 | 3 | Q.    If we move up to the top below the title, it says |
| 10:30:35 | 4 | inventors.  Do you see that? |
| 10:30:36 | 5 | A.    Yes, I see. |
| 10:30:37 | 6 | Q.    Are the inventors the same for the '7,803 patent and |
| 10:30:41 | 7 | the '333 patent? |
| 10:30:44 | 8 | A.    No.  It's not the same group of inventors.  I see two |
| 10:30:49 | 9 | additional inventors here, one is Klaus Wirth, and the other |
| 10:30:55 | 10 | one is Hans-George Alpermann. |
| 10:30:59 | 11 | Q.    Who is the '7,803 patent assigned to? |
| 10:31:05 | 12 | A.    It's assigned to Hoechst Aktiengesellschaft, or |
| 10:31:10 | 13 | Hoechst AG. |
| 10:31:10 | 14 | Q.    Was the original application filed in the '333 patent |
| 10:31:14 | 15 | before the application was filed for the '7,803 patent? |
| 10:31:18 | 16 | A.    Yes. |
| 10:31:19 | 17 | Q.    Did you make a timeline to compare the '333 and the |
| 10:31:24 | 18 | '7,803? |
| 10:31:25 | 19 | A.    Yes, I did. |
| 10:31:26 | 20 | Q.    Is that in your demonstratives? |
| 10:31:30 | 21 | A.    In the demonstratives, I think it's the very last |
| 10:31:36 | 22 | page.  It's PDX5.9. |
| 10:31:45 | 23 | Q.    And without reading this entire slide, what did you |
| 10:31:52 | 24 | want to convey with this slide? |
| 10:31:56 | 25 | A.    I wanted to convey the timelines, the timeline from |

Wingefeld - direct

10:32:07  1    the first prosecution, the '333 patent, and the timeline

10:32:11  2    from the prosecution of the '7,803 patent.

10:32:15  3    Q.    Is the '7,803 patent in the '333 patent family?

10:32:22  4    A.    No.  They go -- they have different German priority

10:32:32  5    documents, and also, we received different innovation --

10:32:40  6    invention disclosure statements from the inventors.

10:32:42  7    Q.    Please turn to DTX-55.  It is also in your binder.

10:32:52  8              Do you recognize this document?

10:32:54  9    A.    Yes.  This is the file history of this U.S. patent

10:33:01  10   5,597,803.

10:33:09  11   Q.    Please turn to DTX-55.73.  Are you there?

10:33:24  12   A.    Yes.

10:33:24  13   Q.    The second paragraph, top, I will read it into the

10:33:28  14   record quickly:  "Bradykinin-antagonistic peptides are

10:33:33  15   described, inter alia, in WO 86/07263 and European Patent

10:33:40  16   Applications No. 370 453, No. 413 277, No. 455 133 and No.

10:33:52  17   472 220."

10:33:54  18              Did I read that correctly?

10:33:55  19   A.    Yes.

10:33:55  20   Q.    Do you know what is being referenced here with the

10:33:57  21   European patent applications?

10:33:59  22   A.    Yes.  Here is referenced the WO 86, that's one

10:34:08  23   competitor patent application, what we think is prior art to

10:34:12  24   this application.  And these three European patent

10:34:17  25   applications, 370 453, that's the European corresponding

Wingefeld - direct

10:34:23    1    patent application to the Group 1 of this '333 patent, the

10:34:31    2    next one, 413 277, is the European corresponding patent

10:34:38    3    application to the Group 2 peptides of the '333 patent, and

10:34:47    4    455 133 is the corresponding European patent application to

10:34:57    5    Group 3 of the '333 patent.   And the last one is another

10:35:01    6    patent application from one of the competitors.

10:35:03    7    Q.     So is it the case that the '333 patent disclosure was

10:35:09    8    cited in the '7,803 specification?

10:35:11    9    A.     Yes.

10:35:12   10    Q.     Please turn to DTX-55.155.   Do you recognize this

10:35:29   11    document?

10:35:31   12    A.     Yes.

10:35:32   13    Q.     What is it?

10:35:33   14    A.     This is an office action received for the patent

10:35:40   15    application, the '176 application.   We received this on

10:35:46   16    August 24th, 1993.

10:35:49   17    Q.     Did the examiner reject the claims for lack of utility

10:35:54   18    under 101?

10:35:57   19    A.     Yes, he did.

10:35:59   20    Q.     In that rejection did the examiner reject the claims

10:36:02   21    for lack of utility because there was no in vivo data

10:36:07   22    submitted?

10:36:14   23    A.     Yes -- one second.   I am sorry.

10:36:30   24           Yes.   He said that the assays are not relevant

10:36:36   25    to utility in human beings.

| | | |
|---|---|---|
| 10:36:38 | 1 | Q.    Did the examiner reject the claims under 35 U.S.C. |
| 10:36:43 | 2 | 102(b) as anticipated by the Henke 370 453, Breipohl 455 |
| 10:36:50 | 3 | 133, and Henke 413 277 applications? |
| 10:36:54 | 4 | A.    Yes, he did. |
| 10:36:55 | 5 | Q.    These are all the European patent equivalents to the |
| 10:36:59 | 6 | '333 patent.  Isn't that right? |
| 10:37:01 | 7 | A.    Yes. |
| 10:37:02 | 8 | Q.    Please turn to DTX-55.164? |
| 10:37:14 | 9 | A.    Yes. |
| 10:37:14 | 10 | Q.    Do you know what this is? |
| 10:37:16 | 11 | A.    This is an amendment we filed on February 24th, 1994 |
| 10:37:23 | 12 | in this case.  We amended the claims, which means we |
| 10:37:33 | 13 | canceled the claims presently on file and added new claims, |
| 10:37:41 | 14 | and also sent remarks. |
| 10:37:43 | 15 | Q.    Please turn to DTX-55.169 through 173.  If you could |
| 10:37:51 | 16 | just quickly scan through that.  My question is, does this |
| 10:37:56 | 17 | section of your remarks respond with arguments to the |
| 10:38:01 | 18 | examiner's rejection under 101? |
| 10:38:05 | 19 | A.    Yes. |
| 10:38:06 | 20 | Q.    Please turn to DTX-55.176.  What is this? |
| 10:38:16 | 21 | A.    This is now the final office action we received on May |
| 10:38:22 | 22 | 30th 1994 in this '176 case. |
| 10:38:26 | 23 | Q.    Were the claims still under rejection? |
| 10:38:29 | 24 | A.    Yes. |
| 10:38:29 | 25 | Q.    Please turn to the next page, DTX-55.177? |

Wingefeld - direct

10:38:35   1   A.      Yes.

10:38:35   2   Q.      If you go down to where it says No. 3, the U.S. 35,

10:38:39   3   U.S.C., 101 rejection, do you see that?

10:38:42   4   A.      I see it.

10:38:42   5   Q.      And I am just going to read this.

10:38:45   6           "Due to the cancellation of the rejected claims

10:38:47   7   (Claims 6 and 7, which were directed to the non-statutory

10:38:51   8   subject matter of intended use), this rejection is

10:38:56   9   withdrawn."

10:38:57   10          Do you see that?

10:38:58   11  A.      Yes, I see it.

10:38:59   12  Q.      And then the next one, No. 4, if we go down one more,

10:39:06   13  it says, "In view -- withdraw that.

10:39:09   14          "In view of applicant's argument, this rejection

10:39:12   15  is withdrawn."

10:39:14   16          What is your understanding of what the examiner

10:39:16   17  is saying there?

10:39:17   18  A.      Now the examiner is saying that we presented

10:39:21   19  documents, that the 101 rejection is withdrawn for the

10:39:28   20  claims, Claims 9 through 11, which were on file.

10:39:33   21  Q.      Was it necessary to submit any in vivo data in order

10:39:37   22  to have the examiner withdraw the rejection under 101?

10:39:40   23  A.      No.

10:39:41   24  Q.      What was the date of this office action?

10:39:42   25  A.      This was May 13th, 1994.

Wingefeld - direct

10:39:48    1    Q.    Please turn to DTX-55.220.  What is this?

10:40:06    2    A.    This is an examiner interview summary record from an

10:40:12    3    interview of May 30th, 1995.

10:40:16    4    Q.    Did you interview this case with the examiner?

10:40:20    5    A.    Yes, I did.

10:40:21    6    Q.    Was that on the same day, May 30, 1995, as you

10:40:25    7    interviewed the other case?

10:40:27    8    A.    Yes.

10:40:27    9    Q.    I would like you to go to the last paragraph where the

10:40:31   10    examiner is writing a summary.  If you could please read

10:40:36   11    that?

10:40:36   12    A.    Okay.  I will try.

10:40:40   13            "Applicants will provide declaration with data

10:40:42   14    for Compounds 19 through 26 (Table, Page 25).  Applicant

10:40:50   15    will narrow claims to overcome 102(b) and will discuss

10:40:55   16    nonobviousness of claimed compounds when compared to

10:41:00   17    compounds of EP 0370 453.  Applicants will show evidence of

10:41:08   18    correlation of in vitro tests (Table 3, Page 27) to in vivo

10:41:17   19    efficacy."

10:41:18   20            THE COURT:  Doctor, did you mean "Table 1" on

10:41:22   21    Page 25, the first line?  I think you left out the 1, that's

10:41:27   22    all.

10:41:27   23            THE WITNESS:  I am sorry.

10:41:28   24            MR. HAUG:  Thank you, Your Honor.

10:41:29   25    BY MR. HAUG:

10:41:30  1   Q.    Thank you, Dr. Wingefeld.

10:41:35  2         Let's now go to DTX-55.237.

10:41:44  3   A.    Yes.

10:41:45  4   Q.    Actually, before that, did you respond to the patent

10:41:53  5   examiner after the interview?

10:41:56  6   A.    Yes, we did.

10:41:57  7   Q.    And did you make further arguments to overcome the

10:42:01  8   rejection over the '333 European patent disclosures?

10:42:05  9   A.    Yes.

10:42:06  10  Q.    Now we are on DTX-55.237.  What is this document?

10:42:11  11  A.    This is a notice of allowability in this '464 case,

10:42:33  12  which was issued on June 24th, 1996.

10:42:38  13  Q.    Please go to DTX-55.238, the next page?

10:42:43  14  A.    Yes.

10:42:43  15  Q.    About halfway down, I am going to read, it says the

10:42:49  16  following:  "The following is an Examiner's Statement of

10:42:53  17  Reasons for Allowance.  The instant invention peptides,

10:42:56  18  methods, and compositions are neither taught nor suggested

10:43:00  19  by the prior art of record such as Henke et al. (0370453A3),

10:43:10  20  Breipohl et al., and Henke et al.  (0413277A1)."

10:43:21  21        Did I read that correctly?

10:43:22  22  A.    Yes.

10:43:22  23  Q.    And what is your understanding of what the examiner is

10:43:25  24  saying here?

10:43:27  25  A.    The examiner says that there is not the -- the '7,803

Wingefeld - direct

| | | |
|---|---|---|
| 10:43:38 | 1 | patent or invention is -- was allowed because those three -- |
| 10:43:50 | 2 | they cite only two prior arts, and they said that those are |
| 10:43:56 | 3 | not prior art for the '7,803 case. |
| 10:44:00 | 4 | Q.   What is the date again of the notice of allowability? |
| 10:44:03 | 5 | A.   That was June 24th, 1996. |
| 10:44:10 | 6 | Q.   Thank you.  I have one last topic.  That concerns |
| 10:44:18 | 7 | Nova.  What do you know about Nova?  Do you know Nova? |
| 10:44:21 | 8 | A.   I know Nova.  Nova is a pharmaceutical company.  I |
| 10:44:31 | 9 | wrote some letters to Nova back in 1991. |
| 10:44:38 | 10 | Q.   I am going to show you some of those letters right |
| 10:44:41 | 11 | now.  Please turn to PTX-58 in the same binder, the small |
| 10:44:45 | 12 | one that you have before you? |
| 10:44:47 | 13 | A.   Yes. |
| 10:44:47 | 14 | Q.   Do you have it? |
| 10:44:48 | 15 | A.   Yes, I have it. |
| 10:44:49 | 16 | Q.   Are you familiar with this letter? |
| 10:44:52 | 17 | A.   Yes. |
| 10:44:52 | 18 | Q.   Is that "Dr. Wingefeld" down at the bottom, is that |
| 10:44:58 | 19 | your signature? |
| 10:44:58 | 20 | A.   That is my signature. |
| 10:44:59 | 21 | Q.   Who signed this letter next to you? |
| 10:45:02 | 22 | A.   That is Dr. Schulze-Steinen.  He was my supervisor at |
| 10:45:08 | 23 | that time. |
| 10:45:08 | 24 | Q.   Was he in the Patent Department? |
| 10:45:11 | 25 | A.   He was in the Patent Department, yes. |

Wingefeld - direct

10:45:13   1   Q.    I would like you to focus your attention on the second

10:45:16   2   paragraph, which I can read:

10:45:19   3          "We like to advise you that the above-mentioned

10:45:22   4   bradykinin antagonist has already been described in our

10:45:25   5   European Patent Application No. 370 453 published on May 30,

10:45:30   6   1990 (see especially Example 48).  Since it is good general

10:45:35   7   practice to refer to the original source, we expect that you

10:45:39   8   will conform to this practice in the future."

10:45:41   9          Did I read that correctly?

10:45:42   10  A.    Yes.

10:45:43   11  Q.    Why did you write this letter to Nova?

10:45:45   12  A.    We did this because we became aware that this

10:45:53   13  compound, a compound which was disclosed and published in

10:45:58   14  our European patent application '453, that this compound was

10:46:06   15  presented under an NPC number, which means a Nova

10:46:13   16  pharmaceutical compound, with the No. 16731 at two

10:46:19   17  conferences, one in New York in 1990, and the other one was

10:46:25   18  in London, also in 1990.

10:46:29   19  Q.    Please turn to PTX-59.  Do you recognize this letter?

10:46:35   20  A.    Yes, I do.

10:46:40   21          That's the reply letter from Nova, in fact, from

10:46:44   22  Larry Steranka, Dr. Larry Steranka, who was vice president,

10:46:50   23  research, of Nova Pharmaceutical Corporation.

10:46:56   24  Q.    Could you please just read the second paragraph into

10:46:58   25  the record?

Wingefeld - direct

| | | |
|---|---|---|
| 10:46:59 | 1 | A.    Yes. |
| 10:47:00 | 2 | "Certainly, it is embarrassing for NOVA to be |
| 10:47:04 | 3 | associated with failure to acknowledge the work of others, |
| 10:47:07 | 4 | and we do acknowledge the importance of Hoechst's |
| 10:47:11 | 5 | contribution to the bradykinin field.  I assure you that we |
| 10:47:15 | 6 | will acknowledge Hoechst in all future presentations and |
| 10:47:20 | 7 | publications.  Please accept our apology." |
| 10:47:24 | 8 | Q.    Please turn to PTX-60? |
| 10:47:27 | 9 | A.    Yes. |
| 10:47:27 | 10 | Q.    Do you recognize this letter? |
| 10:47:30 | 11 | A.    Yes.  This is another letter from Nova to myself, or |
| 10:47:36 | 12 | to Hoechst, from Dr. Enna, who was executive vice president. |
| 10:47:45 | 13 | Q.    Could you just read this one? |
| 10:47:48 | 14 | A.    Okay. |
| 10:47:51 | 15 | "Dear Dr. Wingefeld: |
| 10:47:54 | 16 | "Please accept our apology for failing to cite |
| 10:47:56 | 17 | the original disclosure by Hoechst of the bradykinin |
| 10:48:00 | 18 | antagonist," and it's D-Arg-Hyp-3-Thi-5-D-Tic-7-Tic-8 BK. |
| 10:48:15 | 19 | Be assured that in the future we will be more careful in |
| 10:48:18 | 20 | insuring that proper credit is given when referring to this |
| 10:48:23 | 21 | compound and other agents described in your patents.  Like |
| 10:48:27 | 22 | you, I trust this incident will not affect our |
| 10:48:32 | 23 | relationship." |
| 10:48:32 | 24 | Q.    What is the date of this letter? |
| 10:48:34 | 25 | A.    This is March 25th, 1991. |

Wingefeld - direct

| 10:48:38 | 1 | Q.     Did this exchange of letters and the apology by Nova |
| 10:48:42 | 2 | in 1991 make you take any action to delay any of the |
| 10:48:45 | 3 | prosecution of the '333 patent? |
| 10:48:48 | 4 | A.     No. |
| 10:48:48 | 5 | MR. HAUG:  No further questions, Your Honor. |
| 10:48:53 | 6 | THE COURT:  Cross-examination. |
| 10:48:57 | 7 | Mr. Haug, you can collect this, because I am |
| 10:49:00 | 8 | sure Mr. Wiesen is going to have some sort of binders. |
| 10:49:03 | 9 | MR. WIESEN:  We will, Your Honor.  With your |
| 10:49:05 | 10 | permission, we will hand them out. |
| 10:49:07 | 11 | THE COURT:  Except, Mr. Haug, you can leave her |
| 10:49:14 | 12 | demonstratives with the Court. |
| 10:49:40 | 13 | MR. WIESEN:  Your Honor, if I can take a second |
| 10:49:43 | 14 | to explain the binders. |
| 10:49:45 | 15 | THE COURT:  No, you can't.  Let's examine the |
| 10:49:48 | 16 | witness. |
| 10:49:57 | 17 | CROSS-EXAMINATION |
| 10:49:58 | 18 | BY MR. WIESEN: |
| 10:49:59 | 19 | Q.     Dr. Wingefeld, we put all the prosecution histories in |
| 10:50:10 | 20 | the big binder and all the other documents in the small |
| 10:50:12 | 21 | ones. |
| 10:50:13 | 22 | THE COURT:  He was determined to explain. |
| 10:50:16 | 23 | MR. WIESEN:  I apologize, Your Honor.  We will |
| 10:50:18 | 24 | use exactly the same binders for Dr. Ellis.  So we have |
| 10:50:21 | 25 | combined everything. |

10:50:22 | 1           THE COURT:  I told you I didn't need an

10:50:25 | 2   explanation, Mr. Wiesen.  I meant it.  Let's go.

10:50:27 | 3   BY MR. WIESEN:

10:50:28 | 4   Q.    Good morning, Dr. Wingefeld.

10:50:32 | 5   A.    Good morning.

10:50:32 | 6   Q.    Now, when you testified on Wednesday you explained to

10:50:40 | 7   the Court that it was difficult at Hoechst to get in vivo

10:50:43 | 8   data.  Is that right?

10:50:44 | 9   A.    Yes.

10:50:45 | 10   Q.    Because at Hoechst you weren't allowed to do in vivo

10:50:48 | 11   testing for every compound.  Right?

10:50:50 | 12   A.    Yes.

10:50:50 | 13   Q.    You were only allowed to do it when there was a

10:50:52 | 14   particular need?

10:50:53 | 15   A.    Yes.

10:50:53 | 16   Q.    So you really only did in vivo testing for lead

10:50:56 | 17   compounds.  Right?

10:50:57 | 18   A.    Yes.

10:50:58 | 19   Q.    So would that be just one or two compounds in any

10:51:03 | 20   particular program?

10:51:04 | 21   A.    In some programs there was no other compounds.  In

10:51:09 | 22   some programs there were a couple, yes.

10:51:11 | 23   Q.    What is the most compounds you can remember ever

10:51:13 | 24   getting in vivo data on?

10:51:17 | 25   A.    In this particular era?

Wingefeld - cross

| | | |
|---|---|---|
| 10:51:19 | 1 | Q.    In this era, in the late eighties/early nineties. |
| 10:51:26 | 2 | A.    Six, four to six, maybe, at the most. |
| 10:51:30 | 3 | Q.    If you could turn then to DTX-59, it's going to be in |
| 10:51:35 | 4 | the small binder because it's the '7,803 patent. |
| 10:51:46 | 5 | A.    I am sorry? |
| 10:51:48 | 6 | Q.    DTX-59, the '7,803 patent. |
| 10:51:51 | 7 | A.    Yes. |
| 10:51:51 | 8 | Q.    This was filed I think you said in 1992.  Correct? |
| 10:51:56 | 9 | A.    Yes, correct. |
| 10:51:57 | 10 | Q.    If you turn to Table 1, it's in Column 14, which is on |
| 10:52:03 | 11 | Page 8? |
| 10:52:08 | 12 | A.    Yes. |
| 10:52:08 | 13 | Q.    This is the in vivo data.  Right? |
| 10:52:10 | 14 | A.    Right. |
| 10:52:11 | 15 | Q.    And I want to not look at all the compounds.  I want |
| 10:52:14 | 16 | to just focus on the first five, if we can pull those out? |
| 10:52:17 | 17 | A.    Yes. |
| 10:52:17 | 18 | Q.    For these five compounds, you would agree that a |
| 10:52:26 | 19 | smaller number is more active, right, for IC50 data? |
| 10:52:33 | 20 | A.    Yes, I agree. |
| 10:52:37 | 21 | Q.    So the smallest number here is Compound 5.  Right? |
| 10:52:40 | 22 | 4.1 times ten to the negative nine? |
| 10:52:48 | 23 | A.    For all those 16 on this? |
| 10:52:54 | 24 | Q.    I only want to look at the first five.  I don't want |
| 10:52:56 | 25 | to go down the whole chart. |

10:52:58  1      I have been told I may have said this is in vivo

10:53:00  2  data.  I want to be clear.  This is in vitro data.  Right?

10:53:03  3  A.    This is in vitro data.

10:53:08  4  Q.    Focusing just on the first five because I don't want

10:53:11  5  to read too many, the best compound is No. 5.  Right?

10:53:15  6  A.    Yes.

10:53:15  7  Q.    And the weakest one is No. 3 because of the ten to the

10:53:19  8  negative 8.  Right?  That's the biggest number?

10:53:21  9  A.    Yes.

10:53:22  10  Q.    If we go to the next column, 15, to Table 2?

10:53:28  11  A.    Yes.

10:53:28  12  Q.    If you would pull that out.  This is more in vitro

10:53:37  13  data for those same five compounds.  Correct?  Table 2 in

10:53:43  14  Column 15 of DTX-59.

10:53:45  15  A.    Yes.

10:53:46  16  Q.    Again, we see that here, longer is better, right, in

10:53:54  17  this in vitro test?

10:54:11  18  A.    I am not an expert in pharmacology.

10:54:15  19  Q.    If we go to the text below this table, we won't focus

10:54:20  20  on the data, so Column 15, Lines 50 to 55?

10:54:30  21  A.    Yes.

10:54:31  22  Q.    There is in vivo data described in the '7,803 patent

10:54:35  23  as well.  Right?

10:54:35  24  A.    Right.

10:54:36  25  Q.    It says, "Selected compounds were likewise

10:54:39   1   investigated in vivo in the test described below."  Correct?

10:54:43   2   A.    Yes.

10:54:43   3   Q.    And then if we look for the test, it's described,

10:54:55   4   Lines 52 and 53, "Antiinflammatory effect after systemic

10:55:00   5   administration:  carrageenan-induced edema of the rat paw."

10:55:05   6        Right?

10:55:06   7   A.    Right.

10:55:06   8   Q.    So there is in vivo data in the '7,803 patent in this

10:55:11   9   carrageenan-induced edema of the rat paw model.  Right?

10:55:15   10  A.    Right.

10:55:15   11  Q.    And the results for that are reported in Table 3 in

10:55:19   12  Column 16.  Correct?

10:55:25   13  A.    I told you, I am not a pharmacologist to get this

10:55:31   14  straightened out in my mind.

10:55:33   15  Q.    Do you agree these are the results from that model?

10:55:39   16  A.    Yes, I agree.

10:55:41   17  Q.    We don't have to get into the model.

10:55:46   18        There are six compounds reported.  Right?

10:55:48   19  A.    Right.

10:55:48   20  Q.    Here in this patent, there is in vivo data for six

10:55:52   21  compounds?

10:55:53   22  A.    Yes.

10:55:53   23  Q.    And this is the only in vivo data in the '7,803

10:55:58   24  patent.  Right?

10:55:59   25  A.    Yes.

Wingefeld - cross

| | | |
|---|---|---|
| 10:55:59 | 1 | Q.    Were all six of these compounds lead compounds for |
| 10:56:09 | 2 | development? |
| 10:56:10 | 3 | A.    Pardon me? |
| 10:56:10 | 4 | Q.    Were all six of these compounds lead compounds for |
| 10:56:13 | 5 | development at Hoechst in 1992? |
| 10:56:18 | 6 | A.    I don't recall, but might be, because otherwise they |
| 10:56:26 | 7 | wouldn't have been tested at that time. |
| 10:56:28 | 8 | Q.    But you don't remember? |
| 10:56:30 | 9 | A.    No, I don't remember, because I am a member of the |
| 10:56:35 | 10 | Patent Department and not of the Pharmacology Department. |
| 10:56:40 | 11 | Q.    Would you put that aside.  If you turn to Exhibit 6A, |
| 10:56:46 | 12 | so that would be in the big binder in the prosecution |
| 10:56:50 | 13 | history. |
| 10:56:55 | 14 |         We have put some tabs in the binder to direct |
| 10:56:57 | 15 | you to pages.  We are going to go around Tab F. |
| 10:57:04 | 16 |         That's JTX06A.221. |
| 10:57:10 | 17 | A.    Yes. |
| 10:57:11 | 18 | Q.    This is the February 19th, 1991 response.  Correct? |
| 10:57:17 | 19 | A.    Yes. |
| 10:57:19 | 20 | Q.    And you pointed the Court to this document in your |
| 10:57:24 | 21 | direct, talking about the in vitro data should have been |
| 10:57:26 | 22 | enough to support utility.  Right? |
| 10:57:28 | 23 | A.    Right. |
| 10:57:28 | 24 | Q.    You went to JTX-6 or 6A.233 there.  Right?  Quoted the |
| 10:57:43 | 25 | MPEP? |

Wingefeld - cross

10:57:51    1    A.      Yes.

10:57:51    2    Q.      Along with this argument, you could have also

10:57:55    3    submitted in vivo data.  Right?

10:58:01    4    A.      If we have no in vivo data, we could not.

10:58:03    5    Q.      Well, you have in vivo data for icatibant.  Right?

10:58:06    6    A.      Yes.

10:58:06    7    Q.      And you could have submitted that data at this date.

10:58:11    8    Right?

10:58:14    9    A.      They were already submitted because they were -- the

10:58:23   10    Wirth article -- one second.

10:58:43   11              May I take this?

10:58:45   12              THE COURT:  Sure.

10:58:52   13              THE WITNESS:  Thank you.

10:59:24   14              That was for November 1st.

10:59:25   15    BY MR. WIESEN:

10:59:25   16    Q.      There was no in vivo data at this time submitted?

10:59:31   17    A.      Not here, no.

10:59:32   18    Q.      And the very first time you actually physically

10:59:35   19    submitted, gave the Patent Office in vivo data and pointed

10:59:39   20    to it for the Section 101 rejection was June 6th, 1995.

10:59:45   21    Right?

10:59:50   22    A.      When we pointed to them, yes.  But they were already

10:59:55   23    on record early on.

10:59:56   24    Q.      The examiner had given you a 102(f) rejection over the

11:00:02   25    Wirth 1991 paper.  Right?

Wingefeld - cross

| | | |
|---|---|---|
| 11:00:04 | 1 | A.    Right. |
| 11:00:04 | 2 | Q.    And until June 6th, 1995 you never said, examiner, |
| 11:00:08 | 3 | look at the argument, look at the evidence there, that's |
| 11:00:11 | 4 | responsive to the 101 rejection.  Correct? |
| 11:00:15 | 5 | A.    To my understanding, this article was on the record |
| 11:00:21 | 6 | already, and the examiner did know that there were in vivo |
| 11:00:29 | 7 | data in this Wirth article to this compound. |
| 11:00:32 | 8 | Q.    But you agree you never actually pointed it out, you |
| 11:00:36 | 9 | never made that point explicitly to the examiner.  Right? |
| 11:00:39 | 10 | A.    Explicitly. |
| 11:00:40 | 11 | Q.    Correct. |
| 11:00:43 | 12 | A.    That there were in vivo data in this article? |
| 11:00:46 | 13 | Q.    Yes. |
| 11:00:47 | 14 | A.    No. |
| 11:00:48 | 15 | Q.    You did that in June of 1995.  Correct? |
| 11:00:54 | 16 | A.    In this declaration, yes. |
| 11:00:56 | 17 | Q.    The Scholkens declaration specifically relied on just |
| 11:01:00 | 18 | two papers in the declaration.  Right? |
| 11:01:05 | 19 | A.    Sorry.  The Scholkens -- |
| 11:01:07 | 20 | Q.    Dr. Scholkens's declaration in June of 1995 relied on |
| 11:01:11 | 21 | only two papers.  Correct? |
| 11:01:18 | 22 | A.    Two papers, yes. |
| 11:01:19 | 23 | Q.    He relied on the Wirth '91 paper and the Wirth '93 |
| 11:01:23 | 24 | paper.  Right? |
| 11:01:24 | 25 | A.    Yes. |

| | | |
|---|---|---|
| 11:01:24 | 1 | Q.    And the Wirth '91 paper was submitted in 1990.  Right? |
| 11:01:30 | 2 | Was submitted to the journal for publication in 1990. |
| 11:01:33 | 3 | Right? |
| 11:01:33 | 4 | A.    Yes. |
| 11:01:33 | 5 | Q.    And the Wirth '93 paper was submitted to the journal |
| 11:01:37 | 6 | for publication in December of '91, I believe.  Right? |
| 11:01:41 | 7 | A.    I don't know. |
| 11:01:41 | 8 | Q.    We can look at that.  It's in the record. |
| 11:01:45 | 9 | And that's the only data that Dr. Scholkens |
| 11:01:48 | 10 | specifically relied on in his June 6th, 1995 declaration in |
| 11:01:53 | 11 | response to the 101 utility rejection.  Right? |
| 11:01:59 | 12 | A.    I have to look at the declaration again. |
| 11:02:07 | 13 | Q.    It should be Exhibit 7A, Tab H. |
| 11:02:12 | 14 | A.    H? |
| 11:02:13 | 15 | Q.    H. |
| 11:02:20 | 16 | I am going to look at Paragraph 5, which runs |
| 11:02:25 | 17 | from 7A.329 to .330. |
| 11:02:50 | 18 | A.    Can you please repeat? |
| 11:02:52 | 19 | Q.    7A.329 to 330.  We will put it up on the screen as |
| 11:03:21 | 20 | well. |
| 11:03:21 | 21 | A.    Yes. |
| 11:03:22 | 22 | Q.    So in Paragraph 5 Dr. Scholkens explains the evidence |
| 11:03:25 | 23 | he is relying on to conclude that the bradykinin antagonists |
| 11:03:29 | 24 | are active in in vivo models.  Correct? |
| 11:03:32 | 25 | A.    Correct. |

11:03:32  1    Q.    And he cites only two papers in this paragraph.

11:03:35  2    Right?

11:03:35  3    A.    Right.

11:03:35  4    Q.    Wirth '91 as Exhibit 2?

11:03:39  5    A.    Yes.

11:03:39  6    Q.    And then further down, Wirth '93 as Exhibit 3.  Right?

11:03:46  7    A.    Yes.

11:03:46  8    Q.    And based just on those two papers alone, he says,

11:03:49  9    "Thus, a compound that counteracts this effect of bradykinin

11:03:54  10   in vivo in an animal model can be reasonably predicted to be

11:03:58  11   effective in vivo in treating asthma."

11:04:01  12          Right?

11:04:01  13   A.    Right.

11:04:02  14   Q.    And he is an expert and you are providing an expert

11:04:05  15   declaration to the PTO for that.  Right?

11:04:09  16   A.    Right.

11:04:09  17   Q.    And if we turn further in, you actually attached

11:04:13  18   copies of those papers, Wirth '91 and '93.  Right?

11:04:20  19   A.    Yes.

11:04:20  20   Q.    Referring to JTX-7A.336.  This is Wirth 1991.  Right?

11:04:33  21   A.    Right.

11:04:34  22   Q.    And we have seen before, this was submitted to the

11:04:38  23   journal in 1990.  Right?

11:04:44  24   A.    Yes.

11:04:45  25   Q.    And if we go to JTX-7A.342, we have a Tab I there.

| | | |
|---|---|---|
| 11:04:57 | 1 | That's the Wirth '93 paper.  Right? |
| 11:05:10 | 2 | A.   Yes. |
| 11:05:10 | 3 | Q.   If we look at the very bottom left-hand corner on that |
| 11:05:14 | 4 | first page, we see that was received in original form |
| 11:05:17 | 5 | December 16, 1991.  Right? |
| 11:05:24 | 6 | A.   Yes. |
| 11:05:24 | 7 | Q.   And this is a paper by investigators from Hoechst. |
| 11:05:28 | 8 | Correct? |
| 11:05:29 | 9 | A.   Right. |
| 11:05:29 | 10 | Q.   Including Dr. Scholkens, right, as an author? |
| 11:05:35 | 11 | A.   Yes. |
| 11:05:35 | 12 | Q.   Who was an inventor? |
| 11:05:37 | 13 | A.   Correct. |
| 11:05:38 | 14 | Q.   Who owes a duty of candor to disclose material |
| 11:05:41 | 15 | information during -- |
| 11:05:43 | 16 | THE COURT:  Sustained. |
| 11:05:43 | 17 | BY MR. WIESEN: |
| 11:05:44 | 18 | Q.   So Hoechst had all the in vivo data that Dr. Scholkens |
| 11:05:51 | 19 | relied on in his January 6th, 1995 declaration by December |
| 11:05:56 | 20 | 16th, 1991, right, all the in vivo data? |
| 11:06:02 | 21 | A.   One in vivo data, yes. |
| 11:06:03 | 22 | Q.   That's all the in vivo data that Dr. Scholkens relied |
| 11:06:07 | 23 | on in his declaration.  Right? |
| 11:06:09 | 24 | A.   Yes. |
| 11:06:10 | 25 | Q.   And you had it all almost four years before it got |

11:06:15    1    submitted with the Scholkens declaration.  Right?

11:06:19    2    A.    Yes.

11:06:22    3    Q.    Now, when you submitted this data, you didn't give up

11:06:25    4    on your argument that in vitro data should have been enough,

11:06:28    5    did you?

11:06:33    6    A.    Yes.

11:06:34    7    Q.    Well, let's go back to the prosecution history, the

11:06:38    8    argument you made.  We looked at some of the remarks.  If we

11:06:42    9    turn to JTX-7A.298.  I think it's Tab G.  It's partway into

11:06:54   10    Tab G.

11:07:01   11          You looked at these pages, 298, 299, on direct

11:07:05   12    with Mr. Haug.  Is that right?

11:07:06   13    A.    Yes.

11:07:06   14    Q.    This is where the 101 response is, in this June 6th,

11:07:10   15    1995 statement, or response to the office action.  Right?

11:07:14   16    A.    Right.

11:07:14   17    Q.    And if we go to the next page, 299, and pull out the

11:07:21   18    whole first -- the first complete paragraph, the "According

11:07:26   19    to" paragraph.  Mr. Haug read the first part of this into

11:07:30   20    the record.  Right?

11:07:31   21    A.    Yes.

11:07:32   22    Q.    But it continues, "Applicants submit that the utility

11:07:38   23    of the claimed invention would be considered credible by one

11:07:41   24    of ordinary skill in the art on the basis of the

11:07:44   25    specification alone."

Wingefeld - cross

11:07:47    1           Do you see that?

11:07:47    2    A.    Yes.

11:07:48    3    Q.    So you continued to argue that in vitro data was

11:07:51    4    enough.  Right?

11:07:53    5    A.    Yes.

11:07:54    6    Q.    But here you didn't stop, did you?  You went on and

11:08:01    7    said, "However, to address the examiner's specific concerns

11:08:04    8    about the predictive value of the guinea pig contractile

11:08:08    9    assay, applicants submit herewith an unsigned declaration

11:08:12    10   under 37 C.F.R. Section is 1.132 of Dr. Bernward Scholkens,

11:08:20    11   a co-inventor of this application."

11:08:23    12           Right?

11:08:23    13   A.    Yes.

11:08:23    14   Q.    So here you went on and submitted the in vivo

11:08:27    15   icatibant.  You didn't just rest on the legal argument that

11:08:29    16   in vitro was enough.  Right?

11:08:31    17   A.    Right.  However, I want to point out that we had an

11:08:40    18   invention which covers more than 200 examples, 200

11:08:45    19   compounds.  We had in vivo data for just one compound.  And

11:08:53    20   at that time we believed it's not -- we cannot overcome the

11:09:01    21   rejection with the one in vivo showing that was done -- in

11:09:11    22   vivo showing was done only for one single compound.  And we

11:09:14    23   wanted, as always, we wanted to get all the claims allowed

11:09:19    24   and all the covered compounds allowed.

11:09:23    25           So we still believed that in vitro data is

Wingefeld - cross

11:09:31    1    enough to show for utility purposes.

11:09:34    2    Q.    Dr. Wingefeld, you don't know why Hoechst didn't

11:09:39    3    present this argument in this response in prior applications

11:09:44    4    from the 333 prosecution, do you?

11:09:51    5    A.    I don't recall why specifically we didn't do this.

11:10:00    6    However, I do know what the Hoechst practice was at that

11:10:11    7    time.

11:10:11    8    Q.    But you don't actually remember, all the logic you

11:10:15    9    have given us, you don't actually remember that that applied

11:10:18    10   in this case, do you?

11:10:21    11   A.    Yes.    This is almost -- more than 25 years ago.    I

11:10:29    12   don't recall what I specifically did in the prosecution, and

11:10:35    13   which data we did submit and which data we did not submit.

11:10:40    14       But I truly recall what the strategy was at that

11:10:45    15   time in our company.

11:10:47    16   Q.    So just to be clear, you have looked back through the

11:10:51    17   prosecution history and all this material, and your

11:10:54    18   testimony is based on your reconstruction based on what you

11:10:58    19   think may have happened.    Right?

11:10:59    20       THE COURT:    That I think mischaracterizes her

11:11:02    21   testimony unfairly, Mr. Wiesen.    I understand it's

11:11:05    22   cross-examination.    But you can't do that.

11:11:08    23       MR. WIESEN:    Thank you, Your Honor.

11:11:11    24   BY MR. WIESEN:

11:11:11    25   Q.    You can take that down.

Wingefeld - cross

| | | |
|---|---|---|
| 11:11:34 | 1 | Can we have PDX5.3.  I think, Dr. Wingefeld, |
| 11:11:43 | 2 | this is one of the slides you prepared but I am not sure you |
| 11:11:45 | 3 | went over it on direct.  Do you remember this slide? |
| 11:11:48 | 4 | A.    Yes. |
| 11:11:48 | 5 | Q.    This was a timeline you put together of what you |
| 11:11:52 | 6 | called the Group 1 prosecution.  Correct? |
| 11:11:55 | 7 | A.    Yes. |
| 11:11:56 | 8 | Q.    I want to start on the left-hand side here for a |
| 11:12:04 | 9 | minute.  You talked about May 31st, 1991, the '162 |
| 11:12:08 | 10 | application final office action.  You got a second office |
| 11:12:11 | 11 | action in the '162.  Right? |
| 11:12:20 | 12 | A.    Yes. |
| 11:12:21 | 13 | Q.    And you chose to file a CIP after that.  Correct? |
| 11:12:31 | 14 | A.    Yes, we did. |
| 11:12:34 | 15 | Q.    You chose not to appeal the '162 final office action. |
| 11:12:39 | 16 | Right? |
| 11:12:39 | 17 | A.    Yes. |
| 11:12:39 | 18 | Q.    And you agree you can only appeal after a second |
| 11:12:44 | 19 | rejection.  Correct?  Not after the first rejection? |
| 11:12:47 | 20 | A.    Yes -- could?  I am not familiar with the U.S. |
| 11:12:50 | 21 | standards. |
| 11:12:53 | 22 | THE COURT:  You are taking his word for it. |
| 11:12:55 | 23 | THE WITNESS:  Yes. |
| 11:12:57 | 24 | BY MR. WIESEN: |
| 11:12:57 | 25 | Q.    I think you testified yesterday it takes about three |

11:13:00    1    years to resolve an appeal.  Is that right?

11:13:02    2    A.    Yes.

11:13:03    3    Q.    So if you had appealed in May 31st, 1991, the appeal

11:13:08    4    would have been resolved sometime in 1994.  Is that right?

11:13:11    5    A.    Yes.

11:13:12    6    Q.    The patent didn't actually issue until 1997.  Is that

11:13:16    7    right?

11:13:16    8    A.    Yes.

11:13:31    9    Q.    You can take that down.

11:13:41    10              Sorry.  Can you put the timeline up, PDX-5.3.

11:13:48    11              You also talked a little bit about the examiner

11:13:51    12    interview from May 30th, 1995.  Do you remember that?

11:13:55    13    A.    Yes.

11:13:55    14    Q.    I think on Wednesday you said it was the only

11:13:59    15    interview you had.  But we pointed out today there were

11:14:02    16    actually two interviews on that same day.  Right?

11:14:05    17    A.    Yes.  The only occasion I went to the U.S. for an

11:14:07    18    examiner's interview, I think I said.

11:14:09    19    Q.    And you had two interviews with two different

11:14:12    20    examiners on that same day?

11:14:13    21    A.    Yes.

11:14:13    22    Q.    One in the, what turned out to be the '333 and one

11:14:17    23    that turned out to be in the '7,803.  Right?

11:14:20    24    A.    Yes.

11:14:21    25    Q.    And if we turn to 7A.261, that was the interview

11:14:29  1    summary we looked at in the '333.  That should be Tab F in

11:14:37  2    7A.  We will put it up on the screen.  We will pull out the

11:14:43  3    text here, if we can.  I think you did an excellent job

11:14:46  4    reading it.

11:14:48  5              But is it fair to say that you talked about the

11:14:50  6    arguments that you would present in the future in this

11:14:54  7    interview?  Correct?

11:14:56  8    A.    That was summarized, yes.

11:14:57  9    Q.    But you didn't actually make the arguments or present

11:14:59  10   the evidence here.  Right?

11:15:02  11   A.    I don't recall specifically what was talked about in

11:15:05  12   this interview.  I can rely on -- I must rely on what this

11:15:15  13   record says, the summary record says.

11:15:18  14   Q.    In fact, you even talked about the possibility of

11:15:21  15   filing another continuation.  Right?

11:15:22  16   A.    Yes.

11:15:22  17   Q.    And eventually, you did file another continuation

11:15:25  18   before the patent actually issued.  Right?

11:15:29  19   A.    Yes, after we had submitted an amendment, a reply.

11:15:43  20   Q.    You can take that down.

11:15:45  21              I want to spend a couple minutes talking about

11:15:47  22   the relationship with Nova.

11:15:50  23   A.    Okay.

11:15:51  24   Q.    You testified about some Hoechst correspondence with

11:15:55  25   Nova.  Right?

11:15:56  1   A.    Right.

11:15:56  2   Q.    It was in PTX-58, if we turn there, please.  We will

11:16:01  3   put it on the screen, Dr. Wingefeld.  It is a short one.

11:16:05  4   A.    Okay.

11:16:06  5   Q.    This was the February 26th, 1991 letter that you

11:16:11  6   wrote.  Right?

11:16:12  7   A.    Yes.

11:16:13  8   Q.    And you identified that Nova had recently published on

11:16:18  9   a compound that they numbered NPC No. 16731.  Right?

11:16:23  10  A.    Right.

11:16:23  11  Q.    And you gave the structure of it.  Correct?

11:16:25  12  A.    Yes.

11:16:26  13  Q.    And I am just going to describe it as the D-Tic7-Tic-8

11:16:33  14  compound, if that's okay?

11:16:34  15  A.    Yes, that's okay.

11:16:38  16  Q.    Now, you know, by this point you knew that Nova had

11:16:43  17  published data on NPC 16731.  Right?

11:16:49  18  A.    I knew that they presented something, yes.

11:16:53  19  Q.    And if we turn to the next page, PTX-58.2, there is

11:17:01  20  actually an article by Steven Farmer, who had been at Nova,

11:17:05  21  attached to your letter.  Correct?

11:17:07  22  A.    Yes.

11:17:07  23  Q.    If we turn to PTX-58.7, pull out the bottom paragraph,

11:17:18  24  they report that the activity of NPC 16731 is better than

11:17:25  25  the activity of NPC 567.  Right?

11:17:30    1    A.    Yes.

11:17:30    2    Q.    So you knew all of that by February of 1991 at

11:17:35    3    Hoechst.   Correct?

11:17:36    4    A.    Yes.

11:17:36    5    Q.    Now, you told the Nova folks to go look at your

11:17:41    6    European patent.   Right?

11:17:42    7    A.    Yes.

11:17:43    8    Q.    And that the compound was disclosed there?

11:17:45    9    A.    Right.

11:17:45    10   Q.    If you look at, in your binder it should be PTX-357,

11:17:56    11   it's in the small binder because it's a patent application,

11:18:00    12   not the prosecution history.   Sorry.   PTX-357?

11:18:09    13   A.    Yes.

11:18:09    14   Q.    That's all the European application, 0 370 453.

11:18:14    15   Right?

11:18:15    16   A.    Yes.

11:18:16    17   Q.    I think you may have looked at this?

11:18:19    18   A.    Yes.

11:18:19    19   Q.    If we turn to 357.17, Example 48?

11:18:27    20   A.    Yes.

11:18:29    21   Q.    That's that same D-Tic-Tic compound.   Right?

11:18:38    22   A.    Yes.

11:18:38    23   Q.    So this is what you were saying:   We have published

11:18:41    24   NPC 16731 in our patent application before you, Nova,

11:18:46    25   published your papers.   Right?

Wingefeld - cross

| | | |
|---|---|---|
| 11:18:47 | 1 | A.    Yes. |
| 11:18:48 | 2 | Q.    If we turn back, however, to Page PTX-357.1 -- I am |
| 11:18:57 | 3 | sorry, .10, Table 1 here is the activity data.  Right? |
| 11:19:07 | 4 | THE COURT:  Hold on. |
| 11:19:10 | 5 | THE WITNESS:  Yes. |
| 11:19:11 | 6 | BY MR. WIESEN: |
| 11:19:12 | 7 | Q.    And this is in vitro data only? |
| 11:19:16 | 8 | A.    Yes. |
| 11:19:16 | 9 | Q.    And will you take my word on it that that compound, |
| 11:19:21 | 10 | Example 48, is not contained in this table? |
| 11:19:27 | 11 | There is one D-Tic-Tic compound.  It's about |
| 11:19:29 | 12 | halfway down, a little bit more, but it's different in the 2 |
| 11:19:33 | 13 | and 3 position? |
| 11:19:34 | 14 | A.    Yes. |
| 11:19:35 | 15 | Q.    So in the prior Hoechst patent application, there was |
| 11:19:42 | 16 | no data for 16731, right?  Just the structure? |
| 11:19:47 | 17 | A.    Yes. |
| 11:19:47 | 18 | Q.    That was true in the original U.S. application, |
| 11:19:58 | 19 | correct, as well, in June 30, 1989, there was no data for |
| 11:20:02 | 20 | this NPC 16731 compound.  Right? |
| 11:20:06 | 21 | A.    Right. |
| 11:20:07 | 22 | Q.    But you later -- later it was added into the -- well, |
| 11:20:17 | 23 | let's look at a couple things Hoechst did. |
| 11:20:20 | 24 | I want to go to the U.S. patent prosecution then |
| 11:20:23 | 25 | to JTX-6A.256. |

Wingefeld - cross

| | | |
|---|---|---|
| 11:20:35 | 1 | It's in Tab G of 6A? |
| 11:20:44 | 2 | A.    Sorry.  6A? |
| 11:20:47 | 3 | Q.    .256. |
| 11:21:00 | 4 | A.    Yes. |
| 11:21:01 | 5 | Q.    And this is a supplemental information disclosure |
| 11:21:05 | 6 | statement.  Correct? |
| 11:21:06 | 7 | A.    Yes. |
| 11:21:06 | 8 | Q.    And if we go to the next page, it was submitted August |
| 11:21:10 | 9 | 14th, 1991.  Right? |
| 11:21:13 | 10 | A.    Right. |
| 11:21:13 | 11 | Q.    And that's after you had seen the Nova publications on |
| 11:21:18 | 12 | data for NPC 16731, because we saw that in February of 1991. |
| 11:21:27 | 13 | A.    Yes. |
| 11:21:28 | 14 | Q.    And if we go to the first page of this, Entry 1, do |
| 11:21:39 | 15 | you recognize this as the Kyle article that's been -- that's |
| 11:21:42 | 16 | marked as JTX-9?  It's an article by people from Nova. |
| 11:21:46 | 17 | Correct? |
| 11:21:46 | 18 | A.    Yes. |
| 11:21:47 | 19 | Q.    About that same compound? |
| 11:21:48 | 20 | A.    Yes. |
| 11:21:49 | 21 | Q.    So you gave it to the Patent Office after you had seen |
| 11:21:53 | 22 | the data from Nova.  Right? |
| 11:21:55 | 23 | A.    Right. |
| 11:21:55 | 24 | Q.    And you also added data about that compound into your |
| 11:22:00 | 25 | patent after you had seen that Nova had data on the |

Wingefeld - cross

11:22:04    1   compound.  Right?

11:22:06    2   A.    We added data later on to -- more than this compound

11:22:12    3   to the patent, yes.

11:22:14    4   Q.    If you go to JTX-6A.323, which is Tab H?

11:22:28    5   A.    Yes.

11:22:28    6   Q.    This is the preliminary amendment from the '149

11:22:33    7   application?

11:22:33    8   A.    Yes.

11:22:33    9   Q.    And it's filed in 1991.  Right?

11:22:36   10   A.    Yes.

11:22:38   11   Q.    And if you turn to Page JTX-6A.328?

11:22:44   12   A.    Yes.

11:22:44   13   Q.    This is some of the data that you add in the

11:22:50   14   continuation-in-part.  Right?

11:22:51   15   A.    Right.

11:22:51   16   Q.    And we see here now data for Example 48.  Right?

11:22:56   17   A.    Yes.

11:22:56   18   Q.    But you didn't have any data in the patent for NPC

11:23:00   19   16731 until after you saw that Nova had generated data on

11:23:05   20   the compound and published on it?

11:23:07   21   A.    There were no data on this compound in the

11:23:11   22   specification before, yes.

11:23:12   23   Q.    You can take that down then.

11:23:23   24         I want to go to the prosecution history for the

11:23:25   25   '7,803.  That is in the big binder, because it's a

11:23:28  1   prosecution history.  It's DTX-55.

11:23:31  2   A.     Okay.

11:23:32  3   Q.     Unfortunately, it's in the back of that binder.

11:23:44  4          You prosecuted this patent?

11:23:45  5   A.     Yes.

11:23:46  6   Q.     Or technically you supervised U.S. lawyers prosecuting

11:23:50  7   the patent?

11:23:51  8   A.     Yes.

11:23:51  9   Q.     And we looked at the notice of allowance, or you

11:23:55  10  looked at the notice of allowance with Mr. Haug, it's

11:23:59  11  DTX-55.237.  If we pull up the first line there, it refers

11:24:11  12  to preliminary amendments on 1/17/95 and 9/18/95.  Right?

11:24:19  13  A.     Right.

11:24:19  14  Q.     Let's go back to that second preliminary amendment,

11:24:23  15  the last thing you filed before the notice of allowance.  I

11:24:26  16  think it's PTX-55.221.

11:24:40  17  A.     Yes.

11:24:41  18  Q.     You talked about the interview before this and the

11:24:43  19  notice of allowance, but not this document with Mr. Haug.

11:24:48  20  Right?

11:24:49  21  A.     We talked about this interview, yes.

11:24:52  22  Q.     If you turn in 55.226, at the bottom you are

11:25:03  23  responding to a 102 -- DTX.226?

11:25:15  24  A.     Yes, I have it.

11:25:17  25  Q.     If we can get it up on the screen.

Wingefeld - cross

11:25:28  1       At the very bottom you are responding to a

11:25:30  2  102(b) rejection.  Right?

11:25:34  3  A.     Right.

11:25:34  4  Q.     That is the question of whether the compounds of the

11:25:38  5  '333 patent render invalid the compounds of the '7,803

11:25:44  6  patent.  Right?

11:25:45  7  A.     Right.

11:25:45  8  Q.     So the question the examiner is looking at is whether,

11:25:49  9  if you start with icatibant, is Fmoc icatibant obvious.

11:25:56  10  Right?

11:25:57  11       MR. HAUG:  Objection, Your Honor.  That is a

11:25:58  12  characterization of what may or may not have happened.

11:26:01  13       THE COURT:  Okay.  Sustained.  Rephrase.

11:26:03  14  BY MR. WIESEN:

11:26:03  15  Q.     The examiner here is looking at the compounds of the

11:26:08  16  '333 application or the European priority one, whether those

11:26:13  17  render invalid the compounds claimed in the '7,803 patent.

11:26:18  18  Right?

11:26:19  19  A.     Yes.

11:26:19  20  Q.     The examiner is not looking at whether the compounds

11:26:23  21  of the '7,803 patent render invalid the compounds of the

11:26:27  22  '333 patent.  Right?

11:26:32  23  A.     Yes.

11:26:33  24  Q.     If we go to the next page, and we pull out the first

11:26:43  25  full -- the second full paragraph that says "The compound of

Wingefeld - cross

11:26:48    1    the invention?"

11:26:49    2    A.    Yes.

11:26:50    3          May I add something to my last response?

11:26:53    4    Q.    Mr. Haug will have an opportunity.

11:26:55    5    A.    Okay, sorry.

11:26:56    6    Q.    You wrote in the last thing submitted in the '7,803

11:27:00    7    prosecution, "The compounds of the invention differ from

11:27:03    8    those of prior are" -- I think it should be "art,"

11:27:09    9    not "are."  Right?

11:27:11   10    A.    Yes.

11:27:11   11    Q.    "The compounds of the invention differ from those of

11:27:14   12    the prior art because they have at the N-terminus a large

11:27:17   13    lipophilic residue that can, but need not, function as a

11:27:21   14    protective group.  For example, Fmoc is a protective group

11:27:25   15    according to the invention, and Fmoc differs from the acetyl

11:27:30   16    group disclosed in the prior art references."

11:27:33   17          Do you see that?

11:27:34   18    A.    Yes, I see it.

11:27:35   19    Q.    So you told the PTO that Fmoc could function as a

11:27:41   20    protective group in the '7,803 patent.  Right?

11:28:02   21    A.    That's one number what Fmoc can be, can be a

11:28:06   22    protective group, yes.  It can be, but it must not be a

11:28:12   23    protective group.

11:28:12   24    Q.    It can be a protective group but it can not be a

11:28:16   25    protective group.  Right?

Wingefeld - cross

11:28:17    1    A.      Right.

11:28:18    2    Q.      And you are not -- that's what you are telling the

11:28:20    3    examiner here?

11:28:21    4    A.      Yes.

11:28:22    5    Q.      If we go to the two paragraphs underneath this.

11:28:37    6            You are talking about here then whether there

11:28:39    7    are unexpected results with the Fmoc protective groups.

11:28:45    8    Correct?

11:28:45    9    A.      With the Fmoc group.

11:28:48   10    Q.      It's actually any of a different acetyl groups or

11:28:52   11    Fmoc, right, because there is a series of groups that can go

11:28:56   12    in that Z.  Do you remember that?

11:28:58   13    A.      There are many of those groups that can get in.

11:29:03   14    Q.      Let me do it this way to make sure it's very specific.

11:29:06   15    If you turn to the next page, DTX-55.228.  Pull out the

11:29:12   16    table?

11:29:13   17    A.      Yes.

11:29:13   18    Q.      These are some of the compounds that are claimed in

11:29:17   19    the '7,803 patent, the five examples.  Correct?

11:29:20   20    A.      Correct.

11:29:21   21    Q.      And what you are you were arguing here is that the

11:29:26   22    results for these compounds were better than the results for

11:29:29   23    icatibant, and that was unexpected.  Right?

11:29:34   24    A.      For the purpose of the '7,803 patent application

11:29:41   25    better.

11:29:41  1    Q.      And it was unexpected that they were better.  Correct?

11:29:45  2    A.      Correct.

11:29:45  3    Q.      And so without the data, a person would have expected

11:29:49  4    that icatibant is better than Fmoc icatibant.  Right?

11:29:56  5              MR. HAUG:  Objection.  That is a question that

11:29:59  6    is not even connected to this file history.  That is asking

11:30:02  7    for expert opinion.

11:30:04  8              THE COURT:  That's, I think, the gravamen of

11:30:08  9    your objection.  Mr. Wiesen, do you understand?

11:30:11  10             MR. WIESEN:  I do.  And I will tie it back.

11:30:14  11   BY MR. WIESEN:

11:30:15  12   Q.      If we can go back to the prior page and pull out this

11:30:19  13   bottom paragraph, it says -- now we are on DTX-55.227, it

11:30:27  14   says, "Applicants have informed the undersigned that the

11:30:30  15   duration of action (T50) of HOE140, a prior art compound

11:30:34  16   with an N-terminal acetyl group, is 51 minutes."

11:30:41  17             HOE140 is icatibant?

11:30:42  18   A.      Yes.

11:30:42  19   Q.      So we have got 51 minutes for icatibant.  Right?

11:30:48  20   A.      Right.

11:30:48  21   Q.      If you go to the next page, DTX-55.228, Compound 1,

11:30:57  22   would you agree with me, is Fmoc, and then the sequence for

11:31:00  23   icatibant?

11:31:00  24   A.      Yes.

11:31:01  25   Q.      And so the comparison here is icatibant to a series of

| | | |
|---|---|---|
| 11:31:06 | 1 | compounds that includes Fmoc icatibant.  Right? |
| 11:31:15 | 2 | A.    Yes, three of them, yes. |
| 11:31:16 | 3 | Q.    And if we look at the paragraph underneath Table 2 on |
| 11:31:20 | 4 | DTX-55.228, you wrote, "As one of ordinary skill in the art |
| 11:31:26 | 5 | would not have expected these compounds to show a greater |
| 11:31:29 | 6 | duration of action, these results represent an unexpected |
| 11:31:33 | 7 | improvement over the prior art." |
| 11:31:36 | 8 | Right? |
| 11:31:36 | 9 | A.    Right. |
| 11:31:37 | 10 | Q.    So your conclusion is that Fmoc icatibant is better |
| 11:31:41 | 11 | than icatibant.  Correct? |
| 11:31:44 | 12 | A.    Yes, for this purpose, yes. |
| 11:31:47 | 13 | Q.    But that was unexpected? |
| 11:31:48 | 14 | A.    Yes. |
| 11:31:48 | 15 | Q.    Which means that before someone saw this data they |
| 11:31:52 | 16 | would have expected icatibant to be better than Fmoc |
| 11:31:56 | 17 | icatibant.  It turns out that's wrong.  But that's what they |
| 11:31:59 | 18 | would have expected.  Right? |
| 11:32:03 | 19 | MR. HAUG:  Objection to that question. |
| 11:32:05 | 20 | THE COURT:  Sustained. |
| 11:32:11 | 21 | You don't have to answer.  He is asking you for |
| 11:32:13 | 22 | an expert opinion. |
| 11:32:16 | 23 | THE WITNESS:  Thank you. |
| 11:32:17 | 24 | MR. WIESEN:  You can take that down. |
| 11:32:19 | 25 | BY MR. WIESEN: |

11:32:19   1    Q.    Now, Dr. Wingefeld, the '7,803 patent application was

11:32:32   2    never disclosed during the '333 prosecution.   Right?

11:32:37   3    A.    Yes.

11:32:38   4    Q.    You never told the examiner in the '333 prosecution

11:32:44   5    that you had another application to other compounds -- to

11:32:49   6    these other compounds in the '7,803.   Right?

11:32:52   7    A.    Yes.

11:32:52   8    Q.    You went to two interviews on May 30th, 1995.

11:32:56   9    Correct?

11:32:57   10   A.    Yes.

11:32:57   11   Q.    With two different examiners.   Right?

11:32:59   12   A.    Yes.

11:33:00   13   Q.    And at one of the interviews you talked about whether

11:33:03   14   the compounds of the '333 patent rendered invalid the

11:33:09   15   compounds claimed in the '7,803 patent.   Right?

11:33:12   16   A.    Yes.

11:33:12   17   Q.    And then in the interview about the '7,803 patent, you

11:33:17   18   didn't even mention the compounds of the -- sorry, in the

11:33:20   19   interview about the '333 patent, you didn't mention the

11:33:24   20   existence of the compounds about the '7,803.   Right?

11:33:34   21   A.    I don't recall if we mentioned it.   But it's not in

11:33:38   22   the records.

11:33:39   23   Q.    Now, looking at your chart of the prosecution history,

11:33:44   24   you combined the Group 1, Group 2 and Group 3 patents into

11:33:50   25   the '849.   Correct?

11:33:52    1    A.    Yes.

11:33:52    2    Q.    And you did that, I think you testified, because there

11:33:56    3    were ODP rejections.  Right?

11:33:59    4    A.    Right.

11:34:00    5    Q.    Obviousness-type double patenting rejections.  Right?

11:34:03    6    A.    Yes.

11:34:04    7    Q.    You never provided a scientific response to those

11:34:07    8    obviousness-type double patenting rejections.  Right?

11:34:11    9    A.    I am sorry, what is a scientific --

11:34:15   10    Q.    You overcame those objections by combining everything

11:34:18   11    into one application so that there weren't multiple

11:34:21   12    applications to reject over.  Right?

11:34:23   13    A.    Yes.

11:34:23   14    Q.    You never argued the examiner's logic is incorrect on

11:34:30   15    the obvious-type double patenting rejection?

11:34:41   16    A.    From reviewing the file history, we did this before in

11:34:45   17    this specific Group 3 and Group 2, and when those groups

11:34:55   18    were separated.

11:34:56   19    Q.    But you never did it in the Group 1 claims.  Right?

11:35:05   20    A.    I don't know now.

11:35:07   21    Q.    Let's look at one of those obviousness-type double

11:35:12   22    patenting rejections.  It's JTX6A.474.  It's in Tab I.

11:35:34   23              Just for context, this is a July 1, 1992

11:35:40   24    rejection.  If you go back to the beginning of Tab I, if you

11:35:43   25    need to see it.

Wingefeld - cross

| | | |
|---|---|---|
| 11:35:57 | 1 | A.   Okay.  Yes.  I see it. |
| 11:35:59 | 2 | Q.   And if you turn -- we are on JTX-6A.474, the paragraph |
| 11:36:09 | 3 | that begins "Claims 5 through 17 are provisionally |
| 11:36:14 | 4 | rejected." |
| 11:36:15 | 5 | A.   Yes, I see that. |
| 11:36:16 | 6 | Q.   This was one of the obviousness-type double patenting |
| 11:36:20 | 7 | rejections you received? |
| 11:36:21 | 8 | A.   Right. |
| 11:36:22 | 9 | Q.   This was in one of the Group 1 applications.  Right? |
| 11:36:24 | 10 | A.   Yes. |
| 11:36:24 | 11 | Q.   And the objection was over, I think it's one of the |
| 11:36:27 | 12 | Group 2 applications.  Correct?  The '270? |
| 11:36:32 | 13 | A.   Yes. |
| 11:36:32 | 14 | Q.   And the examiner wrote, "Although the conflicting |
| 11:36:37 | 15 | claims are not identical, they are not patentably distinct |
| 11:36:40 | 16 | from each other because the difference seen, i.e., D-Phe of |
| 11:36:46 | 17 | the claimed peptide sequence as opposed to the co-pending |
| 11:36:49 | 18 | D-Tic does not constitute a patentable distinction as these |
| 11:36:53 | 19 | residues are obvious variants, both belonging to the same |
| 11:36:57 | 20 | class of D-aromatic amino acid residues." |
| 11:37:01 | 21 |      Do you see that? |
| 11:37:02 | 22 | A.   Yes, I see it. |
| 11:37:02 | 23 | Q.   And you at Hoechst overcame this rejection by |
| 11:37:08 | 24 | combining all the applications together.  Correct? |
| 11:37:11 | 25 | A.   Yes. |

Wingefeld - redirect

| | | |
|---|---|---|
| 11:37:11 | 1 | Q.    You never presented an argument to the examiner that |
| 11:37:15 | 2 | said, this logic, this scientific logic, is incorrect. |
| 11:37:19 | 3 | Right? |
| 11:37:24 | 4 | A.    I would have to read all of my responses. |
| 11:37:28 | 5 | Q.    Let me ask it a different way.  If you filed that |
| 11:37:32 | 6 | response, we would find it in the prosecution histories. |
| 11:37:36 | 7 | Right? |
| 11:37:36 | 8 | A.    Right. |
| 11:37:37 | 9 | MR. WIESEN:  No further questions, Your Honor. |
| 11:37:39 | 10 | THE COURT:  Mr. Haug. |
| 11:37:40 | 11 | REDIRECT EXAMINATION |
| 11:37:41 | 12 | BY MR. HAUG: |
| 11:37:42 | 13 | Q.    Just a very few questions, Dr. Wingefeld. |
| 11:37:57 | 14 | Moments ago you were looking at the '7,803 file |
| 11:38:00 | 15 | history.  Do you remember that? |
| 11:38:01 | 16 | A.    Yes. |
| 11:38:01 | 17 | Q.    And Mr. Wiesen was taking you to the comparison |
| 11:38:05 | 18 | between the compounds that were contained in the '7,803 with |
| 11:38:11 | 19 | icatibant.  Right? |
| 11:38:13 | 20 | A.    Right. |
| 11:38:13 | 21 | Q.    Do you know if icatibant has an acetyl group attached |
| 11:38:18 | 22 | to it? |
| 11:38:19 | 23 | A.    Yes, it has. |
| 11:38:22 | 24 | Q.    Mr. Wiesen also asked you about the '7,803 and asked |
| 11:38:31 | 25 | you whether it was disclosed in the '333 patent.  Do you |

| | | |
|---|---|---|
| 11:38:35 | 1 | remember that? |
| 11:38:36 | 2 | A.    I am sorry.  Can you please repeat? |
| 11:38:40 | 3 | Q.    I believe your testimony is that the '7,803 patent was |
| 11:38:46 | 4 | not mentioned or disclosed during the '333 patent |
| 11:38:51 | 5 | prosecution? |
| 11:38:51 | 6 | A.    Yes. |
| 11:38:51 | 7 | Q.    He didn't ask you why.  So I am going to ask you why. |
| 11:38:55 | 8 | Why was the '7,803 patent not disclosed during the '333 |
| 11:38:59 | 9 | patent prosecution history? |
| 11:39:01 | 10 | A.    The '7,803 patent application was filed about four |
| 11:39:07 | 11 | years after the '333 patent was filed in the U.S., so the |
| 11:39:17 | 12 | '7,803 patent is not prior art over the '333 patent, and |
| 11:39:25 | 13 | that's the reason why we didn't -- that's why it was not |
| 11:39:31 | 14 | disclosed. |
| 11:39:33 | 15 | MR. HAUG:  Thank you.  No further questions. |
| 11:39:35 | 16 | Thank you, Dr. Wingefeld. |
| 11:39:36 | 17 | THE COURT:  Thank you, Doctor.  Be careful |
| 11:39:38 | 18 | stepping down. |
| 11:39:39 | 19 | THE WITNESS:  Thank you. |
| | 20 | (Witness excused.) |
| 11:39:45 | 21 | THE COURT:  What do we have next? |
| 11:39:53 | 22 | MR. HAUG:  Plaintiffs call Dr. Joan Ellis. |
| 11:39:58 | 23 | THE COURT:  Is this by video? |
| 11:40:00 | 24 | MR. HAUG:  No. |
| 11:40:01 | 25 | THE COURT:  Okay. |

| | |
|---|---|
| 11:40:02 | 1 |
| 11:40:04 | 2 |
| 11:40:36 | 3 |
| 11:40:47 | 4 |
| 11:40:57 | 5 |
| 11:41:00 | 6 |
| 11:41:03 | 7 |
| 11:41:03 | 8 |
| 11:41:04 | 9 |
| 11:41:05 | 10 |
| 11:41:23 | 11 |
| 11:41:25 | 12 |
| 11:41:31 | 13 |
| 11:41:35 | 14 |
| 11:41:38 | 15 |
| 11:41:41 | 16 |
| 11:41:41 | 17 |
| 11:41:42 | 18 |
| 11:41:45 | 19 |
| 11:41:46 | 20 |
| 11:41:52 | 21 |
| 11:41:53 | 22 |
| 11:41:58 | 23 |
| 11:42:03 | 24 |
| 11:42:10 | 25 |

MR. HAUG:  This will be our last witness, Your
Honor.

... JOAN ELLIS, having been duly sworn as a
witness, was examined and testified as follows ...

THE COURT:  Good morning, Doctor.

THE WITNESS:  Good morning.

THE COURT:  All right.

DIRECT EXAMINATION

BY MR. HAUG:

Q.    Good morning, Dr. Ellis.

A.    Good morning.

Q.    Where are you currently employed?

A.    I am employed at Dickinson Wright PLLC.

Q.    And you have -- you should have a binder in front of
you with some demonstrative exhibits in it.  Do you see
that?

A.    I do, yes.

Q.    Did you prepare these demonstratives?

A.    Yes, I did.

Q.    If you would turn to PDX6.1, can you briefly describe
your educational background?

A.    Yes.  In 1973 I received a Bachelor's degree in
microbiology from Southern Illinois University.  And then in
1983 I received a Ph.D. in molecular parasitology and
biochemistry from New York University School of Medicine.

| | | |
|---|---|---|
| 11:42:13 | 1 | And then in 1992 I received a J.D. at George Washington |
| 11:42:20 | 2 | University School of Law. |
| 11:42:22 | 3 | Q.    Please turn to PTX-65.  Are you familiar with this |
| 11:42:27 | 4 | document? |
| 11:42:28 | 5 | A.    Yes, I am. |
| 11:42:30 | 6 | Q.    What is it? |
| 11:42:31 | 7 | A.    It is my CV. |
| 11:42:33 | 8 | Q.    Is your CV up to date? |
| 11:42:35 | 9 | A.    Yes, it is. |
| 11:42:36 | 10 | Q.    Could you now briefly describe your professional |
| 11:42:39 | 11 | experience immediately following your Ph.D.? |
| 11:42:43 | 12 | A.    Immediately after my Ph.D., I was a research fellow at |
| 11:42:49 | 13 | the New York University School of Medicine, and then I took |
| 11:42:55 | 14 | a junior faculty position at the Rockefeller University.  In |
| 11:42:59 | 15 | both of those jobs I was doing research in molecular |
| 11:43:04 | 16 | science. |
| 11:43:05 | 17 | Then in 1987 I joined the U.S. PTO as a patent |
| 11:43:10 | 18 | examiner, and I was a patent examiner there for about eight |
| 11:43:14 | 19 | years.  And then in 1995 I was promoted to be an APJ at the |
| 11:43:22 | 20 | U.S. PTO. |
| 11:43:22 | 21 | Q.    How long were you at the U.S. PTO? |
| 11:43:25 | 22 | A.    Over 20 years -- almost 20 years. |
| 11:43:28 | 23 | Q.    Please turn to PDX6.3.  If you could just briefly |
| 11:43:36 | 24 | describe your experience at the PTO as an examiner? |
| 11:43:40 | 25 | A.    Well, in 1988, I was a junior examiner in the biotech |

Ellis - direct

11:43:46    1    group.  And then in 1991 I was promoted to primary examiner.

11:43:52    2    To become a primary examiner your office actions are

11:43:57    3    evaluated by senior people within your group, SPEs and the

11:44:02    4    group director, because they are evaluated on a very special

11:44:06    5    program, and then if you pass that program, you are granted

11:44:11    6    full signatory authority.

11:44:13    7                That's what I did.  I passed the program.

11:44:16    8                Then in 1991, the very same year, my docket was

11:44:21    9    also evaluated by a special group down at the -- a special

11:44:25   10    board at the Commerce Department downtown.  And they

11:44:29   11    determined that the applications in my docket required at

11:44:32   12    least a Master's degree in molecular biology.  So I received

11:44:38   13    an examiner's senior level classification.

11:44:42   14                Then two years later in 1993, the same board

11:44:45   15    down at the Commerce Department again evaluated my docket

11:44:50   16    and determined that it required a Ph.D. in molecular biology

11:44:54   17    to examine those applications.  So I was then classified as

11:45:00   18    an examiner Ph.D. level.  And that is the highest level of

11:45:06   19    classification that an examiner can receive.

11:45:09   20    Q.    And what was your experience as an administrative

11:45:13   21    patent judge?

11:45:14   22    A.    Well, initially, I was an ex parte judge.  And I sat

11:45:19   23    on three-judge panels.  And we reviewed the examiners'

11:45:27   24    decisions, the examiners' office actions, the examiners'

11:45:32   25    decisions on patentability.  And my decisions of those

| | |
|---|---|
| 11:45:36 | 1 |

applications were the final agency decision.

Q.    As an examiner in the biotechnology group, what roles did you hold?

A.    Well, as an examiner, I reviewed and evaluated the patent applications that were before me, and I had to search the prior published literature and patents to determine what was known in the prior art at the time an application was filed.  And I prepared office actions and conducted interviews with applicants' attorneys, and I, of course, reviewed applicants' responses to my office actions and any evidence that accompanied those responses.

Q.    Did you receive any training as an examiner?

A.    Yes.  I received training both in the classroom and on the job in the patent statutes, in the examination procedure as set forth in the Code of Federal Regulations and the Manual of Patent Examining Procedure.

So I evaluated the applications that came before me based on those statutes and those regulations, and that would include, you know, 35 U.S.C. 101, 102, 103 and 112.

Q.    Did you ever receive any awards for your work as an examiner?

A.    Yes.  In 1994 under the recommendation of my group director I received the AIPLA Examiner of the Year Award.

Q.    You mentioned that you were promoted to an APJ.  Why were you promoted?

| | | |
|---|---|---|
| 11:47:22 | 1 | A.    I was promoted based on my ability to examine |
| 11:47:29 | 2 | biotechnology applications.  And I was the first APJ to go |
| 11:47:34 | 3 | to the board that actually had a biotechnology background. |
| 11:47:37 | 4 | Q.    What were your initial responsibilities as an APJ at |
| 11:47:42 | 5 | the U.S. PTO? |
| 11:47:42 | 6 | A.    Initially, I examined ex parte appeals from the |
| 11:47:48 | 7 | examining board and rendered decisions on patentability. |
| 11:47:52 | 8 | And those decisions were the final agency decision. |
| 11:47:57 | 9 | Q.    Did you hear any other types of cases as an APJ? |
| 11:48:01 | 10 | A.    Yes.  I also conducted interference proceedings.  And |
| 11:48:05 | 11 | those decisions that I rendered covered the issues of |
| 11:48:11 | 12 | patentability as well as priority.  Those were also the |
| 11:48:15 | 13 | final agency decision. |
| 11:48:18 | 14 | Q.    How long were you an APJ? |
| 11:48:21 | 15 | A.    Over 11 years. |
| 11:48:22 | 16 | Q.    How many decisions, approximately, did you author? |
| 11:48:24 | 17 | A.    Well, I authored over 250 ex parte decisions and 50 |
| 11:48:31 | 18 | inter partes decisions.  But I participated in approximately |
| 11:48:36 | 19 | three times that many as Judge No. 2 and No. 3. |
| 11:48:42 | 20 |           MR. HAUG:  At this point plaintiffs offer Dr. |
| 11:48:43 | 21 | Ellis as an expert witness in the practices and procedure |
| 11:48:48 | 22 | before the U.S. PTO relating to the prosecution of patents |
| 11:48:52 | 23 | during the time she was working for the U.S. PTO. |
| 11:48:55 | 24 |           THE COURT:  I would like to see counsel at |
| 11:48:57 | 25 | sidebar. |

1          (The following took place at sidebar.)

2          THE COURT:  Why do I need to hear from this

3     witness?

4          MR. HAUG:  Well, she is only -- I would only ask

5     her two points.

6          THE COURT:  I want to know why I need to hear

7     from her.

8          MR. HAUG:  Only if you think it would be helpful

9     to you.

10          THE COURT:  Well, if you think it would be

11     helpful to your case.  And why this is relevant.  I have

12     never heard this kind testimony before, Mr. Blumenfeld may

13     correct me, he is probably over there -- I shouldn't say

14     never.  I probably have never permitted a patent examiner to

15     testify as an expert in my courtroom.  I want to know why I

16     should make an exception today.

17          MR. HAUG:  Only because of the issues that are

18     in this case, particularly the laches issue and how the

19     Patent Office deals with issues.

20          THE COURT:  How is she going to help me

21     understand the laches issue?

22          MR. HAUG:  Your Honor, if you don't think you

23     need it...

24          THE COURT:  You are not going to put it on me.

25     You have to make your record.  If I am not going to let her

11:57:13  1   testify, which I am unlikely to, you have got to tell me

2   why.

11:57:13  3              MR. HAUG:  Ms. Ellis was in the PTO for a good

11:57:13  4   20 years, whatever, in the very same biotechnology group,

11:57:13  5   180, which prosecuted this particular patent at issue here.

11:57:13  6   She is prepared to talk about the rules that were in force

11:57:13  7   during that period of time, and also the Patent Office's

11:57:14  8   policy on giving warning of laches.

11:57:14  9              THE COURT:  What is your reaction to this?

11:57:14  10             MR. WIESEN:  Your Honor, I don't think it's

11:57:14  11  necessary.  I think it's mainly legal testimony, talking

11:57:14  12  about the Guidelines in the MPEP.  They are more than

11:57:14  13  welcome to cite them and argue from them.  But I don't think

11:57:14  14  a witness is necessary to describe them in this courtroom.

11:57:14  15             THE COURT:  Why aren't the Guidelines, the

11:57:14  16  citation to the MPEP sufficient.

11:57:14  17             MR. HAUG:  If I can argue without this witness

11:57:14  18  putting any of -- talking about any of them, if I can argue

11:57:14  19  all those guidelines and MPEP sections and it is policies of

11:57:14  20  the Patent Office with respect to laches, then I think that

11:57:14  21  is sufficient, if Your Honor doesn't think --

11:57:14  22             THE COURT:  What is your reaction to that?

11:57:14  23             MR. WIESEN:  The Guidelines are published in the

11:57:14  24  C.F.R., in the Federal Register.  I think it's akin to

11:57:14  25  citing a statute.  I think the MPEP is often treated the

Ellis - direct

| 11:57:14 | 1 | same way and cited as regulatory guidance.  I don't think we |

11:57:14  1   same way and cited as regulatory guidance.  I don't think we

11:57:14  2   would object if that is what the issue is, just to put them

11:57:14  3   into the record.

11:57:14  4           THE COURT:  Are you offering this testimony as

11:57:14  5   relevant to the prosecution practice, you said a couple of

11:57:14  6   times, with regard to prosecution laches, their practice is

11:57:14  7   somehow relevant to my decision in this case?  If so, how?

11:57:14  8           MR. HAUG:  Because the examiners are trained to

11:57:14  9   look for laches.  If they find anything that is a laches

11:57:15 10   issue, they issue a warning.  And no such warning was issued

11:57:15 11   in this case.

11:57:15 12           THE COURT:  I should infer from that -- maybe

11:57:15 13   they missed it.  No?

11:57:15 14           MR. HAUG:  Your Honor will make that decision.

11:57:15 15           THE COURT:  She is here.  I am going to let her

11:57:15 16   testify.  I doubt that I am going to consider the testimony.

11:57:15 17   You paid her.  Let her go ahead and testify.

11:57:15 18           (End of sidebar conference.)

11:57:15 19           MR. HAUG:  Your Honor, I think where I got to

11:57:15 20   is I offered Dr. Ellis as an expert.

11:57:15 21           MR. WIESEN:  No objection, Your Honor.

11:57:15 22           THE COURT:  She is accepted as an expert.

11:57:15 23           MR. HAUG:  Thank you, Your Honor.

11:57:15 24   BY MR. HAUG:

11:57:15 25   Q.    If we could turn to PDX6.5, please.

11:57:15    1          Is this a summary of your opinions?

11:57:15    2    A.    Yes, it is.

11:57:15    3    Q.    Could you just please go through them quickly?

11:57:15    4    A.    Yes.  During the time of the '333 patent prosecution,

11:57:15    5    the U.S. PTO could have issued a warning of prosecution

11:57:15    6    laches, but it did not.

11:57:15    7          During the time of the '333 patent prosecution,

11:57:16    8    the 1988 MPEP Utility Guidelines that were set forth in

11:57:16    9    608.01(p) permitted use of in vivo or in vitro data or a

11:57:16    10   combination thereof as proof of utility.

11:57:16    11         And that the '333 patent applicants complied

11:57:16    12   with the 1995 U.S. PTO Utility Guidelines to rebut the

11:57:16    13   rejection for lack of utility.

11:57:16    14   Q.    You mentioned the issuance of a warning of prosecution

11:57:16    15   laches.  What do you mean by warning of prosecution laches?

11:57:16    16   A.    Based on a board decision, patent examiners were

11:57:16    17   instructed to issue a warning that a patent applicant would

11:57:16    18   forfeit his or her patent rights if they filed continuation

11:57:16    19   after continuation on allowed claims.

11:57:16    20   Q.    I would like to turn to your second opinion.  If you

11:57:16    21   could please go to PDX-6.28.

11:57:16    22   A.    Yes.

11:57:16    23   Q.    At the time of the -- withdrawn.

11:57:16    24         What is MPEP 608.01(p)?

11:57:16    25   A.    What is being shown here is the section of the MPEP

Ellis - direct

| | | |
|---|---|---|
| 11:57:16 | 1 | that was in effect at the time the '333 patent applications |
| 11:57:16 | 2 | were being prosecuted. |
| 11:57:16 | 3 | Q.    Was this section in force from 1990 to 1997? |
| 11:57:16 | 4 | A.    Well, it was in force.  But this section was updated |
| 11:57:16 | 5 | in 1995.  So it became -- so that it made it very clear that |
| 11:57:17 | 6 | the utility guidelines were directed to inventions involving |
| 11:57:17 | 7 | biotech and immunotherapy. |
| 11:57:17 | 8 | Q.    If you could turn to PDX-6.30, what do you mean by |
| 11:57:17 | 9 | "proposed utility guidelines"? |
| 11:57:17 | 10 | A.    Well, in 1995, because there was a lot of uproar in |
| 11:57:17 | 11 | the biotech industry about all of the utility rejections |
| 11:57:17 | 12 | that were being made in the biotech group, the Patent Office |
| 11:57:17 | 13 | decided to write new utility guidelines for the examiners. |
| 11:57:17 | 14 | And that was done in 1993, the first draft came out, and it |
| 11:57:17 | 15 | was published in the Federal Register, as you see here, on |
| 11:57:17 | 16 | January 3rd, 1995, at the same time it was also published in |
| 11:57:17 | 17 | the MPEP. |
| 11:57:17 | 18 | MR. HAUG:  No further questions, Your Honor. |
| 11:57:17 | 19 | THE COURT:  Mr. Wiesen. |
| 11:57:17 | 20 | MR. WIESEN:  No questions, Your Honor. |
| 11:57:17 | 21 | THE COURT:  Thank you, Doctor.  Please be |
| 11:57:17 | 22 | careful stepping down. |
| 11:57:17 | 23 | (Witness excused.) |
| 11:57:17 | 24 | MR. HAUG:  With that, Your Honor, plaintiffs |
| 11:57:17 | 25 | rest. |

| | | |
|---|---|---|
| 11:57:17 | 1 | THE COURT:  Mr. Wiesen. |
| 11:57:17 | 2 | MR. WIESEN:  Your Honor, we have a very short |
| 11:57:17 | 3 | video designation from Ms. Andresen, and then one live |
| 11:57:17 | 4 | witness, Dr. Pines, who had been on our witness list.  We |
| 11:57:17 | 5 | have decided not to call him.  We will just have Mr. Hofmann |
| 11:57:17 | 6 | on commercial success. |
| 11:57:17 | 7 | THE COURT:  Let's take a stretch. |
| 11:57:17 | 8 | (Recess taken.) |
| 12:08:49 | 9 | THE COURT:  Please continue.  Mr. Wiesen. |
| 12:08:51 | 10 | MR. WIESEN:  Your Honor, defendant's rebuttal |
| 12:08:53 | 11 | case will be brief.  The first witness is Dr. Andresen, who |
| 12:08:56 | 12 | is in the Global Medical Affairs Department at Shire.  The |
| 12:08:59 | 13 | designations are about nine minutes long. |
| 12:09:01 | 14 | THE COURT:  Okay. |
| 12:09:06 | 15 | MR. WIESEN:  We have transcripts to hand up. |
| 12:09:07 | 16 | THE COURT:  Great.  Okay. |
| 12:09:25 | 17 | (Designations played as follows.) |
| 12:09:27 | 18 | "Mr. Stull:  So I will go ahead and mark as |
| 12:09:30 | 19 | Exhibit 1, Fresenius notice of 30(b)(6) deposition of |
| 12:09:36 | 20 | plaintiffs. |
| 12:09:39 | 21 | "And if you could look at Topic No. 21.  Do you |
| 12:09:44 | 22 | see that? |
| 12:09:45 | 23 | "Answer:  Yes. |
| 12:09:45 | 24 | "Question:  Is this one of the topics you |
| 12:09:47 | 25 | understand you will be here to testify about? |

Andresen - deposition

| | | |
|---|---|---|
| 12:09:50 | 1 | "Answer:  Yes. |
| 12:09:51 | 2 | "Question:  So if you could look at Topic 23, is |
| 12:09:57 | 3 | that another one of the topics you understand you are here |
| 12:10:00 | 4 | to testify about? |
| 12:10:01 | 5 | "Answer:  Yes. |
| 12:10:02 | 6 | "Question:  Okay.  And how many products for HAE |
| 12:10:07 | 7 | does Shire have now? |
| 12:10:09 | 8 | "Answer:  Are you talking about -- asking about |
| 12:10:12 | 9 | U.S. or -- |
| 12:10:13 | 10 | "Question:  How about U.S.? |
| 12:10:14 | 11 | "Answer:  I think three. |
| 12:10:17 | 12 | "Question:  Three? |
| 12:10:18 | 13 | "Answer:  Yes. |
| 12:10:19 | 14 | "Question:  Would that be Cinryze, Firazyr, and |
| 12:10:24 | 15 | Kalbitor? |
| 12:10:24 | 16 | "Answer:  Yes. |
| 12:10:25 | 17 | "Question:  Do they have a product in Phase III |
| 12:10:27 | 18 | trials for HAE? |
| 12:10:28 | 19 | "Answer:  Yes. |
| 12:10:28 | 20 | "Question:  Was that acquired from Dyax? |
| 12:10:33 | 21 | "Answer:  Yes. |
| 12:10:34 | 22 | "Question:  And when Firazyr was originally |
| 12:10:37 | 23 | approved in the U.S., it was approved for |
| 12:10:39 | 24 | self-administration.  Correct? |
| 12:10:43 | 25 | "Answer:  That's my understanding, yes. |

Andresen - deposition

12:10:44  1      "Question:  At the time in 2011, are you aware

12:10:47  2  that Shire had any other products that were -- it was

12:10:51  3  marketing for HAE?

12:10:52  4      "Answer:  I'm not aware of.

12:10:56  5      "Mr. Stull:  Mark as Exhibit 11 a document with

12:11:00  6  Bates Nos. SHRSAN00436603 through 436854.

12:11:16  7      "And is this a copy of Shire's 10-K for the

12:11:19  8  fiscal year ending December 31, 2015?

12:11:23  9      "Answer:  That's correct.

12:11:24  10      "Question:  Would you turn to Page 22.  Do you

12:11:27  11  see where there is a heading that says Recently Acquired

12:11:30  12  Product?

12:11:32  13      "Answer:  Yes.

12:11:33  14      "Question:  And below that there is a listing

12:11:35  15  for Kalbitor?

12:11:38  16      "Answer:  Yes.

12:11:39  17      "Question:  And above Kalbitor it says,

12:11:44  18  'Following completion of acquisition of Dyax on January 22,

12:11:49  19  2016.  Shire obtained Kalbitor.'

12:11:54  20      "Is that correct?

12:11:55  21      "Answer:  This is what is stated here, yes.

12:11:57  22      "Question:  Mark as Exhibit 16 a document with

12:12:00  23  Bates Nos. SHRSAN0005127 through 5135.

12:12:12  24      "Does this appear to be a Shire document

12:12:15  25  regarding pre-approval key messages Q&A for Firazyr?

Andresen - deposition

12:12:21   1          "Answer:  Yes.

12:12:21   2          "Question:  So the question says, 'Is there a

12:12:25   3   medical need for Firazyr in the U.S. since there are several

12:12:28   4   other treatments already available to treat HAE?'

12:12:35   5          "Do you see that?

12:12:36   6          "Answer:  I see that question.

12:12:37   7          "Question:  Is that an accurate description of

12:12:41   8   the unmet need?

12:12:44   9          "Answer:  In general, yes.

12:12:48   10          "Question:  If you could turn to Page 8.  Do you

12:13:34   11   see there is a question that states, 'How does

12:13:41   12   Firazyr/icatibant injection differ from existing therapies?'

12:13:46   13          "Answer:  I see that question.

12:13:47   14          "Question:  Is that an accurate description of

12:13:49   15   how Firazyr differs from existing therapies?

12:13:52   16          "Answer:  Yes.

12:14:03   17          "Question:  Has Shire marketed Firazyr in the

12:14:06   18   United States as being -- having superior efficacy in

12:14:09   19   treating acute attacks of HAE as compared to any of the

12:14:13   20   other known treatments for acute attacks of HAE?

12:14:16   21          "Answer:  We have never shown superiority.  This

12:14:20   22   would mean a head-to-head study.

12:14:24   23          "Question:  And has there ever been a

12:14:29   24   head-to-head study?

12:14:30   25          "Answer:  No, never.

Andresen - deposition

| | | |
|---|---|---|
| 12:14:32 | 1 | "Mr. Stull:  I will mark as Exhibit 17 a |
| 12:14:36 | 2 | document with Bates numbers SHRSAN00005688 through 5704. |
| 12:14:50 | 3 | "Is this a Shire presentation entitled Firazyr |
| 12:14:54 | 4 | Launch Commercial Team Q&A? |
| 12:14:58 | 5 | "Answer:  This is what it says. |
| 12:14:59 | 6 | "Question:  Is this something that would have |
| 12:15:02 | 7 | been generated from the marketing department? |
| 12:15:05 | 8 | "Answer:  As it is commercial team, yes, I would |
| 12:15:09 | 9 | assume it is. |
| 12:15:10 | 10 | "Question:  And if you could look to what is |
| 12:15:16 | 11 | Page 3 of the presentation, there is a question at the top |
| 12:15:21 | 12 | which says, 'How does the efficacy or safety of Firazyr |
| 12:15:26 | 13 | compare to other HAE treatments?' |
| 12:15:32 | 14 | "Answer:  I see that. |
| 12:15:33 | 15 | "Question:  And there's a response.  There's two |
| 12:15:36 | 16 | bullet points. |
| 12:15:38 | 17 | "Do you see that? |
| 12:15:39 | 18 | "Answer:  Yes. |
| 12:15:39 | 19 | "Question:  Is that response accurate? |
| 12:15:43 | 20 | "Answer:  Yeah.  The first one, I said already, |
| | 21 | there have never been any head-to-head studies; and the |
| | 22 | second, yes. |
| 12:15:52 | 23 | "Question:  And the second one is -- just refers |
| 12:15:54 | 24 | to the individual product prescribing information? |
| 12:15:58 | 25 | "Answer:  Yes. |

Andresen - deposition

| | | |
|---|---|---|
| 12:15:59 | 1 | "Mr. Stull:  Mark as Exhibit 19 a document with |
| 12:16:04 | 2 | Bates Nos.   SHRS00439330 through 439389. |
| 12:16:14 | 3 | "Does this appear to be a Shire presentation |
| 12:16:16 | 4 | entitled 2013 Firazyr Global Medical Affairs Plan dated |
| 12:16:21 | 5 | August 2012? |
| 12:16:24 | 6 | "Answer:  That's correct. |
| 12:16:25 | 7 | "Question:  And if you could look at Page 8 of |
| 12:16:28 | 8 | the presentation, do you see there's a -- it's sort of a |
| 12:16:43 | 9 | flowchart on the right-hand side that says Operating |
| 12:16:47 | 10 | Strategies, and there are four operating strategies.  Is |
| 12:16:52 | 11 | that correct? |
| 12:16:53 | 12 | "Answer:  Yes. |
| 12:16:53 | 13 | "Question:  Do you see the first one says, |
| 12:16:56 | 14 | 'Disseminate scientific data of Firazyr as preferred |
| 12:17:00 | 15 | first-line treatment for all HAE attacks (unique MoA, key |
| 12:17:10 | 16 | indicator, key mediator, efficacy).' |
| 12:17:16 | 17 | "Do you see that? |
| 12:17:18 | 18 | "Answer:  Yes. |
| 12:17:18 | 19 | "Question:  What does preferred first-line |
| 12:17:21 | 20 | treatment mean there? |
| 12:17:22 | 21 | "Answer:  Because of the entity icatibant it has |
| 12:17:27 | 22 | several aspects which are unique, as like the mode of |
| 12:17:36 | 23 | action, that it is targeted to the bradykinin receptors, |
| 12:17:46 | 24 | what hasn't been on the market so far, and it is directly |
| 12:17:50 | 25 | targeting the key mediator bradykinin. |

Andresen - deposition

| | | |
|---|---|---|
| 12:17:54 | 1 | "Question:  There is no study that's shown that |
| 12:17:56 | 2 | the unique method of action leads to superior efficacy. |
| 12:18:00 | 3 | Right? |
| 12:18:00 | 4 | "Answer:  That's right. |
| 12:18:01 | 5 | "Question:  Back in 2011, Kalbitor is not |
| 12:18:05 | 6 | approved for self-administration; is that correct? |
| 12:18:09 | 7 | "Answer:  Yes. |
| 12:18:09 | 8 | "Question:  And what -- do you know why it |
| 12:18:12 | 9 | wasn't approved for self-administration? |
| 12:18:14 | 10 | "Answer:  Like for performing, and they had |
| 12:18:17 | 11 | anaphylactic reaction in the study of some cases; and, |
| 12:18:21 | 12 | therefore, it can't be done and can't just be provided by a |
| 12:18:24 | 13 | healthcare provider. |
| 12:18:28 | 14 | "Question:  Because of the anaphylactic shock? |
| 12:18:30 | 15 | "Answer:  Yeah.  You can never exclude that. |
| 12:18:32 | 16 | "Question:  Does Shire market its product as |
| 12:18:34 | 17 | having a superior safety profile as to the other products |
| 12:18:38 | 18 | that are marketed for treatment of acute attacks of HAE? |
| 12:18:43 | 19 | "Answer:  It's difficult to judge, because we |
| 12:18:45 | 20 | have not done head-to-head safety studies. |
| 12:18:47 | 21 | "Question:  So do they market it based on |
| 12:18:50 | 22 | superior safety to the other acute HAE products? |
| 12:18:56 | 23 | "Answer:  No." |
| 12:19:06 | 24 | THE COURT:  Mr. Wiesen, how long will this next |
| 12:19:09 | 25 | witness take, approximately? |

Andresen - deposition

| | | |
|---|---|---|
| 12:19:10 | 1 | MR. WIESEN:  I believe the direct examination is |
| 12:19:13 | 2 | maybe a half-hour or less. |
| 12:19:15 | 3 | THE COURT:  Let's start with the witness and |
| 12:19:19 | 4 | see. |
| 12:19:20 | 5 | MR. WIESEN:  Your Honor, defendants call Mr. |
| 12:19:22 | 6 | Ivan Hofmann, and Mr. Sherry will conduct the examination. |
| 12:19:25 | 7 | THE COURT:  Okay. |
| 12:19:42 | 8 | ... IVAN HOFMANN, been duly sworn as a witness, |
| 12:19:50 | 9 | was examined and testified as follows ... |
| 12:19:54 | 10 | THE COURT:  Good morning, Mr. Hofmann. |
| 12:20:00 | 11 | THE WITNESS:  Good morning, Your Honor. |
| 12:20:02 | 12 | THE COURT:  I should say afternoon. |
| 12:20:02 | 13 | THE WITNESS:  I guess so.  You are right. |
| 12:20:07 | 14 | DIRECT EXAMINATION |
| 12:20:07 | 15 | BY MR. SHERRY: |
| 12:20:08 | 16 | Q.   Mr. Hofmann, where are you currently employed? |
| 12:20:24 | 17 | A.   I am a vice president and managing director at Gleason |
| 12:20:29 | 18 | IP, which is an economic accounting and financial consulting |
| 12:20:32 | 19 | firm where I am the leader of the intellectual property |
| 12:20:34 | 20 | practice. |
| 12:20:34 | 21 | Q.   And what is the nature of your work in the economics |
| 12:20:39 | 22 | of the pharmaceutical industry? |
| 12:20:40 | 23 | A.   So sometimes I am called upon to analyze economic |
| 12:20:43 | 24 | issues involving intellectual property in a dispute setting |
| 12:20:47 | 25 | such as this, analyzing issues like secondary considerations |

12:20:51    1    of nonobviousness as well as damages, irreparable harm.

12:20:54    2            Outside of a dispute setting, I regularly

12:20:57    3    analyze the economics of intellectual property for things

12:20:59    4    like licensing, product pipeline consulting, market

12:21:04    5    analysis, et cetera.

12:21:04    6    Q.   How many pharmaceutical products have you performed

12:21:08    7    economic analysis on?

12:21:09    8    A.   Over the last 20 years, more than a hundred different

12:21:13    9    pharmaceutical products, including virtually every major

12:21:17   10    therapeutic class of drugs.

12:21:18   11    Q.   Please turn to DTX-314 in your binder.  What is this

12:21:26   12    document?

12:21:26   13    A.   It is a copy of my curriculum vitae.

12:21:29   14    Q.   Is it up to date and accurate?

12:21:31   15    A.   It is.

12:21:34   16            MR. SHERRY:  We present Mr. Hofmann as an expert

12:21:36   17    in the field of pharmaceutical economics.

12:21:38   18            THE COURT:  Mr. Blumenfeld?

12:21:40   19            MR. BLUMENFELD:  No objection, Your Honor.

12:21:41   20            THE COURT:  The witness is accepted as an expert

12:21:43   21    in the field.

12:21:44   22    BY MR. SHERRY:

12:21:44   23    Q.   Mr. Hofmann, what did Fresenius ask you to do in this

12:21:47   24    matter?

12:21:47   25    A.   I was asked to respond to certain issues involving

12:21:50    1    pharmaceutical economics, specifically, to respond to some

12:21:53    2    of the opinions expressed by Dr. Bell regarding commercial

12:21:57    3    success and nexus with respect to Claim 14 of the '333

12:22:02    4    patent.

12:22:02    5    Q.      Have you prepared slides to assist you in presenting

12:22:06    6    your opinions today?

12:22:10    7    A.      I have.

12:22:11    8    Q.      Can you briefly summarize your opinions regarding

12:22:14    9    plaintiffs' claims of commercial success?

12:22:16   10    A.      Sure.  The primary focus of my testimony is the lack

12:22:19   11    of nexus between the commercial performance of Firazyr and

12:22:24   12    Claim 14 of the '333 patent.  And there is three main areas.

12:22:29   13            The first is Dr. Bell only compared the

12:22:31   14    performance of Firazyr to other marketed products.  He

12:22:36   15    didn't compare the performance of Firazyr versus the closest

12:22:41   16    prior art and failed to show a nexus because of that.

12:22:45   17            Secondly, there are unique aspects of the small

12:22:48   18    Orphan Drug market for Firazyr as a treatment of HAE,

12:22:54   19    combined with certain business strategies of Shire, that

12:22:58   20    have nothing to do with the '333 patent that explain the

12:23:01   21    performance of Firazyr.

12:23:03   22            And then finally, we have some real-world

12:23:05   23    objective evidence of the failure of Hoechst to do anything

12:23:10   24    commercially with icatibant despite having the patent and

12:23:16   25    the resources for a dozen years to the compound.

12:23:20  1   Q.     Let's turn to your opinions in a little bit more

12:23:22  2   detail.

12:23:24  3          Could you please explain how the commercial

12:23:26  4   performance of Firazyr is attributable to features known in

12:23:29  5   the prior art?

12:23:30  6   A.     Sure.  I think we already heard some testimony this

12:23:32  7   week that subcutaneous injection through self-administration

12:23:38  8   and portability are really the drivers of the performance of

12:23:41  9   Firazyr.  And my understanding is that the convenience

12:23:44  10  associated with subcutaneous injection are properties that

12:23:49  11  are shared with other bradykinin antagonists and were known

12:23:53  12  in the prior art.  As a result, there is a failure to show

12:23:57  13  nexus because these attributes which drive the performance

12:24:00  14  of Firazyr were known in the prior art.

12:24:02  15  Q.     What led you to the conclusion that

12:24:05  16  self-administration is a convenience that drives Firazyr's

12:24:11  17  market performance?

12:24:11  18  A.     A combination of Shire documents, as well as

12:24:14  19  third-party discussion, and then I think we heard that from

12:24:17  20  Dr. Kaplan and even Dr. Bell.

12:24:19  21  Q.     Let's look at the Shire documents.  Can you please

12:24:24  22  turn to JTX-43 in your binder, Page 32, which we have up on

12:24:31  23  the screen here.  Can you tell us what document this is?

12:24:33  24  A.     Yes.  This is a 2017 HAE strategic business plan.  And

12:24:38  25  this is a slide from within that document.

Hofmann - direct

| | | |
|---|---|---|
| 12:24:40 | 1 | Q.    And what does Shire's business plan say about the |
| 12:24:50 | 2 | importance of portability and self-administration by |
| 12:24:52 | 3 | subcutaneous injection? |
| 12:24:53 | 4 | A.    I have highlighted that on the screen.  Basically, |
| 12:24:55 | 5 | portability and self-administration are key attributes that |
| 12:24:58 | 6 | drive prescribing. |
| 12:24:58 | 7 | Q.    Let's turn to the second part of your opinion.  If you |
| 12:25:02 | 8 | go back to the previous slide.  If you turn to Slide 9, Mr. |
| 12:25:08 | 9 | Chase. |
| 12:25:10 | 10 | What did you do to reach a conclusion regarding |
| 12:25:13 | 11 | whether the properties of icatibant that allow |
| 12:25:19 | 12 | self-administration are found in the prior art? |
| 12:25:21 | 13 | A.    I am not a scientist so I relied on Dr. Bachovchin's |
| 12:25:25 | 14 | opinions in that case. |
| 12:25:26 | 15 | Q.    What information from Dr. Bachovchin regarding the |
| 12:25:28 | 16 | properties of icatibant did you use in your analysis? |
| 12:25:30 | 17 | A.    So I have summarized some of his testimony from |
| 12:25:33 | 18 | earlier this week on the screen.  But basically, it's his |
| 12:25:37 | 19 | opinion and my understanding that these attributes of the |
| 12:25:41 | 20 | ability for subcutaneous objection -- |
| 12:25:46 | 21 | THE COURT:  You might want to direct your |
| 12:25:47 | 22 | attention out there.  I am listening. |
| 12:25:50 | 23 | THE WITNESS:  Of course, Your Honor.  Excellent. |
| 12:25:52 | 24 | The attributes that allow for subcutaneous |
| 12:25:55 | 25 | injection and tolerability and stability are attributes that |

12:25:58  1   were known and attributes contained in prior bradykinin

12:26:04  2   antagonists.

12:26:05  3   BY MR. SHERRY:

12:26:05  4   Q.    How did this scientific information regarding

12:26:08  5   icatibant in the prior art affect your economic analysis?

12:26:12  6   A.    Well, my understanding from an economic perspective is

12:26:15  7   that in order to show nexus one has to show that there are

12:26:19  8   incremental novel properties over what was known in the

12:26:23  9   prior art, and that that has not been shown in the analysis

12:26:28  10  we heard from Dr. Bell.

12:26:31  11  Q.    Thank you, Mr. Hofmann.

12:26:34  12        Can you explain, let's turn to your next

12:26:37  13  opinion, can you explain your opinions regarding the HAE

12:26:40  14  market and Shire's business strategies?

12:26:43  15  A.    Sure.   There are several attributes to this.   As I

12:26:48  16  have touched on earlier, HAE is a very small market.   It's

12:26:52  17  an Orphan Drug.   And because it's a very small market, there

12:26:56  18  are unique attributes with respect to pricing and

12:26:58  19  reimbursement.

12:27:00  20        There have also been a number of business

12:27:02  21  strategies undertaken by Shire which have allowed them to

12:27:07  22  aggressively take advantage of these market dynamics.   And

12:27:11  23  consistent with that, Shire has also acquired a number of

12:27:14  24  HAE products which gives them some control and a leadership

12:27:17  25  position in the marketplace that again affects the

12:27:20    1    commercial performance of Firazyr.

12:27:22    2    Q.    Well, let's start by talking about the size of the

12:27:25    3    market for Firazyr.  You mentioned that HAE is a rare

12:27:29    4    disease.  How uncommon does a disease need to be in order to

12:27:33    5    be considered rare?

12:27:34    6    A.    Well, it is an Orphan Drug.  My understanding in the

12:27:38    7    U.S., that means a prevalence of 200,000 or less individuals

12:27:41    8    in the U.S.

12:27:42    9    Q.    How does the HAE market compare with the market for

12:27:46   10    other rare diseases?

12:27:47   11    A.    It is kind of an ultra-Orphan Drug.  We are talking

12:27:50   12    about thousands of individuals in terms of prevalence,

12:27:53   13    versus that 200,000 threshold, which is already low.

12:27:57   14    Q.    How does the size of a patient population typically

12:28:00   15    affect drug prices?

12:28:02   16    A.    So patients typically don't pay out of pocket for the

12:28:05   17    actual cost of the drug.  They rely on third-party payors

12:28:10   18    like insurance companies.

12:28:12   19          So it isn't a traditional kind of supply and

12:28:16   20    demand dynamic for pharmaceutical products.  Typically,

12:28:19   21    these insurance companies will negotiate pricing with the

12:28:23   22    manufacturers, and for diseases with high prevalence, like

12:28:27   23    diabetes, they can exert some influence and focus a lot of

12:28:32   24    attention on trying to get rebates and discounts, whereas

12:28:36   25    for small populations, for Orphan Drugs, there is less

12:28:41    1   attention devoted.

12:28:41    2   Q.    And how are drug prices affected when the patient

12:28:47    3   population is very small?

12:28:50    4   A.    So because there is only a few thousand people that

12:28:53    5   are actually undergoing treatment for HAE, and there are

12:28:56    6   several thousand third-party payors or insurance companies

12:29:00    7   in the country, any particular payor only has a handful of

12:29:06    8   patients that may be treated for HAE.  So they typically

12:29:09    9   devote much less resources to something like an ultra-Orphan

12:29:15   10   Drug like HAE, which allows the manufacturer to basically

12:29:17   11   charge much higher prices per patient.

12:29:19   12   Q.    Does Shire acknowledge that the market for Firazyr has

12:29:25   13   this dynamic with third-party payors?

12:29:29   14   A.    Yes, that was in the Shire documents, business plans,

12:29:32   15   et cetera.

12:29:32   16   Q.    Please turn to JTX-12 in your binder, which we have up

12:29:36   17   on the screen now, Page 25.  Can you tell us what document

12:29:40   18   this is?

12:29:41   19   A.    Yes.  This is a business plan from 2015.

12:29:44   20   Q.    What does the Shire business plan say about the HAE

12:29:47   21   market?

12:29:47   22   A.    Well, I have highlighted an excerpt of it.  It says,

12:29:51   23   Payors report that HAE is a low priority to manage.

12:29:53   24         You can see the title is HAE Continues to Fly

12:29:56   25   Under the Radar.  This is consistent with what I was saying,

Hofmann - direct

| | | |
|---|---|---|
| 12:29:59 | 1 | that payors don't really focus as much attention on pricing |
| 12:30:03 | 2 | for ultra-Orphan Drugs like for HAE. |
| 12:30:06 | 3 | Q.    Let's take a look at another aspect of the HAE market. |
| 12:30:10 | 4 | In developing your opinions, did you find information |
| 12:30:14 | 5 | regarding how frequently Firazyr is used by patients who are |
| 12:30:17 | 6 | prescribed the drug? |
| 12:30:18 | 7 | A.    I did. |
| 12:30:18 | 8 | Q.    Would you please turn to DTX-298, the last page, Page |
| 12:30:25 | 9 | 56.  We have it up on the screen.  Can you explain what this |
| 12:30:30 | 10 | slide shows? |
| 12:30:31 | 11 | A.    Yes.  This is a slide from the 2016 long-range |
| 12:30:36 | 12 | planning for HAE by Shire. |
| 12:30:38 | 13 | This is kind of a busy dual-axis graph.  So I |
| 12:30:41 | 14 | will walk through what it tells us, because it's rather |
| 12:30:44 | 15 | important and telling. |
| 12:30:46 | 16 | What you have on the bottom is quintiles.  And |
| 12:30:49 | 17 | what quintiles means is basically Shire is looking at of the |
| 12:30:53 | 18 | uses of Firazyr how does it break out by patient population. |
| 12:30:57 | 19 | 20 percent of sales is represented in each quintile. |
| 12:31:01 | 20 | On the left side of the dual-axis graph, it's |
| 12:31:07 | 21 | the percentage of Firazyr users in that year.  And that's |
| 12:31:10 | 22 | what's covered by these bars. |
| 12:31:12 | 23 | So you can see the top quintile, the 20 percent |
| 12:31:16 | 24 | of uses is actually one percent of patients consumed 20 |
| 12:31:22 | 25 | percent of Firazyr.  And you can see like the bottom |

12:31:26   1   quintile, 68 percent of patients or 69 percent, you know,

12:31:30   2   cover that 20 percent.

12:31:31   3            So you have high users with a concentrated use

12:31:34   4   of Firazyr.

12:31:36   5            Then what's on the right side of the dual-axis

12:31:38   6   graph is the average number of syringes per patient.  And

12:31:44   7   that's what's covered in the line graph.  You can see for

12:31:47   8   the high users, they are using about 30 syringes a month,

12:31:53   9   which then declines as you go to lower average users.

12:31:56   10  Q.    And what does DTX-298 show regarding Firazyr usage

12:32:08   11  patients?

12:32:08   12  A.    You can see that the title is Five Percent of Patients

12:32:12   13  Account For 40 Percent of Firazyr Users.  And they have

12:32:16   14  highlighted that.  You can see that these top two quintiles

12:32:20   15  represent a very high concentration, represented a very

12:32:23   16  limited number of patients representing a significant

12:32:25   17  portion of Firazyr sales.

12:32:27   18  Q.    Now, five percent of patients account for 40 percent

12:32:31   19  of sales, how many patients are we actually talking about

12:32:34   20  here?

12:32:34   21  A.    Right.  So five percent of patients, based on some of

12:32:37   22  the patient information, we are talking about less than a

12:32:40   23  hundred patients.  If you look at the top quintile, that one

12:32:44   24  percent, you know, these 16 or less than 20 patients who are

12:32:48   25  using 30 syringes a month are actually consuming millions of

12:32:55  1   dollars worth of Firazyr per patient.  I think we heard that

12:32:59  2   Firazyr costs about nine to ten thousand per syringe.

12:33:03  3   Because they are using 30 syringes a month, it is about more

12:33:06  4   than three million dollars per patient in that group.

12:33:08  5   Q.    How does the size of the HAE market and Firazyr's

12:33:15  6   usage patterns affect your economic analysis of commercial

12:33:18  7   success?

12:33:18  8   A.    Well, these are economic and market dynamics that

12:33:22  9   really have nothing to do with the patent.  They are

12:33:24  10  commercial business things that drive the dollar sales we

12:33:27  11  heard about that are unrelated to the patent.

12:33:30  12  Q.    Let's turn to Shire's business strategy regarding

12:33:37  13  pricing.  Please turn to PTX-092, which we have a

12:33:45  14  representation of that up on the screen.  This was

12:33:49  15  information discussed in Dr. Bell's testimony.

12:33:52  16       Can you explain what this graph shows about how

12:33:55  17  the price of Firazyr varied over time as compared to

12:34:00  18  competing acute HAE therapies?

12:34:02  19  A.    Sure.  So all of these therapies are very expensive

12:34:05  20  per attack, as I just explained.  But Shire has deployed a

12:34:10  21  commercial strategy where they have consistently kept the

12:34:13  22  price of Firazyr about one to three thousand dollars below

12:34:17  23  the cost of other available treatments for acute attacks, as

12:34:23  24  a kind of business strategy.

12:34:24  25  Q.    How does this discounted pricing affect your analysis

12:34:28   1   of commercial success?

12:34:29   2   A.    Well, this is yet another commercial and business

12:34:34   3   strategy that is unrelated to the '333 patent that drives

12:34:36   4   some of the sales and volume of Firazyr.

12:34:38   5   Q.    Let's turn to the next aspect of your opinion,

12:34:44   6   regarding Shire's business strategy, the position in the

12:34:52   7   market.  What is the perception of Shire in the HAE market?

12:34:54   8   A.    Well, they have through acquisition, you know, become

12:34:57   9   a leader in the space, having control of a number of

12:34:59   10  treatments for HAE.

12:35:00   11  Q.    And which products do they control?

12:35:04   12  A.    They have Firazyr, Cinryze and Kalbitor, which are

12:35:07   13  three out of the five products available for the treatment

12:35:10   14  of HAE.

12:35:10   15  Q.    And why does Shire's leadership position in the market

12:35:14   16  matter?

12:35:14   17  A.    Well, for a few commercial reasons.  One, it allows

12:35:17   18  them to manage the marketing attention and resources devoted

12:35:21   19  to the different products.  It also allows them to exert

12:35:26   20  some influence over pricing strategy.  So it's that

12:35:30   21  combination of commercial strategies which, again, drives

12:35:34   22  sales but really has nothing to do with the patent.

12:35:36   23  Q.    And how does Shire's leadership position affect the

12:35:41   24  commercial success analysis?

12:35:43   25  A.    Well, alongside some of the things I already talked

12:35:45  1    about, this is another business and commercial strategy

12:35:48  2    unrelated to the '333 patent that explains the performance

12:35:51  3    of Firazyr.

12:35:52  4    Q.    Let's turn to the next point on nexus, which concerns

12:35:58  5    the gap between the invention of icatibant and the

12:36:02  6    development of the HAE indication.  How does the sequence of

12:36:06  7    events in the development of icatibant affect your economic

12:36:10  8    analysis?

12:36:11  9    A.    Well, what we have is we have some real-world evidence

12:36:15  10   where Hoechst created the icatibant molecule, worked on it

12:36:20  11   for many years, and then essentially abandoned the compound.

12:36:24  12   And this provides evidence that something other than the

12:36:27  13   compound that later occurred explains the performance of

12:36:31  14   Firazyr.

12:36:31  15   Q.    Before we just get into the economic implications,

12:36:35  16   let's just go over the timeline.  Can you give an overview

12:36:40  17   of the period that ultimately resulted in Firazyr's

12:36:44  18   commercial product?

12:36:45  19   A.    Sure.  On the far left, we have the brief period of

12:36:47  20   development of icatibant in the '87-'88 time frame.  Then in

12:36:54  21   gray, we have the period where Hoechst worked on finding

12:36:58  22   uses for icatibant and ultimately abandoned development of

12:37:02  23   the product.  In green, we have a period of time where

12:37:06  24   Jerini out-licensed the compound and did work on cirrhosis

12:37:12  25   and HAE.  And then finally, in the last orange period, we

Hofmann - direct

12:37:17    1    have the, 20 years later, commercial sales of Firazyr.

12:37:21    2    Q.    So when did Hoechst first develop icatibant?

12:37:26    3    A.    That's in 1989.

12:37:28    4    Q.    When did work begin on developing a method of using

12:37:32    5    icatibant to treat HAE?

12:37:35    6    A.    Not until after 2001 when Jerini took over and worked

12:37:41    7    on cirrhosis and HAE.

12:37:43    8    Q.    And what happened during the 12-year period in between

12:37:48    9    the development of icatibant and the beginning of work on

12:37:53   10    developing a method and using that method of using icatibant

12:37:56   11    to treat HAE?

12:37:57   12    A.    Well, Hoechst was focused on larger population

12:38:02   13    indications, things like rheumatoid arthritis and asthma and

12:38:06   14    rhinitis.  They worked on those potential indications and

12:38:09   15    then ultimately gave up on development and abandoned the

12:38:12   16    compound.

12:38:13   17    Q.    And did you identify information in preparing your

12:38:18   18    opinions for this case showing that Hoechst abandoned the

12:38:22   19    element of icatibant before it was licensed to Jerini?

12:38:26   20    A.    I did.  There was some testimony from Dr. Knolle that

12:38:29   21    I relied on.

12:38:29   22    Q.    What was his testimony?

12:38:31   23    A.    Well, I put it on the screen.  I mean, basically, he

12:38:35   24    described icatibant as a dead compound sitting in the

12:38:38   25    basement at Hoechst.  Basically after having worked on it

12:38:41  1   for more than a decade, the company discontinued development

12:38:46  2   and ultimately out-licensed the product to Jerini.

12:38:49  3   Q.     And what do you conclude with respect to commercial

12:38:54  4   success from Hoechst's failure to exploit icatibant

12:38:59  5   commercially while they had it?

12:39:00  6   A.     Well, the whole construct of commercial success is the

12:39:05  7   idea that there would have been motivation for others to

12:39:08  8   potentially exploit the invention, as an example, as shown

12:39:14  9   through commercial sales.  But here we have Hoechst, a

12:39:17  10  worldwide pharmaceutical company that devoted 12 years of

12:39:20  11  time and resources and was unable to find a use, commercial

12:39:24  12  use for icatibant.  This provides real-world evidence that

12:39:30  13  something other than the icatibant compound and the '333

12:39:33  14  patent explains the much later commercial performance of

12:39:37  15  Firazyr, things like the method of use for the treatment of

12:39:40  16  HAE, the particular formulation for subcutaneous injection,

12:39:45  17  et cetera.

12:39:45  18  Q.     I would like to ask you a few questions about Dr.

12:39:49  19  Bell's analysis.

12:39:50  20          Did Dr. Bell apportion Firazyr's commercial

12:39:54  21  performance to factors other than the patents in suit?

12:39:57  22  A.     No.  He attributed everything to the '333 compound

12:40:00  23  patent.

12:40:01  24  Q.     What factors should Dr. Bell have considered when

12:40:04  25  considering the marketplace performance of Firazyr?

Hofmann - direct

12:40:07   1   A.    As kind of illustrated by that timeline, there were

12:40:09   2   later things like the method of use for the treatment of HAE

12:40:12   3   and the formulation that allows for subcutaneous injection

12:40:17   4   that he didn't ascribe any value to.

12:40:19   5           He also didn't address some of the business and

12:40:21   6   commercial strategies I talked about, the unique aspects of

12:40:26   7   the Orphan Drug market and the business strategies of Shire.

12:40:28   8   Q.    And in your opinion, why is it important to ascribe

12:40:33   9   value to the method of treating acute attacks of HAE with

12:40:37   10  icatibant?

12:40:37   11  A.    Well, it undermines his claims of nexus by ascribing

12:40:42   12  all the commercial sales of Firazyr to the '333 patent.  He

12:40:48   13  fails to attribute the very important and later development

12:40:53   14  of things like the method of use, the formulation, and the

12:40:55   15  business strategies undertaken by Shire.

12:40:58   16  Q.    Can I have Slide 22, please.

12:41:03   17          Mr. Hofmann, can you please briefly summarize

12:41:05   18  your opinions?

12:41:06   19  A.    Sure.  So, as I said, the focus is the lack of nexus

12:41:13   20  between the performance of Firazyr and the '333 patent.  In

12:41:16   21  particular, the performance and the ability to

12:41:18   22  subcutaneously inject are things that I understand were

12:41:23   23  known in the prior art.

12:41:24   24          There is the unique aspects of the Orphan Drug

12:41:27   25  market and the business strategies of Shire that explain the

Hofmann - direct

12:41:29    1    performance.

12:41:30    2             And then, really, very compelling is the actual

12:41:34    3    objective period that we have, where Hoechst tried and

12:41:37    4    failed to develop a commercial use for icatibant that shows

12:41:40    5    that something other than the molecule must explain the

12:41:43    6    commercial performance of Firazyr.

12:41:45    7    Q.    Thank you, Mr. Hofmann.  No further questions.

12:41:48    8             THE COURT:  Mr. Blumenfeld.

12:41:50    9             MR. BLUMENFELD:  Thank you, Your Honor.

12:41:52   10                    CROSS-EXAMINATION

12:41:52   11    BY MR. BLUMENFELD:

12:41:57   12    Q.    If I may hand up some notebooks, I hope I won't be

12:42:00   13    using many of these exhibits.

12:42:25   14             Good afternoon, Mr. Hofmann.

12:42:27   15    A.    Good afternoon.

12:42:28   16    Q.    We haven't met before.  My name is Jack Blumenfeld.

12:42:31   17    Nice to meet you.

12:42:33   18    A.    Nice to meet you as well.

12:42:34   19    Q.    I just want to ask you a few questions this afternoon.

12:42:37   20             You talked about how there is a small Orphan

12:42:40   21    Drug market for hereditary angioedema.

12:42:44   22             Now, Firazyr is an Orphan Drug.  Right?

12:42:47   23    A.    It is.

12:42:47   24    Q.    Berinert is an Orphan Drug?

12:42:51   25    A.    It is.

Hofmann - cross

| | | |
|---|---|---|
| 12:42:51 | 1 | Q.    Kalbitor is an Orphan Drug? |
| 12:42:53 | 2 | A.    Yes. |
| 12:42:54 | 3 | Q.    And so this is the same small market for all three of |
| 12:42:58 | 4 | those Orphan Drugs.  Right? |
| 12:43:00 | 5 | A.    Yes.  They are all approved for similar indications. |
| 12:43:03 | 6 | Q.    You have looked at the relative market shares of those |
| 12:43:06 | 7 | products.  Correct? |
| 12:43:08 | 8 | A.    I have, yes. |
| 12:43:08 | 9 | Q.    And could we put up PDX-4.6. |
| 12:43:24 | 10 | This PDX-4.6, this is one of Dr. Bell's slides. |
| 12:43:27 | 11 | You have seen the before.  Right? |
| 12:43:29 | 12 | A.    I have. |
| 12:43:30 | 13 | Q.    You don't dispute any of the data that he put together |
| 12:43:37 | 14 | for this slide.  Correct? |
| 12:43:38 | 15 | A.    It does reflect the underlying data accurately.  I |
| 12:43:43 | 16 | disagree with his conclusions on it.  But, yes, I agree. |
| 12:43:46 | 17 | Q.    Firazyr greatly outperformed Berinert and Kalbitor in |
| 12:43:51 | 18 | the HAE market.  Correct? |
| 12:43:53 | 19 | A.    I think for the reasons I explained on direct, that's |
| 12:43:55 | 20 | right. |
| 12:43:55 | 21 | Q.    Now, one of the things you talked about was the |
| 12:43:59 | 22 | multiple products that Shire has.  Right? |
| 12:44:01 | 23 | A.    Correct. |
| 12:44:02 | 24 | Q.    Now, from 2011 to 2013, Firazyr was Shire's only |
| 12:44:11 | 25 | product in the HAE market.  Right? |

| | | |
|---|---|---|
| 12:44:13 | 1 | A.   Correct.   The others were acquired later. |
| 12:44:15 | 2 | Q.   They were acquired later? |
| 12:44:17 | 3 | A.   Correct. |
| 12:44:17 | 4 | Q.   Kalbitor really, right toward the end of the graph |
| 12:44:22 | 5 | that is shown here? |
| 12:44:23 | 6 | A.   Correct, in 2016. |
| 12:44:25 | 7 | Q.   And from 2011 to 2013, when Firazyr was Shire's only |
| 12:44:34 | 8 | product, it outperformed Berinert and Kalbitor by a lot of |
| 12:44:41 | 9 | dollars.   Correct? |
| 12:44:42 | 10 | A.   Well, I mean, the vast majority of the dollars come in |
| 12:44:46 | 11 | the period after they acquired Cinryze and had control of |
| 12:44:50 | 12 | both products.   But I don't disagree that it outpaced the |
| 12:44:52 | 13 | other products in that period. |
| 12:44:54 | 14 | Q.   You are in fact not contesting any of Dr. Bell's sales |
| 12:45:02 | 15 | and marketplace performance data.   Is that correct? |
| 12:45:06 | 16 | A.   In terms of data, I think that's right.   I mean, I |
| 12:45:09 | 17 | don't think he adequately addressed the unique aspects of |
| 12:45:11 | 18 | the high prices for Orphan Drugs and the impact that has on |
| 12:45:15 | 19 | those dollars.   But, yes, I would agree with you. |
| 12:45:18 | 20 | Q.   Let's talk about that a little bit. |
| 12:45:22 | 21 | You referred during the course of your testimony |
| 12:45:26 | 22 | to document JTX-43.   Can you turn to that? |
| 12:45:33 | 23 | It's in the book that Mr. Sherry gave you. |
| 12:45:42 | 24 | A.   Okay. |
| 12:45:42 | 25 | Q.   And you prepared a Slide, let me get the right slide, |

12:45:53    1    pointing to Page 32 of this document.  Right?

12:45:59    2             It's your slide, if you have it in front of you,

12:46:02    3    DDX6-7?

12:46:04    4    A.    Yes.

12:46:06    5    Q.    And what you pointed to on this page was "Portability

12:46:13    6    and self-administration are key Firazyr attributes that

12:46:18    7    drive prescribing."

12:46:19    8             Do you see that?

12:46:20    9    A.    Yes.

12:46:20    10   Q.    Above that, three bullet points above that, it says,

12:46:25    11   "70 percent of HCPs agreed patients should treat symptoms as

12:46:31    12   soon as they arise."

12:46:34    13            Right?

12:46:34    14   A.    I do see that.

12:46:35    15   Q.    And treating symptoms of HAE patients quickly is

12:46:40    16   important to the patients, isn't it?

12:46:43    17   A.    I am not a clinician.  But certainly, the subcutaneous

12:46:47    18   ready-to-use self-injection does contribute to that, yes.

12:46:52    19   Q.    And that's one of the attributes of Firazyr.  Right?

12:46:56    20   A.    Yes.

12:46:57    21   Q.    Now, can we turn back in this document to JTX-13.28.

12:47:08    22   A.    I am sorry.  Turn to what?

12:47:10    23   Q.    I am sorry, 43.28.  A few pages before the one you

12:47:17    24   were looking at.

12:47:18    25   A.    All right.

12:47:18    1    Q.     And on this page it says, "Payors recognize the burden

12:47:23    2    of HAE and importance of on-demand access; value of

12:47:28    3    prophylaxis varies."

12:47:31    4                    Do you see that?

12:47:31    5    A.     I do see that.

12:47:32    6    Q.     On-demand access, that means at-home access, the

12:47:37    7    patients have it right there and they can use it?

12:47:39    8    A.     Ready to use subcutaneous self-administration.

12:47:42    9    Q.     That's important to patients.  Right?

12:47:44   10    A.     Correct.

12:47:44   11    Q.     And important to doctors?

12:47:46   12    A.     That's my understanding.

12:47:47   13    Q.     And if you look down, there is a heading that says

12:47:51   14    "Value On-Demand," if we blow that up, this is talking about

12:47:55   15    payors, right, like insurance companies and other health

12:47:59   16    care payors?

12:48:00   17    A.     Correct.

12:48:01   18    Q.     "Payors care about onset and effectiveness of relief

12:48:04   19    and are also interested in effectiveness of a single

12:48:09   20    injection.  They rate highly the ability for patients to

12:48:12   21    self-administer and value rapid initiation of treatment and

12:48:17   22    flexibility."

12:48:18   23                    Do you see that?

12:48:19   24    A.     I do.

12:48:19   25    Q.     Those are things that payors do value.  Correct?

12:48:22   1   A.      Yes.   And it goes on to talk about the low cost, which

12:48:26   2   I talked about.   But, yes.

12:48:27   3   Q.      You talked about the cost.   You didn't talk about the

12:48:30   4   rest of this?

12:48:31   5   A.      No, I did.   I talked about the importance of

12:48:33   6   self-administration and subcutaneous injection.

12:48:36   7   Q.      It also talks about payors care about onset and

12:48:41   8   effectiveness of relief and in addition the patient's

12:48:48   9   ability to self-administer.   Right?

12:48:50   10   A.      I see that.

12:48:52   11   Q.      And another attribute of Firazyr is the effectiveness

12:48:56   12   of the relief that it provides to patients.   Right?

12:49:01   13   A.      Yeah, among other attributes, yes.

12:49:03   14   Q.      And the effectiveness of relief that Firazyr provides

12:49:07   15   to patients, that is an attribute of icatibant.   Correct?

12:49:14   16   A.      Yeah.   I would defer to technical experts on that.   I

12:49:17   17   am not a medicinal chemist or formulator.   But, you know,

12:49:21   18   that's part of it, sure.

12:49:23   19   Q.      If there was no icatibant in the Firazyr, it wouldn't

12:49:27   20   treat the acute attacks.   Correct?

12:49:31   21   A.      Combined with the formulation and method of use, I

12:49:36   22   would agree with that.

12:49:36   23   Q.      And Firazyr is the only FDA-approved treatment for

12:49:42   24   acute attacks of hereditary angioedema that is

12:49:46   25   self-administered subcutaneously.   Right ?

12:49:51    1    A.    That's my understanding.

12:49:52    2    Q.    Can we put up your Slide 6-6.

12:50:04    3          This slide at the top, it refers to "Features

12:50:07    4    Responsible for Firazyr's Performance."

12:50:10    5          Do you see that?

12:50:11    6    A.    It goes on.  But yes.

12:50:13    7    Q.    Right.  You talked about shared with known peptides.

12:50:17    8          But this slide is directed to features

12:50:19    9    responsible for Firazyr's performance.  Right?

12:50:22   10    A.    That's the heading, yes.

12:50:23   11    Q.    And then the third bullet point, you said,

12:50:29   12    "Icatibant's convenience properties are shared with known

12:50:31   13    bradykinin antagonist peptides."

12:50:34   14          Do you see that?

12:50:34   15    A.    In reliance on Dr. Bachovchin, yes.

12:50:37   16    Q.    Right.  I understand you are relying on him.

12:50:40   17          When you were referring at the top of the slide

12:50:42   18    to the features responsible for Firazyr's performance, and

12:50:47   19    then at the bottom of the slide to icatibant's convenience

12:50:51   20    properties, you were referring to the same thing.  Right?

12:50:57   21    A.    Essentially.

12:50:58   22    Q.    And what you were saying is that the features

12:51:01   23    responsible for Firazyr's performance were a result of

12:51:07   24    icatibant's properties.  Right?

12:51:09   25    A.    Well, I mean, I think we heard from Dr. Andresen,

Hofmann - cross

| 12:51:14 | 1 | icatibant really doesn't differentiate on efficacy.  What is |
| 12:51:18 | 2 | differentiated, as I explained, is the method of use through |
| 12:51:20 | 3 | subcutaneous self-injection.  That is what I am talking |
| 12:51:23 | 4 | about here. |
| 12:51:24 | 5 | Q.    It doesn't differentiate from what in terms of |
| 12:51:29 | 6 | efficacy? |
| 12:51:31 | 7 | A.    Other available treatments. |
| 12:51:33 | 8 | Q.    Now, there are no other available treatments that are |
| 12:51:38 | 9 | based on bradykinin antagonist peptides.  Correct? |
| 12:51:44 | 10 | A.    Commercially, I am not aware of any. |
| 12:51:46 | 11 | Q.    Are you aware of any that are in development? |
| 12:51:51 | 12 | A.    That's a better question for a technical expert. |
| 12:51:53 | 13 | Q.    Now, the convenience properties that you talk about, |
| 12:52:00 | 14 | they include subcutaneous administration? |
| 12:52:02 | 15 | A.    Yes. |
| 12:52:03 | 16 | Q.    And self-administration? |
| 12:52:06 | 17 | A.    Yes. |
| 12:52:06 | 18 | Q.    And prefilled syringes that can be stored at room |
| 12:52:11 | 19 | temperature.  Is that a convenience property? |
| 12:52:12 | 20 | A.    Yes. |
| 12:52:13 | 21 | Q.    And are there any other convenience properties than |
| 12:52:16 | 22 | those? |
| 12:52:18 | 23 | A.    I think those there the main ones. |
| 12:52:20 | 24 | Q.    Can you tell me which prior art bradykinin antagonist |
| 12:52:27 | 25 | peptides were self-administered? |

Hofmann - cross

| | | |
|---|---|---|
| 12:52:32 | 1 | A.     Well, I mean, I think, as we discussed, it is the only |
| 12:52:35 | 2 | one that has been commercially launched.  So the prior art |
| 12:52:40 | 3 | question is, are these attributes unique to icatibant over |
| 12:52:45 | 4 | what was known in the prior art.  And I have relied on Dr. |
| 12:52:49 | 5 | Bachovchin regarding that. |
| 12:52:49 | 6 | Q.     You don't know of any other bradykinin antagonist |
| 12:52:56 | 7 | peptide that was ever self-administered.  Correct? |
| 12:53:01 | 8 | A.     I am not aware of any other one that has been |
| 12:53:03 | 9 | commercially launched, no. |
| 12:53:04 | 10 | Q.     You don't know of any that was ever administered to a |
| 12:53:06 | 11 | human, do you? |
| 12:53:08 | 12 | A.     Better question for a technical expert. |
| 12:53:10 | 13 | Q.     And you -- |
| 12:53:12 | 14 |             THE COURT:  He is asking if you know. |
| 12:53:14 | 15 |             THE WITNESS:  I don't know. |
| 12:53:14 | 16 | BY MR. BLUMENFELD: |
| 12:53:15 | 17 | Q.     Do you know any prior art bradykinin antagonist |
| 12:53:19 | 18 | peptide that can be stored at room temperature for years and |
| 12:53:24 | 19 | still be effective? |
| 12:53:27 | 20 | A.     I am not aware of anybody undertaking the research to |
| 12:53:31 | 21 | do that one way or the other. |
| 12:53:32 | 22 | Q.     When you look at the products that have been approved |
| 12:53:45 | 23 | by the FDA that are based on bradykinin antagonist peptides, |
| 12:53:52 | 24 | there is a class of one product.  Correct? |
| 12:53:55 | 25 | A.     In terms of what has been developed and commercially |

12:54:00    1    launched, I believe that's right.

12:54:01    2    Q.    And that one product is Firazyr.  Right?

12:54:06    3    A.    That's correct.

12:54:07    4    Q.    Now, you agree that Firazyr is effective in treating

12:54:18    5    acute attacks of hereditary angioedema?

12:54:22    6    A.    That's my understanding.  I am not a clinician, but,

12:54:25    7    yes.

12:54:25    8    Q.    And you don't have an opinion as to whether icatibant

12:54:29    9    is responsible for that effectiveness?

12:54:32    10    A.    Not in any technical way, no.

12:54:34    11    Q.    And you understand that Firazyr has been approved as a

12:54:40    12    safe drug for the treatment of acute attacks of hereditary

12:54:46    13    angioedema?

12:54:46    14    A.    Yes, it's FDA approved as a safe and effective

12:54:49    15    treatment.

12:54:49    16    Q.    And you don't have any opinion as to whether that

12:54:57    17    safety is due to the icatibant?

12:55:02    18    A.    Not in any technical way, no.

12:55:03    19    Q.    And the same with bioavailability, you understand that

12:55:08    20    its a bioavailable product and that permits the subcutaneous

12:55:13    21    administration?

12:55:13    22    A.    I would defer to technical experts on that.

12:55:15    23    Q.    You don't have an opinion as to whether that

12:55:17    24    bioavailability is a property of the icatibant, do you?

12:55:23    25    A.    Not in any technical way, no.

Hofmann - cross

12:55:24  1   Q.      And the same with stability, you understand that it's

12:55:27  2   a stable product.   Correct?

12:55:29  3   A.      That's my understanding.

12:55:29  4   Q.      And you don't have an opinion as to whether that

12:55:32  5   stability is provided by the icatibant?

12:55:35  6   A.      I would defer to technical experts on that.

12:55:37  7   Q.      You have looked at the labels of other products, of

12:55:42  8   Firazyr and other products, like Berinert and Kalbitor.

12:55:45  9   Right?

12:55:46  10  A.      I have.

12:55:46  11  Q.      Now, Kalbitor, its label, if you want to look at it,

12:55:53  12  is JTX-47, it has a black box warning that refers to

12:56:00  13  hypersensitivity reactions including anaphylaxis.   You are

12:56:06  14  familiar with that.   Right?

12:56:07  15  A.      I am.

12:56:07  16  Q.      And if you look at the Berinert label, again, that is

12:56:14  17  before you as JTX-21 if you want to look at it, it also

12:56:18  18  talks about hypersensitivity reactions, and having

12:56:25  19  epinephrine available.   If you look up at the top right, the

12:56:30  20  very first line under Warnings an Precautions?

12:56:35  21  A.      I see that.

12:56:36  22  Q.      This is talking about Berinert, and it says Warnings

12:56:39  23  and Precautions, Hypersensitivity reactions may occur.

12:56:44  24  Epinephrine should be immediately available.

12:56:45  25          Do you see that?

Hofmann - cross

```
12:56:46    1   A.    I do.

12:56:46    2   Q.    And you know epinephrine should also be available for

12:56:51    3   Kalbitor.  Right?

12:56:52    4   A.    Yes.  I am not a clinician, but I understand that from

12:56:55    5   the label.

12:56:55    6   Q.    That's because -- that's the reason that it's not

12:57:00    7   self-administered.  Right?

12:57:01    8   A.    Again, I am not weighing in as a clinician on that.

12:57:04    9   But that is my understanding from some of the documents.

12:57:06   10   Q.    Now, you have looked at the Firazyr label.  It doesn't

12:57:10   11   have a black box warning or a warning about hypersensitivity

12:57:14   12   reactions.  Right?

12:57:17   13   A.    I don't believe so, no.

12:57:17   14   Q.    And you don't have any opinion whether it's icatibant

12:57:23   15   that's responsible for the absence of any warnings about

12:57:28   16   hypersensitivity reactions with Firazyr, do you?

12:57:31   17   A.    I wouldn't be the one to weigh in on that.  As I

12:57:34   18   explained, commercially, the documents explain that Shire

12:57:37   19   hasn't been able to differentiate on efficacy.

12:57:40   20   Q.    Well, the absence of hypersensitivity reactions and

12:57:53   21   anaphylaxis is something that's important in Shire's ability

12:58:01   22   to sell Firazyr.  Correct?

12:58:05   23   A.    Well, I mean, as I explained earlier, what Shire

12:58:09   24   identifies as important to its sales is the convenience and

12:58:13   25   self-administration.  The Shire marketing and commercial
```

Hofmann - cross

12:58:18    1    documents did not identify what you just described as, you

12:58:21    2    know, the main differentiators.  It was the convenience and

12:58:26    3    self-administration.

12:58:26    4    Q.    You pointed to JTX-13, and it's on Slide PDX-6.8.  Do

12:58:42    5    you remember that?

12:58:42    6    A.    I do.

12:58:43    7    Q.    And this is a Cowen & Company document.  Right?

12:58:48    8    A.    Yes.

12:58:50    9    Q.    You quoted just a little bit of it on the slide about

12:58:54    10   the "The FDA has indeed allowed for the inclusion of

12:58:57    11   self-administration in the label.  This is critical to the

12:59:00    12   commercial success, as our consultants have previously

12:59:03    13   referred to self-administration as the 'holy grail' for

12:59:08    14   acute HAE treatment."

12:59:10    15            Do you see that?

12:59:10    16   A.    I do.

12:59:11    17   Q.    And the ability to self-administer Firazyr is because

12:59:21    18   of the active ingredient icatibant.  Isn't it?

12:59:25    19   A.    Well, I mean, I think it's identifying the method of

12:59:28    20   use.  It's the formulation, combined with the active

12:59:32    21   ingredient, and then looking at that all in the context of

12:59:35    22   what was known in the prior art.  But, yes.

12:59:36    23   Q.    Can we put up JTX-13.1.  I want to look at the rest of

12:59:44    24   the sentence.  Just put three lines up.

12:59:49    25            What it says in the part that you didn't blow up

| | | |
|---|---|---|
| 12:59:51 | 1 | was, "We believe that Firazyr now has the most |
| 12:59:54 | 2 | differentiated formulation relative to other HAE treatment |
| 13:00:01 | 3 | options on the U.S. market primarily due to the drug's |
| 13:00:04 | 4 | stability at room temperature and subcutaneous |
| 13:00:08 | 5 | self-administration." |
| 13:00:09 | 6 | Do you see that? |
| 13:00:10 | 7 | A. Yes. |
| 13:00:11 | 8 | Q. They said it was the most differentiated formulation |
| 13:00:14 | 9 | relative to other HAE treatment options. Right? |
| 13:00:17 | 10 | A. I see that, yes. |
| 13:00:18 | 11 | Q. And they refer to stability at room temperature and |
| 13:00:22 | 12 | subcutaneous self-administration. And all of those things |
| 13:00:26 | 13 | are properties that result from the presence of icatibant in |
| 13:00:31 | 14 | the Firazyr product correct? |
| 13:00:35 | 15 | A. Along with what I explained on direct, which I |
| 13:00:37 | 16 | understand from Dr. Bachovchin are aspects which were |
| 13:00:41 | 17 | previously known. But, yes. |
| 13:00:44 | 18 | MR. BLUMENFELD: Your Honor, I have no further |
| 13:00:45 | 19 | questions. |
| 13:00:45 | 20 | THE COURT: Redirect. |
| 13:00:46 | 21 | MR. SHERRY: No redirect, Your Honor. |
| 13:00:48 | 22 | THE COURT: Thank you, sir. Be careful stepping |
| 13:00:50 | 23 | down. |
| 13:00:50 | 24 | THE WITNESS: Thank you, Your Honor. |
| 13:00:52 | 25 | (Witness excused.) |

| | | |
|---|---|---|
| 13:00:55 | 1 | THE COURT:  Do you rest? |
| 13:00:56 | 2 | MR. WIESEN:  For the record, yes, Your Honor, |
| 13:00:59 | 3 | yes, Fresenius rests. |
| 13:01:00 | 4 | THE COURT:  Let's talk about next steps, |
| 13:01:03 | 5 | counsel. |
| 13:01:07 | 6 | In terms of submission of proposed findings of |
| 13:01:10 | 7 | fact and conclusions of law, what is your proposal? |
| 13:01:13 | 8 | MR. BLUMENFELD:  Your Honor, we did discuss this |
| 13:01:15 | 9 | last night.  What we would propose, if acceptable to Your |
| 13:01:19 | 10 | Honor, is that we exchange 40-page submissions, one set, and |
| 13:01:26 | 11 | the date, because of trial commitments and other things, the |
| 13:01:30 | 12 | date that we were hoping would be acceptable to Your Honor |
| 13:01:33 | 13 | was March 20th. |
| 13:01:34 | 14 | THE COURT:  I think that's probably going to be |
| 13:01:37 | 15 | too long. |
| 13:01:38 | 16 | MR. BLUMENFELD:  Why -- |
| 13:01:40 | 17 | THE COURT:  How many days is that, Mr. |
| 13:01:42 | 18 | Blumenfeld?  I was contemplating giving you 30 days. |
| 13:01:47 | 19 | MR. BLUMENFELD:  That's a couple weeks longer |
| 13:01:49 | 20 | than 30 days.  If you want it within 30 days, we will get it |
| 13:01:52 | 21 | to you in within 30 days. |
| 13:01:54 | 22 | THE COURT:  That is what I need. |
| 13:01:55 | 23 | MR. BLUMENFELD:  I think that comes to March 4. |
| 13:01:59 | 24 | THE COURT:  Please have hyperlinks to the record |
| 13:02:01 | 25 | and to authority. |

834

13:02:03    1              I am not going to accept an appendix that

13:02:07    2    contains evidence that wasn't discussed in this trial.

13:02:11    3              Let's not do a document dump.

13:02:14    4              Anything else you need to cover?

13:02:16    5              MR. BLUMENFELD:  The only thing, Your Honor, I

13:02:19    6    am trying to think in my mind what day of the week March 4th

13:02:22    7    is.  If it is a weekend, which I think it may be, the next

13:02:27    8    business day after that?

13:02:31    9              I think it's a Sunday.

13:02:33   10              THE COURT:  So the 5th.

13:02:35   11              MR. BLUMENFELD:  That would be fine.  Thank you,

13:02:36   12    Your Honor.

13:02:38   13              THE COURT:  I am assuming that 30 days from

13:02:40   14    today works in terms of the availability of the transcript.

13:02:45   15              Mr. Maurer, is that do-able?

13:02:46   16              THE COURT REPORTER:  Yes.

13:02:47   17              MR. BLUMENFELD:  We discussed, also, and we will

13:02:50   18    discuss more, getting you a list of the admitted exhibits or

13:02:55   19    filing a list of the admitted exhibits, agreeing on that,

13:02:58   20    and also working on an errata to the transcript, which we

13:03:02   21    can get to Mr. Maurer.

13:03:03   22              THE COURT:  Could you provide me with some

13:03:05   23    pictures of the witnesses as well.

13:03:06   24              MR. BLUMENFELD:  Absolutely, Your Honor.

13:03:08   25              THE COURT:  Of who testified, so that this

| | |
|---|---|
| 13:03:12 | 1 |
| 13:03:15 | 2 |
| 13:03:20 | 3 |
| 13:03:27 | 4 |
| 13:03:28 | 5 |
| 13:03:32 | 6 |
| 13:03:35 | 7 |
| 13:03:38 | 8 |
| 13:03:40 | 9 |
| 13:03:42 | 10 |
| 13:03:45 | 11 |
| 13:03:50 | 12 |
| 13:03:52 | 13 |
| 13:03:56 | 14 |
| 13:04:02 | 15 |
| 13:04:05 | 16 |
| 13:04:12 | 17 |
| 13:04:13 | 18 |
| 13:04:15 | 19 |
| 13:04:17 | 20 |
| 13:04:23 | 21 |
| 13:04:26 | 22 |
| 13:04:30 | 23 |
| 13:04:34 | 24 |
| 13:04:34 | 25 |

doesn't get too stale.

What's your collective, both of you, idea on the
relevance of secondary considerations in an obviousness-
type double patenting case?

MR. BLUMENFELD:  Your Honor, this is an issue we
discussed at the pretrial.  We are going to have a
difference of view on this.  We know that.

THE COURT:  That is okay.  I am trying to get a
little bit of guidance as to your view.

MR. BLUMENFELD:  In our view, in the Eli Lilly
case, Eli Lilly versus Teva, which was in the Federal
Circuit from an appeal, Your Honor, I think they clarified
that secondary considerations, including commercial success,
which was one of them there, apply in the obvious-type
double patenting situation.  And that's true.  It was in
that case and in many cases, even if the reference was not
publicly available.

In fact, if the reference was publicly
available, we would be talking about obviousness here, not
about obviousness-type double patenting.  We think after Eli
Lilly and the case from Judge Stark, also, the UCB versus
Accord case, that secondary considerations apply here.

I think the Federal Circuit said in Eli Lilly
they must be considered.

THE COURT:  It seems they said that.  Mr.

13:04:39    1    Wiesen.

13:04:39    2              MR. WIESEN:  Your Honor will remember, you may

13:04:43    3    remember I was part of the team that tried that case.

13:04:45    4              THE COURT:  I think I do remember that.

13:04:47    5              MR. WIESEN:  We had argued at that time based on

13:04:50    6    prior law that they were legally inapplicable.

13:04:53    7              THE COURT:  You got me in trouble.

13:04:56    8              MR. WIESEN:  I think we did.  I apologize for

13:04:58    9    that.

13:04:59   10              We are not arguing here that they are not

13:05:01   11    legal -- they are legally inapplicable.  The question is

13:05:03   12    whether they have established the nexus for this case.  And

13:05:07   13    we think on that there is an absence of proof and therefore

13:05:10   14    in this case, for the two -- especially for commercial

13:05:15   15    success and long-felt need, there isn't a nexus.

13:05:19   16              I can imagine for example unexpected results,

13:05:22   17    you could compare the compounds to the '7,803 and icatibant,

13:05:26   18    and if there were unexpected results, use that secondary

13:05:28   19    consideration.

13:05:30   20              It is also the case that sometimes for

13:05:32   21    obviousness-type double patenting the reference is actually

13:05:36   22    prior art and there is also an obviousness-type double

13:05:39   23    patenting argument.  You can imagine in a compound case, if

13:05:43   24    you can avoid the lead compound argument, as you do in

13:05:46   25    obvious-type double patenting but you don't in obviousness,

13:05:49   1    you might actually use a prior art patent for obviousness-

13:05:53   2    type double patenting.  In that situation, it may be that

13:05:56   3    things like commercial success play in.

13:06:01   4              Here -- and we can argue it in the briefs --

13:06:03   5    certainly, we believe they have not established why the

13:06:06   6    economic or medical logic behind long-felt need and

13:06:10   7    commercial success would support those secondary

13:06:12   8    considerations being relevant.

13:06:14   9              THE COURT:  I do know that.

13:06:18   10             Unless there is anything else, I wish you safe

13:06:21   11   travels home, counsel.  Take care.

13:06:24   12             (Trial concluded.)

           13                       -   -   -

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25